UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| INTEGRATED TECHNOLOGY SOLUTIONS LLC, | |
| Plaintiff, | Civ. A. No. 1:21-cv-11477-IT |
| vs. | |
| IRACING.COM MOTORSPORT SIMULATIONS, LLC | Leave to file granted on January 20, 2022 |
| Defendant | |

**DEFENDANT IRACING'S MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

## **<u>Table of Contents</u>**

**INTRODUCTION** ...................................................................................................1

**BACKGROUND** .....................................................................................................2

**LEGAL STANDARD** ............................................................................................6

**ARGUMENT** ..........................................................................................................9

    I.    *Alice* Step 1: The Independent Claims Are Directed to an Abstract Idea .......................9

        A.    The Independent Claims Recite Abstract Ideas of Racetrack Simulation..................9

        B.    The Independent Claims Are Comparable to Others Found Abstract......................12

        C.    The Independent Claims Do Not Improve Computer Technology ..........................14

    II.    *Alice* Step 2: The Independent Claims Recite No Inventive Concept..........................16

    III.    The Dependent Claims Are Equally Unpatentable Under § 101...................................19

    IV.    Neither ITS's First Amended Complaint, nor Any Further Amendment, Can Avoid Dismissal ....................................................................................................21

    V.    Claim Construction Is Not Necessary; Dismissal at the Outset is Appropriate ............25

## Table of Authorities

**Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121 (Fed. Cir. 2018) ..............23

*Aatrix Software, Inc. v. Green Shades Software, Inc.*, 890 F.3d 1354 (Fed. Cir. 2018) ..............24

*Adams v. Wells Fargo Bank*, No. 17-12092-FDS, 2018 U.S. Dist. LEXIS 197766
(D. Mass. 2018) (Saylor, J.) ..........................................................................................24

*Affinity Labs of Tex. v. DIRECTV, LLC*, 838 F.3d 1253 (Fed. Cir. 2016) ............................passim

*Affinity Labs of Tex., LLC v. Amazon.com, Inc.*, 838 F.3d 1266 (Fed. Cir. 2016) ...................8, 14

*Alice Corp. Pty. Ltd. v. CLS Bank International*, 573 U.S. 208 (2014) ........................7, 8, 11, 16

*Am. Well Corp. v. Teladoc, Inc.*, 191 F. Supp. 3d 135 (D. Mass. 2016) ........................................8

*Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229 (Fed. Cir. 2016) ......................................................8

*BASCOM Glob. Internet Servs. v. AT&T Mobility LLC*,
827 F.3d 1341 (Fed. Cir. 2016) .................................................................................9, 17

*Berkheimer v. HP Inc.*, 881 F.3d 1360 (Fed. Cir. 2018) ................................................................24

*Berkheimer v. HP Inc.*, 890 F.3d 1369 (Fed. Cir. 2018) ..................................................................8

*Bot M8 LLC v. Sony Corp. of Am.*, 4 F.4th 1342 (Fed. Cir. July 13, 2021) .................................13

*Bot M8 LLC v. Sony Corp. of Am.*, 465 F. Supp. 3d 1013 (N.D. Cal. 2020) ...................12, 13, 19

*BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281 (Fed. Cir. 2018) ......................................16, 24

*Cardionet, LLC v. Infobionic, Inc.*, 2017 U.S. Dist. LEXIS 68241
(D. Mass. 2017) (Talwani, J.)..........................................................................................7

*Cleveland Clinic Found. v. True Health Diagnostics LLC*,
859 F.3d 1352 (Fed. Cir. 2017) ....................................................................................26

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*,
776 F.3d 1343 (Fed. Cir. 2014) ....................................................................................19

*Customedia Techs., LLC v. Dish Network Corp.*, 951 F.3d 1359 (Fed. Cir. 2020) .....................15

*DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014)...............................8, 18

*Dropbox, Inc. v. Synchronoss Techs., Inc.*, 815 F. Appx. 529 (Fed. Cir. 2020) ....................22, 23

*Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016) ......................7, 12, 17, 18

*Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327 (Fed. Cir. 2016) ..............................................7, 14

*In re Rosenberg*, 813 F. Appx. 594 (Fed. Cir. 2020) ......................................................................12

*In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607 (Fed. Cir. 2016) ......................................7, 8

*KCG Techs., LLC v. Carmax Auto Superstores, Inc.*, 424 F. Supp. 3d 196
(D. Mass. 2019) (Sorokin, J.) ...............................................................................................passim

*Lemelson v. U.S. Bank Nat'l Ass'n*, 721 F.3d 18 (1st Cir. 2013) ....................................................7

*McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299 (Fed. Cir. 2016) ..................15, 16

*Mortg. Application Techs., LLC v. MeridianLink, Inc.*,
839 F. Appx. 520 (Fed. Cir. 2021) ................................................................................................26

*Ocasio-Hernandez v. Fortuño-Burset*, 640 F.3d 1 (1st Cir. 2011).................................................7

*Palomar Techs., Inc. v. MRSI Sys., LLC*, 462 F. Supp. 3d 13
(D. Mass. 2020) (Saylor, J.) .....................................................................................................20, 21

*Quest Integrity USA, LLC v. Clean Harbors Indus. Servs.*,
2015 U.S. Dist. LEXIS 95148 (D. Del. 2015)..................................................................................2

*RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322 (Fed. Cir. 2017).........................................24

*Reese v. Sprint Nextel Corp.*, 774 F. Appx. 656 (Fed. Cir. 2019) ..........................................25, 26

*Rodriguez v. Nationstar Mortg. LLC*, 2014 U.S. Dist. LEXIS 151328
(D. Mass. 2014) (Talwani, J.).................................................................................................7, 22

*Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905 (Fed. Cir. 2017) .......................24

*Simio, LLC v. Flexsim Software Prods.*, 983 F.3d 1353 (Fed. Cir. 2020)..............................22, 25

*Smart Software, Inc. v. PlanningEdge, LLC*, 192 F. Supp. 3d 243
(D. Mass. 2016) (Saris, J.) .............................................................................................................26

*Tele-Publishing, Inc. v. Facebook, Inc.*, 252 F. Supp. 3d 17
(D. Mass. 2017) (Woodlock, J.) ......................................................................................................9

*Two-Way Media Ltd v. Comcast Cable Communs., LLC*, 874 F.3d 1329 (Fed. Cir. 2017)..........10

*Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709 (Fed. Cir. 2014) .................................................26

*Whitserve LLC v. Dropbox, Inc.*, 854 F. Appx. 367 (Fed. Cir. 2021) ....................................21, 25

*Worlds, Inc. v. Activision Blizzard, Inc.*, No. 12-10576-DJC,
2021 U.S. Dist. LEXIS 84115 (D. Mass. Apr. 30, 2021) (Casper, J.) ..................................9, 19

## INTRODUCTION

Plaintiff Integrated Technology Solutions' ("ITS") First Amended Complaint for infringement of U.S. Patent No. 10,046,241 ("the '241 Patent")[1] should be dismissed because all claims of the '241 Patent are invalid for claiming patent-ineligible abstract ideas in violation of 35 U.S.C. § 101.  Under the Supreme Court's two-part *Alice* test, a patent claim is invalid if (1) its basic thrust is directed to an abstract idea; and (2) it does not recite a *technological* inventive concept beyond that abstract idea.  The claims of the '241 Patent—which are directed to *the idea* of a racing videogame that simulates unspecified effects of rubber tire residue or racetrack temperature on a vehicle's performance, as opposed to *how* to simulate these variables— uniformly fail this test.

