# Exhibit A-2

'241 Patent Filewrapper, second 70 pages

information, route information, opinion information (e.g., a group of users say a road is difficult to drive), visual information, audio information, depth information, etc.  Physical information can be gleaned from a variety of sources, including a network or data link to the Internet, local networks, direct-connected systems, and communication devices capable of providing physical

5   information from sources such as satellites, weather systems and stations, radio or telephonic communication, proprietary databases, geological or other surveys, map datum or data, and others. A baseline for such data can be ascertained in order to produce an average result where differing or conflicting physical information exists, and to fill gaps where physical information is incomplete or imperfect.  It is to be appreciated that this is by no means a limiting list of physical

10   information and one of ordinary skill in the art can appreciate that other information is to be included.

In one embodiment, the physical information set is a physical map information set and where the video game output 630 is a video game map.  In one embodiment, the video game map comprises a race course and where the video game enables use of the race course in a racing video

15   game application.  In one embodiment, the video game map comprises an environment upon which an avatar (e.g., human-type character) can navigate

In one embodiment, the physical information set is voice information and where the video game output is video game audio commentary.  For example, a college football broadcasting team (e.g., a play-by-play broadcaster and color commentator) can provide audio support for the

20   broadcast of a college football game.  The collection component 605 can obtain a copy of the audio support.  The render component 610 can break down the audio support and extract singular lines (e.g., individual lines for the play-by-play broadcaster and color commentator related to play on the field).  During game play of a college football video game on a video game console, the render component 610 can output (e.g., cause a video game console) of a singular line or multiple lines

25   in response to an occurrence in gameplay, to set tone of gameplay, etc.  For example, if a player in the game makes a hard <u>hit</u>, then a common term used by the color commentator can be played. As opposed to playing a version of the common term pre-recorded for the video game, a version is ~~played~~ extracted from a real broadcast <u>and played</u>.  In one embodiment, the render component 610 alters the common term to make it more suitable for gameplay (e.g., lowers volume, changes

30   tone, replaces a player name, removes possibly offensive language, etc.).

16

While aspects disclosed herein discuss that the render component 610 produces a video game output 630, the render component 610 (and other components) can function to produce non-video game outputs. Thus, aspects disclosed herein can have applicability outside of the video game realm.

Figure 7 illustrates one embodiment of a system 700 that includes an identification component 705 and an approximation component 710 along with the collection component 605 and the render component 610. The identification component 705 can be configured to identify missing information in the physical information set (e.g., obtained from the physical information sources 615, 620, and 625). The approximation component 710 can be configured to determine a substitute information set for the missing information, where the video game output 620 is based, at least in part, on the physical information set and the substitute information set.

The collection component 605 can receive a user request for a map to be made of a dirt road area for a rally car racing video game. The collection component 605 can obtain information pertaining to the dirt road area, including information related to how road are configured, weather conditions, and the like. However, some information about the road area may be unavailable. For example, what type of dirt the road is made up of, a mixture ratio of different dirt types for a road surface, and other information may be unavailable. The identification component 705 can identify the missing information (e.g., compare available information against information used to create previous map, compare available information against hardcoded information listed as desirable, etc.). The approximation component 710 can compensate for this missing information by generating substitute information. For example, an aerial photograph of the dirt road area can show the road being a certain color. The approximation component 710 can estimate a road dirt type based on this color. The render component 610 can produce the video game output 630 that is consistent with the estimated road dirt type. The video game output 630 can be a racing track where the track responds in a manner consistent with the estimated dirt type.

Figure 8 illustrates one embodiment of a system 800 that includes a monitor component 805, an appraisal component 810, and a decision component 815 in addition to the collection component 605 and the render component 610. The monitor component 805 can be configured to monitor a content 820 presented by way of an electronic device (e.g., a video displayed on a television, a song played on a personal computer speaker system, a webpage visited on a smartphone, etc.). It is to be appreciated that the system 800 can function without the monitor

17

component 805.  The appraisal component 810 can be configured to evaluate the content 820.  The decision component 815 can be configured to proactively (e.g., automatically) select the video game output 820 for production (e.g., send an instruction to the render component 810 on what video game output 820 the render component 610 should produce) based, at least in part, on a result from evaluating the content 820.

The system 800 can function to provide a user with content the user is likely to want.  For example, a user can watch a car race on television on a particular track.  The system 800 can make an[[in]] inference (e.g., through use of at least one artificial intelligence technique) that the particular track should be created for the user after the monitor component 805 monitors the content 820.  In one embodiment, before moving further, the system 800 can confirm with a user that the track should be rendered as video game output 620 (e.g., through a user interface) and the decision component 815 instructs components to go forward based, at least in part, on the user confirmation.  The appraisal component 810 can evaluate the content and based on this evaluation, the collection component 605 can seek out information about the particular track, such as recording the content 820 (e.g., on a computer readable medium), performing an Internet search for a website of the particular track and downloading results, and others.  This information can be used by the render component 610 to produce the video game output 630.

In one embodiment, a user can be watching a classic baseball game at Tiger Stadium in Detroit, Michigan on a smartphone, where the classic baseball game is the content 820.  The monitor component 805 can monitor the content 820 (e.g., extract information from the content 820, where the extracted information is a monitoring result).  The appraisal component 810 can evaluate the content 820 (e.g., the content 820 itself, information extracted from the content 820, inferences drawn from monitoring the content 820, etc.) and based on this evaluation, the decision component 815 can decide if the video game output 630 should be produced based on the content 820, determine if enough information is available to produce the video game output 630 (e.g., if so, then instruct the render component 610 to operate; if not, then cause the collection component 605 to gather more information), etc.

Figure 9 illustrates one embodiment of a system 900 that includes an assessment component 905, determination component 910, filter component 915, and output component 920.  The system 900 can incorporate the analysis component 105 of Figure 1, production component 110 of Figure 1, the collection component 605 of Figure 6, and/or the render component 610 of

18

Figure 6. Different pieces of map data 925 (e.g., that are part of the map data set 115 and/or obtained by the sources 615, 620, and/or 625) can be collected by the system 900. Example map data can include personal images, map application data, text (e.g., available online for a message board), microblogging (e.g., used to ascertain real-time traffic information), new information service broadcasts (e.g., traffic accident reports from new organizations), and others.

The assessment component 905 can evaluate the map data and the determination component 910 can determine which map data 925 to use in rendering and/or updating a map. In one example, different pieces of map data can contradict one another.

In one example, an information source states that traffic on Main Street is heavy while a news report states that traffic on Main Street is medium. In an embodiment, the information source can be a real-time feed or stream such as a microblog (e.g., Twitter) or feed from a social, news or government network (e.g., Facebook news feed, local media RSS (Really Simple Syndication) feed, state police network, etc.). The determination component 910 can determine if traffic on Main Street is heavy or medium (e.g., a determination is made that traffic is medium if intelligence of the determination component 910 weighs the news report as more accurate than the microblog (e.g., microblogs in general, a specific person who made the microblog, and others)).

In one example, two photographs (e.g., a first photograph and a second photograph) are collected by the system 900 and evaluated by the assessment component 905. In the first photograph a light pole is shown colored green. In the second photograph, the light pole is shown as colored blue. The determination component 910 can determine what color to make the light pole in an output (e.g., the rendered map 120 of Figure 1). In one example, the determination component 910 can analyze when the photographs were taken and information in a more recent photograph is used (e.g., date stamp, Exchangeable Image File Format (EXIF) information, Extensible Metadata Platform (XMP) information, International Press Telecommunications Council (IPTC) metadata information, other metadata, an inference such as that the pole was painted and therefore the more recent photograph is more accurate, and others). In one example, the determination component 910 can actively seek out information to be used in determining a color for the light pole (e.g., find other photographs, acquire a real-time satellite image, and others).

The filter component 915 can limit map data 925 transferred to the output component 920 (e.g., the output component 920 functioning as the production component 110 of Figure 6, the output component 920 functioning as the render component 610 of Figure 6, etc.). In one

19

embodiment, the determination component 910 instructs the filter component which pieces of map data 925 should be passed to the output component 920 (e.g., used to create a map). The output component 920 can render a map based on the map data 925 (e.g., map data 925 passed through the filter component 915). The output component 920 can produce a map output 930 (e.g., the rendered map 120 of Figure 1, a data set upon which the production component 110 of Figure 1 renders a map, an instruction on how to modify the rendered map 120 of Figure 1, the video game output 630 of Figure 6, etc.).

In one embodiment, information related to a person can be used proactively create data (e.g., a gaming map) for the person. In one example, a person could frequent message boards and write posts stating that they wished they could play a first person shooter on the moon, send messages to friends (e.g., e-mails) expressing this desire, and others. Based on the posts and messages, an inference could be drawn that the player wants to play a map of the moon in a game she commonly plays. The system 900 can proactively gather map data 925 that pertains to the moon and proactively generate the map output 930 of the moon for play in the game.

Similarly, a map can be modified based on information. In one example, a person can play a map on a first person shooter game. In this map, an unintentional game aspect can occur that a person considers a cheat. In this example, players may play on opposing teams and have a goal of capturing and retaining checkpoints to achieve a team score. However, a map can include a feature where players on one team can lob grenades across a game board in an unrealistic and/or unfair manner toward one of the checkpoints that kills members of the opposing team. A component can function to identify this supposed cheat, determine if a proactive modification of the map and/or the game should occur, and if a positive determination is made, then to modify the map and/or the game. Various outcomes can cause proactive modification and different modifications can occur. In one instance, the modification can be in response to observed player behavior (e.g., players skipping a map a disproportionate amount of times (e.g., when disproportionate skipping is identified, analyzing conduct to infer why skipping occurs)), response to complaints filed against a certain player who is performing the supposed cheat, response to conversations over a network hosting the game complaining of the supposed cheat, and others. The modification can include modifying the map to render the supposed cheat inoperable (e.g., placing a barrier (e.g., real or invisible) such that the cheat is disabled), modifying the game (e.g., causing the grenade to explode if sent from a certain angle, from a certain spot, from a certain spot with a certain angle, from a

20

certain weapon, etc.), modifying the game and/or map locally, modifying the game and/or map universally, and others.  Enabling proactive modification can enable a game to be improved after later versions are out, a game is no longer supported by a manufacturer, and others.

Figure 10 illustrates one embodiment of a system 1000 that includes an obtainment component 1005, a gather component 1010, a generation component 1015, and a transfer component 1020.  The system 1000 can incorporate the analysis component 105 of Figure 1, production component 110 of Figure 1, the collection component 605 of Figure 6, and/or the render component 610 of Figure 6.  A person can make a request 1025 for a map to be generated and the obtainment component 1005 (e.g., operating as the collection component 605 of Figure 6) collects the request 1025.  In one embodiment, the request 1025 is for a specific area to be created (e.g., a map of Bonneville Salt Flats).  In one embodiment, the request 1025 is for a specific area with specific characteristics (e.g., a map of New Orleans on Fat Tuesday (e.g., with roads closed for parade routes), a map of New York City in heavy traffic, a map of Glasgow, Scotland in heavy rain, and others).  In one embodiment, the request 1025 is a general request (e.g., a request for a random map to be created).

The gather component 1010 can be employed to gather information.  In one embodiment, the gather component 1010, obtainment component 1005, and collection component 605 of Figure 6 can implement as one component.  In one embodiment, a requested map may already exist (e.g., on a database, on a game console, and others).  If a requested map already exists, then the gather component 1010 can collect the requested map and the requested map can be outputted as output 1030 (e.g., by the transfer component 1020 and without passing the map through the transfer component).

In one embodiment, the gather component 1010 searches for a map meeting the request 1025 and identifies a map that meets the request 1025 at a location.  The transfer component 1020 can cause the map that meets the request 1025 to transfer to a location designated in the request 1025 (e.g., transfer directly without residing on the system 1000).

In one embodiment, the gather component 1010 identifies information sources and collects information that can be used in generating a rendered map.  Based on collected information, the generation component 1015 can construct a map for use on a computer (e.g., a video game, a training map, a movie (e.g., a map used in a cartoon), and others).  The transfer component 1020

can transfer the map as output 1030 (e.g., the rendered map 120 of Figure 1, the video game output 630 of Figure 6, etc.).

In one embodiment, a base map (e.g., base map 210 of Figure 5) for a requested map is available.  The gather component 1010 can collect the base map.  In one example, the person requests a map of Lucas County, Ohio.  Maps may be available for Toledo, Ohio; Sylvania, Ohio; and Oregon, Ohio (e.g., these three cities for the base map).  However, maps may not be available for Maumee, Ohio as well as for villages and townships of Lucas County, Ohio.  Therefore, the gather component 1010 collects information on how to render Maumee, Ohio as well as for villages and townships of Lucas County, Ohio.  The generation component 1015 renders a map and the transfer component 1020 outputs the map (e.g., as output 1030).

In one embodiment, the base map is a map of a city and the generation component 1015 modifies the map for specific characteristics.  In one example, the city is Tyler, Texas and a base map for Tyler, Texas is available.  However, the request 1025 can include a portion that specifies racing in a hot temperature.  A hot temperature can change road conditions.  The base map for Tyler, Texas can be configured to function with average temperature properties.  The generation component 1015 can modify the base map to change properties to those of hot temperature.  In one embodiment, public or private weather services or other information sources can be consulted for these purposes (e.g., cause map to reflect weather that is actual/real-time, representative of historic trends, user-selected, etc.).  In one embodiment, how roads in Tyler, Texas react to hot temperatures can be reflected in the output 1030.

