# Exhibit A-7

'241 Patent Filewrapper, seventh 70 pages



UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 13/194,946 | 07/30/2011 | Ronald Charles Krosky | CI108USA | 1966 |

85449         7590         03/05/2014
CONVERGENT INSIGHT, LLC
19530 Telbir Ave.
Rocky River, OH 44116

| EXAMINER |
|---|
| HOANG, BACH V |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3718 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 03/05/2014 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

 United States Patent and Trademark Office

**Under Secretary of Commerce for Intellectual Property and
Director of the United States Patent and Trademark Office
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov**

CONVERGENT INSIGHT, LLC
19530 TELBIR AVE.
ROCKY RIVER, OH 44116

Appeal No:   2014-002908
Application:  13/194,946
Appellant:   Ronald Charles Krosky et al.

# Patent Trial and Appeal Board Docketing Notice

Application 13/194,946 was received from the Technology Center at the Board on January 13, 2014 and has been assigned Appeal No: 2014-002908.

In all future communications regarding this appeal, please include both the application number and the appeal number.

The mailing address for the Board is:

PATENT TRIAL and APPEAL BOARD
UNITED STATES PATENT AND TRADEMARK OFFICE
P.O. BOX 1450
ALEXANDRIA, VIRGINIA 22313-1450

Telephone inquiries can be made by calling 571-272-9797 and referencing the appeal number listed above.

By order of the Patent Trial and Appeal Board.

MLS

Application No.:     13/194,946          Confirmation No.:   1966

Applicant:          Ronald Krosky, et al.   Filed:              July 30, 2011

Examiner:           Hoang, Bach V          Art Unit:           2628

Docket Number:      CI108USA              Customer Number:    85449

Mail Stop Appeal Brief - Patents

Commissioner for Patents

P.O. Box 1450

Alexandria VA 22313-1450

## REPLY TO EXAMINER'S ANSWER TO APPEAL BRIEF

Appellants' representative submits this Reply Brief in response to the Examiner's Answer mailed November 8, 2013 (hereafter, "Examiner's Answer").

## New Ground of Rejection

Claim 41 is newly rejected under 35 U.S.C. 103(a) as being unpatentable over U.S. P.G. Pub. No. 2008/0293488 (hereafter "Cheng") in view of U.S. P.G. Pub. No. 2012/0306923 (hereafter "Boschker").   The rationale provided by the Office for rejection of this claim is identical to the rationale provided with regard to the interface component of claim 4.  For reasons similar to those discussed with regard to claim 4, claim 41 is not unpatentable over Cheng in view of Boschker.   It should be noted that the term 'explicit' is not found in claim 41, and as such any argument by the Office with regard to 'explicit' has no bearing on this claim feature.

## Appellants Remarks Regarding the Office's Response to Arguments of the Appeal Brief

Appellants hereafter address and refute the Office's position in the Examiner's Answer on a claim-by-claim basis as asserted in the most recent correspondence.  In addition, Appellants note ambiguity regarding the propriety of Boschker inasmuch as the priority date of teachings in this reference has not been established by the Office.

## I.      Claim 38

Appellants state that the animation map is a non-photographic map.  This removes any concerns raised in the Examiner's Answer.    Further, one of ordinary skill in the art would understand that the class of games discussed – identified as, for example, Gran Turismo and Forza – are racing games played on non-photographic maps.

## II.     Claim 4

The Office provides two separate definitions for 'explicit request.'  On page 7 of the Examiner's Answer, the Office cites Merriam-Webster for a definition of 'explicit' without providing any argument or rationale as to why that definition is reasonable in light of the specification. The Office then argues that 'explicit request' means "a request which is fully revealed or expressed without vagueness, implication, or ambiguity; fully developed or formulated; unambiguous in expression" as well as that "an explicit request by a user for a specific area to be rendered is any request which is clear as to which area the user wants rendered."  Examiner's Answer, p. 7.  Thereafter on page 8, paragraph 4 the Office provides a

different definition where an 'explicit request' for an area to be rendered is an input by a user which unambiguously describes the user's desire for an area to be rendered.

These differing definitions contradict one another. In the first definition, any request which is clear will satisfy the interpretation advanced, while in the second definition there must be no ambiguity. Both these definitions differ from the definition provided in the Advisory Action dated June 10, 2013 (hereafter "Advisory Action") where the Office argues that 'explicit request' means "a request that is stated clearly and in detail". Thus, the Advisory Action definition ignores the want or desire of the user, while the definitions relied upon in the Examiner's Answer specifically require such want or desire. These three different definitions being used show that the Office has not clearly articulated its argument as required under the MPEP. This fails to establish sustainable grounds of rejection, and deprives Appellants of a fair opportunity to respond to the rejections because Appellants are unsure which definition the Office is using in its interpretation.

In addition to the inconsistencies identified above, the Office's arguments are unpersuasive. First, the Office reviews Appellants' argument that a player may hit a 'bad' shot, and responds by noting that the player may also hit a 'good' shot. In such instances, an expected, exact location may be rendered. Rather than bolstering the rejection, the Office's argument serves to illustrate the point made by the Appellants.

In Cheng, the outcome as to whether a specific playing area of a course is provided to a player is not dependent on an explicit user request. Instead an outcome on if a specific area is provided to a player is dependent on how the user so happens to hit a shot. The user can hit the shot exactly where he or she intends, but the user can also hit the shot in near infinite locations that were not intended (*e.g.*, near right, far right, near left, far left, short, short left, long right). Thus, the area provided to the user is based on gameplay of the user as distinguished from an explicit request, regardless of whether such action lines up with a desired outcome of the player. In short, hitting a golf shot in a video game falls well short of an explicit request submitted by a user for a specific area to be rendered.

Further, the Office concedes that Cheng does not have a user ask for a specific course to be rendered. The Office tries to overcome this deficiency of Cheng by arguing that the user provides specific inputs. These specific inputs by the user are inputs to play the golf game, and do not have any bearing on the claimed aspects. Providing specific inputs (hitting a virtual golf

ball) is not sufficient to anticipate explicit request submitted by a user for a specific area to be rendered.

In addition, Appellants rely upon paragraph [0181] of the Cheng in distinguishing this reference from the claims. The Office argues that since paragraph [0181] was not cited by the Office, Appellants' arguments are moot. This is incorrect, and ignores the admonition of MPEP § 2141.02(VI), the header of which specifically notes each cited reference must be considered in its entirety, "INCLUDING DISCLOSURES THAT TEACH AWAY FROM THE CLAIMS". MPEP § 2141.02(VI) (emphasis original). As noted by Appellants, paragraph [0181] of Cheng clearly shows this reference does not address an explicit request submitted by a user for a specific area to be rendered, but instead a continuation of an ongoing machine process invisible to the user produced when a state is reached.

### III.    Claim 5

In the Examiner's Answer, the Office again addresses paragraph [0184] of Cheng. However, paragraph [0184] of Cheng describes selecting a highest priority photograph when multiple photographs are available. The Office's discussion of a landmark is that a photo with a landmark is given higher priority over a photo without a landmark. Cheng's paragraph [0184] identifies what to do when multiple photographs are available, but does not anticipate or render obvious determining if such availability exists. By contrast, claim 5 recites a search component configured to make a determination if a base map for a rendered map is available.

### IV.    Claim 6

The Office argues that the first course photo and the second course photo are the base map, but provides no explanation on how the first or second photos are base maps. The Office additionally asserts that alignment and stabilization alters the course photos. While this addresses alteration, this does not address the analysis component. The Office states that claim 6 requires that a base map be altered based on a determination. This statement still ignores the core argument made by Appellants. The analysis component is configured to make the determination on how to alter the base map in response to the determination if the base map for the rendered map is available being positive. Cheng does not address determining how to alter the base map in any fashion, and is additionally deficient with regard to doing so in response to

determining that the base map is available.  The Office states that Cheng alters base map photos of a golf course based on a determination of the alignment of common features and through stabilization.  This shows the actual alignment and stabilization of the base photos without addressing determining how to alter a base map.

In short, while Cheng may address performing actual alignment and stabilization, Cheng is silent with regard to any determination on how such alignment and stabilization should occur and is silent with regard to making such a determination when a specific metric is met, such as in response to the determination if the base map for the rendered map is available being positive.

## V.    Claim 21

The Office argues that when two photos are stitched together in Cheng, there is a determination that both course photos should be used.  However, Cheng is silent on this feature.  The aspects of claim 21 are not found expressly in Cheng, and the Office has provided no rationale as required under MPEP § 2112(IV) to support any case for inherency.  This is because such aspects are, in fact, not inherent.   The Office takes the position that two photos stitched together are each base maps, but has not provided any evidence or rationale for this unsupported assertion.

## VI.    Claim 38

The Office argues that the inclusion of animation in Cheng's paragraph [0047] anticipates this claim feature.  However, Cheng clearly shows these animations as being distinct from the playable course (*e.g.*, animation of the ball 108 in paragraph [0062] and [0177]) and thus the course is still photographic and not animated.

The Office further argues that Appellants' statement that video games use an animation-type map along with Cheng's discussion of there being maps used in video games shows that Cheng discloses animation maps.  However, this is logically incorrect.  'A' can include 'B' and 'C', but it is possible that 'B' and 'C' have no relation.  Here video games (A) can include animation maps (B) and photographic maps (C).  That does not mean that a publication discussing photographic maps used in video games (intersection of A-C) has any bearing on animation maps in video games (intersection of A-B).

In view of the foregoing, Appellants believe it is clear that animations in Cheng are not part of the map.

## VII.    Claim 40

The Office argues that Cheng is not using the original map, but instead copies. However, photographs are intended to provide identical reproduction. With this understood, Appellants submit that copies of digital photographs include the exact same data (required for photographic reproduction) as the original and as such the map data itself is included in Cheng.

## VIII.   Claim 22

The Office argues that Boschker's determination of similarity is the means by which Boschker ultimately determines whether a rendered map is available for display. However, such a position misinterprets the teachings of this reference. In Boschker, two memories exist - a local memory and a main map data store. Boschker, para. [0055]. Boschker makes determination regarding whether an existing part of a map is sufficiently similar to a new part of the map. *Id*. If the existing part of the map is sufficiently similar, then data of the existing part of the map from the local memory is used. *Id*. If the existing part of the map is not sufficiently similar, then data of the existing part of the map from the main map data store is used. Boschker, para. [0056]. Thus, if similarity is high enough then data from a local memory is used. However, if similarity is not high enough, then data from the non-local memory is used.

In short, the similarity outcome merely addresses the source from which data is obtained. The availability concept is not discussed in Boschker, which assumes that the data is available. Further, Boschker is limited to a determination regarding from which source to obtain the available data. If the similarity is large, use the locally stored data, and if the similarity is small then use remote data. By contrast the gather component addresses situations when the rendered map is available (obtain the rendered map), as well as situations when the rendered map not available (collect a map data set).

## IX.    Claim 31

With regard to claim 31, the Office appears to misunderstand Appellants' argument. Appellants argue that the Office has not properly addressed at least the appraisal and/or decision

component(s), and as such the Office has not supported its *prima facie* conclusion of obviousness. In the Final Office Action, sections 38-41 address the gather component. The text of sections 43-46 of the Final Office Action is identical to that of sections 38-41, except for updating the claim number(s) in section 44. Appellants raised this issue in their response to the Final Office Action, but in the Advisory Action the Office gave cursory response to the appraisal component and still ignored the decision component. Because the Office appears to have ignored the decision component, and substantively ignored the appraisal component, the Office's burden to establish a *prima facie* case of obviousness has not been met, and Appellants need not substantively address rejection of such.

The first paragraph of page 16 in the Examiner's Answer asserts Boschker teaches a system that reuses a previous map if available and that a system can render a map through loading data. Thereafter, the Office states Boschker determines if the map should be rendered based on similarity. Neither of these positions addresses the appraisal or decision components even if the parts are correct.