The '241 Patent's specification—which is almost exclusively directed to unclaimed functions for automatic generation of videogame maps—barely mentions racetrack surface simulation, and *never* describes its technical underpinnings.  At its most descriptive, the specification notes only that "[a] hot temperature can change road conditions" ('241 Patent, 18:42-43) and "more rubber on a track can lead to a different gaming result" (*id*. at 9:41-42). The claims even more generically list "components" that perform indeterminate simulation functions in unspecified ways.  As ITS explains, the claims merely recite that:

> the **identifying component identifies** discrete sections of track, the **check component determines** effects players actions may have on the discrete sections of track in the form of leaving tire remnants, and the **modification component changes** the performance parameters of that discrete track section.

(Dkt. No. 20, ¶ 41.)[2]  Nor does the description of the "components" supply any substance. Rather, the '241 Patent insists that the claims are not limited by the specification ('241 Patent,

---

[1] The '241 Patent is available at Dkt. No. 20-1.

[2] Unless otherwise specified, all emphases herein are added.

27:59-63), but even if they were, the "components" may be any available generic hardware or software (*id*. at 5:16-40).  Thus, at most, the claims recite unpatentable *aspirations*, not technological *inventions*.

ITS's conclusory allegations parroting legal criteria for patentability cannot cure the '241 Patent's inherent deficiencies.  Nor could claim construction.  Whatever the *precise contours* of the claims, the Patent definitively establishes that their *basic character* is irredeemably abstract.

## **BACKGROUND**

Defendant iRacing is a Chelmsford, Massachusetts based racing simulation software developer founded in 2003.  iRacing is best known for its flagship racing simulation software—accused of infringement here—which allows players to use force feedback steering wheels, pedals, and shifters to compete online in realistic simulations of real-world racing events.  For instance, iRacing is the official simulation partner of NASCAR, and facilitated official, televised digital races by professional drivers in lieu of in-person events during the pandemic.

By contrast, Plaintiff ITS is not a technology company, but a patent holding company associated with prolific patent plaintiff Leigh Rothschild.  (Ex. 1 (Prosecution History Excerpts), at 1.)[3]  The '241 Patent that ITS asserts names as inventors not videogame pioneers—or even videogame makers—but patent attorneys Ronald Krosky (USPTO Reg. No. 58,564) and Brendan Clark (USPTO Reg. No. 67,691).  Consistent with this pedigree, the '241 Patent does not claim *technology*, only abstract *ideas* that the patentees effectively invite somebody else to develop.

As of the filing of the '241 Patent, "it was known in the art how one may typically play a simulation videogame," and "simulations [were already] becom[ing] increasingly realistic."

---

[3] Excerpts of the prosecution history are provided for *context*, but this Motion to Dismiss does not *rely* on their content.  Even if it did, "[t]he prosecution history . . . is a public document that the court may rely upon in deciding this motion to dismiss."  *Quest Integrity USA, LLC v. Clean Harbors Indus. Servs.*, 2015 U.S. Dist. LEXIS 95148, at *4, n.4 (D. Del. 2015).

(Dkt. No. 20 at ¶¶ 39 (citing '241 Patent, 1:12-19), 40.)  Accordingly, the patent did not purport

to offer new *techniques* for performing simulations, it merely suggested that two variables—

rubber deposited by a vehicle's tires (independent claim 1) and track temperature (independent

claims 8 and 15)—*should somehow* be simulated.  As shown below, each independent claim

recites only nebulous "components" that perform the generic steps that essentially *any* simulation

must: "identify[ing]" a portion of the track surface, "determin[ing]" how rubber or temperature

might affect the surface, and "modify[ing]" the surface using unspecified criteria to "impact[]"

performance of the vehicle" in some undetermined manner.  But this merely restates the

problem.  The question is *how* to simulate these variables.  The claims offer no answer.

| Independent Claim 1 | Independent Claim 8 | Independent Claim 15 |
| --- | --- | --- |
| 1. A system, that is at least partially hardware, comprising: | 8. A system, that is at least partially hardware, comprising: | 15. A system, that is at least partially hardware, comprising: |
| an **identification component** configured to identify a racing area for a vehicle set with a tire set in a racing video game; | an **identification component** configured to identify a racing surface of a racing circuit in a racing video game during a racing video game session; | an **identification component** configured to identify a change in a temperature of a racing surface in a racing video game; |
| a **check component** configured to determine an action set of the vehicle set that causes a remnant of the tire set to be laid upon the racing area; | | |
| a **determination component** configured to determine where to place the remnant of the tire set on the racing area based, at least in part on the action set of the vehicle set; and | a **determination component** configured to determine a first temperature for a first portion of the racing surface and a second temperature for a second portion of the racing surface; and | a **determination component** configured to determine an impact of the change in the temperature of the racing surface; and |
| a **modification component** configured to make an alteration to the racing area | a **modification component** configured to cause the first portion of the racing surface to implement with the first temperature and the second portion of the racing surface to | a **modification component** configured to make an alteration to the racing surface in accordance with the impact of the change in the temperature, |

|  | implement with the second temperature, |  |
|---|---|---|
| such that the remnant impacts performance of the vehicle set. | where the first temperature and the second temperature are different temperatures, | where the alteration influences performance of a vehicle in the racing video game. |
|  | where the first portion of the racing surface and the second portion of the racing surface do not overlap one another, where the first portion of the racing surface being at the first temperature causes a vehicle of the racing video game to have a first response to an action, |  |
|  | where the second portion of the racing surface being at the second temperature causes the vehicle of the racing video game to have a second response to the action, and |  |
|  | where, due to the difference in temperature, the first response and the second response are not identical. |  |

Nor does the specification of the '241 Patent purport to offer a technical solution.  The specification is directed not to racetrack simulation—which the patent claims—but to automatic videogame map generation—which the patent does not claim.[4]  The patentees only retroactively amended the claims to recite racetrack surface simulation on May 21, 2016—five years into the prosecution of the '241 Patent (Ex. 1, at 5, 8-9, 13), and one year *after* the publication of certain evidence of alleged infringement that ITS cites in its First Amended Complaint (*e.g.*, Dkt. No.

---

[4] The '241 Patent's discussion of automatic map creation—which accounts for the vast majority of the specification—is equally hollow.  The specification explains that automatic generation of complex videogame maps requires only instructing a computer to "collect information," "analyze information," "determine how to make map," and "cause map to be made."  ('241 Patent, Fig. 18, 25:33-51.)  But, as the almost farcical recitation of the "determine how to make map" step indicates, the question is *how*.

4

20, ¶ 61 (article dated June 30, 2015); *id.* at ¶ 62 (video dated September 3, 2015)).