In one embodiment a player requests (e.g., through the request 1025) for an arena to be created (e.g., a modern-day Madison Square Garden, a 1920 Madison Square Garden set-up for a fight between Jack Dempsey and Bill Brennan, a Madison Square Garden with player requested modifications, and others) for play in a boxing game.  The gather component 1010 can search the Internet for images and information on Madison Square Garden.  In one example, if the request 1025 is for the 1920 Madison Square Garden set-up for the fight between Jack Dempsey and Bill Brennan, then the gather component 1010 can search the Internet to find archived photographs, newspaper descriptions, and others.  Based on data collected by the gather component 1010, the generation component 1015 can create the arena and the transfer component 1020 can transmit the arena as output 1030 (e.g., transmit the arena to a game console).

22

Figure 11 illustrates one embodiment of a system 1100 that includes an examination component 1105, an identification component 1110, a separation component 1115, and a generation component 1120. The system 1100 can incorporate the analysis component 105 of Figure 1, production component 110 of Figure 1, the collection component 605 of Figure 6, and/or

5 the render component 610 of Figure 6. Map information 1125 (e.g., the map information is the map data set 115 of Figure 1 and/or is obtained from the sources 615, 620, and 625 of Figure 6) can be collected (e.g., actively (e.g., the system 1100 seeks out map information) and/or passively (e.g., map information is sent to the system 1100 (e.g., directly (e.g., by another unit) or indirectly (e.g., radio waves)))) by the system 1100 and evaluated by an examination component 1105. The

10 system 1100 can be configured to render a map 1130 based off a specific location. However, a desire may exist for a map to not be a correct representation of the specific location. In one example, a person can request to have a map made of Windsor, Ontario, Canada. However, some real-life roads may include adult establishments (e.g., casino, strip clubs, night clubs, and others). The desire may be to mask these adult establishments from a child, so if a person making a map

15 request is a child, the system 1100 can filter out adult aspects when producing the map 1130 (e.g., the map 1130 can be the rendered map 120 of Figure 1, the map 1130 can be video game output 630 of Figure 6, etc.).

The examination component 1105 can examine the map information 1125 and produce an examination result. The identification component 1110 can use the evaluation result to identify

20 items to not be rendered in the map 1110. In one example, parental controls can at least partially control intelligence used by the identification component 1110 to identify map information not to be used, replaced, and other in the map 1130. In one embodiment, the identification component 1110 can identify copyrighted information and cause the copyrighted information to be replaced in a rendered map. In one embodiment, the identification component 1110 functions by scanning

25 photographs for copyrighted information, inappropriate content (e.g., sexually suggestive advertisements), etc.

In one embodiment, the system 1100 can function to replace advertisements with targeted advertisements. In one example, the identification component 1110 can identify unused advertisement locations in the map information 1125, identify advertisements that can be replaced,

30 as well as select advertisements for use (e.g., based on aggression levels, personal history, contract fulfillment, and others).

23

The separation component 1115 can filter out map information not to be rendered, not to be considered in rendering, and others.  The generation component 1120 can take information produced out of the separation component 1115 and render the map 1130 or cause the map 1130 to be rendered (e.g., at another location).  In one embodiment, the generation component 1120 modifies the rendered map 120 of Figure 1.  In one embodiment, the production component 110 of Figure 1 and/or the render component 610 of Figure 6 function as the generation component 1120.

Figure 12 illustrates one embodiment of a system 1200 that includes the examination component 1105, the identification component 1110, an approximation component 1205, and a composition component 1210.  The system 1200 can incorporate the analysis component 105 of Figure 1, production component 110 of Figure 1, the collection component 605 of Figure 6, and/or the render component 610 of Figure 6.  The system 1200 can collect map information 1215 (e.g., the map data set 115 of Figure 1) and the examination component 1105 can evaluate the map information 1215.  The examination component 1105 can evaluate the map information 1215, at least in part, with regards to if there are any unknown areas.

In one embodiment, the map information 1215 may be deficient or otherwise less than ideal for a particular context or in a particular instance.  In one example, the map information is to train submarine crews on navigating oceans.  However, specific information at deep ocean depths may not be available.  Therefore, the system 1200 can make approximations.  The identification component 1110 can identify areas that are appropriate for approximation and the approximation component 1205 can make approximations of these areas.

In one example, a map is designated for creation of an area of ocean at a deep depth.  Actual map information related to the area at the deep depth may not be available.  However, the system 1200 may be able to obtain auxiliary information.  Example auxiliary information can include: wildlife found in the region and are comfortable around the deep depth, scientific calculation information (e.g., pressure at the depth, natural light that would make it to the depth, and others), information derived from ocean models, and others.

The composition component 1210 (e.g., production component 110 of Figure 1, render component 610 of Figure 6, etc.) can create a map based on approximation information and map information 1215.  The map can be outputted as an outputted map 1220 (e.g., rendered map 120, video game output 630, etc.).  In one embodiment, the composition component 1210 can cause a

24

component to create a map and/or output a map (e.g., send an instruction to the production component 110 of Figure 1 to create the rendered map 120 of Figure 1).

In one embodiment, the outputted map 1220 can be evaluated to determine if approximations are appropriate.  If approximations are appropriate, then the outputted map 1220 can be transmitted (e.g., caused to be transmitted, caused to be rendered, caused to be created, and others).  If an approximation is not appropriate, then the system 1200 can determine how to correct the approximation (e.g., through implementation of an artificial intelligence technique) and correct the approximation.  Another check can occur, this can repeat if appropriate, and the outputted map 1220 can be outputted.  In one embodiment, approximations can be noted (e.g., in a file associated with the outputted map 1220) and as new map information is gathered, the approximations can be replaced with real map information, approximations can be modified as new information is available, and others.

In one embodiment, the outputted map 1220, the video game output 630 of Figure 6, the rendered map 120, and others can be checked for accuracy after production.  In one example, the examination component 1105 can compare the rendered map 120 of Figure 1 against the map data set 115 of Figure 1 to determine if the rendered map 120 of Figure 1 is an accurate representation of the map data set 115 and/or actual location.  If the rendered map 120 of Figure 1 is not an accurate representation, then the rendered map 120 of Figure 1 can be corrected, a subsequent rendered map can be generated, an error message can be presented, etc.  In one embodiment, to avoid correction, ~~then~~ the rendered map 120 of Figure 1 can have a similarity threshold to the map data set 115 of Figure 1 (e.g., rendered map 120 of Figure 1 [[be]]is X% similar to the map data set 115 of Figure 1).

In one example, a football video game can be released with an error (e.g., a rendered stadium can show a running track around a field when a real stadium upon which the rendered stadium is based has no track).  A user can submit information that an error occurred, an inference can be drawn that users are using a map editor to correct the error, a comparison can be made with photographic evidence publically available (e.g., off an Internet map application), and others.  A result can occur where new releases and/or existing releases can be updated correcting the error (e.g., updated automatically).  In one example, a stadium can be rendered correctly (e.g., as the rendered map 120 of Figure 1), but over a season or over time a change can occur.  In one example,

lighting poles can be painted from one color to another.  When this information is learned, an update can occur (e.g., occur proactively).

Figure 13 illustrates one embodiment of a system 1300 that includes the examination component 1105, the identification component 1110, the composition component 1210, and a database component 1305.  The system 1300 can incorporate the analysis component 105 of Figure 1, production component 110 of Figure 1, the collection component 605 of Figure 6, and/or the render component 610 of Figure 6.  Map information 1310 can be collected by the system 1300. The examination component 1105 can analyze the map information 1310 and based on this analysis, the identification component 1110 can identify map information 1310 that can be used to create a map 1320 (e.g., the ~~map a~~ rendered map 120 of Figure 1 produced by the production component 110 of Figure 1).

In one embodiment, the system 1300 is part of a network that shares a database 1315.  The database 1315 can retain maps that can be made available to network members (e.g., on a wired network, on a wifi network, on a super wifi network, and others).   The map 1320 (e.g., the outputted map 1220 of Figure 12, the rendered map 120 of Figure 1, etc.) can be retained on the database 1315 (e.g., in addition to transferring the map to a designated destination).

In one embodiment, the system 1300 can receive a request for a map 1320 (e.g., a map of Normandy, France on June 6, 1944).  A check can occur by the system 1300 (e.g., by the examination component 1105) to determine if the database 1315 includes the map 1320.  If the database 1315 does include the map 1320, then the system 1300 is caused to output the map 1320 (e.g., cause the map 1320 to be sent directly from the database 1315).  If the database 1315 does not include the map 1320, system 1300 can create the map 1320 (e.g., as the map of Normandy, France on June 6, 1944).

In one embodiment, a check is performed to determine if the database 1315 does not include the map 1320.  However, the database 1315 may include a modern-day map of Normandy, France.  The system 1300 can gather the modern-day map of Normandy, France and collect historical information about Normandy, France on June 6, 1944.  The composition component 1210 can modify (e.g., modify a local copy) and/or base a new map off the modern-day map of Normandy, France.

In one embodiment, the database 1315 is in a central location. In one embodiment, the database 1315 is distributed across a network of nodes. In one embodiment, the database 1315 is distributed across individual units (e.g., individual game consoles).

Figure 14 illustrates one embodiment of a network 1400. The network 1400 can include a first game console 1405 and a second game console 1410. The first game console 1405 and/or the second game console 1410 can incorporate the analysis component 105 of Figure 1, production component 110 of Figure 1, the collection component 605 of Figure 6, and/or the render component 610 of Figure 6 (e.g., a combination thereof). The first game console 1405 can retain a first map 1415 and the second game console 1410 can retain a second map 1420. The network 1400 can be a local network, a network over the Internet, and others. While shown with two game consoles and two maps, it is to be appreciated that the network 1400 can include more than two game consoles, more than two maps, any one particular game console can retain more than one map, and others.

The network 1400 can function such that individual game consoles can have access to a vast amount of maps while retaining relatively few maps locally. In one example, the first game console 1405 retains first map 1415 locally. However, first game console 1405 can have access to the second map 1420 retained on second game console 1410.

In one embodiment, a player using first game console 1405 can request to play second map 1420. A permission and/or security check can occur and based on a positive result, the player can play second map 1420. In one example, a check is made to determine if the player using first game console 1405 makes first map 1415 available to other game consoles. Sharing or exchange schemes can be enforced according to ratios, purchase, bargaining, trading, credits or money, and other methods of map-swapping including user preferences, map popularity and availability, resource intensity or size, relationship or friend status, necessity (e.g., to play in a tournament or with friends), and a variety of other techniques. In an embodiment, one user can give a specific map away for free while another requires an exchange. In one embodiment, users are designated to offer the same map (or other information) for the same value.

In one embodiment, the first map 1415 and the second map 1420 are maps depicting a specific location (e.g., both maps are of Lake Erie). The maps can be identical or be different (e.g., one map is of a higher quality than the second map, the maps have contrasting information, the first map 1415 is configured for a fishing game and has a relatively large amount of fishing data

while the second map 1420 is boating map that has a relatively large amount of wave information, and others).  A search can occur for a map of the specific location.  A component can determine which map to access.  In one example, if the maps are identical, then a component can select a map (e.g., a cheaper map can be selected, a map that can be downloaded faster can be selected, and others).  In one example, if the maps are different, then a component can select a map (e.g., if a player wants to used a searched map a fishing game, then the first map 1415 is selected; if the player wants to use the searched map in an first person shooter game, then a determination can be made on which map can be more easily converted and/or has more useful metadata (e.g., wave information that can impact travelling on the water) and that map can be selected; and others).

In one embodiment, second map 1420 is downloaded onto first game console 1405 and retained (e.g., saved after play is completed, temporarily retained until done playing, and/or others).  In one embodiment, the first game console 1405 can play the second map 1420 while keeping the second map 1420 on the second game console 1410.  In one embodiment, maps (e.g., first map 1415 and second map 1420) are distributed among game consoles (e.g., first game console 1405 and second game console 1410) and/or other locations (e.g., databases).  In one embodiment, in response to a request by a player on first game console 1405 to play second map 1420, second map 1420 can be retained on first game console 1405 and first map 1415 can be removed off first game console 1405 and retained on second game console 1410 (e.g., first game console 1405 and second game console 1410 switch locally-stored maps).

In one embodiment, first map 1415 and second map 1420 can be gaming maps for use in a shooter video game (e.g., first-person shooter).  In one embodiment, first map 1415 and second map 1420 can be based on real-world areas and rendered by the system 100 of Figure 1.  In one example, first map 1415 can be used in a real-world combat simulation game of a city in Iraq and second map 1420 can be used in a fictional space invasion combat arcade game.  The system 100 of Figure 1 can use a component to modify (e.g., intelligently modify) a map to make a map more game combat friendly.  In an embodiment, first map 1415 can be used on first game console 1405 as a racing video game map, and used on second game console 1410 as a shooter video game map.  Features (e.g. resolution, detail, background interaction, background behavior, and others) can be adjusted to better accommodate the particular gaming (or other) context to which a particular map is applied.  In one embodiment, a map can be converted from a first type (e.g., a shooter map) to a second type (e.g., a racing map).