The Office states that Boschker appraises a previously rendered map. The Office then states that Boschker decides, based on the assessment, whether to use the previous map. This is incorrect in that the determination of Boschker is not if the map is used, but from where data is loaded (local memory or non-local memory). Moreover, even if this were correct, the Office's interpretation of Boschker is irrelevant to the claim language. Decision on use of a previous map is irrelevant to proactively making a request for production of the rendered map based, at least in part, on a result from the appraisal. No such request for production is addressed in Boschker and this claim feature is not addressed by the Office in the Final Office Action, the Advisory Action, or the Examiner's Answer.

## X.   **Boschker's Priority Date**

With regard to Appellants concerns relating the date on which Boschker teaches what the Office asserts, the Office again cites the memorandum of October 29, 2004. The existence of this memorandum does not supersede the Office's obligation to give the Appellants a fair opportunity to provide evidence of patentability and otherwise reply completely at the earliest opportunity as required by the MPEP. A fair hearing provided to an applicant/appellant requires that the Office's decisions be guided by objective, consistent procedures, and that those

Application No. 13/194,946                                                                    CI108USA

procedures be reviewable if deviations occur.  Accordingly, memoranda carry no legal weight. If the Office could change their obligations under the MPEP, CFR, or US Code by way of memorandum, then the Office could simply write a memorandum to circumvent the appeals process.

In the Appeal Brief, the Appellants reminded the Office that the initial burden falls on the Office to establish a *prima facie* case of obviousness.  Without making the priority document available, the Office did not attempt to meet its burden until the Advisory Action.  Therefore, the Appellants were denied their rights as discussed in the Appeal Brief.

<u>**Conclusion**</u>

For at least the above reasons, the claims currently under consideration are believed to be patentable over the cited references and it is requested that the rejections of claims be reversed.

Respectfully submitted,

/Ronald C. Krosky/    /Brendan E. Clark/
Ronald C. Krosky      Brendan E. Clark
Co-Inventor           Co-Inventor

# Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | 13194946 |
| **Filing Date:** | 30-Jul-2011 |
| **Title of Invention:** | OUTPUT PRODUCTION |
| **First Named Inventor/Applicant Name:** | Ronald Charles Krosky |
| **Filer:** | Brendan Edward Clark |
| **Attorney Docket Number:** | CI108USA |

Filed as Small Entity

## Utility under 35 USC 111(a) Filing Fees

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| Appeal Forwarding Fee | 2413 | 1 | 1000 | 1000 |
| **Post-Allowance-and-Post-Issuance:** | | | | |
| **Extension-of-Time:** | | | | |

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Miscellaneous:** | | | | |
| | | | **Total in USD ($)** | **1000** |

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 17819230 |
| **Application Number:** | 13194946 |
| **International Application Number:** | |
| **Confirmation Number:** | 1966 |
| **Title of Invention:** | OUTPUT PRODUCTION |
| **First Named Inventor/Applicant Name:** | Ronald Charles Krosky |
| **Customer Number:** | 85449 |
| **Filer:** | Brendan Edward Clark |
| **Filer Authorized By:** | |
| **Attorney Docket Number:** | CI108USA |
| **Receipt Date:** | 04-JAN-2014 |
| **Filing Date:** | 30-JUL-2011 |
| **Time Stamp:** | 12:16:51 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | Credit Card |
| Payment was successfully received in RAM | $ 1000 |
| RAM confirmation Number | 6373 |
| Deposit Account | |
| Authorized User | |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|

| 1 | Reply Brief Filed | CI108USA_Reply_to_Examiners_Answer_Final-1.pdf | 109841<br><br>ccb82c30377b3eaf6c14f348c868561957ae-abb0 | no | 8 |

| Warnings: | | | | | |
| Information: | | | | | |

| 2 | Fee Worksheet (SB06) | fee-info.pdf | 29889<br><br>b56c28d1cacc442272d66fcbfc88b7a8870b-e264 | no | 2 |

| Warnings: | | | | | |
| Information: | | | | | |

| **Total Files Size (in bytes):** | 139730 |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 13/194,946 | 07/30/2011 | Ronald Charles Krosky | CI108USA | 1966 |

85449          7590          11/08/2013
CONVERGENT INSIGHT, LLC
19530 Telbir Ave.
Rocky River, OH 44116

| EXAMINER |
|---|
| HOANG, BACH V |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3718 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 11/08/2013 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)



UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

## BEFORE THE PATENT TRIAL AND APPEAL BOARD

Application Number: 13/194,946
Filing Date: July 30, 2011
Appellant(s): Krosky, et al.

_____

Ronald Krosky
Brendan Clark
For Appellant

## EXAMINER'S ANSWER

This is in response to the appeal brief filed August 19, 2013.

Application/Control Number: 13/194,946                                    Page 2
Art Unit: 3718

**(1) Grounds of Rejection to be Reviewed on Appeal**

Every ground of rejection set forth in the Office action dated March 18, 2013 from

which the appeal is taken is being maintained by the examiner except for the grounds of

rejection (if any) listed under the subheading "WITHDRAWN REJECTIONS."  New

grounds of rejection (if any) are provided under the subheading "NEW GROUNDS OF

REJECTION."

**NEW GROUNDS OF REJECTION**

Claim 41 is rejected under 35 USC 103(a) as being unpatentable over US Pub.

No. 2008/0293488 A! ("Cheng") in view of US Pub. No 2012/0306923 A1 ("Boschker").

The Final Office Action dated March 18, 2013 rejected independent claim 22,

from which claim 41 depends, under 35 USC 103(a) as being unpatentable over Cheng

in view of Boschker.  However, that Final Office Action rejected claim 41 as anticipated

by Cheng, rather than as obvious over Cheng in view of Boshker (*i.e.*, the rejection of

claim 41 was placed in the incorrect section of the Final Office Action).  The actual

substance of claim 41's rejection is maintained from that Final Office Action, however,

the basis of the rejection is changed (to be obvious over Cheng in view of Boshker,

rather than anticipated by Cheng).

In regards to claim 41, the Cheng-Boshker combination discloses the system of

claim 22, where the request is a direct user request for the rendered map ("Some or all

of a virtual object's movement in the virtual course can be animated in a course

photograph. For example, after the player strikes the golf ball 108 in photograph 102a

(as shown in FIGS. 1A), photograph 102b (as shown in FIGS. 1B) can be presented to

the player along with animation of the ball 108 falling from the sky at location 108a,

impacting the golf course at location 108b, and rolling to resting location 108c."  Cheng

¶ 0062.  A user directly requests a rendered map area to be rendered via an input which

purposefully sends a ball to a portion of a course which is to be rendered.  Additionally,

"clients 702a-d to play in the same virtual course, if desired, and allows for other

multiplayer features such team forming and competitions between players and teams."

Cheng ¶ 0178.  When the clients (users) choose to play on the same course, the

players are directly choosing the course to be rendered.).

**WITHDRAWN REJECTIONS**

The following grounds of rejection are not presented for review on appeal

because they have been withdrawn by the examiner.

The rejection of claim 41 under 35 USC 102(b) is withdrawn; as discussed above

in the new grounds to rejection, the rejection of claim 41 was meant to be included in

the 103(a) obviousness rejection over Cheng in view of Boshker.

The 35 USC 112 rejections of claims 35, 39, and 40 have been withdrawn, as

discussed in the June 10, 2013 Advisory Action.

**(2) Response to Argument**

**I.     *Claim 38 is Rejected under 35 U.S.C. 112 (pre-AIA), First Paragraph, as***
**       *Failing to Comply with the Written Description Requirement.***

The originally-filed specification has not disclosed the newly added subject

matter, "the rendered map is an animation map of an actual location" recited in claim 38.

One of ordinary skill in the art would not have concluded that the inventor possessed

Application/Control Number: 13/194,946                                    Page 4
Art Unit: 3718

the claimed invention because "an animation map" is not a term of art and the originally

filed Specification does not disclose "an animation map."  The specification does not

discuss "animation maps" at all, and the portions the Applicant points do not disclose

"animation maps" such that one of ordinary skill in the art would have understood that

an animation map was disclosed.

MPEP §2163 states: "To satisfy the written description requirement, a patent

specification must describe the claimed invention in sufficient detail that one skilled in

the art can reasonably conclude that the inventor had possession of the claimed

invention. *See, e.g., Moba, B.V. v. Diamond Automation, Inc.*, 325 F.3d 1306, 1319, 66

USPQ2d 1429, 1438 (Fed. Cir. 2003); *Vas-Cath, Inc. v. Mahurkar*, 935 F.2d at 1563, 19

USPQ2d at 1116. However, a showing of possession alone does not cure the lack of a

written description. *Enzo Biochem, Inc. v. Gen-Probe, Inc.*, 323 F.3d 956, 969-70, 63

USPQ2d 1609, 1617 (Fed. Cir. 2002). Much of the written description case law

addresses whether the specification as originally filed supports claims not originally in

the application. The issue raised in the cases is most often phrased as whether the

original application provides "adequate support" for the claims at issue or whether the

material added to the specification incorporates "new matter" in violation of 35 U.S.C.

132."

The Applicant's specification and provisional application 61/409,027 from which it

depends do not specifically disclose animation maps at all nor do they provide adequate

support that rendered maps (the resulting maps from implementing the claimed system)

are animation maps.  While there is no *in haec verba* requirement, in this case, an

Application/Control Number: 13/194,946                                    Page 5
Art Unit: 3718

"animation map" is such a nebulous term such that one of ordinary skill in the art would

not have recognized that an animation map was disclosed—*i.e.*, without knowing what

an animation map is or is not, it would not be possible to understand that an animation

map had been previously disclosed.  An animation map is not a term of art that one of

ordinary skill in the art would recognize.   In electronic gaming and in computer systems

generally, an animation map does not clearly define a particular technology or

technique.  Furthermore, examining the language of the limitation also provides little

guidance on what an animation map is.  Generally, in computing systems, a map can

refer to the data which defines a space.  Modifying a map to be an animation map,

however, leads to significant lack of clarity because a map might be considered

animated if it contains static data but the map can be traversed on a screen (*e.g.*,

scrolling through a Google Map), or it might be considered animated if the underlying

map data itself requires animation data (*e.g.*, the map data itself is in some kind of

animation data format such as an avi file), or it might be considered animated if the

rendered map allow animations on the map (*e.g.*, placing animations on a map).  Since

it is unclear what an animation map is, it is not clear that the application has disclosed

an animation map.

The Applicant argues that animation maps are disclosed in portions of US

provisional application 61/409,027 ('027 provisional) reciting: "real-life places can be

imported and modified to serve as a basis or inspiration for a representation of an

alternate reality."  Appeal at 11, *citing* '027 provisional at 11:13-19.  However, that

portion of the '027 provisional discloses that maps of real life places exist; the portion

Application/Control Number: 13/194,946                                    Page 6
Art Unit: 3718

does not disclose that those maps can be animation maps.  The Applicant further

argues animation maps are disclosed by portions of the '027 provisional reciting a map

"may be applicable in different applications (e.g., one for Xbox and one for PlayStation,

one of Gran Turismo and one for Forza.")."  Appeal at 11, *citing* '027 application at

21:14-17.  Those portions describe maps can be used for games, however, do not

describe that those maps used for games are specifically animation maps.  While the

Applicant argues that one of ordinary skill in the art would inherently understand that

Gran Tourismo and Forza use animated maps, the Applicant has provided no actual

evidence of what one of ordinary skill in the art would understand an animated map to

entail and no actual evidence the maps Gran Tourismo and Forza use are animation

maps.  The Applicant argues the "term is clear on its face – a map that an animation

(e.g., non-photographic)."  Appeal at 12.  The Applicant has provided no basis for that

definition and it is unclear what "a map that an animation" means.  The Applicant has

only provided conclusory statements that animation maps would be understood as

disclosed by portions of the provisional.

As there is no set definition or understanding of what an animation map is or is

not and the Specification does not disclose an animation map at all, one of ordinary skill

in the art would not have concluded an "animation map" was supported by the

application.