Consequently, of the 28-column specification, less than one column—and not a single figure—

even relates to track temperature ('241 Patent, 8:40-67, 18:37-52) or rubber deposits (*id.* at 9:34-

42).[5]

      Like the claims, the specification does not purport to explain *how* one might go about

determining or simulating these effects.  The **sole disclosure** regarding rubber deposits is a

statement that the game might display "tire marks from other video game cars breaking heavily"

and a passing parenthetical noting that "later in a game, more rubber on a track can lead to a

different gaming result."  ('241 Patent, 9:38-42.)  But the specification is silent regarding *what*

the impact of rubber deposits on vehicle performance might be (e.g., whether and how much it

would enhance or undermine tire grip), let alone *how* to program a computer to simulate that

impact.  The **sole disclosures** regarding track temperature are equally vague, noting only that:

- "A hot temperature can change road conditions."  ('241 Patent, 18:42-43.)

- "[T]he game can have a car respond in a certain manner based on the temperature."
  (*Id.* at 8:66-67.)

- "[T]he track can represent properties relevant to the temperature (e.g., a colder
  track can cause a car to respond differently than a warmer track)." (*Id.* at 8:45-48.)

- "[H]ow roads in Tyler, Tex. react to hot temperatures can be reflected in the output."
  (*Id.* at 18:50-52.)

Again, the specification is silent as to *what* the impact of temperature is on vehicle performance

(e.g., whether and how much it impacts vehicle speed and handling), let alone *how* one might

program a computer to simulate the effects.

      And rather than impart a technical solution through the claimed "components," the '241

---

[5] The "Summary" section of the '241 Patent's specification ('241 Patent, 1:23-2:3) is a nearly verbatim reproduction
of the three independent claims.  Accordingly, this portion of the specification cannot supply what the claims lack.

Patent emphasizes that the "components" may be any form of generic hardware and/or software:

> **'Component'**, 'logic', 'module', 'interface' and the like as used herein, includes but *is not limited* to hardware, firmware, software stored or in execution on a machine, a routine, a data structure, and/or at least one combination of these (e.g., hardware and software stored). . . . *and so on*."

('241 Patent, 5:16-40.) The claimed "check component" and "modification component" are never discussed in the specification. ('241 Patent.) And the terms "identification component" and "determination component" are mentioned only in relation to automatic map creation, and even there they are only circularly described as unspecified equipment for somehow performing their eponymous tasks. (*E.g.*, '241 Patent, 14:36-38 ("The *identification component* [] can be configured to *identify* missing information . . ."), 16:16-17 ("The *determination component* [] can *determine* if traffic on Main Street is heavy or medium . . ."). That is, each "component" is a black box that uses unspecified means to somehow achieve whatever function it is tasked with.

In short, the '241 Patent aggressively resists any physical or functional limitations on the claimed idea of simulating a racetrack. (*E.g.*, '241 Patent, 27:59-28:30 ("it is not the intention of the applicants to restrict or in any way limit the scope of the appended claims"), 4:43-63 ("definitions . . . are not intended to be limiting"), 6:59-7:13 (emphasizing non-videogame applications including "convoy preparation," "commercial logistics," "leisure," "navigation," and "contingency development"), 27:6-50.) Instead, the Patent seeks to broadly preempt any inventions "embraced by the general theme" and "spirit" of racetrack simulation. ('241 Patent, 3:14-20.) But only technology is patentable under § 101, not abstract "themes" or "spirits."

## LEGAL STANDARD

Under Rule 12(b)(6), "[f]ederal courts must dismiss cases that fail to state a claim upon which relief can be granted." *KCG Techs., LLC v. Carmax Auto Superstores, Inc.*, 424 F. Supp. 3d 196, 200 (D. Mass. 2019) (Sorokin, J.). In evaluating a motion to dismiss, "[a] court must

disregard 'statements in the complaint that merely offer legal conclusions couched as fact or threadbare recitals of the elements of a cause of action.'" *Rodriguez v. Nationstar Mortg. LLC*, 2014 U.S. Dist. LEXIS 151328, at *5 (D. Mass. 2014) (Talwani, J.) (quoting *Lemelson v. U.S. Bank Nat'l Ass'n*, 721 F.3d 18, 21 (1st Cir. 2013)).  "A plaintiff is not entitled to 'proceed perforce' by virtue of allegations that merely parrot the elements of the cause of action." *Ocasio-Hernandez v. Fortuño-Burset*, 640 F.3d 1, 12 (1st Cir. 2011).

"Subject matter eligibility under Section 101 of the Patent Act is a threshold inquiry and a question of law." *KCG Techs.*, 424 F. Supp. at 200.  Accordingly, "if the patent that is allegedly infringed is directed to ineligible subject matter [under 35 U.S.C. § 101], the complaint does not state a claim upon which relief can be granted." *Id.* (citing *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 609-10 (Fed. Cir. 2016)).

In *Alice Corp. Pty. Ltd. v. CLS Bank International*, 573 U.S. 208 (2014), the Supreme Court set forth a two-step test to determine whether a patent is invalid under § 101.  At the first step of *Alice*, the court must "determine whether the claims at issue are *directed to* a patent-ineligible concept," i.e., an "abstract idea." *Alice*, 573 U.S. at 218.  This step considers "the 'focus' of the claims, their 'character as a whole.'" *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016).  With regard to computerized technology, the test "asks whether the focus of the claims is on the specific asserted improvement in computer capabilities . . . or, instead, on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335-36 (Fed. Cir. 2016).  Where a claim merely recites "'generalized steps to be performed on a computer using conventional computer activity,' it is directed to an abstract idea." *Cardionet, LLC v. Infobionic, Inc.*, 2017 U.S. Dist. LEXIS 68241, at *5 (D. Mass. 2017) (Talwani, J.) (citing *In re*

*TLI Commc'ns*, 823 F.3d at 612).  Similarly, where a claim "recite[s] only a desired function . . . not a particular way of performing that function," it is directed to an abstract idea.  *KCG Techs.*, 424 F. Supp. 3d at 201.  Accordingly, claims that "do not claim a particular way of programming or designing the software" fail step one of the *Alice* test.  *Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1241 (Fed. Cir. 2016); *Affinity Labs of Tex., LLC v. Amazon.com, Inc.*, 838 F.3d 1266, 1269 (Fed. Cir. 2016) (henceforth, "*Affinity I*") ("The purely functional nature of the claim confirms that it is directed to an abstract idea . . . .").

The second step of *Alice* asks if the claims recite an "'inventive concept' sufficient to 'transform' the claimed *abstract idea* into a patent-eligible *application*."  *Alice Corp.*, 573 U.S. at 221.  But "the 'inventive concept' cannot be the abstract idea itself."  *Berkheimer v. HP Inc.*, 890 F.3d 1369, 1374 (Fed. Cir. 2018) (concurrence).  Accordingly, "an idea's novelty cannot by itself save that idea from being abstract."  *Am. Well Corp. v. Teladoc, Inc.*, 191 F. Supp. 3d 135, 144 (D. Mass. 2016).  Similarly, "[t]he Supreme Court . . .  [has] repeatedly made clear that merely limiting the field of use of the abstract idea to a particular existing technological environment does not render the claims any less abstract."  *Affinity Labs of Tex. v. DIRECTV, LLC*, 838 F.3d 1253, 1259 (Fed. Cir. 2016) (henceforth, "*Affinity II*").  Thus, while a "claimed solution [] necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer[s]" may pass muster, *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014), a claim that merely recites a "general concept . . . without offering any technological means of effecting that concept" does not.  *Affinity II*, 838 F.3d at 1262 (distinguishing *DDR*).  Accordingly, the mere "fact that the claims at issue relate and apply to the technological environment of a three-dimensional virtual world, does not necessarily make [them] inventive."  *Worlds, Inc. v. Activision Blizzard, Inc.*, No. 12-

10576-DJC, 2021 U.S. Dist. LEXIS 84115, at *27-28 (D. Mass. Apr. 30, 2021) (Casper, J.).