28

A security component can be used to determine if rendering should occur, to stop a rendering from occurring, and others. In one example, a child can request that a map be rendered of his school for a first-person shooter game. While the map may be rendered from available information (e.g., information from a map application, publically available blueprints, photographs from a social networking site that show decorations, content from a school website, academic or educational games and applications, and others), there may be a social desire to not enable a student to play a game where shootings can happen in school. Therefore, the security component can stop the rendering from occurring, report the requested rendering, stop the rendering if the requestor meets a metric (e.g., is a student at the school, is underage, and others), and others. In one embodiment, the security component is integrated as part of the production component 110 of Figure 1.

The following methodologies are described with reference to figures depicting the methodologies as a series of blocks. These methodologies may be referred to as methods, processes, and others. While shown as a series of blocks, it is to be appreciated that the blocks can occur in different orders and/or concurrently with other blocks. Additionally, blocks may not be required to perform a methodology. For example, if an example methodology shows blocks 1, 2, 3, and 4, it may be possible for the methodology to function with blocks 1-2-4, 1-2, 3-1-4, 2, 1-2-3-4, and others. Blocks may be wholly omitted, re-ordered, repeated or appear in combinations not depicted. Individual blocks or groups of blocks may additionally be combined or separated into multiple components. Furthermore, additional and/or alternative methodologies can employ additional, not illustrated blocks, or supplemental blocks not pictured can be employed in some models or diagrams without deviating from the spirit of the features. In addition, at least a portion of the methodologies described herein may be practiced on a computer-readable medium storing computer-executable instructions that when executed by a computer cause the computer to perform a methodology (e.g., method).

Figure 15 illustrates one embodiment of a method 1500 that includes retaining a video game content at a first location 1505 and causing the video game content to be available to a second location 1510. The method 1500 can function in association with the network 1400 of Figure 14. In one embodiment, the first game console 1405 of Figure 14 can be the first location, the second game console 1410 of Figure 14 can be the second location, the first map 1415 of Figure 14 and/or the second map 1420 of Figure 14 can be the video game content. In one embodiment, the video

game content (e.g., rendered map 120 of Figure 1, video game output 630 of Figure 6, etc.) can be produced and then retained at 1505 by the production component 110 of Figure 1 (e.g., retained in a computer-readable medium, retained in a computer-readable medium by a processor functioning as the production component 110 of Figure 1).  In one embodiment, the production component 110 of Figure 1 causes the video game content to be available at 1510

In one embodiment, the first location 1505 is a first video game console, the second location 1510 is a second video game console, and ~~where~~ the first video game console is remote to the second video game console.  In one embodiment, the video game content is distributed across the first location 1505 and the second location 1510 and/or stored at the first location 1505 or second location 1510 alone.  In one embodiment, the video game content is a video game map.  In one embodiment, the video game content is created at the first location 1505.  In one embodiment, the video game content is created at the second location 1510.  In one embodiment, the video game content is created at a separate location (e.g., a computer system at a company office that is then sent to the first location 1505).  In one embodiment, the video game content is a first video game content (e.g., the first map 1415 of Figure 14) and where the second video game console (e.g., the second game console 1410 of Figure 14) retains a second video game content (e.g., the second map 1420 of Figure 14) that is available to the first video game console (e.g., the first game console 1405 of Figure 14).

Figure 16 illustrates one embodiment of a method 1600 that includes retaining a video game content at [[a]]the first location 1505 of Figure 15 and causing the video game content to be available to [[a]]the second location 1510 of Figure 15.  At 1605, a physical information set is obtained (e.g., in response for a video game content request from entered at the first location 1505 of Figure 15).  In one embodiment, the physical information is obtained by the collection component 605 of Figure 6.  At 1610, the physical information set is evaluated.  This evaluation can be performed by the analysis component 105 of Figure 1 and/or the examination component 1105 of Figure 11.  The video game content can be produced at 1615.  This production can be based, at least in part, on a result from evaluating the physical information set at 1610.  In one embodiment, this production can be performed by the production component 110 of Figure 1 and/or the render component 610 of Figure 6.

Figure 17 illustrates one embodiment of a method 1700 that resolves a difference between maps.  At 1705, the method 1700 can process maps (e.g., collect maps, evaluate maps, compare

30

maps against one another, compare maps against other information, ~~process a map~~, and others). Based on map processing, a determination can be made on map differences at 1710 (e.g., if at least one map difference exists, why a map difference exists, and others). At 1715, a determination can be made on how to resolve a map difference. At 1720, a resolution to resolve the map difference can be caused to implement (e.g., send an instruction to the production component 110 of Figure 1 on how to create a map, the production component 110 of Figure 1 makes the resolution, etc.). In one embodiment, a solution to resolve the map difference can be tested before implementation.

Figure 18 illustrates one embodiment of a method 1800 that causes a map to be made (e.g., a new map to be created, a map to be modified, a map to be replaced, and others). Information (e.g., the map data set 115 of Figure 1) can be collected at 1805. Information can include map application information, request information, information found off the Internet and others. Information can be collected passively (e.g., sent to a computer-readable medium operating the method 1800) and/or actively (e.g., the computer-readable medium operating the method 1800 seeks out information).

The information can be analyzed at 1810. At 1815, a determination can be made on how to make a map (e.g., based on a result of the analysis). In one embodiment, the information collected at 1805 includes instructions and/or format data for a device that may ultimately use the map. At 1820, a map can be caused to be made (e.g., according to a manner determined at 1815). In one embodiment, the map can be made and caused to be displayed, caused to be used in an application (e.g., software application), and others.

Figure 19 illustrates one embodiment of a town grouping 1900. The town grouping 1900 can include various towns (e.g., Towns A-I). In one example, the town grouping 1900 represents a larger organization (e.g., Towns A-I form a county J).

An interface can be presented to a person that enables the person to designate an area for rendering (e.g., by the production component 110 of Figure 1, by the render component 610 of Figure 6, etc.). In one example, the person can access a personal computer and use a mouse and keyboard to designate a selected area 1905. A map of the selected area 1905 can be rendered and transferred (e.g., to a personal computer, to a game console, to a computer-readable medium, and others). While shown as a rectangle, it is to be appreciated that the selected area can be various shapes and/or arrangements.

In addition, a map can be rendered with a three-dimensional component (e.g., render from ground level to 'x' distance in the air). The selected area 1905 can designate a third dimensional limit and/or one can be inferred. As described above, maps can be altered to fit a particular usage context. For example, one usage can be entirely two-dimensional, another can be three-dimensional wherein the third dimension is treated as background or environment, and still another usage context can involve travel through three dimensions wherein the third dimension is actively engaged with the particular use.

Additionally, an inference can be drawn on how to render map boundaries (e.g., how high to make a third dimension). In one embodiment, a map can be rendered for a racing game. In this embodiment, rendering can be limited to a height of an upper limit of a car windshield. In one embodiment, for specific situations (e.g., an in-game car flips over), a more generic setting can be shown (e.g., non-accurately rendered, but resembling other scenery).

Figure 20 illustrates one embodiment of an interface 2000. A creation component can create the interface 2000 and the interface can be disclosed (e.g., caused to be disclosed). In one embodiment, the creation component is part of the system 1000 of Figure 10 and the interface facilitates the request 1025 (e.g., by filling out the interface 2000, the request 1025 is generated). Disclosure of the interface 2000 can occur in response to a command, in response to an inference (e.g., conversation of players wishing they could play a game on a particular circuit), and others. The creation component can identify information that could be beneficial in knowing to create a map and produce the interface 2000. In one embodiment, a person creates the interface 2000 (e.g., a programmer, a player, and others). At least some fields of the interface 2000 can be populated with data and based, at least in part, on the data a map can be rendered.

Figure 21 illustrates one embodiment of a system 2100 that may be used in practicing at least one aspect disclosed herein. The system 2100 includes a transmitter 2105 and a receiver 2110. In one or more embodiments, the transmitter 2105 can include reception capabilities and/or the receiver 2110 can include transmission capabilities. In one embodiment, the system 100 of Figure 1 includes the transmitter 2105 and/or the receiver 2110. In one embodiment, the receiver 2110 integrates with and/or functions as the collection component 605 of Figure 6 and the transmitter 2105 integrates with and/or functions as the render component 610 of Figure 6. In one embodiment, the system 100 of Figure 1 and/or the system 600 of Figure 6 integrate with the system 2100 on a mobile device.

The transmitter 2105 and receiver 2110 can each function as a client, a server, and others. The transmitter 2105 and receiver 2110 can each include a computer-readable medium used in operation. The computer-readable medium may include instructions that are executed by the transmitter 2105 or receiver 2110 to cause the transmitter 2105 or receiver to perform a method.

5   The transmitter 2105 and receiver 2110 can engage in a communication with one another. This communication can over a communication medium. Example communication mediums include an intranet, an extranet, the Internet, a secured communication channel, an unsecure communication channel, radio airwaves, a hardwired channel, a wireless channel, and others. Example transmitters 2105 include a base station, a personal computer, a cellular telephone, a

10   personal digital assistant, and others. Example receivers 2110 include a base station, a cellular telephone, personal computer, personal digital assistant, and others. The example system 2100 may function along a Local Access Network (LAN), Wide Area Network (WAN), and others. The aspects described are merely an example of network structures and intended to generally describe, rather than limit, network and/or remote applications of features described herein.

15   Figure 22 illustrates one embodiment of a system 2200, upon which at least one aspect disclosed herein can be practiced. In one embodiment, the system 2200 can be considered a computer system that can function in a stand-alone manner as well as communicate with other devices (e.g., a central server, communicate with devices through data network (e.g., Internet) communication, etc). Information can be displayed through use of a monitor 2205 and a user can

20   provide information through an input device 2210 (e.g., keyboard, mouse, touch screen, etc.). In one embodiment, the monitor 2205 displays the interface 2000 of Figure 20. A connective port 2215 can be used to engage the system 2200 with other entities, such as a universal bus port, telephone line, attachment for external hard drive, and the like. Additionally, a wireless communicator 2220 can be employed (e.g., that uses an antenna) to wirelessly engage the system

25   2200 with another device (e.g., in a secure manner with encryption, over open airwaves, and others). A processor 2225 can be used to execute applications and instructions that relate to the system 2200. In one example, the processor 2225 executes at least one instruction associated with at least one of the analysis component 105 of Figure 1 or the production component 110 of Figure 1. In one example, the processor 2225 executes at least one instruction associated with at least one

30   of the collection component 605 of Figure 6 or the render component 610 of Figure 6. Storage can be used by the system 2200. The storage can be a form of a computer-readable medium.

33

Example storage includes random access memory 2230, read only memory 2235, or nonvolatile hard drive 2240.  In one embodiment, a memory (e.g., at least one of the random access memory 2230, read only memory 2235, and/or the nonvolatile hard drive 2240) retains instructions that cause a method disclosed herein to operate.  In one embodiment, the memory retains a database in accordance with at least one aspect disclosed herein.

The system 2200 may run program modules.  Program modules can include routines, programs, components, data structures, logic, etc., that perform particular tasks or implement particular abstract data types.  The system 2200 can function as a single-processor or multiprocessor computer system, minicomputer, mainframe computer, laptop computer, desktop computer, hand-held computing devices, microprocessor-based or programmable consumer electronics, and the like.

It is to be appreciated that aspects disclosed herein can be practiced through use of artificial intelligence techniques.  In one example, a determination or inference described herein can, in one embodiment, be made through use of a Bayesian model, Markov model, statistical projection, neural networks, classifiers (e.g., linear, non-linear, etc.), using provers to analyze logical relationships, rule-based systems, or other technique.

While example systems, methods, and so on have been illustrated by describing examples, and while the examples have been described in considerable detail, it is not the intention of the applicants to restrict or in any way limit the scope of the appended claims to such detail.  It is, of course, not possible to describe every conceivable combination of components or methodologies for purposes of describing the systems, methods, and so on described herein.  Therefore, innovative aspects are not limited to the specific details, the representative apparatus, and illustrative examples shown and described.  Thus, this application is intended to embrace alterations, modifications, and variations that fall within the scope of the appended claims.

Functionality described as being performed by one entity (e.g., component, hardware item, and others) may be performed by other entities, and individual aspects can be performed by a plurality of entities simultaneously or otherwise.  For example, functionality may be described as being performed by a processor.  One skilled in the art will appreciate that this functionality can be performed by different processor types (e.g., a single-core processor, quad-core processor, etc.), different processor quantities (e.g., one processor, two processors, etc.), a processor with other entities (e.g., a processor and storage), a non-processor entity (e.g., mechanical device), and others.

In addition, unless otherwise stated, functionality described as a system may function as part of a method, an apparatus, a method executed by a computer-readable medium, and other embodiments may be implemented in other embodiments.  In one example, functionality included in a system may also be part of a method, apparatus, and others.

5      Where possible, example items may be combined in at least some embodiments.  In one example, example items include A, B, C, and others.  Thus, possible combinations include A, AB, AC, ABC, AAACCCC, AB, ABCD, and others.  Other combinations and permutations are considered in this way, to include a potentially endless number of items or duplicates thereof.

10

ABSTRACT

Systems, methods, and other embodiments associated with output production are described.  One example system comprises an analysis component configured to analyze a data set to produce an evaluation result.  The system also comprises a production component

5    configured to produce a rendered output based, at least in part, on the evaluation result, where the rendered output is stored in a computer-readable medium.