**II.    Claim 4 is Anticipated by Cheng Because A User Provides Requests to Play**
**Specific Maps and the User Provides Input Resulting in Display of a Specific Map**
**Area.**

Application/Control Number: 13/194,946                                   Page 7
Art Unit: 3718

Claim 4 recites, in part, "a user request for a rendered map, where the user request is an explicit request submitted by a user for a specific area to be rendered." Given its broadest reasonable interpretation, an "explicit request" is a request which is "fully revealed or expressed without vagueness, implication, or ambiguity; fully developed or formulated; unambiguous in expression" (s*ee* definition of "explicit" *at* http://www.merriam-webster.com/dictionary/explicit). *I.e.*, an explicit request by a user for a specific area to be rendered is any request which is clear as to which area the user wants rendered.

Cheng teaches at least two examples of a computer golf video game in which users explicitly request specific areas to be displayed: first, users request certain golf courses to play and second, portions of golf courses are rendered based on where the user decides to direct his ball during play. Cheng teaches a first example of a user providing a specific request when a user provides input as to which golf course map the user would like to play. Cheng ¶ 0178. By clearly selecting a specific golf course, the user is requesting that specific golf course to be rendered for play. Cheng teaches a second example of a user providing a specific request when a user provides input as to where the user wants his ball to land, resulting in the display of that landing area. In Cheng, a user provides input as to exactly where the user would like a golf ball to land (the point of a golf game is to direct a golf ball to certain areas of a golf map); that input as to where the golf ball to land is an explicit request to render the landing area because the game renders that area in response to the user's input. Cheng ¶ 0062.

Application/Control Number: 13/194,946                                   Page 8
Art Unit: 3718

The Applicant argues that a user request is not explicit because a user may hit a "bad" shot.  Appeal at 13.  However, the flip side to the applicant's argument is that when the user hits a "good" shot to exactly where the user wants, that exact location is rendered, and therefore the user has provided an explicit request.

The Applicant also argues that "Cheng is silent on how the course is made available, and there is no user request that is an explicit request."  Appeal at 13-14.  This is a distinction without a difference.  While Cheng does not literally have the user ask for "Golf Course X to be rendered," the actual effect of a user providing inputs to Cheng's system is that the golf course will be rendered based on the user's explicit inputs.  In Cheng, a user explicitly asks for a golf course (or portion thereof) to be played, providing playing and rendering of the course.

The Applicant also argues paragraph 0181 of Cheng does not teach an explicit request.  Appeal at 14.  The Office Action has not cited that portion for that teaching and therefore those arguments are moot.

An "explicit request" for an area to be rendered is an input by a user which unambiguously describes the user's desire for an area to be rendered.  The users of Cheng's system unambiguously request golf course maps to be rendered for play and resultant ball locations on those golf course maps to be rendered.

### III.   *Claim 5 Is Anticipated By Cheng Because Cheng Parses Through Photos to Determine Priority*

Claim 5 recites, in part, "a search component configured to make a determination if a base map for a rendered map is available."  This limitation is anticipated by Cheng

Application/Control Number: 13/194,946                                      Page 9
Art Unit: 3718

which teaches a system which searches through actual golf course photos (base maps) and determines whether particular photos exist to provide a rendered course map for gameplay.  In Cheng, "if there is more than one photograph that can be used to show a particular portion of a path (or substantially the same portion of the path), the photograph with the highest priority is selected."  Chen ¶ 0184.  As there are multiple photos, Cheng's system must search through all those photos to determine which photo has the highest priority.  Furthermore, priority is based on factors such as whether there is a "landmark in photograph."  Chen Table I.  Cheng determines whether or not a course landmark photo exists because Cheng must determine "*[i]f* there is a course landmark such as a building or a photograph hazard, photographs showing the landmark are given higher priority."  Cheng ¶ 0184, *emphasis added*.  In other words, to determine priority of course landmark photos, Cheng must determine whether or not such a course landmark photo exists (the course landmark photo corresponding to the availability of a base map).

The Applicant argues that Cheng does not "contemplate that a photograph would not be available."  Appeal at 16.  As discussed above, Cheng contemplates whether a photo is available because Cheng must determine "[i]f there is a course landmark such as a building or a photograph hazard."  Cheng ¶ 0184.  Cheng's course map rendering system searches through prioritized photos in order to determine which map photo to use; moreover, Cheng's system can only provide priority for course photos that it determines existing.

**IV.    *Claim 6 is Anticipated by Cheng Because Cheng Stitches Photos Together***

Application/Control Number: 13/194,946                                    Page 10
Art Unit: 3718

Claim 6 recites, in part, "an alteration component configured to alter the base map based, at least in part, on a determination on how to alter the base map." This limitation is anticipated by Cheng, which determines whether or not to combine two course photos (base maps) via an image stitcher in order to create a rendered course map. Cheng ¶ 0060 ("more than one photograph of the virtual object's new location can be digitally stitched together to form a single, composite photograph."). Cheng alters two course photos (base maps) by combining the course photos together. Cheng ¶ 0191 ("Sometimes it may be advantageous to combine two or more photographs into a single continuous photograph."). Furthermore, Cheng determines that the course photos should be combined "by aligning the photographs based on identification of common features, stabilizing the photographs so that they only differ in their horizontal component, and finally stitching the images together." Cheng *Id*.

The Applicant argues that it is unclear "how photos are being stitched together function as an alteration of a base map." Appeal at 17. As discussed above, the base map (the first and second course photos) are altered by combining the course photos via a stitching processes that aligns and stabilizes the photos, altering the course photos to create a rendered course map. *I.e.*, "how" Cheng alters base maps is via digital stitching which aligns and stabilizes two base map photos to stitch the photos together.

Claim 6 requires that a base map be altered based on a determination on how to alter the base map; Cheng alters base map photos of a golf course based on a

Application/Control Number: 13/194,946                                          Page 11
Art Unit: 3718

determination of the alignment of common features in the base photos and stabilizing of

the base photos.

## V.    *Claim 21 is Anticipated by Cheng Because Cheng* Sometimes *Stitches*

## *Course Photos*

Claim 21 recites, in part, "a determination on if the base map should be used for

the rendered map."  This limitation is anticipated by Cheng because Cheng teaches that

"*[s]ometimes* it may be advantageous to combine two or more photographs into a single

continuous photograph, such as when the 'best' photograph for a virtual object would be

a combined photograph."  *Emphasis added*.  In other words, since Cheng's system only

stiches course photos (base maps) some of the time, then Cheng's system must

inherently decide to stitch some course photos and to not stitch other course photos.

The stitching functions are only implemented if Cheng's system determines stitching

produces the best rendered course map.  Stitching together two photos alters the

photos because the resulting combination is a different photo than either of the original

photos.

The Applicant argues "no indication is given in paragraph [0191] of Cheng

regarding a determination on if the base map should be used for the rendered map."

Appeal at 18.  However, as discussed above, Cheng's system discloses that sometimes

two photos are combined; when Cheng's system decides to combine two photos (base

maps), Cheng's system is determining that both course photos should be used for the

rendered course map.

Application/Control Number: 13/194,946                                    Page 12
Art Unit: 3718

Additionally, the Applicant argues "the Office has not established how the photographs function as a base map." Appeal at 18. As discussed in claim 5, from which claim 21 depends, Cheng's base maps are the actual course photos which Cheng's system analyses and uses to render a playable course map based on those actual course photos.

Chen determines whether or not to use course photos (base maps) for stitching in order to provide a single, rendered area of a golf video game.

## VI.  *Claim 38 is Anticipated by Cheng Because Cheng's Rendered Maps Include Animations*

Claim 38 recites "the rendered map is an animation map." An "animation map" is not defined or mentioned by the specification and is not a term of art. Therefore, exactly what an "animation map" is, is given its broadest reasonable interpretation; therefore, any map which includes an animation, can be animated, or allows for animation to occur can be considered an "animation map."

Cheng renders a playable map of a course "where the rendered map is an animation map of an actual location" as recited in claim 38. Cheng's system can "recreate the experience of playing on a course (e.g., a golf course, a baseball diamond, a race track) utilizing digital representations of actual photographs of the course combined with computer generated two dimensional (2D) and 3D graphics, *animation* and effects." Cheng ¶ 0047, *emphasis added*. Cheng's resultant course map is an animation map because the resultant course includes animations.

Application/Control Number: 13/194,946                                    Page 13
Art Unit: 3718

The Applicant argues "digital representations of actual photographs are not an animation map" and "the claim does not refer to 'animations,' but instead to 'an animation map.'" Appeal at 19. However, as discussed above, Cheng explicitly recites that the actual playable rendered course includes animations. Cheng teaches that the playable course (the rendered map) provides animations; therefore, the course is an animation map as broadly interpreted.

Furthermore, by the Applicants own arguments, Cheng's course is an animation map. While arguing the 35 USC 112, first paragraph rejection of claim 38, the Applicant argued that video games are known to use an animation-type map. *See* Appeal at 11-12. The applicant argues "one of ordinary skill in the art would recognize that an animation map could be a representation since a reality-based animation map is a representation of a real location." *Id*. Cheng's rendered course maps are used in video games which include animated play on the course and are animation maps.

## VII. *Claim 40 is Anticipated by Cheng Because Cheng's Rendered Course Maps are Based on Copies of Course Photo Maps*

Claim 40 recites "the rendered map does not include the map data set itself." Given its broadest reasonable interpretation, any rendered map which does not use the original data file does not include that original data file. *I.e*., a rendered map which uses a copy of the map data file, rather than the actual map data file, meets the claimed limitations.

Cheng's rendered course map is built using cached copies of course photos. Cheng can "pre-fetch photographs, course terrain information and course masks for the

Application/Control Number: 13/194,946                                    Page 14
Art Unit: 3718

next hole of golf from the server 704 and store them in a photo cache 706b, terrain

cache 706c, and course mask cache 706d[.]"  Cached copies of the photos are not the

actual course photo data file and the rendered course maps are based on *copies* of the

photos and not the original photos.  Therefore, literally, the actual original photo data

stored by memory is not included in Cheng's rendered course maps.

The applicant argues "even if copies of the original are used, they still include the

original information captured in those photographs."  As discussed above, Cheng is

literally not using the original map—it uses a copy of the original map.  Copies of data

are not the original data.

## VIII.    *Claim 22 is Obvious over Cheng in view Of Boshker Which Teaches A Map*
## *is Available for Use if it is A Similar Map*

Claim 22 recites a "gather component is configured to obtain the rendered map if

the determination is that the rendered map is available[,] and where the gather

component is configured to collect a map data set if the determination is that the

rendered map is not available."  *I.e.*, if a rendered map is available then that rendered map

map is used, but if a rendered map is not available then data is collected.

While Cheng does not explicitly teach such a feature, Boshker teaches a system

which reuses a previously rendered map if it is available; availability of a map for use is

determined on similarity of the map.  Boshker teaches a system for "rendering a map for

display on a mapping or navigation apparatus, in which the map is rendered for display

by loading data representing particular parts of the map to be displayed."  Boshker ¶

0025.  Furthermore, Boshker determines whether or not to render the map, based on

Application/Control Number: 13/194,946                                    Page 15
Art Unit: 3718

whether the map has previously been rendered; Boshker teaches that "if it is
determined that a new part of the map to be processed for display is sufficiently similar
to map data that is already stored in the local memory of the rendering device, data for
the new part of the map is preferably not read from the main map data store and
processed by the rendering device, but instead the existing map data in the local
memory of the rendering device is re-used.".  Boshker ¶ 0027; *See also* ¶ 55-56.  In
other words, if a previously rendered map can be used (*i.e.*, is available), that previously
rendered map will be used rather than re-rendered.  Boshker's determination of whether
map is similar enough to use is a determination of whether a map is available for use;
*i.e.*, if a map is similar, it is available to be displayed, but if a map is not similar then
there is no available map to be displayed.

      The Applicant argues Boshker "discusses similarity rather than availability."
Appeal at 23.  However, Boshker's determination of similarity is the manner in which
Boshker ultimately determines whether a rendered map is available for display.