## ARGUMENT

## I.   *Alice* Step 1: The Independent Claims Are Directed to an Abstract Idea

### A.   The Independent Claims Recite Abstract Ideas of Racetrack Simulation

The first step of *Alice* asks whether "as alternatively stated, 'the focus of the claims,' . . .

their 'character as a whole' . . . or their 'basic thrust,'" is directed to an abstract idea.  *Tele-*

*Publishing, Inc. v. Facebook, Inc.*, 252 F. Supp. 3d 17, 22 (D. Mass. 2017) (Woodlock, J.).

Though reciting different variables—rubber deposits in claim 1, and temperature in claims 8 and

15—the basic thrust of the independent claims is the abstract idea of simulating the impact of a

racetrack surface on a vehicle's performance.  Each claim merely enumerates a series of generic

steps that describe the raw *concept* of this simulation, not *how* to perform it:

- "**identify** a **racing area**" (claim 1) or "a **racing surface**" (claims 8 and 15)

- "**check** [whether to] cause[] a **remnant of the tire set** to be laid upon the racing area" (claim 1)

- "**determine** where to place the **remnant of the tire set**" (claim 1), "**temperature[s]** for a first portion . . . and a second portion of the racing surface" (claim 8), or "the change in **temperature**" (claim 15)

- "**make** an alteration to the racing area . . . [that] **impacts vehicle performance**" (claim 1), "**causes a vehicle to . . . to have a first response . . . and a second response**" (claim 8), or "**influences performance of a vehicle**" (claim 15)[6]

And ITS's own allegations confirm this complete lack of substance.  As ITS explains:

the patented invention describes the invention in the context of an automotive

---

[6] Claim 8 additionally recites the superficial limitations that "the first temperature and the second temperature are different temperatures," "the first portion of the racing surface and the second portion of the racing surface do not overlap," and "the first response and the second response [of the vehicle to the track temperature] are not identical]."  ('241 Patent, Claim 8.)  But these words do not substantively narrow the claim 8; they merely restate its basic thrust—estimating effects of track temperature at two places—in different language.  Accordingly, these limitations cannot save claim 8 from abstraction.  *See BASCOM Glob. Internet Servs. v. AT&T Mobility LLC*, 827 F.3d 1341, 1352 (Fed. Cir. 2016) ("simply because some of the claims narrowed the scope of protection through additional 'conventional' steps for performing the abstract idea . . . did not make those claims any less abstract").

racing simulation whereby the identifying component **identifies discrete sections of track**, the check component **determines effects players actions may have on the discrete sections of track** in the form of leaving tire remnants, and the modification component **changes the performance parameters of that discrete track section**.

(Dkt. No. 20, ¶ 41; *see also id.* at ¶ 42.)  Such "[c]laims directed to generalized steps to be performed on a computer using conventional computer activity are not patent eligible." *Two-Way Media Ltd v. Comcast Cable Communs., LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017); *Affinity II*, 838 F.3d at 1258 (where "[t]here is nothing in [a claim] that is directed to *how* to implement [the claimed technology] . . . the claim is drawn to the idea itself") (emphasis in original).

Nor do the claims recite any non-generic hardware that might change this result. Although each claim's preamble suggests that the elements that follow will be "at least partially hardware," at most, the claims recite nebulous "components" for performing the claimed "identify[ing]," "check[ing]," "determin[ing]," and "modify[ing]."  The specification explains that these "components" are merely placeholders for any available generic hardware or software, including "a software controlled microprocessor, a discrete logic (e.g., ASIC), an analog circuit, a digital circuit, a programmed logic device, a memory device containing instructions, a process running on a processor, a processor, an object, an executable, a thread of execution, a program, a computer and so on." ('241 Patent, 24-30.)  The specification fails even to discuss the claimed "check component" and "modification component." (*See generally*, '241 Patent.)  And the specification uses the terms "identification component" and "determination component" only in the context of unrelated, unclaimed functions for automatic map creation.  For instance:

- "The **identification component** [] can . . . **identify** items to not be rendered in the map . . . by scanning photographs for copyrighted information, inappropriate content (e.g., sexually suggestive advertisements), etc." ('241 Patent, 19:38-50.)

- "[T]he **identification component** [] can **identify** unused advertisement locations in the map information [], identify advertisements that can be replaced, as well as select advertisements for use (e.g., based on aggression levels, personal history, contract fulfillment, and others)."  (*Id*. at 19:53-56).

- "[T]he **determination component** [] can **determine** which map data to use in rendering and/or updating a map."  (*Id*. at 16:5-6.)

- "The **determination component** [] can **determine** what color to make the light pole in an output (e.g., the rendered map . . .)."  (*Id*. at 16:36-38.)

Even in this context, the "components" are only circularly described as empty black boxes for performing any number of desired functions by unspecified means.  Rather than save the claims from abstraction, the "components" compound the problem by injecting empty placeholders where Section 101 demands tangible, technological limitations.

Nor can the specification save the claims from abstraction.  In the first instance, *Alice* Step 1 addresses the content of the *claims*, not the *specification*.  *Alice*, 573 U.S. at 218 ("We must first determine whether *the claims* at issue are directed to a patent-ineligible concept.") Because the *claims* recite only the abstract concept, the inquiry ends there.  In any case, the '241 Patent's specification is equally devoid of tangible embodiments.  Regarding claim 1, the **sole disclosure** regarding rubber deposits—reproduced in its entirety below—is a parenthetical observation that rubber deposits may somehow impact performance:

> In one example, tracks can experience . . . *tire marks* from other video game cars breaking heavily on a track, and others. The track can reflect these changes to influence how a game plays (e.g., later in a game, *more rubber on a track can lead to a different gaming result*).

('241 Patent, 9:36-42.)  Regarding claims 8 and 15, the **only disclosures** regarding track temperature are minor variations on the banal observation that "the game can have a car respond in a certain manner based on the temperature."  ('241 Patent, 8:66-67; *id*. at 8:45-48, 18:42-43, 18:50-52.)  The specification offers no hint regarding *what* the impact of rubber or track

11

temperature on a vehicle's performance might be, let alone *how* to calculate it, much less how non-generic *technology* might implement the requisite calculations. Accordingly, "[e]ven if all the details contained in the specification were imported into the [] claims, the result would still not be a concrete implementation of the abstract idea." *Affinity II*, 838 F.3d at 1259.