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 32918416 |
| **Application Number:** | 13194946 |
| **International Application Number:** | |
| **Confirmation Number:** | 1966 |
| **Title of Invention:** | OUTPUT PRODUCTION |
| **First Named Inventor/Applicant Name:** | Ronald Charles Krosky |
| **Customer Number:** | 85449 |
| **Filer:** | Brendan Edward Clark |
| **Filer Authorized By:** | |
| **Attorney Docket Number:** | CI108USA |
| **Receipt Date:** | 17-JUN-2018 |
| **Filing Date:** | 30-JUL-2011 |
| **Time Stamp:** | 19:52:03 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | no |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Amendment after Notice of Allowance (Rule 312) | CI108USA_312_Amendment.pdf | 132146<br><br>bacd1b7a9270205c68ca64d31be9c04060804e06d | no | 9 |

**Warnings:**

| Information: | | | | | |
|---|---|---|---|---|---|
| 2 | Specification | CI108USA_Substitute_Specification_Clean.pdf | 215326<br><br>082d074e88e4b18584ffd164241b6262f5dc0ba2 | no | 36 |
| Warnings: | | | | | |
| Information: | | | | | |
| 3 | Specification | CI108USA_Substitute_Specification_Redline.pdf | 217696<br><br>28042f8194473ba700ccefabaa2daa181fef7f2c | no | 36 |
| Warnings: | | | | | |
| Information: | | | | | |
| **Total Files Size (in bytes):** | | | 565168 | | |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

<u>New Applications Under 35 U.S.C. 111</u>
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.
<u>National Stage of an International Application under 35 U.S.C. 371</u>
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.
<u>New International Application Filed with the USPTO as a Receiving Office</u>
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

UNITED STATES PATENT AND TRADEMARK OFFICE
COMMISSIONER FOR PATENTS
P.O.BOX 1450
ALEXANDRIA VA 22313-1451

PRESORTED
FIRST-CLASS MAIL
U.S. POSTAGE PAID
POSTEDIGITAL
NNNNN

BCRK
19530 Telbir Ave.
Rocky River, OH 44116



## Courtesy Reminder for
## Application Serial No: 13/194,946

Attorney Docket No: CI108USA
Customer Number: 85449
Date of Electronic Notification: 05/30/2018

This is a courtesy reminder that new correspondence is available for this application. If you have not done so already, please review the correspondence. The official date of notification of the outgoing correspondence will be indicated on the form PTOL-90 accompanying the correspondence.

An email notification regarding the correspondence was sent to the following email address(es) associated with your customer number:
    ronald.krosky@gmail.com
    brendan.edward.clark@gmail.com

To view your correspondence online or update your email addresses, please visit us anytime at **https://sportal.uspto.gov/secure/myportal/privatepair.** If you have any questions, please email the Electronic Business Center (EBC) at EBC@uspto.gov or call 1-866-217-9197.



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# NOTICE OF ALLOWANCE AND FEE(S) DUE

| | | |
|---|---|---|
| 85449    7590    05/30/2018 | | |
| BCRK | | |
| 19530 Telbir Ave. | | |
| Rocky River, OH 44116 | | |

| EXAMINER |
|---|
| HOEL, MATTHEW D |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3714 | |

DATE MAILED: 05/30/2018

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 13/194,946 | 07/30/2011 | Ronald Charles Krosky | CI108USA | 1966 |

TITLE OF INVENTION: OUTPUT PRODUCTION

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | SMALL | $500 | $0 | $0 | $500 | 08/30/2018 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. PROSECUTION ON THE MERITS IS CLOSED. THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT. SEE 37 CFR 1.313 AND MPEP 1308.**

**THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN <u>THREE MONTHS</u> FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. <u>THIS STATUTORY PERIOD CANNOT BE EXTENDED.</u> SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOVE DOES NOT REFLECT A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE IN THIS APPLICATION. IF AN ISSUE FEE HAS PREVIOUSLY BEEN PAID IN THIS APPLICATION (AS SHOWN ABOVE), THE RETURN OF PART B OF THIS FORM WILL BE CONSIDERED A REQUEST TO REAPPLY THE PREVIOUSLY PAID ISSUE FEE TOWARD THE ISSUE FEE NOW DUE.**

**HOW TO REPLY TO THIS NOTICE:**

I. Review the ENTITY STATUS shown above. If the ENTITY STATUS is shown as SMALL or MICRO, verify whether entitlement to that entity status still applies.

If the ENTITY STATUS is the same as shown above, pay the TOTAL FEE(S) DUE shown above.

If the ENTITY STATUS is changed from that shown above, on PART B - FEE(S) TRANSMITTAL, complete section number 5 titled "Change in Entity Status (from status indicated above)".

For purposes of this notice, small entity fees are 1/2 the amount of undiscounted fees, and micro entity fees are 1/2 the amount of small entity fees.

II. PART B - FEE(S) TRANSMITTAL, or its equivalent, must be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed and an extra copy of the form should be submitted. If an equivalent of Part B is filed, a request to reapply a previously paid issue fee must be clearly made, and delays in processing may occur due to the difficulty in recognizing the paper as an equivalent of Part B.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Maintenance fees are due in utility patents issuing on applications filed on or after Dec. 12, 1980. It is patentee's responsibility to ensure timely payment of maintenance fees when due. More information is available at www.uspto.gov/PatentMaintenanceFees.**

PTOL-85 (Rev. 02/11)

**PART B - FEE(S) TRANSMITTAL**

Complete and send this form, together with applicable fee(s), to: **Mail**    Mail Stop ISSUE FEE
Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia 22313-1450
or **Fax**   (571)-273-2885

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

| 85449 | 7590 | 05/30/2018 |
|---|---|---|

BCRK
19530 Telbir Ave.
Rocky River, OH 44116

**Certificate of Mailing or Transmission**
I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being facsimile transmitted to the USPTO (571) 273-2885, on the date indicated below.

| | (Depositor's name) |
|---|---|
| | (Signature) |
| | (Date) |

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 13/194,946 | 07/30/2011 | Ronald Charles Krosky | CI108USA | 1966 |

TITLE OF INVENTION: OUTPUT PRODUCTION

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | SMALL | $500 | $0 | $0 | $500 | 08/30/2018 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| HOEL, MATTHEW D | 3714 | 463-031000 |

**1.** Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. **Use of a Customer Number is required.**

**2.** For printing on the patent front page, list

(1) The names of up to 3 registered patent attorneys or agents OR, alternatively,

(2) The name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 _____

2 _____

3 _____

**3.** ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document has been filed for recordation as set forth in 37 CFR 3.11. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE                                   (B) RESIDENCE: (CITY and STATE OR COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent) :   ☐ Individual   ☐ Corporation or other private group entity   ☐ Government

**4a.** The following fee(s) are submitted:

☐ Issue Fee
☐ Publication Fee (No small entity discount permitted)
☐ Advance Order - # of Copies _____

**4b.** Payment of Fee(s): (**Please first reapply any previously paid issue fee shown above**)

☐ A check is enclosed.
☐ Payment by credit card. Form PTO-2038 is attached.
☐ The director is hereby authorized to charge the required fee(s), any deficiency, or credits any overpayment, to Deposit Account Number _____ (enclose an extra copy of this form).

**5.** Change in Entity Status (from status indicated above)

☐ Applicant certifying micro entity status. See 37 CFR 1.29

☐ Applicant asserting small entity status. See 37 CFR 1.27

☐ Applicant changing to regular undiscounted fee status.

NOTE: Absent a valid certification of Micro Entity Status (see forms PTO/SB/15A and 15B), issue fee payment in the micro entity amount will not be accepted at the risk of application abandonment.

NOTE: If the application was previously under micro entity status, checking this box will be taken to be a notification of loss of entitlement to micro entity status.

NOTE: Checking this box will be taken to be a notification of loss of entitlement to small or micro entity status, as applicable.

NOTE: This form must be signed in accordance with 37 CFR 1.31 and 1.33. See 37 CFR 1.4 for signature requirements and certifications.

Authorized Signature _____                 Date _____

Typed or printed name _____                 Registration No. _____

PTOL-85 Part B (10-13) Approved for use through 10/31/2013.          OMB 0651-0033          U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 13/194,946 | 07/30/2011 | Ronald Charles Krosky | CI108USA | 1966 |

85449      7590      05/30/2018

BCRK
19530 Telbir Ave.
Rocky River, OH 44116

| EXAMINER |
|---|
| HOEL, MATTHEW D |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3714 | |

DATE MAILED: 05/30/2018

## Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
(Applications filed on or after May 29, 2000)

The Office has discontinued providing a Patent Term Adjustment (PTA) calculation with the Notice of Allowance.

Section 1(h)(2) of the AIA Technical Corrections Act amended 35 U.S.C. 154(b)(3)(B)(i) to eliminate the requirement that the Office provide a patent term adjustment determination with the notice of allowance. See Revisions to Patent Term Adjustment, 78 Fed. Reg. 19416, 19417 (Apr. 1, 2013). Therefore, the Office is no longer providing an initial patent term adjustment determination with the notice of allowance. The Office will continue to provide a patent term adjustment determination with the Issue Notification Letter that is mailed to applicant approximately three weeks prior to the issue date of the patent, and will include the patent term adjustment on the patent. Any request for reconsideration of the patent term adjustment determination (or reinstatement of patent term adjustment) should follow the process outlined in 37 CFR 1.705.

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at 1-(888)-786-0101 or (571)-272-4200.

PTOL-85 (Rev. 02/11)

## OMB Clearance and PRA Burden Statement for PTOL-85 Part B

The Paperwork Reduction Act (PRA) of 1995 requires Federal agencies to obtain Office of Management and Budget approval before requesting most types of information from the public. When OMB approves an agency request to collect information from the public, OMB (i) provides a valid OMB Control Number and expiration date for the agency to display on the instrument that will be used to collect the information and (ii) requires the agency to inform the public about the OMB Control Number's legal significance in accordance with 5 CFR 1320.5(b).

The information collected by PTOL-85 Part B is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450. Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## Privacy Act Statement

**The Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

| ***Notice of Allowability*** | **Application No.** 13/194,946 | **Applicant(s)** KROSKY ET AL. | |
|---|---|---|---|
| | **Examiner** Matthew D. Hoel | **Art Unit** 3714 | **AIA (First Inventor to File) Status** No |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☒ This communication is responsive to _03/18/2018_.

    ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on_____.

2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on ____; the restriction requirement and election have been incorporated into this action.

3. ☒ The allowed claim(s) is/are _5,68 and 71-88_. As a result of the allowed claim(s), you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov.

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    **Certified copies:**

        a) ☐ All    b) ☐ Some    *c) ☐ None of the:

            1. ☐ Certified copies of the priority documents have been received.

            2. ☐ Certified copies of the priority documents have been received in Application No. _____ .

            3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

    * Certified copies not received: _____.

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application. **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ CORRECTED DRAWINGS ( as "replacement sheets") must be submitted.

    ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____.

    **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**

1. ☒ Notice of References Cited (PTO-892)

2. ☐ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date _____

3. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material

4. ☐ Interview Summary (PTO-413), Paper No./Mail Date _____ .

5. ☐ Examiner's Amendment/Comment

6. ☒ Examiner's Statement of Reasons for Allowance

7. ☐ Other _____.

/OMKAR DEODHAR/
Primary Examiner, Art Unit 3714

Application/Control Number: 13/194,946                                      Page 2
Art Unit: 3714

The present application is being examined under the pre-AIA first to invent

provisions.


### *Allowable Subject Matter*

Claims 5, 68, and 71 to 88 are allowed.

Application/Control Number: 13/194,946                                                    Page 3
Art Unit: 3714

## REASONS FOR ALLOWANCE

The following is an examiner's statement of reasons for allowance: The closest
prior art is Mori (7,736,220 B2); Huston, et al. (6,146,143 A); and Yoshida, et al.
(6,652,376 B1).  Mori pertains to collisions with sidewalls and resistance from road
conditions.  Huston pertains to vehicle tracks left in the snow that impede the
performance of subsequent vehicles.  Yoshida pertains to leaving skidmarks on a track
in a racing game.  None of these references pertains to the skidmarks or heat gradients
on the road surface impeding the traction or performance of vehicles in subsequent laps
as claimed.  The examiner respects that the applicants may have different reasons for
allowance.

Any comments considered necessary by applicant must be submitted no later
than the payment of the issue fee and, to avoid processing delays, should preferably
accompany the issue fee.  Such submissions should be clearly labeled "Comments on
Statement of Reasons for Allowance."

Application/Control Number: 13/194,946                                        Page 4
Art Unit: 3714

### *Citation of Pertinent Prior Art*

The prior art made of record and not relied upon is considered pertinent to applicant's disclosure.  U.S. Patent Publications 2003/0130031 A1; 9,174,652 B2; 8,167,693 B2; 8,012,005 B2; 7,674,167 B2; 9,643,086 B2; 4,148,485 A; 4,500,868 A; 5,366,376 A; 5,707,237 A; 5,921,780 A; 6,200,138 B1; 7,454,715 B2; 7,744,451 B2; 7,749,057 B2; 7,785,178 B2; 7,837,544 B2; 8,133,115 B2; 8,371,915 B2; 8,425,293 B2; 6,422,939 B1; 6,417,854 B1; 6,174,186 B1; 6,053,815 A; 5,607,308 A; 5,368,484 A; and 5,269,687 A teach racing games or driving simulators.  U.S. Patents 5,286,099 A; 7,953,521 B2; and 8,694,236 B2 teach traction control in vehicles.  U.S. Pre-Grant Publication 2003/0153374 A1 teaches deceleration when a vehicle goes off-course.