**IX.**    ***Claim 31 Is Obvious over Cheng in view of Boshker Which Teaches A Map
is Available for Use if the Map is Determined to be A Similar Map***

      Claim 31 recites "an appraisal component configured to make an appraisal of a
content" and "a decision component configured to proactively make a request the
rendered map for production based, at least in part, on a result form the appraisal,
where the search component is configured to make the determination if the base map
for the rendered map is available."

Application/Control Number: 13/194,946                                   Page 16
Art Unit: 3718

While Cheng does not explicitly teach such a feature, Boshker teaches a system which reuses a previously rendered map if it is available; availability of a map for use is determined on similarity of the map.  Boshker teaches a system for "rendering a map for display on a mapping or navigation apparatus, in which the map is rendered for display by loading data representing particular parts of the map to be displayed."  Boshker ¶ 0025.  Furthermore, Boshker determines whether or not to render the map, based on whether the map has previously been rendered; Boshker teaches that "f it is determined that a new part of the map to be processed for display is sufficiently similar to map data that is already stored in the local memory of the rendering device, data for the new part of the map is preferably not read from the main map data store and processed by the rendering device, but instead the existing map data in the local memory of the rendering device is re-used.".  Boshker ¶ 0027; *See also* ¶ 55-56.  In other words, if a previously rendered map can be used (*i.e.*, is available), that previously rendered map will be used rather than re-rendered.  Boshker appraises—i.e. makes an assessment of—a previously rendered map.  Boshker then decides, based upon its assessment of the previously rendered map whether to use that previously rendered map.  Boshker's determination of whether map is similar enough to use is a determination of whether a map is available for use; *i.e.*, if a map is similar, it is available to be displayed, but if a map is not similar then there is no available map to be displayed.

The Applicant argues Boshker does not disclose an appraisal or decision component.  However, those components are taught by Boshker's system which

reviews a previously rendered map (*i.e.*, it appraises the map), and determines whether

or not that previously rendered map should be used.

## X.      Boshker's Priority Date

The Applicant argues the Applicant was denied "fair opportunity to provide

evidence of patentability" because the Examiner did not provide the Applicant a copy of

the provisional application from which Boshker claims priority under 35 USC 102(e).

Appeal at 25.

As stated in the October 29, 2004 memorandum with the subject "Termination of

transitional practice of supplying a copy of a provisional application relied upon to give

prior art effect under 35 U.S.C. § 102(e) to a reference applied in a rejection," "the

transitional practice for supplying a copy of a provisional application relied upon to give

prior art effect under 35 U.S.C. § 102(e) to a reference applied in a rejection has

ended."  *Avilable at*

http://www.uspto.gov/web/offices/pac/dapp/opla/documents/tprovexaminer.pdf.   The

memo further states: "If applicant cannot view or print the provisional application from

the Public PAIR website, applicant can still use the Public PAIR website to order a copy

of the provisional application."  *I.e.*, the Examiner is not required to provide the Applicant

a copy of Boshker's provisional application.

Furthermore, the Applicant states that the rejection is based on 103(a) and not

102(e), and the memo does not apply.  However, priority for 103(a) prior art can be

based on the prior art dates for 102(e).

Application/Control Number: 13/194,946                                    Page 18
Art Unit: 3718

For the above reasons, it is believed that the rejections should be sustained.

This examiner's answer contains a new ground of rejection set forth in section (1) above. Accordingly, appellant must within **TWO MONTHS** from the date of this answer exercise one of the following two options to avoid *sua sponte* dismissal of the appeal as to the claims subject to the new ground of rejection:

(1) **Reopen prosecution**. Request that prosecution be reopened before the primary examiner by filing a reply under 37 CFR 1.111 with or without amendment, affidavit or other evidence. Any amendment, affidavit or other evidence must be relevant to the new grounds of rejection. A request that complies with 37 CFR 41.39(b)(1) will be entered and considered. Any request that prosecution be reopened will be treated as a request to withdraw the appeal.

(2) **Maintain appeal**. Request that the appeal be maintained by filing a reply brief as set forth in 37 CFR 41.41. Such a reply brief must address each new ground of rejection in an arguments section as set forth in 37 CFR 41.37(c)(1) and should be in compliance with the other requirements of 37 CFR 41.37(c). If a reply brief filed pursuant to 37 CFR 41.39(b)(2) is accompanied by any amendment, affidavit or other evidence, it shall be treated as a request that prosecution be reopened before the primary examiner under 37 CFR 41.39(b)(1).

Extensions of time under 37 CFR 1.136(a) are not applicable to the TWO MONTH time period set forth above. See 37 CFR 1.136(b) for extensions of time to reply for patent applications and 37 CFR 1.550(c) for extensions of time to reply for ex parte reexamination proceedings.

Respectfully submitted,

/BACH  HOANG/

Examiner, Art Unit 3718

**A Technology Center Director or designee must personally approve the**

**new ground(s) of rejection set forth in section (1) above by signing below:**

/DONALD T HAJEC/

Director, Technology Center 3700

Conferees:

/Arthur O. Hall/

Supervisory Patent Examiner, Art Unit 3718

/Dmitry  Suhol/

Supervisory Patent Examiner, Art Unit 3716

**PATENT**                                                                                    **CI108USA**

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re patent application of:

Appellant(s):  Ronald C. Krosky, *et al*.              Examiner:     Hoang, Bach V

Serial No:      13/194,946                              Art Unit:       3718

Filing Date:   July 30, 2011

Title:     OUTPUT PRODUCTION

**Mail Stop Appeal Brief – Patents**
**The Honorable Commissioner of Patents and Trademarks**
**P.O. Box 1450**
**Alexandria, VA 22313-1450**

---

## APPEAL BRIEF

---

Dear Sir:

Appellants submit this brief in connection with an appeal of the above-identified patent application in response to the Final Office Action of March 18, 2013 and the Advisory Action of June 10, 2013, and in view of the Notice of Appeal filed by Appellants on June 18, 2013, by which Appellant appeals to the Patent Trial and Appeal Board of the United States Patent and Trademark Office of the rejection, made 'Final' of the at least twice rejected pending claims 2, 4-6, and 21-27, 31, 33, and 35-41 in the above-captioned patent application.

The Appellant's Brief on Appeal is filed within 2 months of the filing of the Notice of Appeal, therefore, no extension of time is required.

This brief contains these items under the following headings and in the order set forth below (37 C.F.R. § 41.37):

I.      Real Party in Interest

II.     Related Appeals and Interferences

III.    Summary of the Claimed Subject Matter

IV.     Arguments

V.      Claims Appendix

The final page of this brief bears the inventors' signatures.


## I.      REAL PARTY IN INTEREST

The real party in interest in the present application is that of Ronald C. Krosky and Brendan E. Clark, co-inventors in the pending application.  Ronald C. Krosky and Brendan E. Clark are presently under contractual obligation to assign their interest in this application to Convergent Insight, LLC of Ohio.


## II.     RELATED APPEALS AND INTERFERENCES

There have been no interferences relating to this pending application, nor any related appeal or litigation.


## III.    SUMMARY OF CLAIMED SUBJECT MATTER

All citations to the specification refer to the specification filed on July 30, 2011 unless otherwise noted.  These citations are merely examples of references to the specification and are not intended to limit interpretation or scope of the claims, nor be an exhaustive listing of references to the specification for the claims.  Claims 1, 3, 7-20, 28-30, 32, and 34 are cancelled. Claims 2, 4-6, 21-27, 31, 33, and 35-41 are pending and under appeal.

Docket No. CI108USA

Application No. 13/194,946

**As claimed in independent claim 4**, a system comprises an interaction component configured to receive a user request for a rendered map, where the user request is an explicit request submitted by a user for a specific area to be rendered (page 9, lines 5-6; page 34, lines 13-22; Figure 3, 305; and Figure 20, 2000); an evaluation component configured to evaluate the request that produces an evaluation result, where the evaluation result indicates information to gather to produce the rendered map (page 9, lines 6-9; Figure 3, 310); a gather component configured to gather the map data set according to information the evaluation result indicates to gather (page 9, lines 9-11; Figure 3, 315); an analysis component configured to analyze the map data set to produce an analysis result (page 7, lines 16-17; Figure 3, 105); and a production component configured to produce the rendered map based, at least in part, on the analysis result, where the rendered map is retained in a computer-readable medium and where the rendered map is a rendering of the specific area (page 7, lines 17-20; page 34, lines 13-22; Figure 3, 110; and Figure 20, 2000).

**As claimed in independent claim 5** a system comprising a search component configured to make a determination if a base map for a rendered map is available (page 8, lines 25-27; Figure 2, 205); an analysis component configured to analyze a map data set to produce an evaluation result, where the base map is at least part of the map data set when available (page 7, lines 16-17; page 8, line 27-30; Figure 2, 105); and a production component configured to produce the rendered map based, at least in part, on the evaluation result, where the rendered map is retained in a computer-readable medium (page 7, lines 17-20; Figure 2, 110).

**As claimed in dependent claim 6** a system comprising an alteration component configured to alter the base map based, at least in part, on a determination on how to alter the base map, where the analysis component being configured to analyze the map data set comprises being configured to make the determination on how to alter the base map in response to the determination if the base map for the rendered map is available being positive (page 13, lines 24-28; Figure 5, 505).

**As claimed in dependent claim 21** where the analysis component is configured to make a determination on if the base map should be used for the rendered map and where the alteration

Docket No. CI108USA

Application No. 13/194,946

component functions in response to the determination on if the base map should be used for the rendered map being positive (page 8, lines 27-30; page 13, lines 24-28)

**As claimed in independent claim 22** a system comprising an interaction component configured to receive a request for a rendered map (page 9, lines 5-6; Figure 3, 305); a gather component configured to make a determination on if the rendered map is available after reception of the request, where the gather component is configured to obtain the rendered map if the determination is that the rendered map is available and where the gather component is configured to collect a map data set if the determination is that the rendered map is not available (page 9, lines 9-11; page 23, lines 13-19; Figure 3, 315; Figure 10, 1010); an analysis component configured to analyze the map data set to produce an analysis result, where the analysis component is configured to analyze the map data set to produce the analysis result if the determination is that the rendered map is not available (page 7, lines 16-17; page 23, lines 13-19; Figure 3, 105; Figure 10, 1010); and a production component configured to produce the rendered map based, at least in part, on the analysis result, where the rendered map is retained in a computer-readable medium and where the production component is configured to produce the rendered map if the determination is that the rendered map is not available (page 7, lines 17-20; page 23, lines 13-19; Figure 2, 110).

**As claimed in dependent claim 23** where the rendered map is usable in a video game, where the computer-readable medium is at a first location, where the rendered map is made available to a second location, and where the first location and the second location are different locations remote to one another (page 31, lines 24-29; page 32, lines 5-7; Figure 14, 1405-1420).

**As claimed in dependent claim 24** where the first location is a first video game system, where the second location is a second video game system, where the rendered map is usable on the first game system, where the rendered map is usable on the second game system, and where the first video game system and the second video game system are different video game systems (page 31, lines 24-29; page 32, lines 5-7; Figure 14, 1405-1420; page 21, lines 14-17, U.S. Provisional Patent Application 61/409,027 incorporated by reference).

Docket No. CI108USA

Application No. 13/194,946

**As claimed in dependent claim 25** where the first location is a first video game system, where the second location is a second video game system, and where the first video game system and the second video game system are the same video game system (page 31, lines 24-29; page 32, lines 5-7; Figure 14, 1405-1420).

**As claimed in dependent claim 26** where a housing retains the computer-readable medium, where the housing retains the analysis component, where the housing retains the production component, where the first location is a video game system, and where the housing is part of the video game system (page 29, lines 1-10; page 35, line 15 to page 36, line 5; Figure 14, 1405 and 1410; Figure 22, 2200).

**As claimed in dependent claim 27** where the first location is a first video game system, where the second location is a second video game system, where the second location is configured to produce a second video game map made available to the first video game system, and where the second video game map is retained at the second video game system (page 29, lines 11-14; page 31, lines 5-17; Figure 14, 1405-1420).