Abstraction is confirmed by the fact that, at the level of generality recited in the claims, a human could perform the claimed operations mentally without even using a pencil and paper. *Elec. Power*, 830 F.3d at 1354 ("mental processes [are] within the abstract-idea category"). The claims do not recite evaluating the effects of rubber deposits or track temperature using any particular method, to any particular degree of certainty, or even in a manner that resembles real physics. They merely require that "the alteration influences performance of a vehicle" in some unspecified manner. ('241 Patent, Claim 15.) A human driver behind the wheel of a physical NASCAR vehicle—or driving a virtual racecar from the comfort of their couch—can do exactly that. For instance, a human driver can (1) visually **identify** portions of a track of interest (e.g., an upcoming portion); (2) **determine** whether that portion of track is affected by rubber deposits or temperatures (e.g., by recognizing rubber or sunlight); and (3) **modify** their mental model of how the track may impact the performance of their vehicle (e.g., increasing or decreasing tire grip) accordingly.[7] The fact that computers might estimate the same parameters faster or more accurately does not render the claims any less abstract, because "claiming the improved speed or efficiency inherent with applying the abstract idea on a computer [is] insufficient to render the claims patent eligible." *In re Rosenberg*, 813 F. Appx. 594, 597 (Fed. Cir. 2020).

### B. The Independent Claims Are Comparable to Others Found Abstract

Courts have repeatedly found comparable claims to be directed to abstract concepts. For

---

[7] Claim 1 additional recites a "check component." But again, a human driver can **check** for vehicles depositing rubber on a track (e.g., by watching for skidding vehicles or smoking tires).

12

instance, in *Bot M8 LLC v. Sony Corp. of Am.*, 465 F. Supp. 3d 1013 (N.D. Cal. 2020), the court

invalidated a gaming patent claim that, like the '241 Patent, recited a series of formless "devices"

(no different from the claimed "components" here) for performing generic steps, including:

> **a total result data receiving device** that receives from the server data of a total game result achieved by the first gaming machine and the second gaming machine based on the data of the game result transmitted by the transmitting device;
>
> **a specification value determining device** that determines a specification value based on the data of the total game result received by the total result data receiving device; and
>
> **a specification value renewing device** that renews to replace the specification value set by the specification value setting device with the specification value determined by the specification value determining device.

*Id*. at 1018.  Because the generic steps recited only the idea that "[f]uture game conditions

change based on prior game results" with "*no means recited; no explanation how to accomplish*

*the result*," the Court found the claims were directed to an abstract concept.  *Id*. at 1021.  As the

Court explained, it was fatal that the claims effectively offered only questions, not solutions:

> The game specification value increases if the players perform well and decreases if the players perform poorly. But **how** do the game conditions change based upon results? **What conditions** change? Based on **what variables**? And, **what are the thresholds** for change?

*Id*. at 1024.  "For the reasons explained by the district court," in which it "discern[ed] no error,"

the Federal Circuit affirmed this result without further discussion.  *Bot M8 LLC v. Sony Corp. of*

*Am.*, 4 F.4th 1342, 1358 (Fed. Cir. July 13, 2021).

As in *Bot M8*, the '241 Patent recites only generic functional steps directed to "a result,

not a means to achieve it.  So, up front it's abstract."  *Bot M8*, 465 F. Supp. 3d at 1021.  Indeed,

the claims recite that the simulated "alteration influences performance of a vehicle" ('241 Patent,

Claim 15), "[b]ut **how** do the game conditions change . . . ?  **What conditions** change? . . .  And,

**what are the thresholds** for change?" (*Bot M8*, 465 F. Supp. 3d at 1022).  The claims offer no answers, and are therefore directed to an abstract concept.

Similarly, in *Affinity I*, the Federal Circuit considered claims "directed to media systems that deliver[ed] content to a handheld wireless electronic device."  838 F.3d at 1267.  As here, although the claims in *Affinity I* purported to claim a technological *environment*, they recited only amorphous hardware performing *generic functional steps*.  *Id.* at 1269.  The claims recited:

> (1) a '**media managing system**' that maintains a library of content, (2) a '**collection of instructions**' that are 'operable when executed' by a handheld wireless device to request streaming delivery of the content, and (3) a '**network based delivery resource**' that retrieves and streams the requested content to the handheld device.

*Id.* at 1269 (paraphrasing the claim language).  The Court found that the claims were directed to an abstract concept because, "[a]t that level of generality, **the claims do no more than describe a desired function or outcome**, without providing any limiting detail that confines the claim to a particular solution to an identified problem."  *Id*.  Similarly here, the claims of the '241 Patent are archetypal abstract ideas because they "describe[] the function of [simulating a racetrack surface], but not a specific means for performing that function."  *Id*.

### C.  The Independent Claims Do Not Improve Computer Technology

The claims do not recite improvements *to computer technology* that would spare them from abstraction as in *Enfish, LLC v. Microsoft Corp*., 822 F.3d 1327 (Fed. Cir. 2016).  There, the computer database claims at issue were "not simply directed to *any form* of storing tabular data, but instead [were] specifically directed to a *self-referential table* for a computer database . . . [that] function[ed] differently than conventional database structures . . . [and offered specific] benefits over conventional databases, such as increased flexibility, faster search times, and smaller memory requirements."  *Id*. at 1337.  In short, the claims recited a specific "data structure designed to improve the way a computer stores and retrieves data in memory."  *Id.* at

14

1339.  Because the "focus of the claims [was] on an *improvement to computer functionality* itself," the Circuit held that the claims were not directed to an abstract concept.  *Id.* at 1336.

By contrast, here the asserted claims recite only generic "components" performing generic processes of (1) **identifying** a portion of a track; (2) **determining** whether that portion of track is affected by rubber deposits or temperature; and (3) **modifying** vehicle performance in some undefined manner.  ('241 Patent, Claims 1, 8, 15, 5:16-40.)  These steps do not purport to *address*—let alone *improve*—the functioning of computer technology.  They merely recite steps to be performed on a computer using unspecified programming.  The situation is analogous to this Court's decision in *KCG Techs., LLC v. Carmax Auto Superstores, Inc.*, 424 F. Supp. 3d 196 (D. Mass. 2019) (Sorokin, J.).  There the claims recited in broad functional language "emulating the features of a smartphone or other handheld device on another screen."  *Id*. at 201.  In finding the claims abstract, the Court explained that, while "the *Enfish* patent claimed an improvement in <u>how</u> a computer can store information" (*id*. at 204), the claims at issue could not "'solve' any technological problem when they do not recite how the claimed invention is to be implemented" (*id*. at 203-04).  Similarly here, the claims of the '241 Patent "are not directed to any specific implementation of the function of [racetrack simulation], let alone to a specific improvement of that function that would enable it to be performed in a particular way."  *Id*. at 204.[8]

Relatedly, the claims here are unlike those found patent-eligible in *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299 (Fed. Cir. 2016).  There, the Federal Circuit addressed claims reciting specific means for programming a computer to automate lip synchronization in an animation using "rules that evaluate sub-sequences consisting of multiple sequential

---

[8] The possibility that a user might *enjoy* a videogame that simulates rubber deposits or track temperature does not change this result, because "improving a user's experience while using a computer application is not, without more, sufficient to render the claims directed to an improvement in computer functionality."  *Customedia Techs., LLC v. Dish Network Corp.*, 951 F.3d 1359, 1365 (Fed. Cir. 2020).

phonemes." *Id*. at 1311.  Whereas previously animation "was driven by subjective determinations," "[t]he claimed process use[d] a combined order of ***specific rules*** that render[ed] information into a ***specific format*** that is then used and applied to create desired results." *Id*. at 1314-15.  Because the claims used "***limited rules*** in a process ***specifically designed*** to achieve an improved ***technological result*** . . . [they were] not directed to an abstract idea." *Id*. at 1316; *KCG Techs.*, 424 F. Supp. at 200 (explaining that *McRO* avoids abstraction only where "claims contain[] not merely a prescription for performance of a method, but an adequate description of how the desired result . . . [is] to be achieved").  By contrast, the claims here recite no specific rules, no specific format for rendering results, and no improved technological result, but only an invitation for *someone else* to simulate a racetrack *somehow*.  That is a textbook abstract concept.