## *Conclusion*

Any inquiry concerning this communication or earlier communications from the examiner should be directed to Matthew D. Hoel whose telephone number is (571)272-5961.  The examiner can normally be reached on 8:00 A.M. to 4:30 P.M..

Examiner interviews are available via telephone, in-person, and video conferencing using a USPTO supplied web-based collaboration tool. To schedule an interview, applicant is encouraged to use the USPTO Automated Interview Request (AIR) at http://www.uspto.gov/interviewpractice.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, David L. Lewis can be reached on (571) 272-7673.  The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system.  Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service Representative or access to the automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/M. D. H./

Examiner, Art Unit 3714

Application/Control Number: 13/194,946                                    Page 6
Art Unit: 3714

/OMKAR DEODHAR/

Primary Examiner, Art Unit 3714

| | | | | | | |
|---|---|---|---|---|---|---|
| ***Notice of References Cited*** | | Application/Control No.<br>13/194,946 | | Applicant(s)/Patent Under Reexamination<br>KROSKY ET AL. | | |
| | | Examiner<br>Matthew D. Hoel | | Art Unit<br>3714 | Page 1 of 3 | |

**U.S. PATENT DOCUMENTS**

| * | | Document Number<br>Country Code-Number-Kind Code | Date<br>MM-YYYY | Name | CPC Classification | US Classification |
|---|---|---|---|---|---|---|
| * | A | US-7,736,220 B2 | 06-2010 | Mori; Kazuhiro | A63F13/10 | 463/23 |
| * | B | US-6,146,143 A | 11-2000 | Huston; Genevieve | G09B9/05 | 345/620 |
| * | C | US-6,652,376 B1 | 11-2003 | Yoshida; Shigeru | A63F13/10 | 463/6 |
| * | D | US-2003/0130031 A1 | 07-2003 | Yoshida, Shigeru | A63F13/10 | 463/23 |
| * | E | US-9,174,652 B2 | 11-2015 | Chang; Hsuan | B60W50/14 | 1/1 |
| * | F | US-8,167,693 B2 | 05-2012 | Fujii; Daisuke | A63F13/10 | 340/953 |
| * | G | US-8,012,005 B2 | 09-2011 | Ohta; Keizo | A63F13/10 | 463/6 |
| * | H | US-7,674,167 B2 | 03-2010 | Ohta; Keizo | A63F13/10 | 463/59 |
| * | I | US-9,643,086 B2 | 05-2017 | Tipping; Michael | A63F13/5375 | 1/1 |
| * | J | US-4,148,485 A | 04-1979 | Rains; Lyle V. | A63F13/005 | 463/31 |
| * | K | US-4,500,868 A | 02-1985 | Tokitsu; Naoki | B60K35/00 | 180/282 |
| * | L | US-5,366,376 A | 11-1994 | Copperman; Norman S. | A63F13/005 | 273/148B |
| * | M | US-5,707,237 A | 01-1998 | Takemoto; Takatoshi | A63F13/08 | 348/121 |

**FOREIGN PATENT DOCUMENTS**

| * | | Document Number<br>Country Code-Number-Kind Code | Date<br>MM-YYYY | Country | Name | CPC Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

**NON-PATENT DOCUMENTS**

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

U.S. Patent and Trademark Office
PTO-892 (Rev. 01-2001)                     **Notice of References Cited**                     Part of Paper No. 20180328

| | | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|---|
| **Notice of References Cited** | | 13/194,946 | KROSKY ET AL. |
| | | Examiner | Art Unit | |
| | | Matthew D. Hoel | 3714 | Page 2 of 3 |

**U.S. PATENT DOCUMENTS**

| * | | Document Number<br>Country Code-Number-Kind Code | Date<br>MM-YYYY | Name | CPC Classification | US Classification |
|---|---|---|---|---|---|---|
| * | A | US-5,921,780 A | 07-1999 | Myers; Nicole J. | G09B9/05 | 434/29 |
| * | B | US-6,200,138 B1 | 03-2001 | Ando; Takeshi | A63F13/10 | 273/148B |
| * | C | US-7,454,714 B2 | 11-2008 | Totman; Scott V. | G06F3/0482 | 715/810 |
| * | D | US-7,744,451 B2 | 06-2010 | Tipping; Michael | A63F13/10 | 434/62 |
| * | E | US-7,749,057 B2 | 07-2010 | Tipping; Michael | A63F13/10 | 434/62 |
| * | F | US-7,785,178 B2 | 08-2010 | Tipping; Michael E. | A63F13/10 | 463/6 |
| * | G | US-7,837,544 B2 | 11-2010 | Tipping; Michael | A63F13/10 | 434/62 |
| * | H | US-8,133,115 B2 | 03-2012 | Campbell; Scott | A63F13/10 | 463/31 |
| * | I | US-8,371,915 B2 | 02-2013 | Tipping; Michael E. | A63F13/10 | 463/31 |
| * | J | US-8,425,293 B2 | 04-2013 | Tipping; Michael | A63F13/10 | 434/62 |
| * | K | US-6,422,939 B1 | 07-2002 | Koyama; Shigeo | A63F13/10 | 463/6 |
| * | L | US-6,417,854 B1 | 07-2002 | Isowaki; Takashi | A63F13/10 | 345/473 |
| * | M | US-6,174,186 B1 | 01-2001 | Hashiguchi; Osamu | G06K7/0013 | 439/260 |

**FOREIGN PATENT DOCUMENTS**

| * | | Document Number<br>Country Code-Number-Kind Code | Date<br>MM-YYYY | Country | Name | Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

**NON-PATENT DOCUMENTS**

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages |
|---|---|---|
| | U | |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

| | Notice of References Cited | | Application/Control No. 13/194,946 | | Applicant(s)/Patent Under Reexamination KROSKY ET AL. | |
|---|---|---|---|---|---|---|
| | | | Examiner Matthew D. Hoel | | Art Unit 3714 | Page 3 of 3 |

**U.S. PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Name | CPC Classification | US Classification |
|---|---|---|---|---|---|---|
| * | A | US-6,053,815 A | 04-2000 | Hara; Yoshiteru | A63F13/08 | 434/66 |
| * | B | US-5,607,308 A | 03-1997 | Copperman; Norman S. | A63F13/005 | 273/148B |
| * | C | US-5,368,484 A | 11-1994 | Copperman; Norman S. | A63F13/005 | 273/148B |
| * | D | US-5,269,687 A | 12-1993 | Mott; Stephanie J. | A63F13/10 | 273/454 |
| * | E | US-5,286,099 A | 02-1994 | Fujita; Yasuhiko | B60T7/22 | 180/271 |
| * | F | US-7,953,521 B2 | 05-2011 | Tipping; Michael | G05B13/0265 | 273/442 |
| * | G | US-8,694,236 B2 | 04-2014 | Takagi; Kiyokazu | G01S17/936 | 701/300 |
| * | H | US-2003/0153374 A1 | 08-2003 | Gilmore, Anell | G07F17/32 | 463/6 |
| | I | US- | | | | |
| | J | US- | | | | |
| | K | US- | | | | |
| | L | US- | | | | |
| | M | US- | | | | |

**FOREIGN PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Country | Name | Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

**NON-PATENT DOCUMENTS**

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

**EAST Search History**

**EAST Search History (Prior Art)**

| Ref # | Hits | Search Query | DBs | Default Operator | Plurals | Time Stamp |
|---|---|---|---|---|---|---|
| S1 | 122 | "tocci, pat".in. or "moyer, mike".in. or "nbcuniversal".as. | US-PGPUB; USPAT; USOCR | OR | ON | 2018/02/21 18:54 |
| S2 | 5936 | G06Q10/0639.CPC. | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2018/02/21 18:59 |
| S3 | 2940 | G06Q50/20.CPC. | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2018/02/21 18:59 |
| S4 | 2449 | 700/91-93.CCLS. | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2018/02/21 18:59 |
| S5 | 3483 | G06Q10/06393.CPC. | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2018/02/21 19:03 |
| S6 | 2385 | G06Q10/06395.CPC. | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2018/02/21 19:03 |
| S7 | 4012 | G06Q50/34.CPC. | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2018/02/21 19:04 |
| S8 | 4877 | A63B24/00.CPC. | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; | OR | ON | 2018/02/21 19:06 |

| | | | DERWENT; IBM_TDB | | | |
|---|---|---|---|---|---|---|
| S9 | 7370 | A63B24/0062.CPC. | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2018/02/21 19:08 |
| S10 | 1418 | A63B24/0084.CPC. | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2018/02/21 19:08 |
| S11 | 4566 | A63B71/06.CPC. | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2018/02/21 19:10 |
| S12 | 1883 | A63B71/0669.CPC. | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2018/02/21 19:10 |
| S13 | 4858 | A63B2071/0694.CPC. | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2018/02/21 19:11 |
| S14 | 68 | A63B2244/108.CPC. | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2018/02/21 19:12 |
| S15 | 5 | "national wrestling coaches association".as. | US-PGPUB; USPAT; USOCR | OR | ON | 2018/02/21 19:16 |
| S18 | 191 | yoshida.in. and 463/$.ccls. | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2018/02/27 19:18 |
| S19 | 10 | ("2003/0130031").URPN. | USPAT | OR | ON | 2018/02/27 19:28 |
| S20 | 39 | ("4148485" \| "4500868" \| "4750888" \| "5286099" \| "5366376" \| "5683082" \| "5707237" \| "5921780" \| "5983161" \| "6146143" \| "6200138" \| "6241524").PN. | US-PGPUB; USPAT; USOCR | OR | ON | 2018/02/27 19:31 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | OR ("6652376").URPN. | | | | |
| S21 | 48 | ("4750888" \| "4760388" \| "4817948" \| "5017141" \| "5131848" \| "5184956" \| "5261820" \| "5269687" \| "5275565" \| "5277584" \| "5366376" \| "5415550" \| "5474453" \| "5547382" \| "5573402" \| "5660547").PN. OR ("6146143").URPN. | US-PGPUB; USPAT; USOCR | OR | ON | 2018/02/27 19:38 |
| S22 | 44 | ("20010008847" \| "20010016518" \| "20030153374" \| "20040113932" \| "3120389" \| "3171215" \| "4148485" \| "4210084" \| "4349744" \| "4439989" \| "4500868" \| "4679789" \| "5269687" \| "5368484" \| "5607308" \| "5623642" \| "5625575" \| "5683082" \| "5785630" \| "5921780" \| "5959613" \| "6053815" \| "6067096" \| "6171186" \| "6203426" \| "6213878" \| "6222546" \| "6222554" \| "6244959" \| "6278439" \| "6288727" \| "6366845" \| "6417854" \| "6422939" \| "6652376" \| "6679702" \| "6752716").PN. OR ("7736220").URPN. | US-PGPUB; USPAT; USOCR | OR | ON | 2018/02/27 19:40 |
| S23 | 817 | 463/6.ccls. | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2018/02/27 19:57 |
| S24 | 1369 | 463/58-69.ccls. | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2018/02/27 19:57 |
| S25 | 486 | 434/29.ccls. | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2018/02/27 19:58 |
| S26 | 1046 | 434/62-71.ccls. | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2018/02/27 19:59 |
| S27 | 16000 | 701/70-98.ccls. | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2018/02/27 20:04 |
| S28 | 14878 | 701/400-449.ccls. | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; | OR | ON | 2018/02/27 20:05 |

| | | | DERWENT; IBM_TDB | | | |
|---|---|---|---|---|---|---|
| S29 | 660 | A63F13/422.cpc. | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2018/02/27 20:07 |
| S30 | 1703 | A63F13/57.cpc. | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2018/02/27 20:08 |
| S31 | 1927 | A63F13/5375.cpc. | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2018/02/27 20:08 |
| S32 | 2628 | A63F13/803.cpc. | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2018/02/27 20:09 |
| S33 | 4303 | A63F2300/64,643.cpc. | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2018/02/27 20:11 |
| S34 | 3856 | A63F2300/69.cpc. | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2018/02/27 20:12 |
| S35 | 3527 | A63F2300/8017.cpc. | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2018/02/27 20:12 |
| S36 | 1619 | G09B9/04.cpc. | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2018/02/27 20:18 |
| S37 | 79 | G09B9/203.cpc. | US-PGPUB; USPAT; USOCR; | OR | ON | 2018/02/27 20:18 |

| | | | FPRS;<br>EPO; JPO;<br>DERWENT;<br>IBM_TDB | | | |
|---|---|---|---|---|---|---|

**EAST Search History (Interference)**

| Ref # | Hits | Search Query | DBs | Default Operator | Plurals | Time Stamp |
|---|---|---|---|---|---|---|
| S16 | 2862 | G06Q10/0639.CPC. | US-PGPUB;<br>USPAT | OR | ON | 2018/02/21<br>18:59 |
| S17 | 867 | G06Q50/20.CPC. | US-PGPUB;<br>USPAT | OR | ON | 2018/02/21<br>18:59 |

**3/29/2018 9:08:40 PM**
**C:\ Users\ mhoel\ Documents\ EAST\ Workspaces\ 13194946, 02-27-2018.wsp**

13194946-563230-NPL

**Report Information from ProQuest Dialog**

**Databases:** ABI/INFORM® Professional Advanced,  Abstracts in New Technology & Engineering,  British Library Inside Conferences,  CAB ABSTRACTS,  Computer and Information Systems Abstracts,  Ei Compendex®,  Ei EnCompassLIT,  Electronics & Communications Abstracts,  Gale Group Computer Database™,  Gale Group Newsletter Database™,  Inspec®,  Jane's Defense & Aerospace News,  Mechanical & Transportation Engineering Abstracts,  NTIS: National Technical Information Service,  ProQuest Newsstand Professional,  PsycINFO,  SciSearch®: a Cited Reference Science Database,  Social SciSearch®