**As claimed in dependent claim 31** a system comprising an appraisal component configured to make an appraisal of a content presented by way of a non-video game application that runs on an electronic device (page 7, lines 22-24; page 8, lines 4-10; page 19, line 2; Figure 8, 810); and a decision component configured to proactively make a request for production of the rendered map based, at least in part, on a result from the appraisal, where the search component is configured to make the determination if the base map for the rendered map is available upon reception of the request (page 19, lines 3-6; page 8, lines 25-27; page 34, lines 25-26; Figure 8, 815).

**As claimed in dependent claim 33** a system comprising an identification component configured to identify a missing information set in the map data set, where the map data set is a physical information set for the specific area, where an actual information set for the missing information set is unavailable to the an interaction component, the evaluation component, the gather

Docket No. CI108USA

Application No. 13/194,946

component, the production component, and the analysis component (page 18, lines 7-9; Figure 7, 705); and an approximation component configured to generate a substitute information set for the missing information set, where the substitute information is part of the map data set (page 18, lines 9-11; Figure 7, 710).

**As claimed in dependent claim 35** a system comprising a discovery component configured to discover an information set about the specific area, where the information set is not part of the map data set (page 14, lines 14-18); and an alteration component configured to alter the rendered map to reflect the new information set (page 14, lines 1-13).

**As claimed in dependent claim 36** where the information set is a correction to a piece of data of the map data set (page 14, lines 1-13).

**As claimed in dependent claim 37** where the user request is entered through the user filling out a form on an interface (page 34, lines 13-22; Figure 20, 2000).

**As claimed in dependent claim 38** where the rendered map is an animation map of an actual location (page 11, lines 13-19 of U.S. Provisional Patent Application 61/409,027 incorporated by reference; page 21, lines 14-17 of U.S. Provisional Patent Application 61/409,027 incorporated by reference).

**As claimed in dependent claim 40** where the production component is configured to create the rendered map, where the rendered map is based, at least in part, on the map data set, and where the rendered map does not include the map data set itself (page 9, lines 17-22).

**As claimed in dependent claim 41** where the request is a direct user request for the rendered map (page 34, lines 13-22; Figure 20, 2000).

Docket No. CI108USA

Application No. 13/194,946

## IV.   ARGUMENT

### STATUS OF AMENDMENTS

Following the Final Office Action of March 18, 2013 (hereafter "FOA"), Appellants filed a Response on May 20, 2013 including amendments to the claims and specification.  On June 10, 2013 two documents were present in the Image File Wrapper that told conflicting information. An Advisory Action of that date said amendments were not to be entered, but another document was entered titled "Amendment After Final or under 37CFR 1.312, initiated by the examiner" that said the amendments were "ok to enter".   Appellants proceed in this appeal with the understanding these amendments were entered.

### LEGAL BASIS FOR ARGUMENT

#### 35 U.S.C. § 102 – Anticipation

The statutory standard under 35 U.S.C. §102(b)  (pre-AIA) is that a patent may not be obtained when the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States.

In order to anticipate a claim under 35 U.S.C. § 102, a prior art reference must teach all of the limitations of that claim.  MPEP § 2131.  "A claim is anticipated only if *each and every element* as set forth in the claim is found, either expressly or inherently described, in a single prior art reference" (emphasis added).  *Verdegaal Bros. v. Union Oil Co. of California*, 814 F.2d 628, 631, 2 USPQ2d 1051, 1053 (Fed. Cir. 1987).  "The identical invention must be shown in as complete detail as is contained in the [...] claim." *Richardson v. Suzuki Motor Co*., 868 F.2d 1226, 1236, 9 USPQ2d 1913, 1920 (Fed. Cir. 1989).  Because the cited reference does not disclose *each and every element* of the rejected claims, the rejection is in error and should be reversed.

Docket No. CI108USA

Application No. 13/194,946

### 35 U.S.C. § 103 (Obviousness)

The statutory standard under 35 U.S.C. §103(a) is that a patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

A claimed invention is unpatentable under 35 U.S.C. §103 if the differences between it and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art.  35 U.S.C. § 103 (1994); *Graham v. John Deere Co.,* 383 U.S. 1, 14 (1966).

The Supreme Court issued its opinion in *KSR* regarding obviousness under 35 U.S.C. §103(a) when the claim recites a combination of elements of the prior art.  *KSR Int'l Co. v. Teleflex, Inc.,* 550 U.S. 398 (2007).  The Court reaffirmed the *Graham* factors in the determination of obviousness under 35 U.S.C. §103(a).  The four factual inquiries under *Graham* are:

(a)  determining the scope and contents of the prior art;

(b)  ascertaining the differences between the prior art and the claims in issue;

(c)  resolving the level of ordinary skill in the pertinent art; and

(d)  evaluating evidence of secondary consideration.

*Graham v. John Deere*, 383 U.S. 1, 17-18, 148 USPQ 459, 467 (1966).

The Court in *KSR* did not totally reject the use of the earlier "teaching, suggestion, or motivation" (*See*, *e.g.*, *Winner Int'l Royal Corp. V. Wang*, 202 F.3d 1340 (Fed. Cir. 2000)) as a factor in the obviousness analysis.  Rather, the Court recognized that a showing of "teaching, suggestion, or motivation" to combine the prior art to meet the claimed subject matter could provide a helpful insight in determining whether the claimed subject matter is obvious under 35 U.S.C. §103(a).The Court noted that the analysis supporting a rejection under 35 U.S.C. §103(a) should be made explicit, and that it was "important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the [prior art] elements" in the manner claimed.  The Court specifically stated:

> Often, it will be necessary […] to look to interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art, all in order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue.  To facilitate review, this analysis should be made explicit.

*KSR*, slip op. at 14 (emphasis added).

Therefore, in formulating a rejection under 35 U.S.C. §103(a) based upon a combination of prior art elements, it remains necessary to identify the reason why a person of ordinary skill in the art would have combined the prior art elements in the manner claimed.

35 U.S.C. § 112 – Written Description Requirement

35 U.S.C.  § 112, first paragraph (pre-AIA) states:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

The MPEP provides guidance regarding application of this law to the claims of a patent application:

> It should be noted, however, that exact terms need not be used in haec verba to satisfy the written description requirement of the first paragraph of 35 U.S.C. 112. Eiselstein v. Frank, 52 F.3d 1035, 1038, 34 USPQ2d 1467, 1470 (Fed. Cir. 1995); In re Wertheim, 541 F.2d 257, 265, 191 USPQ 90, 98 (CCPA 1976). See also 37 CFR 1.121(e) which merely requires substantial correspondence between the language of the claims and the language of the specification.

MPEP § 1302.01, ¶ 13.08.  *See also* MPEP § 2163.

Standard of Examination

In addition, "[t]he goal of examination is to clearly articulate any rejection early in the prosecution process so that the applicant has the opportunity to provide evidence of patentability

and otherwise reply completely at the earliest opportunity." MPEP § 706. The rejections of the record do not clearly articulate the rejection as summary treatment of multiple claims does not apprise Appellant of the specific rationale supporting the Office's position, and are accordingly improper.

<u>Citations in Office Correspondence</u>

While discussion hereafter is directed toward citations provided by the Office for purposes of clearly refuting the Office's position with respect to the rejected claims, Appellants are apprised of the requirement to consider cited references in their entirety. A balance exists between MPEP § 706 (discussed above) and full consideration of all information available. Appellants' focus on specific citations (i.e., specific paragraphs or figures) should not be mistaken for failure to consider the document(s) as a whole, and, where relevant, Appellants discuss non-cited portions of the documents.

### **APPLICATION TO CLAIMS**

### **Rejection of Claim 38 – 35 U.S.C. § 112**

The Office rejects claim 38 under 35 U.S.C. § 112, first paragraph for failing to comply with the written description requirement. This rejection should be reversed because this claim complies with 35 U.S.C. § 112. In particular, it is not necessary that the claim recites expressly the exact language of the specification or priority documents (there is no *in haec verba* requirement) to comply with this section:

> It should be noted, however, that exact terms need not be used in haec verba to satisfy the written description requirement of the first paragraph of 35 U.S.C. 112. Eiselstein v. Frank, 52 F.3d 1035, 1038, 34 USPQ2d 1467, 1470 (Fed. Cir. 1995); In re Wertheim, 541 F.2d 257, 265, 191 USPQ 90, 98 (CCPA 1976). See also 37 CFR 1.121(e) which merely requires substantial correspondence between the language of the claims and the language of the specification.

MPEP § 1302.01, ¶ 13.08. *See also* MPEP § 2163.

Docket No. CI108USA

Application No. 13/194,946

For claim 38, the Office argues that the animation map has not been disclosed by the specification.  FOA, section 5.  This rejection should be reversed because full, substantial support exists in the specification and incorporated priority document.  The specification states "[t]his application claims the benefit of U.S. provisional application serial No. 61/409,027 filed on November 1, 2010, which is hereby wholly incorporated by reference." (page 1, lines 4-5).  U.S. provisional application serial No. 61/409,027 states (emphasis added):

> [a] group of people can play an online fantasy game (e.g., World of Warcraft) or similar virtual-world application (e.g., Second Life) as well as other games.  A new area of the game can be based off a real area.  In one example, Central Park in New York City or Nottingham Forrest in England can be analyzed and a map can be rendered with features of these areas playable in the online fantasy game.  In another example, real-life places can be imported and modified to serve as *a basis or inspiration for a representation* of an alternate reality.

Page 11, lines 13-19.  This discusses the actual location (e.g., real-life place) serving as a basis or inspiration for an animation map (e.g., representation).  Furthermore, the provisional application states:

> [a]n iteration component 1704 can make multiple copies of a map.  In one embodiment, a system (e.g., the system 100 of Figure 1) creates a map.  However, that may be applicable in different applications (e.g., one for Xbox and one for Playstation, one for Gran Turismo and one for Forza, etc.).

Page 21, lines 14-17.  These applications do not run live camera views from race tracks but instead use drawn race tracks.  Thus, it is clear that the maps discussed in the specification can be animation maps.  Therefore, the rendered map can be an animation map of an actual location in embodiments.  This satisfies the statutory requirements.

In the Advisory Action, the Office argues that even if an animation could be a representation, one of ordinary skill in the art would not clearly recognize that the animation map could be a representation.  On the contrary, one of ordinary skill in the art would recognize that an animation map could be a representation since a reality-based animation map is a representation of a real location.  The Office also argues that only maps are discussed in the specification (with the provisional application) and not animation maps as claim 38 recites.  However, as stated above, the provisional application expressly discusses maps applicable in

Docket No. CI108USA

Application No. 13/194,946

Gran Turismo and Forza, which are video games known to use an animation-type map. One of ordinary skill in the art would inherently understand that Gran Turismo and Forza use animated maps since these video games do not employ photographic maps. The Office's final statement is that since a definition is not provided, it is unclear what an animation map could or could not be. A definition need not be provided as the term is clear on its face – a map that an animation (e.g., non-photographic). Accordingly, this rejection should be reversed.

Appellants note that specific references to the specification are merely used to show support for claims with regard to 35 U.S.C. § 112(a) and are not to be used to limit the scope of the claims. Furthermore, even though specific references are used these are not necessarily the best or only references in the specification to support this claim feature.

### Rejection of Claims 2, 4-6, 21, 33, and 38-41 – 35 U.S.C. § 102

Claim 2, 4-6, 21, 33, and 38-41 are rejected under 35 U.S.C. § 102(b) as being anticipated by Cheng (US Pub. No. 2008/0293488 A1) (hereafter "Cheng"). The rejection of claims 2, 4-6, 21, 33, and 38-41 should be reversed because **Cheng does not identically disclose each and every element** of the rejected claims as required under the authorities cited above.