## II.    *Alice* Step 2: The Independent Claims Recite No Inventive Concept

The second step of *Alice* asks whether the elements of the claims recite an "'inventive concept' sufficient to 'transform' the claimed *abstract idea* into a patent-eligible *application*." *Alice Corp.*, 573 U.S. at 221.  That is, language <u>in the claims</u>, but <u>beyond the abstract idea</u>, must supply an inventive concept.  *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1290 (Fed. Cir. 2018) ("the ineligible concept to which [a claim] is directed cannot supply the inventive concept that renders the invention 'significantly more' than that ineligible concept.").

This is fatal to the '241 Patent because, other than the abstract concept of simulating a racetrack surface, the claims recite *nothing* beyond generic computer "components."  Namely, the claims recite generic functions for (1) **identifying** a portion of a track; (2) **determining** whether that portion of track is affected by rubber deposits or temperature; and (3) **modifying** vehicle performance in some undefined manner.  ('241 Patent, Claims 1, 8, 15.)  But these steps are the ineligible abstract idea itself, and therefore cannot supply the separate inventive concept.

Beyond these steps, the claims recite only that the abstract functions are performed by "identification component[s]," "check component[s]," "determination component[s]," and "modification component[s]."  ('241 Patent, Claims 1, 8, 15.)  But, as detailed above, the '241 Patent takes pains to clarify that these "components" do not recite specific hardware; they are merely placeholders for *any* generic hardware *or* software.  ('241 Patent, 5:16-40, 27:59-28:30.)  The Federal Circuit has "repeatedly held that such invocations of computers . . . that are not even arguably inventive are 'insufficient to pass the test of an inventive concept in the application' of an abstract idea."  *Elec. Power*, 830 F.3d at 1355.

Nor do the claims recite an "ordered combination of limitations" that might pass muster as in *BASCOM Global Internet Services, Inc. v. AT&T Mobility LLC*, 827 F.3d 1341 (Fed. Cir. 2016).  There, the Court found that the claims survived under *Alice* Step 2 because, beyond the abstract idea of "filtering content on the Internet," the claims recited in detail "the installation of a filtering tool at a ***specific location***, remote from the end-users, with customizable filtering features specific to each end user."  *Id*. at 1350.   This amounted to a "***particular arrangement*** of elements [comprising] a ***technical improvement***," and therefore provided "a ***specific, discrete implementation*** of the abstract idea of filtering content."  *Id*. at 1350.  By contrast, the claims here recite a formless soup of "components" with no structural relationship to one another or to anything else.  ('241 Patent, Claims 1, 8, 15.)  The "components" are limited only in that they must somehow "identify," "check," "determine," or "modify."  But they need not take any particular form or position.  (*Id*.)  Indeed, the specification actively resists limiting the "components" to discrete or joint incarnations, let alone specific arrangements:

> Where multiple components are described, it may be possible to incorporate the multiple components into one physical component.  Similarly, where a single component is described, it may be possible to distribute that single component between multiple physical components.

('241 Patent, 5:32-36.)  And the '241 Patent even explains that the "components" need not even

be limited to the already boundless definition of "components":

> Functionality described as being performed by one entity (e.g., **component**, hardware item, and others) **may be performed by other entities**, and individual aspects can be performed by a plurality of entities simultaneously or otherwise.  For example, functionality may be described as being performed **by a processor**.  One skilled in the art will appreciate that this functionality can be performed **by . . . a non-processor entity (e.g., a mechanical device), and others**.

('241 Patent, 28:5-16.)  In short, "[t]he specificity of the technical solution provided by the

claims in BASCOM stands in sharp contrast to the absence of any such specific technical

solution in the claims of the" '241 Patent.  *Affinity II*, 838 F.3d at 1265.

For the same reasons, the claims do not recite a technological solution that might survive

under *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014).  There, the Court

addressed claims directed to generating a "hybrid web page that merges content associated with

the products of [a] third-party merchant with the stored 'visually perceptible elements' from [an]

identified host website."  *Id*. at 1257.  But beyond the abstract concept, the claims "recite[d] a

**specific way** to automate the creation of a composite web page by an 'outsource provider' that

incorporates elements from multiple sources in order to **solve a problem faced by websites**."  *Id*.

at 1259.  The claims "**specif[ied] how** interactions with the Internet are manipulated to yield a

desired result—a result that **overrides the routine and conventional sequence** of events

ordinarily triggered by the click of a hyperlink."  *Id*. at 1258.  Thus, *DDR Holdings* stands for the

uncontroversial proposition that a claim that recites a specific "solution [that] is necessarily

rooted in computer technology in order to overcome a problem specifically arising in the realm

of computer[s]" may survive *Alice* Step 2.  *Id.* at 1257.  But the claims here do not recite *any*

*solution* for simulating a racetrack surface, let alone the requisite *technological solution*.

Finally, and "obviously, limiting the claims to the particular technological environment of [video games] is, without more, insufficient to transform [the claims] into patent-eligible applications of the abstract idea at their core." *Elec. Power*, 830 F.3d at 1354. "The Supreme Court and [the Federal Circuit] have repeatedly made clear that merely limiting the field of use of the abstract idea to a particular existing technological environment does not render the claims any less abstract." *Affinity II*, 838 F.3d at 1259. As this Court held last year in *Worlds, Inc. v. Activision Blizzard, Inc.*, No. 12-10576-DJC, 2021 U.S. Dist. LEXIS 84115 (D. Mass. Apr. 30, 2021) (Casper, J.), that conclusion applies with full force to video games. *Id.* at *27-28. The claims at issue in *Worlds* related to an abstract idea for "crowd control" of virtual avatars within online multiplayer videogames. *Id*. at *25. The plaintiff suggested that the claimed technological environment—a video game—supplied the requisite inventive concept. *Id*. at *27. Rejecting this argument, the Court instructed that merely "display[ing] graphical results and generat[ing] a view of the virtual world" was neither "inherently inventive [n]or sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Id*. at *28.

In short, like *Alice* Step 1, "the search for an inventive concept [in Step 2] still entails a search for both a ***technological problem*** . . . and ***an improvement*** the claim offers." *Bot M8*, 465 F. Supp. 3d at 1026. Here, that search only confirms that the '241 Patent fails to demonstrate "***how*** the patent achieves its [supposed] improved result." *Id*. (emphasis in original).

## III.    The Dependent Claims Are Equally Unpatentable Under § 101

All dependent claims of the '241 Patent are equally unpatentable because they are "substantially similar and linked to the same abstract idea." *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014). At Step 1, this Court has explained that dependent claims "add [nothing] to the abstract idea analysis" where

they recite only "minor details that broadly describe generic types of components and features."