**Search Strategy**

| Set# | Searched for | Results |
|------|-------------|---------|
| S16 | (s14 and s5) and (pd(<20101101)) | 35° |
| S15 | (s14 and s4) and (pd(<20101101)) | 1° |
| S14 | (s8 and s1) and (pd(<20101101)) | 210° |
| S13 | (s10 and s1) and (pd(<20101101)) | 39° |
| S12 | (s10 and s2) and (pd(<20101101)) | 19° |
| S11 | (s9 and s1) and (pd(<20101101)) | 0° |
| S10 | (s4 n/5 s5) and (pd(<20101101)) | 930° |
| S9 | (s2 n/10 s4) and (pd(<20101101)) | 50° |
| S8 | (s2 n/5 s3) and (pd(<20101101)) | 13118* |
| S7 | (s1 and s2 and s3 and s4 and s5) and (pd(<20101101)) | 5° |
| S6 | s1 and s2 and s3 and s4 and s5 | 18° |
| S5 | ((Following or follower or subsequent or tailing or trailing or after or later or behind) n/3 (vehicles or cars or trucks or coaches or cabs or automobiles or conveyance[*1] or drivers or player or players or users or participants)) | 6962100* |
| S4 | ((Slow[*3] or imped* or retard* or delay* or (cut p/0 down) or reduce) n/5 (velocity or accel* or speed or rate or momentum)) | 2216557* |

13194946-563230-NPL

| S3 | Appear[*3] or (laid p/0 down) or (show p/0 up) or made or make or creat[*4] or generat[*3] or produc[*3] or leav[*3] or left or placed | 296492340* |
|----|----|----|
| S2 | Skidmarks or ((skid* or tire or tyre) n/2 (tracks or mark or streaks or trails or remnant or scuffs)) | 108868* |
| S1 | Videogame or ((video or electronic or online or digital or arcade or computer) n/3 (gam[*3] or play* or gameplay)) or ((driv* or vehicle or road or rac[*3] or (grand p/0 prix) or (formula p/0 one) or tournament or contest) n/3 simulat*) | 3529992* |

\* Duplicates are removed from the search, but included in the result count.

° Duplicates are removed from the search and from the result count.

----------------------------------------

## Simulation for effective operation of NEV (Neighborhood Electric Vehicle)

**Author:** Yoon, Taekwan 1 ; Baik, Nam-Cheol 11 Korea Institute of Construction Technology, 1190, Simindae-Ro, 411-712, South Korea yoon0204@gmail.com ; ncl00@kict.re.kr

**Publication info:** 17th ITS World Congress Intelligent Transport Systems (ITS). (Jan 1, 2010)

**Abstract (English):** To share the lanes with common cars, traffic operation strategy is needed for NEV (Neighborhood Electric Vehicle). Because NEV cannot accelerate sharply as fast as common car include gasoline, diesel and LPG cars, they may interrupt traffic conditions and make traffic delay. After green lights turn on, all vehicles run through the street including NEV, but NEV have a maximum speed which is 50km/h. It can be an obstacle for following vehicles and will make traffic delay of the intersection. In this reason, we need to organize traffic systems like queue jump with priority traffic signal. To analyze the necessity for NEV road operations, we simulate three scenarios. First is that we examine the condition which is mixed NEV and cars on the road, the second one is that we set up lane only NEV can accepted in simulation and last one is making queue jump lane and providing priority signal for NEV. In conclusion, we can conclude that making lane only for NEV is effective when rate of NEVs is over 20%. Also queue jump lane and priority signal cannot make good effect to intersection delay and average speed.

**Conference:** 17th World Congress on Intelligent Transport Systems, ITS 2010

**Database:** Ei Compendex® (1800 - current)

**Document type:** Conference Paper

## Safe driving education through simulations based on actual driving data when entering a non-signalized intersection

**Author:** Takemoto, Masanori 1 ; Kosaka, Hiroaki 1 ; Nishitani, Hirokazu 1 ; Ueehi, Masaaki 2 ; Sasaki, Kazuya 21 Nara Institute of Science and Technology, Japan 2 Toyota Motor Corporation, Japan

13194946-563230-NPL

**Publication info:** FISITA World Automotive Congress 2008, Congress Proceedings - Mobility Concepts, Man Machine Interface, Process Challenges, Virtual Reality 1: 241-250. Springer Automotive Media. (Dec 1, 2008)

**Abstract (English):** In this study, we discuss the behavior of drivers without the right of way when entering a non-signalized intersection and propose an educational method for safe driving to help prevent right-angle collisions. The main concept of the proposed educational method is to make a driver diagnosis that estimates incorrect awareness of safe driving (we call it drivers' inner factors) and quantitatively evaluates the possibility of causing accidents under various hazardous situations. Such a driver diagnosis will enable general drivers to fundamentally improve their unsafe driving behaviors with inner factors. The proposed educational method is composed of the following five educational methods: [1] showing the usual driving behavior of a subject, [2] showing the desirable driving behavior of the skilled driver, [3] evaluating the possibility of causing an accident using a simulation, [4] showing a driver diagnosis table for revealing the subject's own problem, and [5] teaching a concrete method for improving unsafe driving behaviors and inner factors. Using the proposed educational method, we educated eight subjects who often exhibited unsafe driving behaviors. Based on the actual driving behavior data before and after conducting the educational method, we examined the effectiveness of the method by using several indexes. Furthermore, in order to judge whether the subjects' driving behaviors sufficiently maintained safety, we compared driving behaviors of the subjects with those of two skilled drivers who had high awareness of safe driving. The experimental results revealed that many subjects exhibited safer driving behaviors after the education than before the education. In particular, they increased the number of times and the total time for making safety checks. This is because the subjects raised their awareness of the existence of a bicycle that might appear from behind walls and a crossing car that has the possibility of crashing into the subject's car. In addition, the subjects sufficiently slowed down around the position where their cars entered the crossing road. This is because the subjects had correct awareness of the slow-down speed at which they could stop after perceiving a crossing car. On the other hand, the subjects should improve some unsafe driving behaviors on the basis of the skilled drivers' behaviors. For example, some subjects didn't stop or sufficiently slow down at the stop-line and didn't continue making a safety check until they could look over the crossing road. In the future, we will modify the educational method and establish a more effective method for safe driving.

**Conference:** 32nd FISITA World Automotive Congress 2008

**Database:** Ei Compendex® (1800 - current)

**Document type:** Conference Paper

**Cell phones using drivers: Not only dangerous, but a drag on the commute**

**Author:** Loomis, Brandon

**Publication info:** The Salt Lake Tribune [Salt Lake City, Utah] 03 Jan 2008.

**Abstract (summary):** Pairing that with the slowdown that the Utah researchers observed among the study subjects negotiating simulated Interstate 15 conditions, they estimated the typical Salt Lake Valley freeway commute is 5 percent to 10 percent longer because of cell phones, according to lead researcher Dave Strayer, a psychology professor.

13194946-563230-NPL

**Database:** ProQuest Newsstand Professional

**Document type:** NEWSPAPER

**Language of publication:** English

---

### Agent-based modelling and simulation of urban evacuation: relative effectiveness of simultaneous and staged evacuation strategies

**Author:** Chen, X; Zhan, F B

**Publication info:** The Journal of the Operational Research Society 59.1: 25-33. Taylor & Francis Ltd. (Jan 2008)

**Abstract (summary):** This study investigates the effectiveness of simultaneous and staged evacuation strategies using agent-based simulation. In the simultaneous strategy, all residents are informed to evacuate simultaneously, whereas in the staged evacuation strategy, residents in different zones are organized to evacuate in an order based on different sequences of the zones within the affected area. This study uses an agent-based technique to model traffic flows at the level of individual vehicles and investigates the collective behaviours of evacuating vehicles. We conducted simulations using a microscopic simulation system called Paramics on three types of road network structures under different population densities. The three types of road network structures include a grid road structure, a ring road structure, and a real road structure from the City of San Marcos, Texas. Default rules in Paramics were used for trip generation, destination choice, and route choice. Simulation results indicate that (1) there is no evacuation strategy that can be considered as the best strategy across different road network structures, and the performance of the strategies depends on both road network structure and population density; (2) if the population density in the affected area is high and the underlying road network structure is a grid structure, then a staged evacuation strategy that alternates non-adjacent zones in the affected area is effective in reducing the overall evacuation time. [PUBLICATION ABSTRACT]

**Database:** ABI/INFORM® Professional Advanced (1971 - current)

**Document type:** Feature

**Language of publication:** English

---

### 'GT 4' leaves other racing games in its tire tracks

**Author:** Geoffrey Fattah Deseret Morning News

**Publication info:** Deseret News [Salt Lake City, Utah] 17 Mar 2005: C08.

**Abstract (summary):** With more than 700 choices of cars to drive from all over the world, "GT4" -- for the PlayStation 2 -- doesn't just redefine racing games, it leaves them in its tire tracks.

The cars look gorgeous, and with more than 50 racing tracks from all over the world, there is something for every taste. In addition to traditional racing courses, there are a variety of city courses, from the industrial look of Seattle to the neon-lined streets of Hong Kong. There are also dirt and ice courses for

13194946-563230-NFL

rally racing fans. Cheering crowds have been improved with 3-D models, which add to the realism of game play.

The biggest gripe I had really doesn't have anything to do with "GT4" but rather with the PlayStation's controller. Honestly, it's just not built for racing games. Acceleration is done by pressing on a pressure-sensitive controller button. But with about a millimeter's worth of give, it's very hard to keep from either opening up full throttle or not giving it enough "gas."

**Company / organization:** Company / organization Name: Sony Corp; Ticker: SNE; NAICS: 334310, 334419; DUNS: 69-055-3649;

**Database:** ProQuest Newsstand Professional

**Document type:** NEWSPAPER

**Language of publication:** English

**PEDAL TO THE METAL ; From arcade classics' sparse graphics to today's lifelike games, racing titles have come a long way.: [FINAL Edition]**

**Author:** Yu, Andria

**Publication info:** The Sun [Baltimore, Md] 24 Jan 2002: 10C.

**Abstract (summary):** Game retailer Sam Goody's list of Top 10 sellers last year included three racing titles: Gran Turismo 3, ranked at No. 4, Motocross Mania at No. 7 and Gran Turismo 2 at No. 8. (The top-selling game was Madden NFL 2002.)

Project Gotham Racing, by Microsoft Games for the Xbox, has been able to work out an agreement with the car makers. "Using multi-polygons allowed us to give more detail to the damage, not just squashing the car," said Bill Nielsen, group product manager for sports and racing at Xbox. The realism of the car damage intrigued the companies, he says. "But we agreed not to damage the passenger cabin, so doors don't dent in, windshields won't break."

If you want the latest in reality-based auto racing, Gotham is a must have. But speed is not the only skill you'll need to win these races: The game features kudos - points given for style and stunts. Not only are the details of the cars technically correct, this game uses almost every graphics trick in the book; reflection effects, steam, headlight beams, shadows, skid marks and sunlight that is sometimes blinding. Although your vehicle starts out showroom-new, it can wind up with heavy battle scars.

**Company / organization:** Company / organization Name: Sony Computer Entertainment Inc; NAICS: 334310; SIC: 3674, 3944;

**Database:** ProQuest Newsstand Professional

**Document type:** NEWSPAPER

**Language of publication:** English

13194946-563230-PQD

**Report Information from ProQuest Dialog**

**Databases:** Australia Patents Fulltext,  Canada Patents Fulltext,  China Patents Fulltext,  Eurasia Patents Fulltext,  European Patents Fulltext,  Finland Patents Fulltext,  Global Patents Bibliographic,  India Patents Fulltext™,  Japan Patents  Fulltext,  Korea Patents Fulltext,  Russia Patents Fulltext,  United States Patents Fulltext,  WIPO PCT Patents Fulltext

**Search Strategy**

| Set# | Searched for | Results |
|------|--------------|---------|
| S27 | s26 and ApDA(<20101101) | 22° |
| S26 | s22 and s4 | 26° |
| S25 | s24 and APDA(<20101101) | 31° |
| S24 | s22 and s5 | 47° |
| S23 | s22 and s13 | 0° |
| S22 | s10 and s1 | 91° |
| S21 | s13 and s2 | 7° |
| S20 | s19 and s2 | 2° |
| S19 | s13 and s1 | 149° |
| S18 | s17 and APDA(<20101101) | 18° |
| S17 | s12 and s1 | 32° |
| S16 | s11 and APDA(<20101101) | 38° |
| S15 | s14 and APDA(<20101101) | 1° |
| S14 | s11 and s1 | 4° |
| S13 | s4 n/5 s6 | 2064° |
| S12 | s2 n/8 s5 | 1452° |
| S11 | s2 n/10 s4 | 43° |

13194946-563230-PQD

| S10 | s2 n/5 s3 | 2691° |
|-----|-----------|-------|
| S9 | s8 and APDA(<20101101) | 19° |
| S8 | s1 and s2 and s3 and s4 and s5 and s6 | 32° |
| S7 | s1 and s2 and s3 and s4 and s5 and s6 | 53 |
| S6 | ((Following or follower or subsequent or tailing or trailing or after or later or behind) n/3 (vehicles or cars or trucks or coaches or cabs or automobiles or conveyance[*1] or drivers or player or players or users or participants)) | 3094815 |
| S5 | ((Drive[*1] or run[*1]) p/0 over) or contact* or touch* or encounter* or cross[*3] | 45296821 |
| S4 | ((Slow[*3] or imped* or retard* or delay* or (cut p/0 down) or reduce) n/5 (velocity or accel* or speed or rate or momentum)) | 4225820 |
| S3 | Appear[*3] or (laid p/0 down) or (show p/0 up) or made or make or creat[*4] or generat[*3] or produc[*3] or leav[*3] or left or placed | 78616495 |
| S2 | Skidmarks or ((skid* or tire or tyre) n/2 (tracks or mark or streaks or trails or remnant or scuffs)) | 34673 |
| S1 | Videogame or ((video or electronic or online or digital or arcade or computer) n/3 (gam[*3] or play* or gameplay)) or ((driv* or vehicle or road or rac[*3] or (grand p/0 prix) or (formula p/0 one) or tournament or contest) n/3 simulat*) | 1622774 |

° Duplicates are removed from the search and from the result count.