Independent claim 4

Claim 4 recites (emphasis added) "an interaction component configured to receive a user request for a rendered map, where the user request is an ***explicit*** request submitted by a user for a specific area to be rendered[…] " The Office cites paragraph [0062] of Cheng and incorrectly interprets this paragraph to disclose "[a] user explicitly request a rendered map area to be rendered via an input which sends a ball to a portion of a course which is to be rendered." FOA, page 5, section 14.

In paragraph [0062] of Cheng, a player hits a virtual golf ball played on a course photograph. Depending on where the player hits the virtual golf ball different photographs can be presented consistent with the hit of the golf ball. For example, if the player hits the golf ball from the tee into a sand trap then different photographs are presented showing the ball travel to the sand trap. However, the player submits no explicit request for a rendered map area to be rendered. Instead the user merely requests to play the golfing game without any thought to how

Docket No. CI108USA
Application No. 13/194,946

the next area is rendered.  In other words, at best in Cheng the user requests to play a next shot while claim 4 recites explicit request submitted by a user for a specific area to be rendered.

Put another way, in a golf video game a player can play a par 3 hole and hit the golf ball with an iron onto the green.  The purpose of this shot is to try to play the hole in as few shots as possible and to continue playing the game.  While the player wants to be able to putt his or her next shot and has a vested interest in the green being available for putting, the player is not explicitly requesting for rendering to occur.  Appellants note that, if the user hits a "bad" shot directing the ball to an area not intended, the user will receive a portion of the map they actually did not want.  Further, on this par 3 hole, the player would likely want to have the ball go in the hole in one shot and as such actually not want the green to be displayed at all for putting.  Presentation of more than the tee and hole goes against the desire of the player and therefore would not be an explicit request from the user.

The Office also cites paragraph [0178] of Cheng and then argues "[w]hen the clients (users) choose to play on the same course, the players are explicitly choosing the course to be rendered".  FOA, page 5, section 14.  This is a logical leap that is neither supported by what Cheng discloses nor proper under § 102.  When clients choose to play on the same course, they are expressly deciding what course they want to play on without any indication on if the course is to be rendered or exists and can be played without a rending occurring.  As is appreciated by the context of the claim – involving not only the interaction component, but also the evaluation component, gather component, analysis component, and production component – rendering as claimed involves more than presenting a wholly predefined gameplay area.  The basic choice presented in paragraph [0178] falls short of such claimed aspects.

Cheng's user may request to play a course, but this does not involve an explicit request for that course to be rendered.  Cheng is silent on how the course is made available, and there is no user request that is an explicit request submitted by a user for a specific area to be rendered in Cheng.  As a threshold issue, this makes this reference improper for § 102 reliance.

As an illustrative example, this could be interpreted as the user request being "I am selecting to play Augusta National," as opposed to the user request being "Please render a playable version of Augusta National" – the first request is not explicit with regard to a specific area to be rendered since no concern is given to rendering (and instead to playability) while in

Docket No. CI108USA

Application No. 13/194,946

the second request specific concern to rendering is made.   Even if the first request for Augusta National so happens to be rendered in response to the request, it is irrelevant to the request itself not being explicit with regard to rendering.  In contrast, the second request explicitly requests that Augusta National be rendered, and empowers the user go beyond wholly predefined options.

It is to be appreciated that the foregoing is presented merely to explain differences between Cheng and claim 4 and it should not be used to limit the scope of the claims, used to define any term of the claims, be interpreted as an admission by the Appellants that Cheng and the claims are similar, or for any other purpose other than explaining the differences.

The Office additionally cites paragraph [0181] of Cheng, which states (emphasis added):

> [a]dditionally, the signals can be provided to a server communication component 730 which is responsible for communicating with a server 704. ***The communication component 730 can accumulate signals over time until a certain state is reached and then, based on the state, send a request to the server 704.*** For example, once input signals for a complete swing have been recognized by the server communication component 730, a request to the server is generated with information regarding the physical parameters of the swing (e.g., force, direction, club head orientation). In turn, the server 704 sends a response to the client 702 that can include a virtual object's path through the virtual course based on the physical parameters of the swing, 2D photographs required to visually present the path by the GUI 718, course terrain information, course masks, game assets such as sounds and haptic feedback information, and other information. The response can be broken into one or more individual messages. In addition, some information can be requested by the client 702 ahead of time. For example, the client 702 can pre-fetch photographs, course terrain information and course masks for the next hole of golf from the server 704 and store them in a photo cache 706b, terrain cache 706c, and course mask cache 706d, respectively.

Cheng's request in paragraph [0181] is not an explicit request submitted by a user for a specific area to be rendered, but instead a continuation of an ongoing machine process invisible to the user produced when a state is reached.  While the user may influence the state, one of ordinary skill in the art understands that many processes in computer logic are performed invisibly to the user, and in no way resemble the claimed explicit request.  Cheng goes against an explicit request as claim 4 recites but instead discloses a machine-generated request.

Docket No. CI108USA
Application No. 13/194,946

In the Advisory Action, the Office asserts that Cheng provides rendering when the user provides explicit input sending a golf ball to an areas and that area will be rendered based on those explicit instructions.  Using the Office's example, the explicit input is an attempt to hit the golf ball and advance gameplay.  This is still not an explicit request as claimed.  Whether or not the area is rendered or not is not the concern of the user in Cheng – just that the user can continue to play.  In Cheng the user is not explicitly requesting that the golf ball be sent **and** the area be rendered, just that the golf ball be sent.  Claim 4 requires that the user request be an explicit request for a specific area to be rendered.  Such aspects are not in the reference.

In view of the above, the rejection should be reversed.


<u>Independent claim 5</u>

Claim 5 recites (emphasis added) "a search component configured to make a determination if a base map for a rendered map *is available*".  The Office cites paragraphs [0064] and [0184] as well as TABLE 1 of Cheng against this claim feature.  FOA, section 21.  Paragraph [0064] of Cheng states:

> [i]n order to systematically photograph an actual course (e.g., a track, a golf course, a baseball diamond, a football field, a tennis court, one or more roadways) for use in electronic game or other application, the course can be manually or automatically divided into a grid of cells. Each cell defines a physical area of the course that will be photographed for use in the simulation. Each cell can have one or more photographs associated with the cell. In various implementations, a cell photograph captures the area of the course corresponding to the area of the cell. FIG. 3A illustrates an example course grid 300. A course can be of any size and shape, and can include non adjacent areas. Likewise, cells can have different sizes, shapes and do not have to be adjacent to one another. Depending on the portion of the course they cover, cell density can change. In various implementations, cell density increases in course areas where players are more likely to interact with virtual objects.

Paragraph [0064] of Cheng discusses how a golf course is photographed and provides no discussion of a determination on if a base map for the rendered map is available in Cheng.

Paragraph [0184] of Cheng, that also discusses TABLE 1, states:

Docket No. CI108USA

Application No. 13/194,946

> [i]n various implementations, if there is more than one photograph
> that can be used to show a particular portion of a path (or
> substantially the same portion of the path), the photograph with the
> highest priority is selected for the automatically generated shot
> sequence. Photograph priority is based on one or more factors
> which are described in TABLE 1. However, other factors are
> possible.

Paragraph [0184] discusses selection priority for photographs when more than one photograph can be used (*i.e.*, which photograph should be used among several available photographs) and TABLE 1 details selection factors. With this selection priority, no determination is made if a base map for a rendered map is available. No determination is made on if a photograph is available, but instead a selection of a photograph is made that is part of a photograph set that is already available. (Appellants note that this does not mean that the photograph is equivalent to the base map.)

In the response to amendments/arguments section of the FOA, the Office argues that Cheng discloses multiple photographs and those photographs must be searched to determine a priority photograph to use. FOA, section 72. Regardless of whether this interpretation is accurate, such an aspect is irrelevant to the claim at issue. The fact that the component is called a search component does not mean that any search function covers the recited claim feature, but only a component configured to make a determination if a base map for a rendered map is available. Searching a known database of photos does not identically disclose the claimed aspects as required under § 102.

In the Advisory Action the Office states that Cheng must search through multiple photographs to determine which photograph to use when rendering. This is irrelevant to the claimed base map and a determination on availability. The Office does suggests that the search may come up with a no result with the phrase "if one exists at all", but no citation to Cheng is shown and Cheng does not appear to contemplate that a photograph would not be available.

Thus, the rejection should be reversed.

Dependent claim 6

Claim 6 recites "an alteration component configured to alter the base map based, at least in part, on a determination on how to alter the base map, where the analysis component being

Docket No. CI108USA

Application No. 13/194,946

configured to analyze the map data set comprises being configured to make the determination on how to alter the base map in response to the determination if the base map for the rendered map is available being positive."   The Office cites paragraph [0191] of Cheng against this claim feature.  FOA, section 24.

Paragraph [0191] of Cheng states:

> [s]ometimes it may be advantageous to combine two or more photographs into a single continuous photograph, such as when the "best" photograph for a virtual object would be a combined photograph, to provide a larger field of view than what is afforded by a single photograph, or to create the illusion that users can freely move through a course. In some implementations, an image stitcher component 727 can combine two or more photographs into a continuous image by aligning the photographs based on identification of common features, stabilizing the photographs so that they only differ in their horizontal component, and finally stitching the images together. The image stitcher 727 can be utilized by the photo mapper 722 or the shot selector 720 to combine photographs.

Paragraph [0191] of Cheng discusses image stitching and provides no discussion related to a determination on how to alter the base map.  Although paragraph [0191] states that photo stitching can occur and why such stitching may be beneficial, Cheng is silent with regard to determining how a map alteration would occur.  No disclosure is given in paragraph [0191] or other portions of Cheng as to a determination on how to alter a base map as claim 6 recites, nor is there a suggestion of on what Cheng would base such a determination on.

In addition, as discussed with regard to claim 5, Cheng does not discuss availability of the rendered map.  Cheng therefore does not address any component or technique configured to make the determination on how to alter the base map in response to the determination if the base map for the rendered map is available being positive.

In the response to amendments/arguments section of the FOA, the Office argues that the base map is altered when the photos are stitched to create altered photos.  FOA, section 73.  It is unclear to Appellants how photos being stitched together function as an alteration of a base map.  Additional arguments advanced by the Office (FOA, section 73) do not address the claim language.  The claim language is not, as it appears the Office is interpreting, on a determination whether or not to alter the based map, but a determination on *how* to alter the base map.

Docket No. CI108USA

Application No. 13/194,946

The Advisory Action restates the Office's position from the FOA and then adds that the determination Cheng makes is whether or not to stitch and that exactly how such determinations are made is not required by the claim language.  The Office is focusing on the wrong 'how' – how such determinations are made are irrelevant to the argument advanced by the Appellants, but instead that the claim recites a determination on how to alter the base map.  Cheng discusses no such determination.

In view of the above, the rejection should be reversed.

Dependent claim 21

Claim 21 recites "where the analysis component is configured to make a determination on if the base map should be used for the rendered map and where the alteration component functions in response to the determination on if the base map should be used for the rendered map being positive."  The Office cites paragraph [0191] of Cheng against this claim feature. FOA, section 25.

Paragraph [0191] of Cheng is discussed above with regard to claim 6.  To reiterate, paragraph [0191] discusses photo stitching, the function of a stitcher component, and why such stitching may be beneficial.  No indication is given in paragraph [0191] of Cheng regarding a determination on if the base map should be used for the rendered map.

In the response to amendments/arguments section of the FOA, the Office argues that the base map is altered when the photos are stitched to create altered photos.  This is irrelevant to this claim because it does not address the recited determination.

The Office also argues that a determination inherently has to be made whether or not to stitch photos when it is sometimes advantageous to stitch photos.  This is not supported by the cited document and is accordingly improper under § 102 which requires support for identical features in a proper reference.  In addition, even if this is inherent (a point not asserted by the Appellants), this does not reach as far as the alteration component functioning in response to the determination being positive.  Further, the Office has not established how the photographs function as a base map.

Thus, the rejection should be reversed.