*KCG Techs.*, 424 F. Supp. at 204.  That is precisely the case here.  The dependent claims recite

only insubstantial variations on the abstract idea, such as:

- playing with either one or two vehicles, which may be controlled either by humans or a computer, on the same gaming console or over the Internet (claims 2-7, 11-13, 17-18);

- recognizing track temperature changes caused by a vehicle (claim 9, 19);

- simulating both track temperature *and* rubber deposits (claim 10);

- evaluating how sun exposure impacts track temperature (claim 14); and

- changing temperature within a single race (claim 16), or between races (claim 20).

"None of those additional limitations alter what the claims are directed to; they merely apply the

abstract idea in a generic or conventional fashion. That does not alter the step-one analysis."

*Palomar Techs., Inc. v. MRSI Sys., LLC*, 462 F. Supp. 3d 13, 26 (D. Mass. 2020) (Saylor, J.).

The dependent claims fare no better at Step 2.  Dependent claims 2, 4-7, 10-14, and 16-20

recite no additional "components," and therefore fail for the same reasons as the independent

claims.  Dependent claims 3 and 9 additionally indicate that these generic functions are formed

using a "collection component," "broadcast component," "monitor component," and "evaluation

component."  But, like the "components" of the independent claims, the dependent claim

"components" are merely placeholders for general purpose hardware and/or software.  ('241

Patent, 5:16-40.)  To the extent these "components" are mentioned at all in the specification, they

are described only circularly as the unspecified equipment needed to somehow perform their

eponymous tasks.  (*E.g.*, '241 Patent, 13:22-23 ("The *collection component* [] is configured to

*collect* a physical information set."); *id*. at 15:5-6 ("The *monitor component* 805 can be

configured to *monitor* a content [] presented by way of an electronic device . . .").)  And like the

independent claims, the dependent claims do not specify any *arrangement* of "components"—let

alone an *unconventional arrangement*—that could supply the requisite inventive concept.

Finally, although certain dependent claims depend from other dependent claims, the combinations do not render these claims any less abstract.  Indeed, "[e]ven reading dependent claim limitations together to construct a hypothetical narrowest claim"—e.g., using unspecified "components" to simulate both rubber deposits and track temperature, where track temperature is influenced by sun exposure, with two players and two vehicles, on a single console or over the Internet—"there is nothing more inventive in the ['241 Patent than limiting the application of an abstract idea to the environment of . . . conventional tools."  *Palomar*, 462 F. Supp. 3d at 29.

## IV.   Neither ITS's First Amended Complaint, nor Any Further Amendment, Can Avoid Dismissal

Although *Alice* Step 2 may in certain instances present underlying issues of fact, "[p]atent eligibility may be determined on the intrinsic record alone where, as here, the specification provides that the relevant claim elements are well-understood, routine and conventional." *Whitserve LLC v. Dropbox, Inc.*, 854 F. Appx. 367, 373 (Fed. Cir. 2021).  Neither ITS's present allegations, nor any plausible allegations it could make in a further amended pleading, can change the reality that the '241 Patent definitively establishes its own ineligibility.

In an attempt to fabricate the missing inventive concept through raw pleading, ITS's First Amended Complaint includes boilerplate paragraphs insisting that the claims satisfy *Alice* Step 2.  (Dkt. No. 20, ¶¶ 39-53.)  For instance, ITS alleges without support or explanation that the claims:

- "recite one or more inventive concepts that are rooted in computerized gaming simulations and overcome problems specifically arising in the realm of these technologies."  (*Id.* at ¶ 44.)

- "are not directed at a mere mathematical relationship or formula."  (*Id.* at ¶ 49.)

- "cannot be performed by a human, in the human mind, or by pen and paper." (*Id.* at ¶ 50.)

21

- "recite[] a combination of elements sufficient to ensure that the claim in practice amounts to significantly more than a patent on an ineligible concept." (*Id*. at ¶ 51.)

But these statements do not assert facts, they merely quote patent eligibility criteria. ITS offers equally hollow statements packaged in longer paragraphs. For instance, ITS alleges that:

> The patented invention improved upon . . . the prior art **by . . . having an identification component** for a game play area, **a check component** to determine the effect of a player action, **and a modification component** to alter game play area for later use during the simulation . . . whereby **the identifying component identifies** discrete sections of track, **the check component determines** effects players actions may have on the discrete sections of track, **and the modification component changes** the performance parameters of that discrete track section, usually by placing a tire remnant on the discrete track section.

(Dkt. No. 20, ¶ 41.) But everything after the word "by" merely restates the claimed "components" and their functions, rendering the statement a tautology. In short, ITS offers not factual pleadings, but thinly veiled "legal conclusions couched as fact," which the "court must disregard." *Rodriguez*, 2014 U.S. Dist. LEXIS 151328, at *5.[9]

Courts consistently dismiss claims under § 101 where plaintiffs attempt to circumvent *Alice* Step 2 through conclusory pleadings. *E.g.*, *Simio, LLC v. Flexsim Software Prods.*, 983 F.3d 1353, 1365 (Fed. Cir. 2020) ("We disregard conclusory statements . . . This is therefore not a case in which a complaint's allegations 'prevent resolving the eligibility question as a matter of law.'") For instance, the Federal Circuit rejected a strikingly similar "attempt[] to manufacture a factual question" in *Dropbox, Inc. v. Synchronoss Techs., Inc.*, 815 F. Appx. 529 (Fed. Cir.

---

[9] ITS makes the equally the hollow allegation that the claims are "not merely [] routine or conventional" because they "make[] it possible to interact with a simulation system in a way that allows a user's actions couple[d] with the simulated environment to alter the simulation itself." (Dkt. No. 20, ¶ 45; *id*. at ¶¶ 13, 52-53.) This is equally unavailing, for three reasons. First, because user interaction with the simulation (e.g., by depositing rubber on a track) is the abstract idea itself, it cannot supply the requisite inventive concept as a matter of law. Second, this allegation must be disregarded as conclusory. ITS fails to identify facts supporting the implicit assertion that technological limitations previously prevented videogame users from affecting their environment, let alone explaining how the '241 Patent offered a technological solution. Third, this statement is plainly false. At a minimum, the Court can take judicial notice that videogame players have been altering their environments at least since the Super Mario Brothers began breaking blocks with their heads in the 1980s. Fed. R. Evid. 201(b)(1).

2020). *Id*. at 538 (quoting the district court opinion).  There, as here, the plaintiff alleged "that each of the patents solves given technological problems, but ***never provide[d] more support than a conclusory statement*** that 'the inventions described and claimed . . . solved these problems,' improved the art, 'represented a significant advance over existing approaches[,] and were not well-known, routine, or conventional in the field' at the time of patenting." *Id*.  Thus, those "pleadings provide[d] no more than a series of legal conclusion[s] about the § 101 analysis," which the Federal Circuit did not credit. *Id*.  The Court concluded that "**only** 'plausible and specific factual allegations that *aspects of the claims* are inventive are sufficient'" to survive a motion to dismiss. *Id*. (italics in original).  ITS's First Amended Complaint—which recites only vague legal conclusions without substantive ties to the claim language—roundly fails this test.