-------------------------------

**Multi-Track Multi-Vehicle Roller Coaster**

**Publication info:** Gordon, Jonathan I. (Inventor). Gordon, Jonathan I. (Assignee). US 20150075404 A1 . (Published 19 Mar 2015).

**Abstract (English):** A multi-track multi-vehicle coaster simulates a popular theme of a competition, struggle or conflict taken from history or fiction. The vehicles interact with each other and with the ride scenery in many different ways and vehicle velocity is altered at different points in the ride using multiple motors and brakes. An interactive queue is provided and allows people in the queue to interact with people on the ride. Energy recycling and computer ride control are also disclosed.

13194946-563230-PQD



**Application number:** US 2014553575 (25 November 2014)

**CPC classification:** A63G 7/00 (main)

**Database:** United States Patents Fulltext (1790 - current)

**IPC classification:** Version 8:A63G 7/00 (main)

**Publication language:** English

**US classification:** 104/53 (main)

---

## USER INTERACTIVE EXERCISE SYSTEM

**Publication info:** Waters, Rolland M. (Inventor). WATERS ROLLAND M (Assignee). US 20100279823 A1 . (Published 04 Nov 2010).

**Abstract (English):** System and method for interactive video game fitness equipment. Fitness hardware (e.g., an exercise bicycle, a stair machine, treadmill, elliptical trainer, rotary climbing wall, or other fitness

3

13194946-563230-PQD

equipment) interacts with a video game, optionally via various devices, e.g., a PC, game console, or other hardware and/or software device or system capable of implementing an interactive application), for an immersive hybrid exercise/game user experience.



**IExercise uses USB to connect fitness devices to Xbox and PS2 game consoles and PCs**

**Application number:** US 2010710982 A (23 February 2010)

**CPC classification:** A63F 13/65 (main); A63B 22/0056; A63B 22/0076; A63B 22/02; A63B 22/0605; A63B 22/0664; A63B 24/0006; A63B 24/0084; A63B 24/0087; A63B 69/0048; A63B 69/06; A63B 69/16; A63B 71/0622; A63B 2024/0009; A63B 2024/0096; A63B 2069/163; A63B 2069/165; A63B 2069/168; A63B 2071/0644; A63B 2220/17; A63B 2220/51; A63B 2225/15; A63B 2225/20; A63B 2225/50; A63B 2230/01; A63B 2230/04; A63B 2230/06; A63B 2230/207; A63B 2230/30; A63B 2230/436; A63B 2230/70; A63F 13/06; A63F 13/10; A63F 13/212; A63F 13/22; A63F 13/24; A63F 13/67; A63F 13/803; A63F 13/816; A63F 2300/1043; A63F 2300/69; G05G 9/047; G06F 19/3481

**Database:** United States Patents Fulltext (1790 - current)

**IPC classification:** Version 8:A63B 71/00 (main); A63B 21/00; A63B 22/00; A63B 23/04; A63B 24/00; A63B 69/16; A63F 13/06; A63F 13/10

**Publication language:** English

**US classification:** 482/8 (main)

**USER INTERFACE AND METHODS OF USING IN EXERCISE EQUIPMENT**

**Publication info:** Waters, Rolland M. (Inventor). WATERS ROLLAND M (Assignee). US 20090098980 A1 . (Published 16 Apr 2009).

13194946-563230-PQD

**Abstract (English):** An application programmable interface (API) configured to present a selection of video games having interactive gaming content responsive to a variety of physical motion of the exercise equipment that is powered by the equipment user and designed to encourage ongoing participation by the user in various physical activity scenarios. The API is configured to merge exercise equipment with video gaming that is interoperatively compatible across multiple exerciser hardware configurations, across multiple gaming system equipment configurations, and across independent display monitors. Gaming content is designed to interactively encourage continued and varying exercising by associating the motions of the exercise equipment with changes in audio visual content presented on the monitor or by other gaming system configurations.

The following diagram illustrates the structure and association of the various IExercise hardware and software components. The various object oriented classes (HRG_C..) shown here in three groups, will be combined into one or several APIs. As we go from Group 1 to 3, the level of abstraction increases. Group 2 currently shows representations of bikes and treadmills. This can be expanded to include steppers, elliptical trainers etc. Preferably as new genres applications and games are created, the software tools (new classes) can be added to Group3 - hence the blank boxes. Preferably, Group 3 is where most of the development can be done.



18194946-563230-PQD

**Application number:** US 200850883 A (18 March 2008)

**CPC classification:** A63F 13/428 (main); A63B 21/225; A63B 22/0023; A63B 22/0056; A63B 22/02; A63B 22/0605; A63B 22/0664; A63B 24/0006; A63B 24/0062; A63B 24/0075; A63B 24/0084; A63B 24/0087; A63B 69/0002; A63B 69/002; A63B 69/0048; A63B 69/02; A63B 69/06; A63B 69/16; A63B 71/0622; A63B 2024/0009; A63B 2024/0065; A63B 2024/0096; A63B 2069/163; A63B 2069/165; A63B 2069/168; A63B 2071/0625; A63B 2071/0644; A63B 2220/18; A63B 2220/30; A63B 2220/34; A63B 2220/40; A63B 2220/805; A63B 2225/15; A63B 2225/20; A63B 2225/50; A63B 2230/01; A63B 2230/04; A63B 2230/06; A63B 2230/207; A63B 2230/30; A63B 2230/436; A63B 2230/70; A63F 13/02; A63F 13/06; A63F 13/10; A63F 13/245; A63F 13/803; A63F 2300/1043; A63F 2300/1062; A63F 2300/69; G06F 19/3481; G08C 2201/93

**Database:** United States Patents Fulltext (1790 - current)

**IPC classification:** Version 8:A63F 9/24 (main); A63B 71/00

**Publication language:** English

**US classification:** 482/8 (main); 463/43

---

**The head-up display using a navigation display method and device way**

**Publication info:** グラボースキ,クリストファー ティー.; ザモジョ,トーマス (Inventors). メイキング バーチャル ソリッド,エル.エル.シー. (Assignee). JP 2008501956 A . (Published 24 Jan 2008).

**Abstract (English):**  In an en-route navigation system such as for a vehicle, an image of a cable is presented as a navigation object in a head-up display to indicate a route that the vehicle should follow. In particular embodiments the cable appears to an observer to be a real cable existing in the landscape and extending higher than the head of the observer as would, for example, a trolley cable. The cable is illustratively displayed volumetrically and with an optic flow that is consistent with the optic flow of the landscape when the vehicle is moving, thereby creating the impression that it is real. As a result, the cable can be displayed without any accompanying images that correlate points on the cable with locations in the landscape and yet nonetheless serve as a very useful tool for indicating to a driver the route over which the vehicle should go. The cable may be in any of a number of forms including a continuous line, a line with non-closely-spaced gaps, a line having non-closely-spaced segments that have a different luminance from the rest of the line or a string of closely-spaced objects.

18194946-563230-PQD



**Application number:** JP 2007515584 A (28 May 2005)

**CPC classification:** G02B 27/0101 (main); G01C 21/365; G02B 27/01; G02B 2027/0141

**Database:** Japan Patents Fulltext (1913 - current)

**IPC classification:** Version 8:G01C 21/00 (main); G08G 1/0969; G09G 3/20; G01C 21/32; G01C 21/36

**Publication language:** Japanese

---

**Learning controller for vehicle control**

**Publication info:** Tipping, Michael; Hatton, Mark Andrew; Brumitt, Barry L. (Inventors). Microsoft Corporation (Assignee). US 20070156294 A1 . (Published 05 Jul 2007).

**Abstract (English):**  A learning controller overcomes tuning problems in vehicle simulation programs by estimating requisite vehicle-specific parameters, effectively learning from its mistakes, as the vehicle is automatically driven around a track. After a sufficient period of calibration, the learned parameters are automatically saved to a car-specific file. The file parameters may be loaded in the controller in the future to optimally control a vehicle without the need to re-run the learning procedure.

18194946-563230-PQD



**Application number:** US 2005323697 A (30 December 2005)

**CPC classification:** G05B 13/0265 (main); G09B 9/04; G09B 23/06

**Database:** United States Patents Fulltext (1790 - current)

**IPC classification:** Version 8:G05D 1/00 (main)

**Publication language:** English

**US classification:** 701/1 (main)

**Multi-track multi-vehicle roller coaster**

**Publication info:** Gordon, Jonathan I. (Inventor). GORDON JONATHAN I (Assignee). US 20070089630 A1 . (Published 26 Apr 2007).

**Abstract (English):**  A multi-track multi-vehicle coaster simulates a popular theme of a competition, struggle or conflict taken from history or fiction. The vehicles interact with each other and with the ride scenery in many different ways and vehicle velocity is altered at different points in the ride using multiple motors and brakes. An interactive queue is provided and allows people in the queue to interact with people on the ride. Energy recycling and computer ride control are also disclosed.

18194946-563230-PQD



**Application number:** US 2006351790 A (10 February 2006)

**CPC classification:** A63G 7/00 (main)

**Database:** United States Patents Fulltext (1790 - current)

**IPC classification:** Version 8:A63G 7/00 (main)

**Publication language:** English

**US classification:** 104/53 (main)

18194946-563230-PQD

**USER INTERACTIVE EXERCISE SYSTEM**

**Publication info:** WATERS, Rolland M (Inventor). HEARTRATE GAMES, INC. (Assignee). WO 2005086866 A2 . (Published 22 Sep 2005).

**Abstract (English):**  System and method for interactive video game fitness equipment. Fitness hardware (e.g., an exercise bicycle, a stair machine, treadmill, elliptical trainer, rotary climbing wall, or other fitness equipment) interacts with a video game, optionally via various devices, *e.g.*, a PC, game console, or other hardware and/or software device or system capable of implementing an interactive application), for an immersive hybrid exercise/game user experience.



**Application number:** WO 2005US7781 (09 March 2005)

18194946-563230-PQD

**CPC classification:** A63F 13/65 (main); A63B 22/0056; A63B 22/0076; A63B 22/02; A63B 22/0605; A63B 22/0664; A63B 24/0006; A63B 24/0084; A63B 24/0087; A63B 69/0048; A63B 69/06; A63B 69/16; A63B 71/0622; A63B 2024/0009; A63B 2024/0096; A63B 2069/163; A63B 2069/165; A63B 2069/168; A63B 2071/0644; A63B 2220/17; A63B 2220/51; A63B 2225/15; A63B 2225/20; A63B 2225/50; A63B 2230/01; A63B 2230/04; A63B 2230/06; A63B 2230/207; A63B 2230/30; A63B 2230/436; A63B 2230/70; A63F 13/06; A63F 13/10; A63F 13/212; A63F 13/22; A63F 13/24; A63F 13/67; A63F 13/803; A63F 13/816; A63F 2300/1043; A63F 2300/69; G05G 9/047; G06F 19/3481

**Database:** WIPO PCT Patents Fulltext (1978 - current)

**IPC classification:** Version 8:A63B 21/00; A63B 22/00; A63B 23/04; A63B 24/00; A63B 69/16; A63F 13/06; A63F 13/10

**Publication language:** English

---

### MOTOR VEHICLE DISPLAY SYSTEM AND RANGING DEVICE

**Publication info:** Tonkin, Mark Christopher (Inventor). TONKIN MARK CHRISTOPHER (Assignee). KR 1020010106111 A . (Published 29 Nov 2001).