Docket No. CI108USA
Application No. 13/194,946

Dependent claim 38

Claim 38 recites "where the rendered map is an animation map of an actual location." The Office cites paragraphs [0006] and [0047] of Cheng against this claim feature. With regard to paragraph [0006], the Office cites the sentence "[s]electing a sequence of one or more photographic images is governed by a script." FOA, section 27. The fact that a sequence of photographic images is used does not change these from being photographic images and thus not an animation.

Paragraph [0047] states:

> [v]arious implementations recreate the experience of playing on a course (e.g., a golf course, a baseball diamond, a race track) utilizing digital representations of actual photographs of the course combined with computer generated two dimensional (2D) and 3D graphics, animation and effects.

Digital representations of actual photographs are not an animation map, and nothing in Cheng indicates these to be anything other than photographs, which are distinguished from the claims. The fact that the term 'digital representations' is used does not mean that these are not photographs, or that the reference reads on an animation map. For example, in paragraph [0051] of Cheng element 102a is a digital representation of photographic images of an actual golf course, but review of Figure 1A (which includes 102a) shows a photograph. Other references to 102a in Cheng, including the second sentence of paragraph [0051] as well as paragraphs [0052] and [0062], show that 102a is a photograph. Thus, the digital representation refers to a digital file of the photograph and not an animation.

In the Advisory Action the Office states that Cheng explicitly recites animations. However, this assertion is uncited. Additionally, the claim does not refer to 'animations', but instead to "an animation map", which requires more than a semantic similarity to properly anticipate. Finally, Cheng clearly discusses use of photographs and not animation maps.

In view of the above, the rejection should be reversed.

Dependent claim 40

Claim 40 recites "where the rendered map is based, at least in part, on the map data set, and where the rendered map does not include the map data set itself." The Office cites

Docket No. CI108USA

Application No. 13/194,946

paragraphs [0061] and [0181] against this claim feature, and provides the argument that cached copies of original photographs are used.  FOA, section 29.  Even if copies of the original photographs are used, they still include the original information captured in those photographs. In Cheng, the original information itself contained in the photographs, whether original or copies, are used during play.  In contrast, the rendered map recited in claim 40 does not include the map data itself.

In the Advisory Action the Office argues that photographic data is used to create the maps in Cheng and that the generated maps are copies of photo data, not the data itself. However, Cheng uses the actual photographs and not merely the data contained within the photographs.

In view of the above, the rejection should be reversed.


<u>Dependent claim 41</u>

Claim 41 depends from claim 22.  Claim 22 recites

> a gather component configured to make a determination on if the rendered map is available after reception of the request, where the gather component is configured to obtain the rendered map if the determination is that the rendered map is available and where the gather component is configured to collect a map data set if the determination is that the rendered map is not available

The Office notes that Cheng does not teach this claim feature.  FOA, section 37.  Since this feature is not recited by Cheng and claim 41 depends from claim 22, Cheng cannot disclose what claim 41 recites.

In the Advisory Action the Office asserts that the claim 41's features were already taught by the features of claim 1.  However, claim 41 further defines claim 22, not claim 1.  Claim 22 recites the gather component that the Office expressly states is not taught by Cheng.  Therefore, Cheng alone cannot teach claim 41 and as such a rejection of Cheng alone is improper since Cheng does not teach the gather component as conceded by the Office.

In view of the above, the rejection should be reversed.


<u>Dependent claims not individually treated</u>

Docket No. CI108USA

Application No. 13/194,946

Dependent claims disclosed herein depend from independent claims that are shown herein to not be properly rejected. As such the rejection of claims that depend from these independent claims are also shown herein to not be properly rejected due, at least in part, to their dependency and therefore their rejection should also be reversed.

## Rejection of Claims 22 and 31 under 35 U.S.C. 103(a)

Claim 22 and 31 are rejected under 35 U.S.C. § 103(a) as being obvious in view of Cheng and Boschker *et al*. (U.S. Pub. No. 2012/0306923 A1) (hereafter "Boschker"). This rejection should be reversed because Cheng and Boschker fail to render obvious all aspects of these claims as required by the above-cited authorities.

Independent claim 22

Claim 22 recites (emphasis added):

> a gather component configured to make a determination on if the rendered map is available after reception of the request, where the gather component is configured to obtain the rendered map if the determination is that the rendered map ***is available*** and where the gather component is configured to collect a map data set if the determination is that the rendered map ***is not available***

The Office concedes that Cheng does not teach this claim feature. FOA, section 37. The Office cites paragraphs [0025], [0027], [0055], [0056], and [0182] of Boschker against this claim feature. FOA, section 38.

Paragraph [0025] states:

> [a]ccording to a first aspect of the present invention, there is provided a method of rendering a map for display on a mapping or navigation apparatus, in which the map is rendered for display by loading data representing particular parts of the map to be displayed from a main map data store for processing for display by a rendering processor of the mapping or navigation apparatus and the rendering processor of the mapping or navigation apparatus has a local memory in which data representing particular parts of a map to be displayed can be stored, the method comprising:

This paragraph is an introduction paragraph and is silent regarding map availability.

Paragraph [0027] states (emphasis added):

Docket No. CI108USA
Application No. 13/194,946

> if it is determined that a part of the map for which data is already stored in the local memory of the rendering processor ***is sufficiently similar*** to the new part of the map to be processed, re-using data for the existing part of the map stored in the local memory of the rendering processor for displaying the new part of the map.

This paragraph discusses how similar a map already stored is to a new part of the map to be processed, not if the map is available.

> Paragraphs [0055]-[0056] state:

> > As discussed above, in the present invention if it is determined that a new part of the map to be processed for display is sufficiently similar to map data that is already stored in the local memory of the rendering device, data for the new part of the map is preferably not read from the main map data store and processed by the rendering device, but instead the existing map data in the local memory of the rendering device is re-used.

> > Conversely, if it is determined that the existing map data stored in the local memory of the rendering device is not sufficiently similar to the new map data so as to be able to be re-used, then the data representing the new part of the map should be, and preferably is, loaded and processed by the rendering device so as to display the relevant part of the map.

These portions of Boschker discuss determining if new map data is sufficiently similar to map data already stored. This determination does not consider if a rendered map is available.

> Paragraph [0182] states:

> > [t]hus, in this arrangement, when map data is to be processed for display, it is determined whether to use already cached map data to display the map data in question, or whether new map data needs to be loaded and processed from the main map storage 230. This is done by means of a similarity analysis 601. If the map data already in the cache 706 is determined to be sufficiently similar to the map data that is to be displayed, the new data from the memory 230 is not loaded, but instead the existing data in the cache is processed for display of the map element in question. This has the benefit of a reduced system load, since already processed data does not need to be reloaded and reprocessed.

Docket No. CI108USA

Application No. 13/194,946

As with the other cited portions and remainder of the reference, this paragraph discusses similarity rather than availability.   These are distinct concepts conflated for purposes of sustaining an improper rejection.

In the Advisory Action, the Office affirms that Cheng and Boschker do not disclose availability, but then states that in Boschker's determination of similarity, availability of a map must be determined (an interpretation the Appellants do not concede).   However, this does not reach the claim language.

Claim 22 not only recites a gather component configured to make a determination on if the rendered map is available, but configured to do so after reception of the request.   The Office has not established that this purported determination in Boschker is done after reception of a request as claim 22 recites.   Furthermore, claim 22 also provides detail on what the gather component is configured to do if the map is available (obtain the rendered map) and if the map is not available (collect a map data set).   No such detail is taught by Cheng and Boschker and these features of claim 22 are not something that must be done in order to determine similarity and therefore are not inherent.

In view of the above, the rejection should be reversed.


<u>Dependent Claim 31</u>

MPEP 2142 states "[t]he examiner bears the initial burden of factually supporting any *prima facie* conclusion of obviousness. If the examiner does not produce a prima facie case, the applicant is under no obligation to submit evidence of nonobviousness."   Further:   "The key to supporting any rejection under 35 U.S.C. 103 is the clear articulation of the reason(s) why the claimed invention would have been obvious."   MPEP § 2141.   The Office, in the FOA, did not clearly articulate grounds for finding obvious at least the appraisal component or decision component recited in claim 31, and as such the Office did not meet its requirement with regard to factually supporting the *prima facie* conclusion of obviousness.

In the Advisory Action, the Office asserts that determining similarity is an appraisal. However, merely stating that determining a similarity is an appraisal is not enough to meet the initial burden to establish a *prima facie* case for rejection.   The prosecution history does not address an appraisal component configured to make an appraisal of a content presented by way

of a non-video game application that runs on an electronic device. Furthermore, the Advisory Action still completely ignores the decision component recited in claim 31 in its entirety.

In view of this, the rejection should be reversed.

Evaluation of Boschker's Priority Date

The Office additionally failed to clearly articulate the rejection and establish a *prima facie* case of obviousness by failing to timely establish and provide references cited against the rejected claims.

In addition to looking at Boschker substantively, the priority date of Boschker must be examined. Boschker has a PCT filing date of Feb 4, 2011 and claims priority to U.S. Provisional Application No. 61/301,256 filed on Feb. 4, 2010. Since the subject application claims priority to U.S. Provisional Application No. 61/409,027 filed on Nov. 1, 2010, the subject application has a priority date before that of the PCT application alone of Boschker, but after Boschker's '256 provisional date.

MPEP § 706 states "[t]he goal of examination is to clearly articulate any rejection early in the prosecution process so that the applicant has the opportunity to provide evidence of patentability and otherwise reply completely at the earliest opportunity." Further, MPEP 706.07 states "[…] in every case the applicant is entitled to a full and fair hearing." Moreover, MPEP 2142 states "[t]he examiner bears the initial burden of factually supporting any *prima facie* conclusion of obviousness. If the examiner does not produce a *prima facie* case, the applicant is under no obligation to submit evidence of nonobviousness…The key to supporting any rejection under 35 U.S.C. 103 is the clear articulation of the reason(s) why the claimed invention would have been obvious."

In the Response to the FOA the Appellant detailed to the Office that U.S. Provisional Application No. 61/301,256 (hereafter "the '256 provisional") was not available to them. The Office returned by citing a memo for guidance that states that any applicant wishing to view a provisional application relied upon under 35 U.S.C. 102(e) should check under Public PAIR and if that provisional application is not available through Public PAIR, then Appellants should pay a fee for a copy of the provisional application. However, in this instance the rejection is not simply a 35 U.S.C. 102(e) rejection, but rejection under 35 U.S.C. 103(a). Thus, the Office, by

way of the examiner, bears the initial burden of factually supporting the *prima facie* case of obviousness. By relying on a publication that has a filing date after the filing date of the subject application yet not providing the document upon which priority is based for the publication, the Office did not meet its initial burden. The Office attempted to establish a *prima facie* case of obviousness by asserting that a publication post-dating Appellants' filing date teaches (in the Office's interpretation which is not conceded by Appellants) part of claims 22 and 31. Appellants were unable to fully study the reference relied upon without additional cost, delay, and inconvenience. This violates MPEP § 2142 and falls short of satisfying the Office's initial burden.

In short, the Office did not make readily available the evidence necessary to establish that (in the Office's opinion) Boschker is in fact prior art and teaches these claim features.

The Office had ample opportunity to provide to the Appellants the '256 provisional with the FOA or other correspondence. By only providing the '256 provisional with the Advisory Action, the Office has failed to clearly articulate this rejection early in the prosecution process, which denied the applicant fair opportunity to provide evidence of patentability and otherwise reply completely ***at the earliest opportunity*** as required by the MPEP. The delay and expense denies Appellants their right to full and fair hearing to which they are entitled.

In view of the above, the rejections with regard to Boschker should be reversed.

### Rejection of Claims 23 and 25-27 under 35 U.S.C. 103(a)

Claim 23 and 25-27 are rejected under 35 U.S.C. § 103(a) as being obvious in view of Cheng and Masuyama *et al.* (U.S. Pub. No. 2002/0072418 A1) (hereafter "Masuyama"). This rejection should be reversed because claims 23 and 25-27 depend from claim 4 which is believed to be allowable in view of the above. Further, the addition of Masuyama fails to render obvious at least above-distinguished aspects of claim 4. Therefore, this rejection should be reversed.