Because the root of the problem is not inartful pleadings, but inherent deficiencies in the '241 Patent's claims, ITS also cannot escape dismissal by further amending its pleadings as in *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121 (Fed. Cir. 2018).  There, the Federal Circuit reversed denial of leave to amend where the proposed amended complaint

> supplie[d] ***numerous allegations*** related to the inventive concepts present in the claimed form file technology.  It ***describe[d] the development*** of the patented invention, including the problems present in prior art computerized form file creation. . . . It then present[ed] ***specific allegations*** directed to 'improvements and problems solved by the [] patented inventions.'

*Id*. at 1127.  Because the proposed amended complaint supplied "***concrete allegations***" explaining specifically *why* the claimed elements were "not well-understood, routine, or conventional activity" (*id*. at 1128), and because "nothing in the specification described[ed] [these elements] as conventional" (*id*. at 1129), the Federal Circuit granted leave to amend.  Thus, *Aatrix* stands only for the uncontroversial proposition that specific *factual* allegations detailing *how* the *claimed* features provided an unconventional, technical solution may prevent

dismissal *if not contradicted by the patent itself.* By contrast, "where the specification admits the additional claim elements are well-understood, routine, and conventional, it will be difficult, if not impossible, for a patentee to show a genuine dispute." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 890 F.3d 1354, 1356 (Fed. Cir. 2018) (Moore, Cir. J., concurring).

Under the *Aatrix* decisions, no further amended pleading can cure the deficiencies in the '241 Patent. The claims recite only (1) generic functions (e.g., "identify[ing]," "check[ing]," determin[ing]," and "modify[ing]"); and (2) formless "components" that implement these functions. Because the generic functions recite the abstract idea itself, they cannot supply the inventive concept. *BSG Tech.*, 899 F.3d 1281 at 1290. Accordingly, any conceivable factual dispute must implicate the "components." But the '241 specification explains at length that the "components" are placeholders for any imaginable item of generic hardware and/or software, including even "an analog circuit," "an object," "and so on." ('241 Patent, 5:16-40, 28:5-16.) Any newfound allegation that the "components" are unconventional hardware must therefore be disregarded as contradicted by the specification. *Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 913 (Fed. Cir. 2017) ("a court need not 'accept as true allegations that contradict . . . the claims and the patent specification."). Relatedly, any newfound allegation that the patentees invented an unconventional *arrangement* of "components" could not create an issue of fact. Factual allegations are only relevant "to the extent they are captured in the claims," and the claims here do not recite any particular arrangement of "components." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1369 (Fed. Cir. 2018); *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1327 (Fed. Cir. 2017) ("an inventive concept must be evident *in the claims*").[10]

---

[10] The Court should deny any attempt to replead as futile. *Adams v. Wells Fargo Bank*, 2018 U.S. Dist. LEXIS 197766, at *7-8 (D. Mass. 2018) (Saylor, J.).

The inconsequential additions presented in ITS's First Amended Complaint only underscore the futility of further amendment.  Rather than respond to iRacing's Motion to Dismiss ITS's original Complaint (Dkt. Nos. 14-15)—which, except for this paragraph, is essentially identical to this Motion—ITS filed its First Amended Complaint.  But, as the accompanying redline demonstrates, ITS was unable to plead any facts that would spare the '241 Patent from invalidity.  (Ex. 2 (Redline Comparing ITS' Original and First Amended Complaints).)  Instead, ITS merely added an inapposite summary of the prosecution history (Dkt. No. 20, ¶¶ 14-38); parallel causes of action for induced and contributory infringement of the '241 Patent (*id*. at ¶¶ 66-80), which must also be dismissed because the '241 Patent is invalid under § 101; additional conclusory legal assertions (*id*. at ¶¶ 43, 52-53); and non-substantive line edits.  Allowing *another* redo would only yield even more strained allegations and could not cure the inherent deficiencies of the '241 Patent.

**V.      Claim Construction Is Not Necessary; Dismissal at the Outset is Appropriate**

The Court need not conduct claim construction to find the claims unpatentable on the pleadings.  "[C]laim construction is not an inviolable prerequisite to a validity determination under § 101."  *Reese v. Sprint Nextel Corp.*, 774 F. Appx. 656, 659 (Fed. Cir. 2019).  Rather, to the extent ITS contends that the Court cannot dismiss before entertaining claim construction, it is incumbent **upon ITS** to both (1) allege *specific constructions*; and (2) demonstrate *how* those constructions would render the claims patentable.  For instance, in *Whitserve LLC v. Dropbox, Inc.*, 854 F. Appx. 367 (Fed. Cir. 2021), the Federal Circuit rejected the argument that the district court erred by dismissing under § 101 before claim construction, because the plaintiff "waived any such argument by failing to request claim construction below, and by failing to explain how a different construction of any claim term would lead to a different result."  *Id*.  at 373.

Numerous other Federal Circuit opinions have reached the same conclusion.  *E.g.*, *Simio*, 983

F.3d at 1365 (affirming dismissal where the plaintiff "ha[d] not explained how it might benefit

from any particular term's construction under an Alice § 101 analysis"); *Mortg. Application*

*Techs., LLC v. MeridianLink, Inc.*, 839 F. Appx. 520, 524-25 (Fed. Cir. 2021); *Cleveland Clinic*

*Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2017).[11]

Even if ITS were to propose specific constructions, "there is no claim construction

dispute relevant to eligibility [where the Court] can fully understand the ***basic character*** of the

claims without claim construction." *Reese*, 774 F. Appx. at 660.  Here, the claims recite only

generic functions ("identify[ing]," "check[ing]," "determin[ing]," and "modif[ying]")

implemented on empty "components," which the specification confirms are general purpose

hardware and/or software.  ('241 Patent, Claims 1, 8, 15, 5:16-40.)  No colorable construction

that ITS could propose can change the reality that the ***basic character*** of the claims is an abstract

idea implemented in a generic computing environment.  Thus, "[n]o formal claim construction

[is] required because the asserted claims disclose[] no more than 'an abstract idea garnished with

accessories' and there [is] no 'reasonable construction that [c]ould bring [them] within patentable

subject matter.'"  *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 719 (Fed. Cir. 2014).

---

[11] The same result holds true if the claimed "components" are interpreted as means-plus-function claim elements. *Smart Software, Inc. v. PlanningEdge, LLC*, 192 F. Supp. 3d 243, 247 (D. Mass. 2016) (Saris, J.).  In that case, ITS would need to "provide the Court with . . . specific corresponding structures in the specification that would plausibly provide a meaningful limitation sufficient to transform an abstract idea into patent-eligible subject matter under § 101." *Id.* at 251.  Because the specification discloses no such structure, that is not possible.

Respectfully submitted,

iRacing.com Motorsport Simulations, LLC,

By its attorneys:


*/s/ Theodore J. Folkman*
Theodore J. Folkman (BBO No. 647642)
FOLKMAN LLC
53 State Street, Suite 500
Boston, MA 02109
(617) 219-7664
ted@folkman.law

Andrew D. Gish (*pro hac vice*)
  andrew@gishpllc.com
  (212) 518-7380
Marti A. Johnson (*pro hac vice*)
  marti@gishpllc.com
  (646) 701-4458
Raymond J. Bilderbeck (*pro hac vice*)
  ray@gishpllc.com
  (646) 415-1092
GISH PLLC
41 Madison Avenue, Floor 31
New York, NY 10010


Dated: January 24, 2022