**Abstract (English):**   A display system for motor vehicles provides an array of lamps (2) at the rear of a subject vehicle (101) to provide an indication of the state of motion of the subject vehicle to the driver of a following vehicle (103). In a first mode of operation, the display indicates a level of warning (A, B, C, D) dependent upon the rate of deceleration of the subject vehicle, the level of warning being determined by deceleration thresholds (F 1A, F 1B, F 1C, F 1D) which are variable in dependence upon the measured speed (v) of the subject vehicle. In a second mode of operation, the lamps provide an indication of the subject vehicle being stationary or near stationary as determined by comparing the measured speed with a threshold speed (V 1). An animate display is created by illuminating the lamps and sequentially deactuating selected pairs of lamps to create a pattern cyclically moving symmetrically outwardly from the centre of the row. The display is discontinued when the speed of the subject vehicle exceeds a second threshold (V 2) defined independently of the first threshold speed. In a third mode of operation, the display indicates that the subject vehicle is stationary or near stationary in a manner which has less prominence, fewer lamps being illuminated a static display, and in response to detection of a following vehicle being in close proximity to the subject vehicle. © KIPO &WIPO 2007

13194946-563230-PQD



**Application number:** KR 1020007012665 P (13 November 2000)

**Database:** Korea Patents Fulltext (1978 - current)

**IPC classification:** Version 8:B60Q 1/44 (main)Version 1-7:B60Q 1/44 (main)

**Publication language:** Korean

---

**Game device**

**Publication info:** Yoshida, Shigeru Sega Enterprises Ltd.; Masuda, Takuji Sega Enterprises Ltd.; Kobayashi, Takanori Sega Enterprises Ltd. (Inventors). SEGA ENTERPRISES, LTD. (Assignee). EP 1029569 A2 . (Published 23 Aug 2000).

**Abstract (English):** Provided is a driving game, wherein players having various driving skills - from beginners to those advanced - may enjoy both aspects of amusement and simulation in consistency. The game device of the present invention moves an object in a virtual three-dimensional space pursuant to operations from a player and generates images of the moving state of such object. This game device is provided with an element for providing to a player a plurality of different movement modes upon moving the vehicle along a traveling line; an element for enabling a player to select a desired movement mode from such plurality of different movement modes; and an element for executing a vehicle-driving game relating to the driving mode selected by the player. Included in this plurality of driving modes are an assist mode in which auto-brake control is performed and a training mode in which various indications, such as the timing of the braking point, are given.

18194946-563230-PQD

# FIG.18



BK                    LNref

**Application number:** EP 2000301148 A (15 February 2000)

**CPC classification:** A63F 13/803 (main); A63F 13/10; A63F 13/422; A63F 13/5375; A63F 13/57; A63F 13/65; A63F 2300/305; A63F 2300/6054; A63F 2300/64; A63F 2300/66; A63F 2300/69; A63F 2300/8017

**Database:** European Patents Fulltext (1978 - current)

**IPC classification:** Version 8:A63F 13/803 (main); A63F 13/42; A63F 13/422; A63F 13/47Version 1-7:A63F 13/10 (main)

**Publication language:** English

------

## TRAFFIC/TRANSPORTATION SYSTEM

**Publication info:** MINAKAMI HIROYUKI; MINAKAMI MOTOYUKI (Inventors). MINAKAMI HIROYUKI; MINAKAMI MOTOYUKI (Assignees). WO 1997002167 A1 . (Published 23 Jan 1997).

**Abstract (English):**  In a traffic/transportation system in which a truck with an automobile/container mounted/fixed thereon travels, a normal steering operation is carried out by changing the direction of wheels (including tires) by an electronically controlled automatic steering system on the basis of steering information, whereby comfortable travel and a smooth turn are obtained. When the truck is about to run off a lane on which it travels, the run-off thereof is prevented physically and mechanically since a fin provided on the truck is inserted in a groove provided in a road, whereby a safe traffic/transportation system is obtained. The truck obtains a driving force by a gap length regulated/controlled linear induction motor so that the truck can travel at a high speed. In branching (diverging) and converging points, the

13194946-563230-PQD

branching (diverging)/converging of the trucks is practiced by steering the wheels (tires) by the automatic steering system, and the truck advances with the fin inserted in a groove in a main line or a ramp, whereby a reliable, safe traffic/transportation system adapted to practice high-speed branching (diverging) is obtained. At the exit/entrance of the present invention to/from a general road, a mode interchange is provided which is adapted to convert a travelling mode of automobile/container, and mount and fix an automobile/container on the truck and unfasten such automobile/container.



**Application number:** WO 1995JP1350 (04 July 1995)

**CPC classification:** B60L 15/38 (main); B60L 5/005; B60L 9/24; B60L 11/1803; B60L 11/182; B60L 11/1831; B60L 11/1833; B60L 13/03; B60L 2200/26; B60L 2200/44; B60L 2240/70; B60L 2260/32; B60P 3/07; B60T 2201/08; B60T 2201/083; B60T 2201/087; B61B 13/08; B62D 1/26; B62D 37/00; B62D 39/00; Y02P 90/60; Y02T 10/7005; Y02T 10/7072; Y02T 10/7291; Y02T 30/30; Y02T 30/40; Y02T 90/12; Y02T 90/121; Y02T 90/122; Y02T 90/125; Y02T 90/14; Y02T 90/16

**Database:** WIPO PCT Patents Fulltext (1978 - current)

**IPC classification:** Version 8:B60P 3/07; B61B 13/08; B62D 1/26; B62D 37/00; B62D 39/00Version 1-7:B61B 13/00 (main); B60F 1/04; B60R 19/24; B61B 13/08; B62D 1/28; B61D 3/18; B62D 37/02; E01B 25/28; E01C 1/00; B60L 13/04; G08G 1/00; B60R 21/00

**Publication language:** Japanese

**Driving games method for automatically controlled cars**

**Publication info:** Rains, Lyle V (Inventor). ATARI INC (Assignee). US 4148485 A . (Published 10 Apr 1979).

**Abstract (English):** In a race car type video game one or more manually controlled player cars race against automatic computer controlled "drone" cars whose courses are controlled by direction vectors associated with cells into which the entire track is divided. The relationship of the cars direction and angular orientation or rotation with respect to the vector is controlled in a manner to provide cumulative minor response variations so that the drone car path may change for each circuit of the track. In an alternate game the drone cars by themselves may be controlled in speed only by competing players (with

14

18194946-563230-PQD

the computer by the use of the direction vectors controlling steering) to simulate a mechanical slotted track racing game where the car can be skidded from one "slot" to another.



**Application number:** US 1977834702 A (19 September 1977)

**CPC classification:** A63F 13/803 (main); A63F 13/005; A63F 13/56; A63F 2300/64; A63F 2300/8017; G09B 9/05

**Database:** United States Patents Fulltext (1790 - current)

**IPC classification:** Version 8:A63F 9/14 (main); A63F 13/00; G09B 9/05; H04N 7/18Version 1-7:A63F 9/14 (main)

**Publication language:** English

**US classification:** 463/6 (main); 463/31

13194946-563230-PQD

## SYSTEM AND METHOD FOR IDENTIFYING AND ASSESSING COMPARATIVE NEGLIGENCE IN INSURANCE CLAIMS

**Publication info:** DANICO, ANGELA G.; HEIDENHEIM, ANDRE R.; HOPKINS, SARAH E.; MURPHY, JAMES D.; LIM, SOON; SHRINER, STEVEN E. (Inventors). METROPOLITAN PROPERTY AND CASUALTY INSURANCE COMPANY (Assignee). US 20110196707 A1 . (Published 11 Aug 2011).

**Abstract (English):**  The invention is a method and system useful in determining the degree of comparative negligence of an insured person involved in an accident as compared to the comparable negligence of other parties involved in the accident, in particular the insurance claimant. The method and system of the invention include, at a minimum, the steps of gathering preliminary information concerning accident type, applying preliminary rules to the preliminary information to determine accident type, gathering additional information specific to the accident type, and applying accident-type-specific rules to the additional information to determine the degree comparative negligence of said insured person and/or the claimant.

13194946-563230-PQD



**Application number:** US 20119458 A (19 January 2011)

**CPC classification:** G06Q 40/08 (main); G06Q 40/02

**Database:** United States Patents Fulltext (1790 - current)

**IPC classification:** Version 8:G06Q 40/02; G06Q 40/08

17

13194946-563230-PQD

**Publication language:** English

**US classification:** 705/4 (main)

**SYSTEM AND METHOD FOR IDENTIFYING AND ASSESSING COMPARATIVE NEGLIGENCE IN INSURANCE CLAIMS**

**Publication info:** Danico, Angela G; HEIDENHEIM, ANDRE R; Hopkins, Sarah E; Murphy, James D; Lim, Soon; Shriner, Steven E (Inventors). METROPOLITAN PROPERTY AND CASUALTY INSURANCE COMPANY (Assignee). CA 2495554 A1 . (Published 19 Feb 2004).

**Abstract (English):** The invention is a method and system useful in determining the degree of comparative negligence of an insured person (320) involved in an accident as compared to the negligence of other parties involved in the accident, in particular the insurance claimant (324). The method and system of the invention include the steps of gathering preliminary information concerning accident type, applying preliminary rules to the preliminary information to determine the accident type (330), gathering additional information specific to the accident type, and applying accident-type-specific rules to the additional information to determine the degree of negligence of said to insured person and/or the claimant.

18194946-563230-PQD



**Application number:** CA 2495554 (07 August 2003)

**CPC classification:** G06Q 40/08 (main); G06Q 40/02

**Database:** Canada Patents Fulltext (1874 - current)

**IPC classification:** Version 8:G06Q 40/02; G06Q 40/08Version 1-7:G06F 17/60 (main)

**Publication language:** English

13194946-563230-PQD

## VEHICLE FOR PLAY

**Publication info:** TAIRA JOJI (Inventor). TAIRA JOJI (Assignee). JP 2001286683 A . (Published 16 Oct 2001).

**Abstract (English):**  PROBLEM TO BE SOLVED: To make a vehicle having wheels slide on a running track set up in a pleasure ground and with a circular or circular arc cross section.

SOLUTION: The track has no guide rail and has a circular or circular arc cross section. Running tires 3 are fitted on front and back and left and right of a body 2 of the vehicle. In order to run smoothly the vehicle in the track, a caster for fixing the direction and preventing the vehicle from floating up caused by bound and falling down sidelong and a leading tire 4 with a shock absorber are fitted. A guide plate and a guide tire are respectively fitted on the track and the body of the vehicle in such a way that the running tires do not slip out at an opening, a stopping point and a point of getting on and off in the track. The body of the vehicle is stabilized by fitting a weight balance 5 on the central part of the bottom part of the body of the vehicle and by increasing a friction between the track and the running tires and by lowering the center of gravity. In addition, a light and parts and a mechanism for stabilizing the body of the vehicle are attached.



**Application number:** JP 2000142574 A (05 April 2000)

**Database:** Japan Patents Fulltext (1913 - current)

**IPC classification:** Version 8:A63G 21/00 (main); A63G 21/02 (main); A63G 25/00Version 1-7:A63G 21/02 (main); A63G 25/00

**Publication language:** Japanese

13194946-563230-PQD

**System for transferring passive vehicles on an active movable track**

**Publication info:** Giraud, Francois Louis (Inventor). Savec (Assignee). US 4078499 A . (Published 14 Mar 1978).

**Abstract (English):** This transport system for transferring passive vehicles such as cars, platforms, containers, by means of a continuous-drive conveyor is characterized in that each vehicle comprises, in addition to carrier wheels engaging the main and fixed carrier rail, at least one tire-mounted wheel carried by cross beams projecting laterally from the vehicle, the tire-mounted wheel being adapted to engage intermediate retarding or acceleration tracks, a skid mounted in parallel relationship at the end of the cross beams and adapted to engage endless belts driven at low linear speeds for embarkment and disembarkment purposes, and also for transferring the vehicle to turnaround turntables at the ends of the system, and another skid adapted to engage the main endless belt conveyor for driving the vehicle at high speed.



**Application number:** US 1976674218 A (06 April 1976)

**Database:** United States Patents Fulltext (1790 - current)

**IPC classification:** Version 8:B61B 13/12; B61B 15/00; E01B 25/00Version 1-7:B61B 13/12 (main)

**Publication language:** English

**US classification:** 104/165 (main); 104/18; 198/324; 198/334

18194946-563230-PQD

**Program, information storage medium, image generation system, and image generation method**

**Publication info:** Takahashi, Tsuyoshi; Iso, Keiko (Inventors). NAMCO BANDAI Games Inc. (Assignee). US 20060221076 A1 . (Published 05 Oct 2006).

**Abstract (English):**  An image generation system generates an image of an object space viewed from a given viewpoint. When a contact event in which a first model object comes in contact with a second model object in the object space has occurred, height information of grid points corresponding to a contact plane of the first model object is fetched by referring to height map data in which height information of a surface of the first model object with respect to a given reference plane set for the fist model object is set in a grid pattern, and vertices of a contact plane of the second model object arm moved based on the fetched height information of the grid points.





**Application number:** US 2006391306 A (29 March 2006)

**CPC classification:** G06T 13/20 (main); G06T 2210/21

**Database:** United States Patents Fulltext (1790 - current)

**IPC classification:** Version 8:A63F 13/00; G06T 15/00; G06T 19/00

**Publication language:** English

18194946-563230-PQD

**US classification:** 345/427 (main)

**Accident evidence recording method**

**Publication info:** Smith, Robert E.; Vogt, Jurgen (Inventors). WDT TECHNOLOGIES, INC. (Assignee). US 20030046003 A1 . (Published 06 Mar 2003).

**Abstract (English):**  A mobile accident recording system ( **40**) includes a GPS receiver-pole ( **41**) and a computer ( **14**) which prompts investigator to place a tip of the receiver-pole on identified position points of evidence items at an accident site to measure and record coordinates of the position points. Data including the recorded coordinates and stored database information for each evidence item are processed to reconstruct a graphical three-dimensional representation of the accident site which is displayed to the investigator from any desired advantage point selected by the investigator.