Masuyama generally relates to integrating acceleration sensors into a portable gaming device and facilitating their relative calibration to particular users and settings in the mobile context. Masuyama, col. 1, line 61 to col. 2, line 6. However, Masuyama fails to disclose or otherwise render obvious "an interaction component configured to receive a user request for a rendered map, where the user request is an explicit request submitted by a user for a specific area

Docket No. CI108USA

Application No. 13/194,946

to be rendered […] where the rendered map is a rendering of the specific area" as recited in independent claim 4.   Accordingly, claim 4 is allowable over Masuyama (alone or in combination with Cheng), and rejection of claims that depend therefrom is improper based at least on their dependence.

While discussion of the particular aspects recited in these claims is omitted for brevity, the foregoing should not be interpreted as a waiver or concession on part of the Appellant with respect to these claims' patentability independent of their respective base claims.

### Rejection of Claim 24 under 35 U.S.C. 103(a)

Claim 24 is rejected under 35 U.S.C. § 103(a) as being obvious in view of Cheng, Masuyama, and Choudhry et al. (U.S. Pub. No. 2008/0227548 A1) (hereafter "Choudhry").  This rejection should be reversed because claim 24 depends from claim 4 which is believed to be allowable in view of the above, and the addition of Choudhry fails to render obvious at least above-distinguished aspects of the respective base claim.  Therefore, the rejection of these claims is moot and their rejection should be reversed.

Choudhry generally relates to a software application designed to include stacks and/or ports that facilitate online multiplayer interaction across multiple gaming platforms.  Choudhry, paragraphs [0002] and [0003].  However, Choudhry does not disclose "[…] an interaction component configured to receive a user request for a rendered map, where the user request is an explicit request submitted by a user for a specific area to be rendered […] where the rendered map is a rendering of the specific area" as recited in independent claim 4.  Accordingly, claim 4 is allowable over Choudhry (alone or in combination with Cheng and/or Masuyama), and rejection of claims that depend therefrom is improper based at least on their dependence.

While discussion of the particular aspects recited in these claims is omitted for brevity, the foregoing should not be interpreted as a waiver or concession on part of the Appellant with respect to these claims' patentability independent of their respective base claims.

### Claim Rejection under 35 U.S.C. 103(a)

Claims 35-36 are rejected under 35 U.S.C. § 103(a) as being anticipated by Cheng in view of Herzog et al. (U.S. Pub. No. 2008/0227548 A1).  This rejection should be reversed

Docket No. CI108USA

Application No. 13/194,946

because claims 35-36 depends from claim 4 which is believed to be allowable in view of the above, and the addition of Herzog fails to render obvious at least above-distinguished aspects of the respective base claim. Therefore, the rejection of these claims is moot and their rejection should be reversed.

Herzog geneally relates to identifying a geospatial pattern based on device data. Map data is defined based on the identified pattern and a determination is made if the map data should be included in a map for presentment to a user (Herzog paragraph [0002]). However, Herzog does not disclose or suggest "a discovery component configured to discover an information set about the specific area, where the information set is not part of the map data set; and an alteration component configured to alter the rendered map to reflect the new information set" or "where the information set is a correction to a piece of data of the map data set" as recited in claims 35 and 36. The Office cites paragraph [0027] against the discovery component recited in claim 35, but Herzog teaches no such components as in claim 35. Accordingly, claims 35-36 are allowable over Herzog (alone or in combination with Cheng), and rejection of claims that depend therefrom is improper based at least on their dependence.

While discussion of the particular aspects recited in these claims is omitted for brevity, the foregoing should not be interpreted as a waiver or concession on part of the Appellant with respect to these claims' patentability independent of their respective base claims.

## Rejection of Claim 37 under 35 U.S.C. 103(a)

In rejecting claim 37, the Office concedes that Cheng does not disclose or suggest "where the user request is entered through the user filling out a form on an interface." To compensate for this deficiency, the Office relies upon Official Notice. MPEP § 2144.03(A) states: "It is never appropriate to rely solely on 'common knowledge' in the art without evidentiary support in the record, as the principal evidence upon which a rejection was based" citing *In re Zurko*, 258 F.3d at 1385, 59 USPQ2d at 1697.

Moreover, the Office takes Official Notice with respect to the subject claim, merely stating that certain claim aspects are old and well known in the art. However, when such Notice is taken, the Office must provide specific factual findings predicated on sound technical and scientific reasoning to support a conclusion of common knowledge. See MPEP 2144.03 citing *In*

Docket No. CI108USA
Application No. 13/194,946

*re Soli*, 317 F.2d 941 (CCPA 1963); *In re Chevenard*, 139 F.2d 713 (CCPA1943).  In the FOA, the Office has not provided any factual findings to support this conclusion.  Instead, the Office simply states "that it is well known for users to make request by filling out forms on interfaces.  Doing so provides an input into a system."  Appellant traverses this rejection as the Office has not provided any factual findings to support the above-noted conclusion as required.  Appellant requested that the Office produce authority for the above-noted conclusion, including documentary evidence in the next Office Action or Advisory Action if this rejection is to be maintained, as required under the MPEP.  *See* MPEP 2144.03 citing *In re Chevenard*, 139 F.2d 713 (CCPA1943) and *In re Zurko*, 258 F.3d 1379 (Fed. Cir. 2001).  No such support was provided.

In the Advisory Action the Office cites a number of patents and one publication that purportedly teach this claim feature and give detail on the publication.  This falls short of the requirement that the Office provide specific factual findings predicated on ***sound technical and scientific reasoning*** to support a conclusion of common knowledge.

In view of the above, the rejection should be reversed.

Docket No. CI108USA

Application No. 13/194,946

## CONCLUSION

For at least the above reasons, the claims currently under consideration are believed to be patentable over the cited references and compliant with the requirements of allowable claims. Accordingly, it is respectfully requested that the rejections of claims 2, 4-6, 21-27, 31, 33, and 35-41 be reversed and a notice of allowance be issued.

Respectfully submitted,

  /Ronald Krosky/
Ronald Krosky, Co-Inventor

  /Brendan Clark/
Brendan Clark, Co-Inventor

Docket No. CI108USA

Application No. 13/194,946

## V.   <u>CLAIMS APPENDIX</u>

1.      (Cancelled)


2.      The system of claim 4, where the production component produces the rendered map such that a pre-rendered map is altered in accordance with the map data set to become the rendered map.


3.      (Cancelled)


4.      A system, comprising:

an interaction component configured to receive a user request for a rendered map, where the user request is an explicit request submitted by a user for a specific area to be rendered;

an evaluation component configured to evaluate the request that produces an evaluation result, where the evaluation result indicates information to gather to produce the rendered map;

a gather component configured to gather the map data set according to information the evaluation result indicates to gather;

an analysis component configured to analyze the map data set to produce an analysis result; and

a production component configured to produce the rendered map based, at least in part, on the analysis result, where the rendered map is retained in a computer-readable medium and where the rendered map is a rendering of the specific area.

Docket No. CI108USA
Application No. 13/194,946

5.      A system, comprising:

a search component configured to make a determination if a base map for a rendered map is available;

an analysis component configured to analyze a map data set to produce an evaluation result, where the base map is at least part of the map data set when available; and

a production component configured to produce the rendered map based, at least in part, on the evaluation result, where the rendered map is retained in a computer-readable medium.

6.      The system of claim 5, comprising:

an alteration component configured to alter the base map based, at least in part, on a determination on how to alter the base map, where the analysis component being configured to analyze the map data set comprises being configured to make the determination on how to alter the base map in response to the determination if the base map for the rendered map is available being positive.

7-20.    (Cancelled)

21.     The system of claim 6, where the analysis component is configured to make a determination on if the base map should be used for the rendered map and where the alteration component functions in response to the determination on if the base map should be used for the rendered map being positive.

Docket No. CI108USA
Application No. 13/194,946

22.    A system, comprising:

an interaction component configured to receive a request for a rendered map;

a gather component configured to make a determination on if the rendered map is available after reception of the request, where the gather component is configured to obtain the rendered map if the determination is that the rendered map is available and where the gather component is configured to collect a map data set if the determination is that the rendered map is not available;

an analysis component configured to analyze the map data set to produce an analysis result, where the analysis component is configured to analyze the map data set to produce the analysis result if the determination is that the rendered map is not available; and

a production component configured to produce the rendered map based, at least in part, on the analysis result, where the rendered map is retained in a computer-readable medium and where the production component is configured to produce the rendered map if the determination is that the rendered map is not available.

23.    The system of claim 4, where the rendered map is usable in a video game, where the computer-readable medium is at a first location, where the rendered map is made available to a second location, and where the first location and the second location are different locations remote to one another.

24.    The system of claim 23, where the first location is a first video game system, where the second location is a second video game system, where the rendered map is usable on the first game system, where the rendered map is usable on the second game system, and where the first video game system and the second video game system are different video game systems.

25.    The system of claim 23, where the first location is a first video game system, where the second location is a second video game system, and where the first video game system and the second video game system are the same video game system.

Docket No. CI108USA

Application No. 13/194,946

26.     The system of claim 23, where a housing retains the computer-readable medium, where the housing retains the analysis component, where the housing retains the production component, where the first location is a video game system, and where the housing is part of the video game system.

27.     The system of claim 26, where the first location is a first video game system, where the second location is a second video game system, where the second location is configured to produce a second video game map made available to the first video game system, and where the second video game map is retained at the second video game system.

28-30.  (Cancelled)

31.     The system of claim 5, comprising:

        an appraisal component configured to make an appraisal of a content presented by way of a non-video game application that runs on an electronic device; and

        a decision component configured to proactively make a request for production of the rendered map based, at least in part, on a result from the appraisal, where the search component is configured to make the determination if the base map for the rendered map is available upon reception of the request.

32.     (Cancelled)

Docket No. CI108USA

Application No. 13/194,946

33.    The system of claim 4, comprising:

an identification component configured to identify a missing information set in the map data set, where the map data set is a physical information set for the specific area, where an actual information set for the missing information set is unavailable to the an interaction component, the evaluation component, the gather component, the production component, and the analysis component; and

an approximation component configured to generate a substitute information set for the missing information set, where the substitute information is part of the map data set.

34.    (Cancelled)

35.    The system of claim 4, comprising:

a discovery component configured to discover an information set about the specific area, where the information set is not part of the map data set; and

an alteration component configured to alter the rendered map to reflect the new information set.

36.    The system of claim 35, where the information set is a correction to a piece of data of the map data set.

37.    The system of claim 4, where the user request is entered through the user filling out a form on an interface.

38.    The system of claim 4, where the rendered map is an animation map of an actual location.

39.    The system of claim 4, where the rendered map is usable in a video game, where the rendered map is in part an accurate reflection of the specific area and where the rendered map is in part an inaccurate reflection of the specific area.

Docket No. CI108USA

Application No. 13/194,946

40.     The system of claim 4, where the production component is configured to create the rendered map, where the rendered map is based, at least in part, on the map data set, and where the rendered map does not include the map data set itself.

41.     The system of claim 22, where the request is a direct user request for the rendered map.

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 16628068 |
| **Application Number:** | 13194946 |
| **International Application Number:** | |
| **Confirmation Number:** | 1966 |
| **Title of Invention:** | OUTPUT PRODUCTION |
| **First Named Inventor/Applicant Name:** | Ronald Charles Krosky |
| **Customer Number:** | 85449 |
| **Filer:** | Brendan Edward Clark |
| **Filer Authorized By:** | |
| **Attorney Docket Number:** | CI108USA |
| **Receipt Date:** | 19-AUG-2013 |
| **Filing Date:** | 30-JUL-2011 |
| **Time Stamp:** | 23:09:59 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | no |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Appeal Brief Filed | CI108USA_Appeal_Brief_Due_8-18-13_Final.pdf | 219714 <br> c037aace3963af6fc2ab251d86a39913dde4 3dcf | no | 35 |

| | |
|---|---|
| **Warnings:** | |
| **Information:** | |