# Exhibit A-8

'241 Patent Filewrapper, eighth 70 pages

Total Files Size (in bytes): 219714

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

<u>New Applications Under 35 U.S.C. 111</u>
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

<u>National Stage of an International Application under 35 U.S.C. 371</u>
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

<u>New International Application Filed with the USPTO as a Receiving Office</u>
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

PTO/SB/31 (07-09)
Approved for use through 07/31/2012. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| **NOTICE OF APPEAL** FROM THE EXAMINER TO THE BOARD OF PATENT APPEALS AND INTERFERENCES | Docket Number (Optional)<br>CI108USA |
|---|---|

I hereby certify that this correspondence is being facsimile transmitted to the USPTO or deposited with the United States Postal Service with sufficient postage as first class mail in an envelope addressed to "Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450" [37 CFR 1.8(a)]
on _____

Signature _____

Typed or printed name _____

In re Application of
Krosky, et al.

| Application Number<br>13/194,946 | Filed<br>7-30-2011 |
|---|---|

For **OUTPUT PRODUCTION**

| Art Unit<br>3718 | Examiner<br>HOANG, BACH V |
|---|---|

Applicant hereby **appeals** to the Board of Patent Appeals and Interferences from the last decision of the examiner.

The fee for this Notice of Appeal is (37 CFR 41.20(b)(1))　　　　$ 800

[✓] Applicant claims small entity status. See 37 CFR 1.27. Therefore, the fee shown above is reduced by half, and the resulting fee is:　　$ 400

[ ] A check in the amount of the fee is enclosed.

[ ] Payment by credit card. Form PTO-2038 is attached.

[ ] The Director has already been authorized to charge fees in this application to a Deposit Account.

[ ] The Director is hereby authorized to charge any fees which may be required, or credit any overpayment to Deposit Account No. _____ .

[ ] A petition for an extension of time under 37 CFR 1.136(a) (PTO/SB/22) is enclosed.

**WARNING: Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038.**

I am the

[✓] applicant/inventor.

[ ] assignee of record of the entire interest. See 37 CFR 3.71. Statement under 37 CFR 3.73(b) is enclosed. (Form PTO/SB/96)

[ ] attorney or agent of record. Registration number _____ .

[ ] attorney or agent acting under 37 CFR 1.34. Registration number if acting under 37 CFR 1.34. _____

/Brendan E. Clark/
Signature

Brendan E. Clark
Typed or printed name

630-452-2416
Telephone number

2013 06 18
Date

NOTE: Signatures of all the inventors or assignees of record of the entire interest or their representative(s) are required. Submit multiple forms if more than one signature is required, see below*.

[✓] *Total of 2 forms are submitted.

This collection of information is required by 37 CFR 41.31. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11, 1.14 and 41.6. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

# Privacy Act Statement

The **Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (*i.e.*, GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

PTO/SB/31 (07-09)
Approved for use through 07/31/2012. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| **NOTICE OF APPEAL** FROM THE EXAMINER TO THE BOARD OF PATENT APPEALS AND INTERFERENCES | Docket Number (Optional) CI108USA |
|---|---|

| I hereby certify that this correspondence is being facsimile transmitted to the USPTO or deposited with the United States Postal Service with sufficient postage as first class mail in an envelope addressed to "Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450" [37 CFR 1.8(a)] on _____ | In re Application of Krosky, et al. | |
|---|---|---|
| | Application Number 13/194,946 | Filed 7-30-2011 |
| Signature_____ | For OUTPUT PRODUCTION | |
| Typed or printed name_____ | Art Unit 3718 | Examiner HOANG, BACH V |

Applicant hereby **appeals** to the Board of Patent Appeals and Interferences from the last decision of the examiner.

The fee for this Notice of Appeal is (37 CFR 41.20(b)(1))                                                      $ 800 _____

☑ Applicant claims small entity status. See 37 CFR 1.27. Therefore, the fee shown above is reduced by half, and the resulting fee is:                                                      $ 400 _____

☐ A check in the amount of the fee is enclosed.

☐ Payment by credit card. Form PTO-2038 is attached.

☐ The Director has already been authorized to charge fees in this application to a Deposit Account.

☐ The Director is hereby authorized to charge any fees which may be required, or credit any overpayment to Deposit Account No. _____ .

☐ A petition for an extension of time under 37 CFR 1.136(a) (PTO/SB/22) is enclosed.

**WARNING: Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038.**

I am the

☑ applicant/inventor.

☐ assignee of record of the entire interest. See 37 CFR 3.71. Statement under 37 CFR 3.73(b) is enclosed. (Form PTO/SB/96)

☐ attorney or agent of record. Registration number _____.

☐ attorney or agent acting under 37 CFR 1.34. Registration number if acting under 37 CFR 1.34. _____

/Ronald Krosky/
_____
Signature

Ronald Krosky
_____
Typed or printed name

216-536-8718
_____
Telephone number

June 16, 2013
_____
Date

NOTE: Signatures of all the inventors or assignees of record of the entire interest or their representative(s) are required. Submit multiple forms if more than one signature is required, see below*.

☑ *Total of 2 _____ forms are submitted.

This collection of information is required by 37 CFR 41.31. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11, 1.14 and 41.6. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

# Privacy Act Statement

The **Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (*i.e.*, GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

## Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | 13194946 |
| **Filing Date:** | 30-Jul-2011 |
| **Title of Invention:** | OUTPUT PRODUCTION |
| **First Named Inventor/Applicant Name:** | Ronald Charles Krosky |
| **Filer:** | Brendan Edward Clark |
| **Attorney Docket Number:** | CI108USA |

Filed as Small Entity

## Utility under 35 USC 111(a) Filing Fees

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| Notice of Appeal | 2401 | 1 | 400 | 400 |
| **Post-Allowance-and-Post-Issuance:** | | | | |
| **Extension-of-Time:** | | | | |

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Miscellaneous:** | | | | |
| | | | **Total in USD ($)** | **400** |

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 16077665 |
| **Application Number:** | 13194946 |
| **International Application Number:** | |
| **Confirmation Number:** | 1966 |
| **Title of Invention:** | OUTPUT PRODUCTION |
| **First Named Inventor/Applicant Name:** | Ronald Charles Krosky |
| **Customer Number:** | 85449 |
| **Filer:** | Brendan Edward Clark |
| **Filer Authorized By:** | |
| **Attorney Docket Number:** | CI108USA |
| **Receipt Date:** | 18-JUN-2013 |
| **Filing Date:** | 30-JUL-2011 |
| **Time Stamp:** | 20:09:50 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | Credit Card |
| Payment was successfully received in RAM | $400 |
| RAM confirmation Number | 7230 |
| Deposit Account | |
| Authorized User | |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|

| 1 | Transmittal Letter | CI108USA_Inquiry.pdf | 88737<br>1b222cdfa0a4f98efb44ce05a4ad7349cc9e2f30 | no | 2 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| 2 | Notice of Appeal Filed | CI108USA_NOA_Brendan.pdf | 244367<br>6066c81703bddda45005f0f6db7c83bdbe8adf92 | no | 2 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| 3 | Notice of Appeal Filed | CI108USA_NOA_Ron.pdf | 244343<br>c4ce1b92ae23404939b6885efa91bd07598afa34 | no | 2 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| 4 | Fee Worksheet (SB06) | fee-info.pdf | 29965<br>ec7fe5cd41b8f5287625890159e58267951da5d6 | no | 2 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| Total Files Size (in bytes): | 607412 |
|---|---|

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

Application No.:    13/194,946       Confirmation No.:   1966

Applicant:         Ronald Krosky, et al.

Filed:            July 30, 2011

Art Unit:          2628

Examiner:        Hoang, Bach V

Docket Number:    CI108USA

Customer Number:   85449

Mail Stop AF

Commissioner for Patents

P.O. Box 1450

Alexandria VA 22313-1450

## TRANSMITTAL LETTER AND INQUIRY

### I.    TRANSMITTAL LETTER

This correspondence is transmitted with a Notice of Appeal. In accordance with the Power of Attorney requiring signatures of both inventors, two forms are provided herewith as both inventors cannot sign the same form.

### II.    INQUIRY

On June 10, 2013 three documents were added to the Image File Wrapper for this application on Private PAIR. The first document was an Office Action Appendix that is not relevant for this inquiry. The second document is titled 'Amendment After Final or under 37CFR 1.312, initialed by the examiner' that states 'O.K. to enter' next to the Examiner's initials and thus indicates that amendments made in the Response to Final Office Action of May 20, 2013 have been entered. The third document is an Advisory Action that states in section 7(a) that the amendments will not be entered. Thus, it is unclear to the application if the amendments made in the Response to Final Office Action of May 20, 2013 have been entered. Therefore, applicants would like clarification from the Office on if the Amendments presented in the Response to Final Office Action of May 20, 2013 have been entered. If a response to this

Application No. 13/194,946
Amendment Dated 2012 05 20
in Reply to Office Action Dated 2012 03 18

inquiry is not provided by the Office, then applicants will proceed with appeal as if the Amendments were entered. The Office is thanked in advance for their response to this inquiry.


/Ronald C. Krosky/                          /Brendan E. Clark/

Ronald C. Krosky                            Brendan E. Clark

Co-Inventor                                 Co-Inventor



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 13/194,946 | 07/30/2011 | Ronald Charles Krosky | CI108USA | 1966 |

85449        7590        06/10/2013
CONVERGENT INSIGHT, LLC
19530 Telbir Ave.
Rocky River, OH 44116

| EXAMINER |
|---|
| HOANG, BACH V |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3718 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 06/10/2013 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

| ***Advisory Action***<br>***Before the Filing of an Appeal Brief*** | Application No.<br>*13/194,946* | Applicant(s)<br>KROSKY ET AL. |
|---|---|---|
| | Examiner<br>BACH HOANG | Art Unit<br>3718 |

| *--The MAILING DATE of this communication appears on the cover sheet with the correspondence address --* |
|---|

THE REPLY FILED <u>20 May 2013</u> FAILS TO PLACE THIS APPLICATION IN CONDITION FOR ALLOWANCE.

<u>NO NOTICE OF APPEAL FILED</u>

1. ☒ The reply was filed after a final rejection. No Notice of Appeal has been filed. To avoid abandonment of this application, applicant must timely file one of the following replies: (1) an amendment, affidavit, or other evidence, which places the application in condition for allowance;

    (2) a Notice of Appeal (with appeal fee) in compliance with 37 CFR 41.31; or (3) a Request for Continued Examination (RCE) in compliance with 37 CFR 1.114 if this is a utility or plant application. Note that RCEs are not permitted in design applications. The reply must be filed within one of the following time periods:

    a) ☐ The period for reply expires _____ months from the mailing date of the final rejection.

    b) ☒ The period for reply expires on: (1) the mailing date of this Advisory Action; or (2) the date set forth in the final rejection, whichever is later. In no event, however, will the statutory period for reply expire later than SIX MONTHS from the mailing date of the final rejection.

    c) ☐ A prior Advisory Action was mailed more than 3 months after the mailing date of the final rejection in response to a first after-final reply filed within 2 months of the mailing date of the final rejection. The current period for reply expires _____ months from the mailing date of *the prior Advisory Action* or SIX MONTHS from the mailing date of the final rejection, whichever is earlier.

        *Examiner Note*: If box 1 is checked, check either box (a), (b) or (c). ONLY CHECK BOX (b) WHEN THIS ADVISORY ACTION IS THE <u>FIRST</u> RESPONSE TO APPLICANT'S <u>FIRST</u> AFTER-FINAL REPLY WHICH WAS FILED WITHIN TWO MONTHS OF THE FINAL REJECTION. ONLY CHECK BOX (c) IN THE LIMITED SITUATION SET FORTH UNDER BOX (c). See MPEP 706.07(f).

Extensions of time may be obtained under 37 CFR 1.136(a). The date on which the petition under 37 CFR 1.136(a) and the appropriate extension fee have been filed is the date for purposes of determining the period of extension and the corresponding amount of the fee. The appropriate extension fee under 37 CFR 1.17(a) is calculated from: (1) the expiration date of the shortened statutory period for reply originally set in the final Office action; or (2) as set forth in (b) or (c) above, if checked. Any reply received by the Office later than three months after the mailing date of the final rejection, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

<u>NOTICE OF APPEAL</u>

2. ☐ The Notice of Appeal was filed on _____. A brief in compliance with 37 CFR 41.37 must be filed within two months of the date of filing the Notice of Appeal (37 CFR 41.37(a)), or any extension thereof (37 CFR 41.37(e)), to avoid dismissal of the appeal. Since a Notice of Appeal has been filed, any reply must be filed within the time period set forth in 37 CFR 41.37(a).

<u>AMENDMENTS</u>

3. ☐ The proposed amendments filed after a final rejection, but prior to the date of filing a brief, will <u>not</u> be entered because

    a) ☐ They raise new issues that would require further consideration and/or search (see NOTE below);

    b) ☐ They raise the issue of new matter (see NOTE below);

    c) ☐ They are not deemed to place the application in better form for appeal by materially reducing or simplifying the issues for appeal; and/or

    d) ☐ They present additional claims without canceling a corresponding number of finally rejected claims.

        NOTE: _____. (See 37 CFR 1.116 and 41.33(a)).

4. ☐ The amendments are not in compliance with 37 CFR 1.121. See attached Notice of Non-Compliant Amendment (PTOL-324).

5. ☒ Applicant's reply has overcome the following rejection(s): <u>35 USC 112 first paragraph rejection of claims 35, 39, and 40; 35 USC 112</u> <u>second paragraph rejection of claim 40</u>.

6. ☐ Newly proposed or amended claim(s) _____ would be allowable if submitted in a separate, timely filed amendment canceling the non-allowable claim(s).

7. ☒ For purposes of appeal, the proposed amendment(s): (a) ☒ will not be entered, or (b) ☐ will be entered, and an explanation of how the new or amended claims would be rejected is provided below or appended.

<u>AFFIDAVIT OR OTHER EVIDENCE</u>

8. ☐ The affidavit or other evidence filed after final action, but before or on the date of filing a Notice of Appeal will <u>not</u> be entered because applicant failed to provide a showing of good and sufficient reasons why the affidavit or other evidence is necessary and was not earlier presented. See 37 CFR 1.116(e).

9. ☐ The affidavit or other evidence filed after the date of filing the Notice of Appeal, but prior to the date of filing a brief, will <u>not</u> be entered because the affidavit or other evidence failed to overcome <u>all</u> rejections under appeal and/or appellant fails to provide a showing of good and sufficient reasons why it is necessary and was not earlier presented. See 37 CFR 41.33(d)(1).

10. ☐ The affidavit or other evidence is entered. An explanation of the status of the claims after entry is below or attached.

<u>REQUEST FOR RECONSIDERATION/OTHER</u>

11. ☒ The request for reconsideration has been considered but does NOT place the application in condition for allowance because: <u>See Continuation Sheet</u>.

12. ☐ Note the attached Information *Disclosure Statement*(s). (PTO/SB/08) Paper No(s). _____.

13. ☐ Other: _____.

<u>STATUS OF CLAIMS</u>

14. The status of the claim(s) is (or will be) as follows:

    Claim(s) allowed: _____.

    Claim(s) objected to: _____.

    Claim(s) rejected: 2, 4-6, 21-27, 31, 33, and 35-41 .

    Claim(s) withdrawn from consideration: _____.

| /Arthur O. Hall/<br>Supervisory Patent Examiner, Art Unit 3718 | /BACH  HOANG/<br>Examiner, Art Unit 3718 |
|---|---|

**Continuation Sheet (PTOL-303)**                                                          **Application No. 13/194,946**

Continuation of 11. does NOT place the application in condition for allowance because:  In regards to the 35 USC 112 first paragraph rejection of claims 35, 39, and 40 Applicant's arguments are persuasive and the rejection is withdrawn.

In regards to the 35 USC 112 first paragraph rejection of claim 38, the Applicant's arguments have been considered but are not persuasive. The Applicant argues that animation maps are disclosed because a representation is an animation map.  Even if an animation could be a representation, one of ordinary skill in the art would not clearly recognize an animation map could be a representation, nor would one of ordinary skill in the art understand the Applicants possessed such a feature.  Additionally, the Applicants argue that a system creates a map for games such as Gran Turismo.  The maps disclosed are only disclosed as "maps," and not specifically animation maps.  As the Specification has not defined what an animation map constitutes, it is unclear what an animation map could or could not be.

In regards to the 35 USC 112 second paragraph rejection of claim 40, the Applicant's arguments are persuasive and the rejection has been withdrawn.

In regards to the 35 USC 102 and 103 rejections, the Applicant's arguments have been considered but are not persuasive.

The Applicant argues that Cheng does not provide an explicit request for a specific area to be rendered.  Cheng provides rendering when a user provides explicitly inputs sending a golf ball to an area; that area will be rendered based on those explicitly instructions.  An "explicit request" is broadly interpreted to mean a request that is stated clearly and in detail; a user's inputs of where the user wants to send a golf ball is a clear statement of the area the user wishes to send the golf ball and the subsequent area rendered.  Furthermore, a request to play a golf course in Cheng is an explicit request for that golf course to be rendered; when a user decides to play on a course, the user is explicitly requesting Cheng's system to render the course.

The Applicant argues that Cheng does not use a search component to make a determination if a base map for a rendered map is available. Cheng must search through multiple photographs to determine which priority/best/preferred photograph (if one exists at all) to use when rendering.

The Applicant argues that Cheng does not disclose altering a base map.  Cheng discloses stitching photos--the stitching alters the base map.  The determination Cheng makes is whether or not to stitch.  Exactly how such a determinations are made is not required by the claims.

The Applicant argues Cheng does not recite animation maps.  Chen explicitly recites "animations."

The Applicant argues Cheng does not disclose an accurate/inaccurate representation. A photograph is both accurate an inaccurate; while the photo can provide visual information, the photo cannot provide other information such as auditory, sensual, etc.

The Applicant argues Chen does not disclose the map is based in part on the data set and does not include the map data set itself. Photographic data is used to create the maps--but the generated maps are copies of the photo data, not the actual photo data itself.

The Applicant argues Cheng does not disclose the request is a direct request.  Claim 41's limitations were already taught by the limitations of claim 1 (the user's explicit request is a direct user request).

A copy of US Provisional Application No. 61/301,256 is included with the response.  The Examiner directs the Applicant to http://www.uspto.gov/web/offices/pac/dapp/opla/preognotice/termprovcopies.pdf for guidance related to retrieving provisional applications from the PTO.

The applicant argues that the Cheng-Boshner combination does not disclose availability; however, in Boschker's determination of similarity, availability must be determined as well in order to determine whether or not a map exists for use.

Regarding the traversal of Official Notice, the Examiner directs the Applicant to MPEP 2144, stating "To adequately traverse such a finding, an applicant must specifically point out the supposed errors in the examiner's action, which would include stating why the noticed fact is not considered to be common knowledge or well-known in the art."  The applicant's single statement that the official notice is improper does not point out errors in the action and why the official notice is not common knowledge.

The Applicant argues that the appraisal component is not equivalent to Boshker's similarity feature.  Determining a similarity is an appraisal.

The Applicant traverses the official notice taken that a user request can be entered via filing out a form on an interface.  The Examiner directs the Applicant to US Pub. No. 2007/0003038 A1 to Siegel ("Next, in operation 210, the user 100 requests additional information about the listing (e.g., by completing a website lead form at 212 and/or by calling the proxy phone number and the extension at 214)."). Additional examples regarding users filling out requests via user forms on an interface can be seen in US-7996512, or US-7996275, or US-7996255, or US-7983963, or US-7975214, or US-7971196, or US-7970858, or US-7970781, or US-7953813, or US-7953812, or US-7953630, or US-7933996, or US-7933864, or US-7921187, or US-7921162, or US-7921035, or US-7917389, or US-7912917, or US-7908150, or US-7904345, or US-7904333, or US-7890602, or US-7890369, or US-7885821, or US-7882115, or US-7877432,. or US-7877396, or US-7873709, or US-7860755, or US-7853472, or US-7849154, or US-7840690, or US-7801845, or US-7797413, or US-7788248, or US-7778591, or US-7761566, or US-7761565, or US-7747746, or US-7739358, or US-7734510, or US-7734509, or US-7720688, or US-7716244, or US-7711598, or US-7707222, or US-7698426, or US-7698425, or US-7698183, or US-7690997, or US-7689470, or US-7680698, or US-7653577,. or US-7644117, or US-7640253, or US-7636672, or US-7536360, or US-7536324, or US-7533084, or US-7533040, or US-7516488, or US-7516094, or US-7496634, or US-7490135, or US-7430528, or US-7392517, or US-7370015, or US-7363254, or US-7343323, or US-7312712, or US-7305392, or US-7295996, or US-7210094, or US-7206791, or US-7194464, or US-7103773, or US-7103556, or US-7096228, or US-7089199, or US-7069249,. or US-6992656, or US-6980982, or US-6980969, or US-6961713, or US-6961712, or US-6959286, or US-6944668, or US-6924828, or US-6836768, or US-6771291, or US-6625581, or US-6615251, or US-6421729, or US-6385592, or US-6241156, or US-6209026, or US-5933811.

Application No.:    13/194,946                  Confirmation No.:    1966

Applicant:          Ronald Krosky, et al.

Filed:              July 30, 2011

Art Unit:           2628

Examiner:           Hoang, Bach V

Docket Number:      CI108USA

Customer Number:    85449

                                                OK TO ENTER: /B.H./

Mail Stop AF

Commissioner for Patents

P.O. Box 1450

Alexandria VA 22313-1450

## FINAL OFFICE ACTION RESPONSE

In response to the Final Office Action of March 18, 2012, please amend the above-identified application as follows:

**Amendments to the Specification** are reflected in the listing of claims which begins on page 2 of this paper.

**Amendments to the Claims** are reflected in the listing of claims which begins on page 3 of this paper.

**Remarks** begin on page 9 of this paper.

Invention Disclosure 2009BER0003 – 2009.09.17             TomTom

| INVENTOR(S) | | | |
|---|---|---|---|
| Full legal name | Home address, zip, city, country, nationality | e-mail | ☎ |
| Jan Nabbefeld | Richard-Sorge-Str. 25, 10249 Berlin, Germany | Jan.nabbefeld@tomtom.com | +4917629204442 |

**Title of invention:**

Turning TomTom PND devices into a mobile network measurement device (like TEMS). Make use of these data for internal and external projects.

**Which technical problems are solved by the invention?**

The TomTom HDT Live devices are able to log GSM infrastructure and cell information. This data isn't used so far by TomTom but could help to improve GSM based positioning technologies (RoDIN24, LBS) or could be saled to 3rd parties.

**How were these problems solved *before* this invention? What are the *disadvantages* of these prior art solutions?**

Without having mobile network measurements within the company itself TomTom was dependent on measurements made by 3rd parties. The delivery of those were whether agreed by contract (e.g. during a research phase of a project like RoDIN24) or had to by bought up on request. This approach is not flexible in general and costs a lot of money (a 4 hours GSM test drive cost approx. 2200€).

**Explanation of the invention:**

The GSM module inside a TomTom 740 PND (N702 GSM/GPRS Data Module) is able to give Extended GPRS logging information, e.g.:

- mobile network parameters like MCC, MNC, LAC, CID, Timing Advance information, RX/TX signal strength of the current cell
- MCC, MNC, LAC, CID, RX/TX value of up to six neighbouring cells

A current version of the Navcore firmware (8.350) was modified to log the mobile network information described above. These measurements will be combined with a geo-position and a time stamp. A suitable log mechanism was implemented in order to save this information on the flash memory inside the PND.

Furthermore, every driver using a TomTom HDT device will turn into a TEMS test driver. This information can be possibly given back to the network operator (they are doing test drives on their own but of course with a limited number of test drivers).

The basic idea isn't depended on the current used GSM module. By providing a

**Which technical features of the invention are not found in the relevant prior art? Which advantages does the invention provide over solutions known from the state of the art?**

For internal projects like RoDIN24 these measurements opens up the possibility to verify and improve the map matching process. Currently RoDIN24 estimates a certain position of a mobile handset on the base of a TA zone and cell change events. To estimate a position of that handset, an area will be calculated and all roads inside of it are assumed to be a possible position. If the handset is moving the number of routes will be reduced. This calculation is based on the theoretical coverage of a certain TA zone (one TA zone equals 550m). In reality the coverage (and the offset from the centre point) can differ up to 550m. Comparing a real TA zone information with the theoretical coverage will help to tune the BTS characteristics (e.g. in urban areas) and it will help us to detect uncovered parts of a road.

Logging the TA zone coverage combined with real geo-positions will give TomTom the possibility to assign parts of a road to a certain TA zone. Depending on the number of measurements pattern matching will provide a more reliable estimation of the position of that handset. This can by used for internal projects like RoDIN24 or by customers.

©2008 TomTom International B.V., The Netherlands – **Confidential**

Invention Disclosure 2009BER0003 – 2009.09.17 

Please indicate at least one example (embodiment) of how to build the invention, including possible tables or figures (see below). Feel free to attach a White Paper, figures and other documentation.



To visualize the generated log files a set of tools available. The measurements represented by dots ( ● ). The size of the dots is representing the RX level of the signal. BTS coverage is symbolized by the colour of the dots. Measurements without GSM coverage (only geo-positions coming from GPS) symbolized by white squares ( ▣ ). A coloured square means GSM coverage but PND wasn't attached to the GPRS domain. The position of the BTS (resp. the antenna) is marked with the following icon

.To give some impressions take a look on the cases below:

**Detecting insufficient GSM coverage**

The following picture pinpoints a GPRS outage during a ride. Once the PND gets connected again the network outage can be communicated forward TomTom and an alarm forwards the network operator can be raised.



---

Invention Disclosure 2009BER0003 – 2009.09.17 

**Weak signal strength**

The following example gives an impression about different GSM signal strengths during a ride. Mobile network operators need to have a good overview about the coverage of their network. Areas with lesser signal strength can cause call drops which isn't in any interest (even for TomTom because 'Live'-PNDs will loose connection as well). Pointing out those areas will help the operators to improve the network coverage.



**GSM cell coverage on a street**

By having more trips of a certain area one can see the certain coverage areas. Every colour is representing a GSM cell. It is very likely that a driver going along this street and having an active voice call will be handed over from one BTS to another on the base of that pattern.



Let's assume that the coloured areas (blue, red and green) in figure above are certain GSM cells. A driver with a set up voice call following that track (from the west to the east) will be handed over from the blue cell to the red cell and finally to the green cell. This pattern (blue, red, green) is a more or less unique for this road.

**In what industrial products, apparatus, process, or uses can the invention be applied? For whom is the invention of interest?**

The following approaches currently exists:

*QoS of the TomTom live service*

Service outages can be logged and reported to the TomTom as soon as the connection appears again. This would give a permanent quality control of road GSM coverage. Expensive test drives can be avoided.

*Using the data for commercial purposes*

Sell the measurements back to mobile operators. TomTom could provide a map with the overall network coverage and signal strength (and possibly something else if they need it).

Invention Disclosure 2009BER0003 – 2009.09.17       **TOMTOM**

*RoDIN24*

### Verification

Use it in the drive testing for verifying RoDIN24 results, and not be dependent on the operator testing. Furthermore the measurements can be used check the reliability of the cell plan coming from the operator (there are agreed amounts of reliability up to 99.5%).

### Coverage area tuning

BTS coverage areas can be tuned on the base of the Thames measurements. By using the data provided by the PND itself the definition of the TA zone shape can be improved. E.g. in urban areas most of the actual positions for higher TA zones not that far away as in non-urban areas (this is mainly because of signal reflections caused by buildings). Countries like Switzerland performing badly with the current used shapes. Switching from TA slices to TA polygons could improve the quality a lot. See a example below:



### Fingerprint of certain parts of a street

A further approach would be to generate and use pattern which occur if a driver gets handed over from one BTS to another while driving. Those patterns could be used to determine which road the driver most probably takes and can be used as a road signature. This kind of fingerprint approach will work best for major roads in rural environment but will also be helpful in urban areas.

#### Indicate when the invention is expected to be publicly disclosed?

Especially for selling the GSM network data to mobile network operators TomTom should check for there requirements on how to present the data before publishing the whole solution.

---

I am / We are the sole and original inventor(s) of this invention. TomTom may, by virtue of applicable legislation, be entitled to full or partial rights to the invention. I/ We acknowledge my/ our obligation to sign as inventor(s) all documents that may be required for protecting the invention in different countries.

Date:

Name(s) of Inventor(s):

---

# Confidential

## Invention Disclosure
### to TomTom or Subsidiary

| IP coordinator field |
|---|
| IP file number: |
| Date of receipt: |

| | |
|---|---|
| **Title of invention**: | Tile-based Road Network Storage & Rendering |
| **Number of inventors**: | TWO |
| **Name inventor(s)**: | Breght R. Boschker,<br>Jeroen Trum |
| **Date**: | 25th June 2009 |

| **Urgency indication:** | |
|---|---|
| - **Product** introduction | (possibly) Navigation3 / 3D Map Rendering for Venice / Sienna |
| - Information **third party** | |
| - Contribution to **standardization** | |

## 1. Which technical problem or which problem that can be solved with technical means is the basis for the invention?

Road networks have a large degree of self-similarity due to re-occurring patterns in e.g. urban construction. For example, to maximize space and reduce cost, building blocks are often rectangular in shape. Consequently, the road network surrounding these built-up areas are typically rectangular as well, e.g. such as in the following map from a suburb of Detroit, MI, USA:





**Figure 1:** *Road network map with a high level of self-similarity occurring at 3 different scales: 1. mainly horizontally & vertically oriented roads, 2. a number of roughly 90° intersections (both 4-way and T-crossings) and 3. combinations of the previous two in 'macro blocks' (similar under stretching & scaling transforms). Next to it a (contrast-optimized) frequency analysis (Fourier) of the picture on the left showing mainly 'horizontal' and 'vertical' frequency components. Below that a picture from the transportation game 'Transport Tycoon' that shows the atomic road network blocks that are used in that game*

Even in mountainous or mediaeval cities, there are similarities in the road network, although possibly at a lower scale. This property of (self-) repetition can be exploited with benefits for the following aspects:

- **map storage** – to store data in the smallest possible amount of storage space, compression algorithms are applied that reduce the redundancy in the data. Multi-scale self-similarity is a form of redundancy that is a possible candidate for more efficient storage. Note that 'similarity' in this sense can also mean equality under scaling, rotation and translation transforms or even nonlinear transformations.

- **map rendering** – when the road network is rendered in tiles & used as textures in a 3D graphics pipeline (such as done in e.g. the AGS RealityMobile stack), the fact of self-similarity can be exploited: similar 'tiles' can be cached and re-used, thereby reducing computational load on the host CPU as well as reducing the amount of memory access by avoiding the need to retrieve data & transfer rendered tiles to GPU memory. Additionally, the same principle may be used for groups of shapes

Multi-scale or multi-resolution techniques are widely employed techniques for e.g. image compression or signal filtering. For example, the JPEG image compression standard (ISO 10918-1) uses a frequency analysis method (Discrete Cosine Transform, DCT) to transform an image into its frequency components and by filtering out high-frequency components that take up space but do not significantly contribute to the visible image.

NOTE We believe the storage & rendering approaches to be separate inventions, even though they share the same underlying idea. They are included in this single document for brevity's sake.

## 2. How has the problem been solved up to now?

Tile-based rendering has existed since the early days of computer games (both in 2D & 3D). Texture caching (either in GPU memory or elsewhere) is common practice in 3D computer graphics. Texture mip-mapping is a technique used for efficiency and quality reasons that deals with creating & using multi-resolution texture images.



**Figure 2:** Mip-map (source: wikipedia.org)

Furthermore, multi-scale (e.g. wavelet-based) techniques for storing GIS data exist. However, these techniques are typically only used to store terrain data. We are not aware of the application of multi-scale techniques on road network storage.

### 3. By which technical features of the invention is the problem mentioned under point 1 solved?

The main feat of the invention(s) is the recognition of the self-similarity (*Similarity Analysis* block in Figure 3) that a large part of the (road) network exposes and its application in efficient storage and rendering optimization. As shown in Figure 1, existing (frequency) component analysis techniques such as the Fourier analysis, Principal Component Analysis, and pattern matching techniques, local search methods, such as simulated annealing, genetic algorithms etc. may be used to detect (the level of) self-similarity in a geographical area and to extract the basic features. These features can then be used to re-construct the original data set (either in rendering or in storage).



**Figure 3:** *Global algorithm*

In a 3D rendered scene, the amount of visible detail decreases with distance from the viewer (see below. In the context described here, this has the additional benefit that the similarity analysis can employ a larger error margin, thereby increasing the chance of a match from the cache and thereby increasing the efficiency of the algorithm.



**Figure 4:** *Levels of detail (LOD) in a 3D scene. Tiles/textures at level 0 (nearest to the viewer) have highest accuracy, accuracy decreases with distance from the viewer (indicated by higher number).*

To deal with (slight) variations in the road network such as a tile not being perfectly aligned, scaling/rotation/translation transforms may be applied. Based on the system configuration and algorithm parameters, such transforms may lead to an unacceptable visual quality (e.g. near to the viewer), which would cause the need for generating a new tile that is accurate enough. As described above, this property can on the other hand be exploited for tiles that are further from the viewer.



**Figure 5:** Tile re-use and non-alignment under rotation and an optional tiling into smaller elements

By using multi-scale techniques, one of the drawbacks mentioned in the previous paragraph may be overcome: by splitting a macro-feature into its smaller components (see Figure 1) and storing the tiles for the features, the effects of non-alignment may be decreased. Furthermore, since the individual features are expected to occur more frequently, their reuse may be rather high. Of course, it is desirable to have a high level of reuse on the macro-element level for efficiency reasons.

Since different parts of the road network differ often by details such as road markings, one-way markers etc., that would decrease the algorithm efficiency. In terms of storage, such properties could be stored as attributes to a tile. In rendering, overlaying multiple textures may be used. This technique could also be employed to augment the road network with e.g. 'face' data showing land use in a geographical area.

## 4. Which advantages are gained by the technical features if the invention indicated under point 3?

The proposed invention has benefits in terms of storage of (compressed) maps, since the technique described exploits the fact of similarity analysis on the geometry level, thereby reducing redundancy. Smaller storage requirements for a digital base map offer the possibility of cost reduction in terms of storage (e.g. a lower bill of materials), possibly a speed increase due to caching effects and reducing the load/read requirements on the storage medium.

Furthermore, since the method is depending on a caching mechanism, it is well-suited for remote applications such as e.g. a web-based map viewer or over-the-air updates of base map

data or map patch distribution (MapShare). To give an example of the latter, most roundabouts share the circular shape and will often have 4 entries/exits. A map patch adding a roundabout, would only need to transfer the reference to the already-stored data in a device.

Applying the technique in a 2D or 3D map renderer has the benefit of a reduced system load, since already rendered map tiles do not need to be re-rendered. Naturally, caching tiles comes at a memory cost, but the algorithm is scalable depending on the available memory (in case less memory is available, tiles would need to be evicted from the cache & regenerated more often).

In extreme cases, a whole 'renderable' map could be distributed in terms of its pre-rendered tiles.

## 5. Drawing(s)/picture(s) of example(s) or alternative solution(s)
with reference to the explanation under point 3.

## 6. Attachments accomplishing this Invention Disclosure

No of sheets, e-files, etc.

representation of example(s) of the invention
additional description (e.g. laboratory reports, test protocols)
literature describing state of the art (reference)
other documentation

Details on person of inventor(s)

| Inventor | 1 | 2 |
|---|---|---|
| **Surname** | Boschker | Trum |
| **First name** | Breght | Jeroen |
| **Employer** | TomTom International B.V. | TomTom International |
| **Business Unit** | PND | Automotive |
| **Department** | Shared Technology | Automotive Technology |
| **Location** | Amsterdam ODE Office | Eindhoven |
| **Telephone** | +31 20 75 748 53 (company)<br>+31 35 70 700 32 (personal) | +31 40 8444 608 (company)<br>+31 40 2444 994 (personal) |
| **Telefax** | | |
| **E-mail** | breght.boschker@tomtom.com | jeroen.trum@tomtom.com |
| **Nationality** | Dutch | Dutch |
| **Private address** Street, house no | Rigelstraat 6 | Florencelaan 35 |
| **Zip/Postal code, Town** | 1223 AT  Hilversum | 5632 PT  Eindhoven |
| **Country** | The Netherlands | The Netherlands |
| **Date of birth** | 14th January 1980 | August 7th, 1974 |

Confidential

# Invention Disclosure
to TomTom or Subsidiary

| IP coordinator field |
| --- |
| IP file number: |
| Date of receipt: |

| **Title of invention:** | Finger-based touch screen operation |
| --- | --- |
| **Number of inventors:** | ONE |
| **Name inventor(s):** | Breght R. Boschker |
| **Date:** | 3rd June 2009 |

**Urgency indication:**                **Date**, if applicable:
- **Product** introduction
- Information **third party**
- Contribution to **standardization**

## 1. Which technical problem or which problem that can be solved with technical means is the basis for the invention?

With the advent of the iPhone, more devices are employing finger-based interaction instead of the traditional stylus-based approach. One of the drawbacks of a finger-based approach, is that due to the fact that a finger is generally thicker than a stylus, interaction may be less precise and unintentional actions may be triggered, possibly leading to data loss. Where some users use their nails to emulate a stylus, this approach fails on a capacitive touch screen.

Portable devices are often used to browse the Web. In contrast to e.g. a user interface (UI) that is tailored for use on a portable device such as supplied by a vendor like TomTom, web pages are often not under control of the device supplier. A mobile web browser will attempt to layout pages for the limited screen real estate typically either by scaling the full page, reflowing the page content or by requesting specially prepared web page for mobile viewing.

Whereas this may provide a usable viewing experience, interaction with the content on screen is often problematic. For example, a page may contain links to add/delete e-mails, but due to the reflowing algorithm, these may become closely positioned together making them unsuitable for finger-interaction (see Figure 1).




| Special mobile version of webpage (mobile.osnews.com) using the full width of an iPhone screen | Same web page with links highlighted. In the small space highlighted, no less than <u>seven</u> links are present. |

**Figure 1:** Examples of links that are close together on a mobile web page

## 2. How has the problem been solved up to now?

Mobile web pages omit or re-flow content that is not suitable for viewing on a small-screen device, thereby possibly omitting or mitigating items that could cause conflicts while interacting.

Devices like the iPhone allow a page to be scaled (zoomed in) so that items on a page become large enough to easily interact with. However, since the whole page is scaled, items become occluded requiring a user to pan/scroll a page to interact with them.

Another feature sported by the iPhone is to selectively zoom in on a web page form and offering controls (previous/next) to jump between the items in the form. Unfortunately, this method is restricted to form-entry (and is thus not generically applicable).

## 3. By which technical features of the invention is the problem mentioned under point 1 solved?

The proposed system consists of a method to analyze screen/page content, a component to determine whether possible conflicts may occur and a method for modifying the page data to minimize the possibility of the conflict occurring. This could be for example:

- **reflowing** – by altering the flow of text, images and other content, making sure that there is a certain 'safe zone' around the interactive components (links)

- **increasing spacing** – a more trivial example is to simply add more space around interactive items

- **pop-ups/callouts** – as a result of a special action/gesture, or autonomously by the system when it detects the user is near a 'cluttered' area, a callout or pop-up could be shown overlaying other items that offers the interactive elements in a way that is better suited for interaction. See Figure 2 for an example.

More intelligent mechanisms could analyze the user's motions on the touch screen and try to determine where the 'hot spot' of the interaction was (e.g. where the finger was positioned longest).



**Figure 2:** Pop-up / call-out example based on Figure 1 that offers a less ambiguous user interaction.

Also in cases where content from multiple applications or pages overlap, the method would be useful.

### 4. Which advantages are gained by the technical features if the invention indicated under point 3?

The proposed invention provides a way of interacting with on-screen content in situations where screen real-estate is limited and/or the user's motions may be imprecise (such as while the user is driving). While the method is applicable in general, it is most valuable in cases where there is no influence or a-priori knowledge on what is displayed on the screen such as is the case in mobile web browsing.

Also in cases where a user interface that was optimized for imprecise touch screen use (TomTom UI) is used in conjunction with unknown content (e.g. a pop-up from a plug-in service), the method may prove its use.

### 5. Drawing(s)/picture(s) of example(s) or alternative solution(s)
with reference to the explanation under point 3.

### 6. Attachments accomplishing this Invention Disclosure

No of sheets, e-files, etc.

representation of example(s) of the invention
additional description (e.g. laboratory reports, test protocols)
literature describing state of the art (reference)
other documentation

Details on person of inventor(s)

| Inventor | 1 |
|---|---|
| **Surname** | Boschker |
| **First name** | Breght |
| **Employer** | TomTom International B.V. |
| **Business Unit** | PND |
| **Department** | Shared Technology |
| **Location** | Amsterdam ODE Office |
| **Telephone** | +31 20 75 748 53 (company)<br>+31 35 70 700 32 (personal) |
| **Telefax** | |
| **E-mail** | breght.boschker@tomtom.com |
| **Nationality** | Dutch |
| **Private address**<br>Street, house no | Rigelstraat 6 |
| **Zip/Postal code, Town** | 1223 AT  Hilversum |
| **Country** | The Netherlands |
| **Date of birth** | 14th January 1980 |

# Confidential

IP coordinator field

IP file number:

Date of receipt:

## Invention Disclosure
### to TomTom or Subsidiary

| | |
|---|---|
| **Title of invention**: | Automatic Scenic Tour Guide |
| **Number of inventors**: | Breght R. Boschker |
| **Name inventor(s)**: | 1 (ONE) |
| **Date**: | September 22nd 2008 |

| **Urgency indication:** | **Date**, if applicable: |
|---|---|
| - **Product** introduction | |
| - Information **third party** | |
| - Contribution to **standardization** | |

## 1. Which technical problem or which problem that can be solved with technical means is the basis for the invention?

Up to now, navigation systems have been mainly used for being guided along a route, be it to travel from A to B, or to travel along a pre-calculated route (scenic route/trip log itinerary etc). As navigation systems become more and more of a commodity, drivers may become attached to having a navigation system with them, even if not used for routing. A driver may simply use the device to be informed of the traffic situation as he drives, or he may be interested in any (over-the-air) services the device offers such as weather at a destination, the TomTom Buddy system etc. Such scenarios are likely in case a driver knows the area/roads he/she is driving on.

However, when driving in an unknown area with the purpose of seeing more the area (e.g. when on holidays), the driver may have other interests. For example, on such scenic tours, the driver may appreciate being told about interesting landmarks in view or in the vicinity and/or other known feats about the area just like a tour guide on a typical touristic trip would do.

## 2. How has the problem been solved up to now?

Pre-defined (scenic) routes may be available from authoritative sources such as e.g. ANWB in the Netherlands, or through a community of enthusiasts as can be seen in TomTom HOME or third-party websites such as www.gpstracks.nl. Such routes are based on the prior experience in a geographical area of (groups of) people and are often based on some (common) interest of the party offering the route. For example, the www.gpstracks.nl offers pre-defined routes for people that want to walk, for motor bikers, for car drivers, for cyclists etc.

Furthermore, 'traditional' paper-based or electronic guides or guides in the flesh exist.

### 3. By which technical features of the invention is the problem mentioned under point 1 solved?

The proposed system consists of existing navigation functionality and a database of features such as landmarks and POIs that is augmented with information. Such information can be the name of the feature or any additional information such as web address, pricing information etc.

To be able to provide a user with information about the vicinity, an algorithm is added to the system that is able to detect features in the vicinity. Such an algorithm can for example be based on the (thresholded) Euclidian distance or route length, or it can employ more complex methods that are based on e.g. the line of sight, should such information be available in the digital map database in sufficient quality. Quality is influenced by the availability of e.g. terrain height data, under/over-pass data, average tree height in woodlands, height of buildings/POIs/landmarks or general built-up areas etc.



A landmark or POI near to the route is not yet visible due to the line of sight being blocked by woodlands (blue dotted line + 'X').

When emerging from the woodlands, the landmark is in the line of sight (blue dotted line).

**Figure 1:** Example using the line of sight method

It is likely that, depending on which area the user is in, different selection algorithms would be chosen. For example, in a rural area it is likely that the line of sight-based method would be useful whereas a vicinity-based selection method may work better in a built-up area since the chance of occlusion of a feature is higher.

Using these methods, the system is able to inform a user of certain features in the area which can be useful e.g. when making a scenic tour through the countryside when on holidays. Similarly, the method is useful when making a city trip, either by foot or by car. The system can thus provide a user with an automatic (scenic) tour guide providing neutral or interesting information to a user whilst moving in an area. If a user wishes to know more, or wishes to visit the feature, the system can use its normal navigation capabilities to plan a route to the feature or, in certain cases, the nearest parking place.

To further enhance the information that can be given to the user, the system can be equipped with a (wireless) network link retrieve data from trusted or 3rd party community, not-for-profit or commercial sources such as the web address stored with the feature or an information lookup on the term on e.g. Wikipedia.org etc. In a Navigation3 context, the functionality and/or the data retrieval may be implemented as a plug-in service.

If a network link is not available, the system still serves a purpose by for example just mentioning the name of the POI or landmark for selected categories such as castles ("On your right-hand side, you see <poi category> <poi name>").

A more complex instance of the methods described above could include pre-determined areas in the map that would trigger the giving of tour information much like the existing POI-warning functionality.

### 4. Which advantages are gained by the technical features if the invention indicated under point 3?

By providing information on trips that are used outside the normal 'A-to-B' context, the TomTom systems and software become useful in more situations. This in turn may lead to more data fed back to TomTom (map patches/GPS traces) as well as contributing to a stronger TomTom-user bond. Furthermore, the proposed system lends itself also for business-to-consumer or consumer-to-consumer (communities) sharing thereby further strengthening the end-user bond. In a typical business-to-consumer situation, the system could e.g. serve for providing user-targeted advertising although that is not the main focus of the invention.

### 5. Drawing(s)/picture(s) of example(s) or alternative solution(s)

### 6. Attachments accomplishing this Invention Disclosure

No of sheets, e-files, etc.

representation of example(s) of the invention
additional description (e.g laboratory reports, test protocols)
literature describing state of the art (reference)
other documentation

Details on person of inventor(s)

| | |
|---|---|
| **Inventor** | 1 |
| **Surname** | Boschker |
| **First name** | Breght |
| **Employer** | TomTom International B.V. |
| **Business Unit** | PND |
| **Department** | Shared Technology |
| **Location** | Amsterdam ODE Office |
| **Telephone** | +31 20 75 748 53 (company)<br>+31 35 70 700 32 (personal) |
| **Telefax** | |
| **E-mail** | breght.boschker@tomtom.com |
| **Nationality** | Dutch |
| **Private address**<br>Street, house no | Rigelstraat 6 |
| **Zip/Postal code, Town** | 1223 AT  Hilversum |
| **Country** | The Netherlands |
| **Date of birth** | 14th January 1980 |



U̲N̲I̲T̲E̲D̲ S̲T̲A̲T̲E̲S̲ P̲A̲T̲E̲N̲T̲ A̲N̲D̲ T̲R̲A̲D̲E̲M̲A̲R̲K̲ O̲F̲F̲I̲C̲E̲

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING OR 371(C) DATE | FIRST NAMED APPLICANT | ATTY. DOCKET NO./TITLE |
|---|---|---|---|
| 13/194,946 | 07/30/2011 | Ronald Charles Krosky | CI108USA |

**CONFIRMATION NO. 1966**

85449
CONVERGENT INSIGHT, LLC
19530 Telbir Ave.
Rocky River, OH 44116

**POA ACCEPTANCE LETTER**



*OC000000061407641*

Date Mailed: 05/29/2013

## NOTICE OF ACCEPTANCE OF POWER OF ATTORNEY

This is in response to the Power of Attorney filed 05/20/2013.

The Power of Attorney in this application is accepted. Correspondence in this application will be mailed to the above address as provided by 37 CFR 1.33.

/sleutchit/

_____

Office of Data Management, Application Assistance Unit (571) 272-4000, or (571) 272-4200, or 1-888-786-0101

Application No.:     13/194,946              Confirmation No.:     1966

Applicant:          Ronald Krosky, et al.

Filed:              July 30, 2011

Art Unit:           2628

Examiner:           Hoang, Bach V

Docket Number:      CI108USA

Customer Number:    85449


Mail Stop AF

Commissioner for Patents

P.O. Box 1450

Alexandria VA 22313-1450


## FINAL OFFICE ACTION RESPONSE

In response to the Final Office Action of March 18, 2012, please amend the above-identified application as follows:

**Amendments to the Specification** are reflected in the listing of claims which begins on page 2 of this paper.

**Amendments to the Claims** are reflected in the listing of claims which begins on page 3 of this paper.

**Remarks** begin on page 9 of this paper.

Application No. 13/194,946
Amendment Dated 2012 05 20
in Reply to Office Action Dated 2012 03 18

## **Amendment to the Specification**

Please replace the paragraph that begins on page 3, line 16 with the following paragraph:

The terms 'may' and 'can' are used to indicate a permitted feature, or alternative embodiments, depending on the context of the description of the feature or embodiments.  In one example, a sentence states 'A can be AA' or 'A may be AA'.  Thus, in the former case, in one embodiment A is AA, and in another embodiment A is not AA.  In the latter case, A may be selected to be AA, or A may be selected not to be AA.  However, this is an example of A, and A should not be construed as only being AA.  In either case, however, the alternative or permitted embodiments in the written description are not to be construed as injecting ambiguity into the appended claims.  Where claim 'x' recites A is AA, for instance, [[then ]]A is not to be construed as being other than AA for purposes of claim x.  This [[is ]] construction is so despite any permitted or alternative features and embodiments described in the written description.


Please replace the paragraph that begins on page 14, line 14 with the following paragraph:

A map can be rendered.  After the map is rendered, new information can become available (e.g., be made known, be discovered by the system ~~600~~ 500, be read, information to make a second data portion more reliable than a first data portion used to create the map, and others).  In one example, the new information can be correction information ~~605~~ that corrects an error of the map.

Application No. 13/194,946
Amendment Dated 2012 05 20
in Reply to Office Action Dated 2012 03 18

**<u>Amendment to the Claims</u>**

This listing of claims will replace all prior versions, and listings, of claims in the application:


What is claimed is:


1.     (Cancelled)


2.     (Previously Presented)      The system of claim 4, where the production component produces the rendered map such that a pre-rendered map is altered in accordance with the map data set to become the rendered map.


3.     (Cancelled)


4.     (Previously Presented)      A system, comprising:

an interaction component configured to receive a user request for a rendered map, where the user request is an explicit request submitted by a user for a specific area to be rendered;

an evaluation component configured to evaluate the request that produces an evaluation result, where the evaluation result indicates information to gather to produce the rendered map;

a gather component configured to gather the map data set according to information the evaluation result indicates to gather;

an analysis component configured to analyze the map data set to produce an analysis result; and

a production component configured to produce the rendered map based, at least in part, on the analysis result, where the rendered map is retained in a computer-readable medium and where the rendered map is a rendering of the specific area.

Application No. 13/194,946
Amendment Dated 2012 05 20
in Reply to Office Action Dated 2012 03 18

5.      (Previously Presented)        A system, comprising:

a search component configured to make a determination if a base map for a rendered map is available;

an analysis component configured to analyze a map data set to produce an evaluation result, where the base map is at least part of the map data set when available; and

a production component configured to produce the rendered map based, at least in part, on the evaluation result, where the rendered map is retained in a computer-readable medium.

6.      (Previously Presented)        The system of claim 5, comprising:

an alteration component configured to alter the base map based, at least in part, on a determination on how to alter the base map, where the analysis component being configured to analyze the map data set comprises being configured to make the determination on how to alter the base map in response to the determination if the base map for the rendered map is available being positive.

7-20.   (Cancelled)

21.     (Previously Presented)        The system of claim 6, where the analysis component is configured to make a determination on if the base map should be used for the rendered map and where the alteration component functions in response to the determination on if the base map should be used for the rendered map being positive.

4

Application No. 13/194,946
Amendment Dated 2012 05 20
in Reply to Office Action Dated 2012 03 18

22.    (Previously Presented)         A system, comprising:

an interaction component configured to receive a request for a rendered map;

a gather component configured to make a determination on if the rendered map is available after reception of the request, where the gather component is configured to obtain the rendered map if the determination is that the rendered map is available and where the gather component is configured to collect a map data set if the determination is that the rendered map is not available;

an analysis component configured to analyze the map data set to produce an analysis result, where the analysis component is configured to analyze the map data set to produce the analysis result if the determination is that the rendered map is not available; and

a production component configured to produce the rendered map based, at least in part, on the analysis result, where the rendered map is retained in a computer-readable medium and where the production component is configured to produce the rendered map if the determination is that the rendered map is not available.

23.    (Previously Presented)         The system of claim 4, where the rendered map is usable in a video game, where the computer-readable medium is at a first location, where the rendered map is made available to a second location, and where the first location and the second location are different locations remote to one another.

24.    (Previously Presented)         The system of claim 23, where the first location is a first video game system, where the second location is a second video game system, where the rendered map is usable on the first game system, where the rendered map is usable on the second game system, and where the first video game system and the second video game system are different video game systems.

25.    (Previously Presented)         The system of claim 23, where the first location is a first video game system, where the second location is a second video game system, and where the first video game system and the second video game system are the same video game system.

Application No. 13/194,946
Amendment Dated 2012 05 20
in Reply to Office Action Dated 2012 03 18

26.     (Previously Presented)        The system of claim 23, where a housing retains the computer-readable medium, where the housing retains the analysis component, where the housing retains the production component, where the first location is a video game system, and where the housing is part of the video game system.

27.     (Previously Presented)        The system of claim 26, where the first location is a first video game system, where the second location is a second video game system, where the second location is configured to produce a second video game map made available to the first video game system, and where the second video game map is retained at the second video game system.

28-30.  (Cancelled)

31.     (Currently Amended) The system of claim 5, comprising:

        an appraisal component configured to make an appraisal of a content presented by way of a non-video game application that runs on an electronic device; and

        a decision component configured to proactively make a request for production of the rendered map ~~for production~~ based, at least in part, on a result from the appraisal, where the search component is configured to make the determination if the base map for the rendered map is available upon reception of the request.

32.     (Cancelled)

Application No. 13/194,946
Amendment Dated 2012 05 20
in Reply to Office Action Dated 2012 03 18

33.     (Previously Presented)          The system of claim 4, comprising:

an identification component configured to identify a missing information set in the map data set, where the map data set is a physical information set for the specific area, where an actual information set for the missing information set is unavailable to the an interaction component, the evaluation component, the gather component, the production component, and the analysis component; and

an approximation component configured to generate a substitute information set for the missing information set, where the substitute information is part of the map data set.

34.     (Cancelled)

35.     (Previously Presented)          The system of claim 4, comprising:

a discovery component configured to discover an information set about the specific area, where the information set is not part of the map data set; and

an alteration component configured to alter the rendered map to reflect the new information set.

36.     (Previously Presented)          The system of claim 35, where the information set is a correction to a piece of data of the map data set.

37.     (Previously Presented)          The system of claim 4, where the user request is entered through the user filling out a form on an interface.

38.     (Previously Presented)          The system of claim 4, where the rendered map is an animation map of an actual location.

39.      (Previously Presented)          The system of claim 4, where the rendered map is usable in a video game, where the rendered map is in part an accurate reflection of the specific area and where the rendered map is in part an inaccurate reflection of the specific area.

Application No. 13/194,946
Amendment Dated 2012 05 20
in Reply to Office Action Dated 2012 03 18

40.      (Previously Presented)        The system of claim 4, where the production component is
configured to create the rendered map, where the rendered map is based, at least in part, on the
map data set, and where the rendered map does not include the map data set itself.


41.      (Previously Presented)        The system of claim 22, where the request is a direct user
request for the rendered map.

8

Application No. 13/194,946
Amendment Dated 2012 05 20
in Reply to Office Action Dated 2012 03 18

## Remarks

The Examiner is thanked for the Final Office Action of March 18, 2013 (hereafter referred to as 'FOA').

## Claim Rejections – 35 U.S.C. § 112

The Office rejects claims 35, 38, 39, and 40 under 35 U.S.C. § 112, first paragraph for failing to comply with the written description requirement. This rejection should be withdrawn because these claims comply with 35 U.S.C. § 112. In particular, it is not necessary that the claims recite expressly the exact language of the specification or priority documents (there is no *in haec verba* requirement) to comply with this section:

> It should be noted, however, that exact terms need not be used in haec verba to satisfy the written description requirement of the first paragraph of 35 U.S.C. 112. Eiselstein v. Frank, 52 F.3d 1035, 1038, 34 USPQ2d 1467, 1470 (Fed. Cir. 1995); In re Wertheim, 541 F.2d 257, 265, 191 USPQ 90, 98 (CCPA 1976). See also 37 CFR 1.121(e) which merely requires substantial correspondence between the language of the claims and the language of the specification.

MPEP § 1302.01, ¶ 13.08. *See also* MPEP § 2163.

For claim 35, the Office agrees that the functionality is discussed in the specification, but that an actual 'discovery component' is not discussed. The specification states "[…] new information[…] can become available (e.g.,[…] be discovered by the system 500[…] )" (page 14, lines 14-18). While this is amended from saying the system 600, it should be noted that this is in a section that discusses the system 500 of Figure 5 and as such the system should be the system 500, not 600. The specification also states "[a] component may be used to perform a function(s) or an action(s)[…] " (page 6, lines 6-7). Thus, the specification clearly shows that a component can be configured to discover an information set about the specific area. Thus a discovery component configured to discover an information set about the specific area, where the information set is not part of the map data set is clearly disclosed in the specification in such a way that the statutory requirements are met.

For claim 38, the Office argues that the animation map has not been disclosed by the specification. The specification states "[t]his application claims the benefit of U.S. provisional

9

Application No. 13/194,946
Amendment Dated 2012 05 20
in Reply to Office Action Dated 2012 03 18

application serial No. 61/409,027 filed on November 1, 2010, which is hereby wholly incorporated by reference." (page 1, lines 4-5).  U.S. provisional application serial No. 61/409,027 states (emphasis added) "[a] group of people can play an online fantasy game (e.g., World of Warcraft) or similar virtual-world application (e.g., Second Life) as well as other games.  A new area of the game can be based off a real area.  In one example, Central Park in New York City or Nottingham Forrest in England can be analyzed and a map can be rendered with features of these areas playable in the online fantasy game.  In another example, real-life places can be imported and modified to serve as ***a basis or inspiration for a representation*** of an alternate reality." (page 11, lines 13-19).  This discusses the actual location (e.g., real-life place) serving as a basis or inspiration for an animation map (e.g., representation).  Furthermore, the provisional application states "[a]n iteration component 1704 can make multiple copies of a map.  In one embodiment, a system (e.g., the system 100 of Figure 1) creates a map.  However, that may be applicable in different applications (e.g., one for Xbox and one for Playstation, one for Gran Turismo and one for Forza, etc.)." (page 21, lines 14-17).  These applications do not run live camera views from race tracks but instead animation race tracks.  Thus, it is clear that the maps discussed in the specification can be animation maps.  Thus, the rendered map can be an animation map of an actual location in embodiments.  This satisfies the statutory requirements.

For claim 39, the Office argues that where the rendered map is in part an accurate reflection of the specific area and where the rendered map is in part an inaccurate reflection of the specific area is not disclosed by the specification.  The specification discloses accurate rendering (see page 27, lines 5-11) and non-accurate rendering (see page 34, lines 10-12).  Furthermore, the specification discloses that a similarity threshold can be used to avoid correction (page 27, lines 11-14) and as such that a map may not be completely accurate.  Further, the approximation component discusses approximating for things that are not known, such that accurate and estimated (that can be inaccurate) detail can be rendered (e.g., see page 18, lines 12-26).  Thus, the statutory requirements are met.

For claim 40, the Office argues that the specification does not disclose the rendered map not including the map data set itself.  The specification states "[i]n one example, racing websites, a web mapping service application, and other locations (e.g., online locations) can be searched to gather information (e.g., map data of the map data set 115) about the Circuit de Monaco.  Based

Application No. 13/194,946
Amendment Dated 2012 05 20
in Reply to Office Action Dated 2012 03 18

on information gathered, the production component 110 can generate a video game version of the Circuit de Monaco and output the video game version (e.g., as the rendered map 210)." (page 9, lines 17-22).  The production component creates (e.g., generates) the video game version based on the map data set but can provide a rendering  not including the map data set itself. Further, as discussed above with regard to claim 38, since real-life places can be an inspiration rather than a verbatim representation, a scenario can arise where the actual map data is not part of the rendered map.  Thus, the statutory requirement is met.

The Office rejects claim 40 under 35 U.S.C. § 112, second paragraph for being indefinite. The Office argues that the map data itself must be included in the rendered map.  It appears beneficial to provide an analogy to explain a situation how the rendered map may not include the map data itself.  As a way of analogy, in an art class a teacher can display a bowl of fruit and the students can each be instructed to make a drawing of the bowl of fruit.  These students can make the drawings, but the drawings could be produced without any actual fruit and instead be made simply of paper and paint.  While it could be possible for a student to use the actual physical fruit as part of his or her drawing (similar to an artist cutting off their ear to be part of a work of art), most students would likely have a drawing that does not include the actual fruit itself.  Similarly, a map can be rendered based on a map data set without actually including the map data set itself, instead providing a product that is transformed from the map data used.

It is to be appreciated that specific references to the specification are merely used to show support for claims with regard to 35 U.S.C. § 112(a) and are not to be used to limit the scope of the claims.  Furthermore, even though specific references are used these are not necessarily the best or only references in the specification to support these claim features.

## Claim Rejections – 35 U.S.C. 102

Claim 2, 4-6, 21, 33, and 38-41 are rejected under 35 U.S.C. 102(b) as being anticipated by US Pub. No. 2008/0293488 A1 (hereafter referred to as 'Cheng').  The rejection of claims 2, 4-6, 21, 33, and 38-41 should be removed in view of the following.

> A claim is anticipated only if each and every element as set forth in the claim is found, either expressly or inherently described, in a single prior art reference.  *Verdegaal Bros. v. Union Oil Co. of California*, 814 F.2d 628, 631 (Fed. Cir. 1987).  MPEP §2131.

Application No. 13/194,946
Amendment Dated 2012 05 20
in Reply to Office Action Dated 2012 03 18

<u>Independent claim 4</u>

     Claim 4 recites (emphasis added) "an interaction component configured to receive a user request for a rendered map, where the user request is an ***explicit*** request submitted by a user for a specific area to be rendered[…] "  The Office cites paragraph [0062] of Cheng and then argues "[a] user explicitly request a rendered map area to be rendered via an input which sends a ball to a portion of a course which is to be rendered." (see FOA, page 5, section 14).  The Office is confusing an explicit request with an action having a desired result.  In Cheng, a user hits a virtual golf ball and upon hitting the virtual golf ball the user wants to continue playing on the virtual golf course.  The user does not care and is not even aware on how the course continues to be playable – all the user is explicitly requesting is to play the golf course.  While the user wants to be able to keep playing the game the user does not care if the course is rendered or if the course is playing through some other manner.  The user makes no explicit request for the course to be rendered.

     To put another way, in a golf video game a player can play a par 3 hole and the golf ball with an iron onto the green.  The purpose of this shot is to try to play the hole in as few shots a possible and to continue playing the game.  While the player wants to be able to putt his or her next shot and has a vested interest in the green being available for putting, the player is not explicitly requesting for rendering to occur.  The player simply wants to play and does not care and is not even aware of how such continued play occurs.  On the other hand, if the user hits a "bad" shot directing the ball to an area not intended, the user will receive a portion of the map they actually did not want.  Thus, the action of the user is not an explicit request for a specific area to be rendered, but instead an in-game action that may so happen to cause photographs to be presented.

     The Office also cites paragraph [0178] of Cheng and then argues "[w]hen the clients (users) choose to play on the same course, the players are explicitly choosing the course to be rendered[…] " (see FOA, page 5, section 14).  The Office is making a logical leap not supported by what Cheng discloses.  When clients choose to play on the same course, they are expressly deciding what course they want to play on without any indication on if the course is to be rendered or exists and can be played without a rending occurring.  These choices are limited, and Cheng does not discuss where the maps come from or how alternative choices can be provided.

Application No. 13/194,946
Amendment Dated 2012 05 20
in Reply to Office Action Dated 2012 03 18

Thus the choice of the users is to play on a course, not for the course to be rendered.  To put another way, the clients want to play the course, but they give no indication on how the course is to be made available.  Thus, there is no user request that is an explicit request submitted by a user for a specific area to be rendered in Cheng.

At best, the player request in Cheng is that a course be made playable without regard to how the course is made playable, such as making an explicit request that the course be rendered.  As an illustrative example, this could be interpreted as the user request being "I am selecting to play Augusta National," as opposed to the user request being "Please render a playable version of Augusta National" – the first request is not explicit with regard to a specific area to be rendered since no concern is given to rendering (and instead to playability) while in the second request specific concern to rendering is made.   Even if the first request for Augusta National so happens to be rendered in response to the request, it is irrelevant to the request itself not being explicit with regard to rendering.  In contrast, the second request explicitly requests that Augusta National be rendered.

It is to be appreciated that the foregoing is presented merely to explain differences between Cheng and claim 4 and it should not be used to limit the scope of the claims, used to define any term of the claims, be interpreted as an admission by the Applicants that Cheng and the claims are similar, or for any other propose other than explaining the differences.

Furthermore, paragraph [0181] of Cheng states (emphasis added):

> [a]dditionally, the signals can be provided to a server communication component 730 which is responsible for communicating with a server 704. ***The communication component 730 can accumulate signals over time until a certain state is reached and then, based on the state, send a request to the server 704.*** For example, once input signals for a complete swing have been recognized by the server communication component 730, a request to the server is generated with information regarding the physical parameters of the swing (e.g., force, direction, club head orientation). In turn, the server 704 sends a response to the client 702 that can include a virtual object's path through the virtual course based on the physical parameters of the swing, 2D photographs required to visually present the path by the GUI 718, course terrain information, course masks, game assets such as sounds and haptic feedback information, and other information. The response can be broken into one or more individual messages. In addition, some information can be requested by the client 702

13

Application No. 13/194,946
Amendment Dated 2012 05 20
in Reply to Office Action Dated 2012 03 18

> ahead of time. For example, the client 702 can pre-fetch
> photographs, course terrain information and course masks for the
> next hole of golf from the server 704 and store them in a photo
> cache 706b, terrain cache 706c, and course mask cache 706d,
> respectively.

Clearly, Cheng's request in paragraph [0181] is not an explicit request submitted by a user for a specific area to be rendered, but instead a continuation of an ongoing machine process invisible to the user produced when a state is reached. While the user may influence the state, the state is not a user request (let alone an explicit request), but a consequence of playing the game that is transparent to any user playing. To put another way, at best in Cheng a request is machine-generated in request to a secondary user function (e.g., the user playing the golf game). Thus, it is clear Cheng goes against an explicit request as claim 4 recites but instead discloses a machine-generated request.

In view of the above, the rejection should be removed.


Independent claim 5

Claim 5 recites (emphasis added) "[…] a search component configured to make a determination if a base map for a rendered map *is available*[…] " The Office cites paragraphs [0064] and [0184] as well as TABLE 1 of Cheng against this claim feature. Paragraph [0064] of Cheng states:

> In order to systematically photograph an actual course (e.g., a
> track, a golf course, a baseball diamond, a football field, a tennis
> court, one or more roadways) for use in electronic game or other
> application, the course can be manually or automatically divided
> into a grid of cells. Each cell defines a physical area of the course
> that will be photographed for use in the simulation. Each cell can
> have one or more photographs associated with the cell. In various
> implementations, a cell photograph captures the area of the course
> corresponding to the area of the cell. FIG. 3A illustrates an
> example course grid 300. A course can be of any size and shape,
> and can include non adjacent areas. Likewise, cells can have
> different sizes, shapes and do not have to be adjacent to one
> another. Depending on the portion of the course they cover, cell
> density can change. In various implementations, cell density
> increases in course areas where players are more likely to interact
> with virtual objects.

14

Application No. 13/194,946
Amendment Dated 2012 05 20
in Reply to Office Action Dated 2012 03 18

Paragraph [0064] of Cheng discusses how a golf course is photographed and no discussion is provided for a determination on if a base map for the rendered map is available in Cheng.

> Paragraph [0184] of Cheng, that also discusses TABLE 1, states:

>> [i]n various implementations, if there is more than one photograph that can be used to show a particular portion of a path (or substantially the same portion of the path), the photograph with the highest priority is selected for the automatically generated shot sequence. Photograph priority is based on one or more factors which are described in TABLE 1. However, other factors are possible.

Paragraph [0184] discusses selection priority for photographs when more than one photograph can be used while TABLE 1 details selection factors. With this selection priority no determination is made if a base map for a rendered map is available. To put another way, paragraph [0184] discusses which photograph should be used among several available photographs. Thus, no determination is made on if a photograph is available, but instead a selection of a photographs is made that are already available (note that this does not mean that Applicants assert that the photograph is equivalent to the base map).

In the response to amendments/arguments section of the FOA, the Office argues that Cheng discloses multiple photographs and those photographs must be searched to determine a priority photograph to use. That argument is irrelevant to the recited claim feature. The fact that the component is called a search component does not mean that any search function covers the recited claim feature, but only a component configured to make a determination if a base map for a rendered map is available. That photographs must be searched is irrelevant. Rather, the inquiry is whether Cheng discloses a search component configured to make a determination if a base map for a rendered map is available. Cheng does not.

Thus, the rejection should be removed.


Dependent claim 6

Claim 6 recites "[…] an alteration component configured to alter the base map based, at least in part, on a determination on how to alter the base map, where the analysis component being configured to analyze the map data set comprises being configured to make the determination on how to alter the base map in response to the determination if the base map for

Application No. 13/194,946
Amendment Dated 2012 05 20
in Reply to Office Action Dated 2012 03 18

the rendered map is available being positive."  The Office cites paragraph [0191] of Cheng against this claim feature.

Paragraph [0191] of Cheng states:

> [s]ometimes it may be advantageous to combine two or more photographs into a single continuous photograph, such as when the "best" photograph for a virtual object would be a combined photograph, to provide a larger field of view than what is afforded by a single photograph, or to create the illusion that users can freely move through a course. In some implementations, an image stitcher component 727 can combine two or more photographs into a continuous image by aligning the photographs based on identification of common features, stabilizing the photographs so that they only differ in their horizontal component, and finally stitching the images together. The image stitcher 727 can be utilized by the photo mapper 722 or the shot selector 720 to combine photographs.

Paragraph [0191] of Cheng discusses image stitching and gives no indication on a determination on how to alter the base map.  All paragraph [0191] states that photo stitching can occur, how the stitcher component can function, and why such stitching may be beneficial.  Cheng is silent with regard to determining how an alteration should occur.  No indication is given in paragraph [0191] of Cheng as to a determination on how to alter a base map as claim 6 recites, nor is there a suggestion of on what Cheng would base such a determination. And again, as discussed with regard to claim 5, Cheng does not discuss availability of the rendered map and therefore does not address being configured to make the determination on how to alter the base map in response to the determination if the base map for the rendered map is available being positive.

In the response to amendments/arguments section of the FOA, the Office argues that the base map is altered when the photos are stitched to create altered photos (see FOA, section 73). It is unclear to Applicants how photos being stitched together function as an alteration of a base map.  Further, the Office argues that it is inherent that a determination is made whether or not to stitch photos when it is sometimes advantageous to stitch photos (see FOA, section 73).  This statement by the Office is irrelevant since it does not address the claim language.  The claim language is not, as it appears the Office is interpreting, on a determination whether or not to alter the based map, but a determination on **_how_** to alter the base map.

In view of the above, the rejection should be removed.

Application No. 13/194,946
Amendment Dated 2012 05 20
in Reply to Office Action Dated 2012 03 18

Dependent claim 21

Claim 21 recites "[…] where the analysis component is configured to make a determination on if the base map should be used for the rendered map and where the alteration component functions in response to the determination on if the base map should be used for the rendered map being positive."  The Office cites paragraph [0191] of Cheng against this claim feature.

Paragraph [0191] of Cheng is discussed above with regard to claim 6.  All paragraph [0191] states that photo stitching can occur, how the stitcher component can function, and why such stitching may be beneficial.  No indication is given in paragraph [0191] of Cheng as to a determination on if the base map should be used for the rendered map.

In the response to amendments/arguments section of the FOA, the Office argues that the base map is altered when the photos are stitched to create altered photos.  This is irrelevant to this claim feature in that it discusses alteration itself and does not address the recited determinations.

The Office also argues that a determination inherently has to be made whether or not to stitch photos when it is sometimes advantageous to stitch photos.  This argument by the Office is not logically supported.  Because something is at times advantageous and other times is not does not necessitate that a determination is made on if that something should occur.  Thus, that photo stitching may be advantageous in some situations does not mean that a determination on whether the base map should be used for the rendered map is disclosed by Cheng.  Further, the Office has not established how the photographs function as a base map.

Thus, the rejection should be removed.

Dependent claim 38

Claim 38 recites "[…] where the rendered map is an animation map of an actual location."  The Office cites paragraphs [0006] and [0047] of Cheng against this claim feature.  With regard to paragraph [0006], the Office cites the sentence "[s]electing a sequence of one or more photographic images is governed by a script." (see FOA, section 27).  The fact that a

17

Application No. 13/194,946
Amendment Dated 2012 05 20
in Reply to Office Action Dated 2012 03 18

sequence of photographic images is used does not change these from being photographic images and thus not an animation.

Paragraph [0047] states:

> [v]arious implementations recreate the experience of playing on a course (e.g., a golf course, a baseball diamond, a race track) utilizing digital representations of actual photographs of the course combined with computer generated two dimensional (2D) and 3D graphics, animation and effects.

Digital representations of actual photographs are still photographs and nothing in Cheng indicates these to not be photographs. The fact that the term 'digital representations' is used does not mean that these are not photographs, but that they are not the actual photographs but instead digital photographs. For example, in paragraph [0051] of Cheng reference 102a is a digital representation of photographic images of an actual golf course, but review of Figure 1A that includes 102a shows a photograph and other references to 102a in Cheng, including the second sentence of paragraph [0051] as well as paragraphs [0052] and [0062], show that 102a is a photograph. Thus, the digital representation refers to a digital file of the photograph and not an animation.

In view of the above, the rejection should be removed.


Dependent claim 39

Claim 39 recites "[…] where the rendered map is in part an accurate reflection of the specific area and where the rendered map is in part an inaccurate reflection of the specific area." The Office cites paragraph [0047] of Cheng with regard to the accurate reflection, but merely states that Cheng cannot convey non-photographic visual information of the area without citation to Cheng. The Office provides no example of non-photographic visual information and merely makes this statement without explaining what visual information cannot be captured by a photograph. Cheng makes no mention of a photograph including an inaccurate reflection. As such Cheng does not disclose where the rendered map is in part an accurate reflection of the specific area and where the rendered map is in part an inaccurate reflection of the specific area.

In view of the above, the rejection should be removed.

Application No. 13/194,946
Amendment Dated 2012 05 20
in Reply to Office Action Dated 2012 03 18

Dependent claim 40

Claim 40 recites "[…] where the rendered map is based, at least in part, on the map data set, and where the rendered map does not include the map data set itself." The Office cites paragraphs [0061] and [0181] against this claim feature and then provides the argument that original photographs are retrieved and those original photographs are not used, but instead cached copies are used (see FOA, section 29). Even if copies of the original photographs are used, they still include the original information captured in those photographs. In Cheng, the original information itself contained in the photographs, whether original or copies, are used during play. In contrast, the rendered map recited in claim 40 does not include the map data itself.

In view of the above, the rejection should be removed.

Dependent claim 41

Claim 41 depends from claim 22. Claim 22 recites "[…] a gather component configured to make a determination on if the rendered map is available after reception of the request, where the gather component is configured to obtain the rendered map if the determination is that the rendered map is available and where the gather component is configured to collect a map data set if the determination is that the rendered map is not available […]" The Office notes that Cheng does not recite this claim feature (FOA, section 37). Since this feature is not recited by Cheng and claim 41 depends from claim 22, Cheng cannot disclose what claim 41 recites.

In view of the above, the rejection should be removed.

**Claim Rejection under 35 U.S.C. 103(a)**

Claim 22 and 31 are rejected under 35 U.S.C. § 103(a) as being anticipated by Cheng in view of Boschker *et al*. (U.S. Pub. No. 2012/0306923 A1).

Evaluation of Boschker's Priority Date

Before looking at Boschker substantively, the priority date of Boschker must be examined. Boschker has a PCT filing date of Feb 4, 2011 and claims priority to U.S. Provisional Application No. 61/301,256 filed on Feb. 4, 2010. Since the subject application claims priority

19

Application No. 13/194,946
Amendment Dated 2012 05 20
in Reply to Office Action Dated 2012 03 18

to U.S. Provisional Application No. 61/409,027 filed on Nov. 1, 2010, the subject application has a priority date before that of the PCT application alone, but after Boschker's '256 provisional date.

MPEP 706 states "[t]he goal of examination is to clearly articulate any rejection early in the prosecution process so that the applicant has the opportunity to provide evidence of patentability and otherwise reply completely at the earliest opportunity."  Further, MPEP 706.07 states "[…] in every case the applicant is entitled to a full and fair hearing."  37 C.F.R. 1.11(a), as cited in MPEP 103, states "[t]he specification, drawings, and all papers relating to the file of: A publish application[…] are open to inspection by the public."

Despite this requirement, a search in PAIR for the '256 application results in the message "Sorry, the entered Application Number "61/301256" is not available as of May 17, 2013. The number may have been incorrectly typed, or assigned to an application that is not yet available for public inspection."

| Select New Case |
|---|
| Sorry, the entered Application Number "61/301,256" is not available. The number may have been incorrectly typed, or assigned to an application that is not yet available for public inspection. |

In addition, under 'Continuity Data' in PAIR for Boschker, the '256 application is not listed          and          as          such          no          link          is          provided.



Under 'Continuity Data' in PAIR for Boschker, a link for the PCT application is provided, but the 'Continuity Data' under the PCT application does not provide a link to the '256 application.

Application No. 13/194,946
Amendment Dated 2012 05 20
in Reply to Office Action Dated 2012 03 18

Without being given access to the '256 application, the Applicants, as well as the Office, have no way of determining if the content of Boschker cited in the FOA are merely supported in Boschker or if they are also disclosed in the '256 provisional application.   In turn, it is impossible to determine if Boschker teaches what claims 22 and 31 recite with a date prior to the priority date of the subject application let alone the invention date.   Thus, through no fault of the Examiner, it is impossible for Applicants to properly evaluate Boschker and thus have been denied their opportunity to potentially provide evidence of patentability since the contents of the application by which Boschker claims priority are not accessible to Applicants.   In addition, without being able to evaluate the application from which Boschker claims priority, the application that causes Boschker to have priority over the filing date of the subject application, then Applicants have, again through no fault of the Examiner, been robbed of the full and fair hearing to which they are entitled.   Furthermore, without access to the '256 provisional application, it is impossible for the Office to establish a *prima facie* case of obviousness that can be understood by the Applicants.   In view of this, the rejection should be removed.

Independent claim 22

Claim 22 recites (emphasis added) "[…] a gather component configured to make a determination on if the rendered map is available after reception of the request, where the gather component is configured to obtain the rendered map if the determination is that the rendered map ***is available*** and where the gather component is configured to collect a map data set if the determination is that the rendered map ***is not available***[…] "  The Office concedes that Cheng does not teach this claim feature (FOA, section 37).  The Office cites paragraphs [0025], [0027], [0055], [0056], and [0182] of Boschker against this claim feature.

Paragraph [0025] states:

> [a]ccording to a first aspect of the present invention, there is provided a method of rendering a map for display on a mapping or navigation apparatus, in which the map is rendered for display by loading data representing particular parts of the map to be displayed from a main map data store for processing for display by a rendering processor of the mapping or navigation apparatus and the rendering processor of the mapping or navigation apparatus has a local memory in which data representing particular parts of a map to be displayed can be stored, the method comprising:

Application No. 13/194,946
Amendment Dated 2012 05 20
in Reply to Office Action Dated 2012 03 18

This paragraph is an introduction paragraph and is silent regarding map availability.

Paragraph [0027] states (emphasis added):

> if it is determined that a part of the map for which data is already stored in the local memory of the rendering processor ***is sufficiently similar*** to the new part of the map to be processed, re-using data for the existing part of the map stored in the local memory of the rendering processor for displaying the new part of the map.

This paragraph discusses how similar a map already stored is to a new part of the map to be processed, not if the map is available.

Paragraphs [0055]-[0056] state:

> As discussed above, in the present invention if it is determined that a new part of the map to be processed for display is sufficiently similar to map data that is already stored in the local memory of the rendering device, data for the new part of the map is preferably not read from the main map data store and processed by the rendering device, but instead the existing map data in the local memory of the rendering device is re-used.
>
> Conversely, if it is determined that the existing map data stored in the local memory of the rendering device is not sufficiently similar to the new map data so as to be able to be re-used, then the data representing the new part of the map should be, and preferably is, loaded and processed by the rendering device so as to display the relevant part of the map.

Similar to as discussed above, Boschker discuss determining if new map data is sufficiently similar to map data already stored. This determination does not consider if a rendered map is available.

Paragraph [0182] states:

> [t]hus, in this arrangement, when map data is to be processed for display, it is determined whether to use already cached map data to display the map data in question, or whether new map data needs to be loaded and processed from the main map storage 230. This is done by means of a similarity analysis 601. If the map data already in the cache 706 is determined to be sufficiently similar to the map data that is to be displayed, the new data from the memory 230 is not loaded, but instead the existing data in the cache is processed for display of the map element in question. This has the benefit of

22

Application No. 13/194,946
Amendment Dated 2012 05 20
in Reply to Office Action Dated 2012 03 18

                a reduced system load, since already processed data does not need
                to be reloaded and reprocessed.

Again, this paragraph discusses similarity and not availability.

      As is shown, Boschker discusses how similar and existing map is to a new map to be generated while claim 22 addresses map availability.

      In view of the above, the rejection should be removed.

      It should also be noted that in the response to arguments section the Office asserts that Official Notice was not properly traversed and therefore this is admitted prior art. This, however, is not the case. Applicants traversed the Official Notice by stating the since claim 22 was amended and in view of this the Official Notice is improper. Furthermore, the language in question of the Official Notice was removed in the claim amendments. The Office appears to agree since the Official Notice is no longer being used. Applicants traversed through argument and the Office changed the rejection in view of this argument. Thus, Applicants did adequately traverse the Office Notice and therefore no admission of prior art was made.

Dependent Claim 31

      MPEP 2142 states "[t]he examiner bears the initial burden of factually supporting any *prima facie* conclusion of obviousness. If the examiner does not produce a prima facie case, the applicant is under no obligation to submit evidence of nonobviousness." Here, it appears the Office repeats sections 38-41 of the FOA against this claim feature with the exception of updating the claim number in section 44 (see FOA, sections 43-46). It does not appear that the Office is addressing the appraisal component and decision component that claim 31 recites and as such the Office does not meet its requirement with regard to factually supporting the *prima facie* conclusion of obviousness. In view of this, the rejection should be removed.

## Claim Rejection under 35 U.S.C. 103(a)

      Claim 23 and 25-27 are rejected under 35 U.S.C. § 103(a) as being anticipated by Cheng in view of Masuyama *et al*. (U.S. Pub. No. 2002/0072418 A1). This rejection should be withdrawn because claims 23 and 25-27 depend from claim 4 which is believed to be allowable in view of the above. The addition of Masuyama fails to render obvious at least above-

Application No. 13/194,946
Amendment Dated 2012 05 20
in Reply to Office Action Dated 2012 03 18

distinguished aspects of claim 4. Therefore, the rejection of these claims is moot and their rejection should be removed.

Masuyama generally relates to integrating acceleration sensors into a portable gaming device and facilitating their relative calibration to particular users and settings in the mobile context. Masuyama, col. 1, line 61 to col. 2, line 6. However, Masuyama fails to disclose or otherwise render obvious "[…] an interaction component configured to receive a user request for a rendered map, where the user request is an explicit request submitted by a user for a specific area to be rendered […] where the rendered map is a rendering of the specific area" as recited in independent claim 4. Accordingly, claim 4 is allowable over Masuyama (alone or in combination with Cheng), and rejection of claims that depend therefrom is improper based at least on their dependence.

While discussion of the particular aspects recited in these claims is omitted for brevity, the foregoing should not be interpreted as a waiver or concession on part of the applicant with respect to these claims' patentability independent of their respective base claims.

**Claim Rejection under 35 U.S.C. 103(a)**

Claim 24 is rejected under 35 U.S.C. § 103(a) as being anticipated by Cheng in view of Masuyama *et al*. and further in view of Choudhry *et al*. (U.S. Pub. No. 2008/0227548 A1). This rejection should be withdrawn because claim 24 depends from claim 4 which is believed to be allowable in view of the above, and the addition of Choudhry fails to render obvious at least above-distinguished aspects of the respective base claim. Therefore, the rejection of these claims is moot and their rejection should be removed.

Choudhry generally relates to a software application designed to include stacks and/or ports that facilitate online multiplayer interaction across multiple gaming platforms. Choudhry, paragraphs [0002] and [0003]. However, Choudhry does not disclose "[…] an interaction component configured to receive a user request for a rendered map, where the user request is an explicit request submitted by a user for a specific area to be rendered […] where the rendered map is a rendering of the specific area" as recited in independent claim 4. Accordingly, claim 4 is allowable over Choudhry (alone or in combination with Cheng and/or Masuyama), and rejection of claims that depend therefrom is improper based at least on their dependence.

24

Application No. 13/194,946
Amendment Dated 2012 05 20
in Reply to Office Action Dated 2012 03 18

While discussion of the particular aspects recited in these claims is omitted for brevity, the foregoing should not be interpreted as a waiver or concession on part of the applicant with respect to these claims' patentability independent of their respective base claims.

### Claim Rejection under 35 U.S.C. 103(a)

Claims 35-36 are rejected under 35 U.S.C. § 103(a) as being anticipated by Cheng in view of Herzog *et al.* (U.S. Pub. No. 2008/0227548 A1). This rejection should be withdrawn because claims 35-36 depends from claim 4 which is believed to be allowable in view of the above, and the addition of Herzog fails to render obvious at least above-distinguished aspects of the respective base claim. Therefore, the rejection of these claims is moot and their rejection should be removed.

Herzog generally relates to identifying a geospatial pattern based on device data. Map data is defined based on the identified pattern and a determination is made if the map data should be included in a map for presentment to a user (Herzog paragraph [0002]). However, Herzog does not disclose "[…] a discovery component configured to discover an information set about the specific area, where the information set is not part of the map data set; and an alteration component configured to alter the rendered map to reflect the new information set." as well as "[…] where the information set is a correction to a piece of data of the map data set." As recited in claims 35 and 36. For example, the Office cites paragraph [0027] against the discovery component recited in claim 35, but Herzog teaches no such components as claim 35 recites. Accordingly, claims 35-36 are allowable over Herzog (alone or in combination with Cheng), and rejection of claims that depend therefrom is improper based at least on their dependence.

While discussion of the particular aspects recited in these claims is omitted for brevity, the foregoing should not be interpreted as a waiver or concession on part of the applicant with respect to these claims' patentability independent of their respective base claims.

### Claim Rejection under 35 U.S.C. 103(a)

In rejecting claim 37, the Office concedes that Cheng does not disclose "[…] where the user request is entered through the user filling out a form on an interface." To compensate for this deficiency, the Office uses Official Notice. MPEP 2144.03(A) states: "It is never

Application No. 13/194,946
Amendment Dated 2012 05 20
in Reply to Office Action Dated 2012 03 18

appropriate to rely solely on 'common knowledge' in the art without evidentiary support in the record, as the principal evidence upon which a rejection was based" citing *In re Zurko*, 258 F.3d at 1385, 59 USPQ2d at 1697.

Moreover, the Office takes Official Notice with respect to the subject claim, merely stating that certain claim aspects are old and well known in the art.  However, when such Notice is taken, the Office must provide specific factual findings predicated on sound technical and scientific reasoning to support a conclusion of common knowledge.  See MPEP 2144.03 citing *In re Soli*, 317 F.2d 941 (CCPA 1963); *In re Chevenard*, 139 F.2d 713 (CCPA1943).  In the instant Office Action, the Office has not provided any factual findings to support this conclusion. Instead, the Office simply states "[…] that it is well known for users to make request by filling out forms on interfaces.  Doing so provides an input into a system."  Therefore, applicant traverses this rejection, as the Office has not provided any factual findings to support the above-noted conclusion as required.  Applicant requests that the Office produce authority for the above-noted conclusion (*See* MPEP 2144.03 citing *In re Chevenard*, 139 F.2d 713 (CCPA1943)), including documentary evidence in the next Office Action or Advisory Action if this rejection is to be maintained (*See* MPEP 2144.03 citing *In re Zurko*, 258 F.3d 1379 (Fed. Cir. 2001)).

Application No. 13/194,946
Amendment Dated 2012 05 20
in Reply to Office Action Dated 2012 03 18

### <u>Conclusion</u>

A Notice of Allowance of this application is hereby requested if appropriate.  If a Notice of Allowance is not appropriate, then the Office is reminded of MPEP 2164.04 which states "[…] the examiner should always look for enabled, allowable subject matter and communicate to applicant what that subject matter is at the earliest point possible in the prosecution of the application."  This communication can include both currently claimed subject matter and subject matter not currently recited in the claims.


<u>/Ronald C. Krosky/</u>

Ronald C. Krosky

Co-Inventor


<u>/Brendan E. Clark/</u>

Brendan E. Clark

Co-Inventor

POWER OF ATTORNEY TO ONE OR MORE OF THE JOINT INVENTORS AND TO PRACTITIONERS
ASSOCIATED WITH A CUSTOMER NUMBER

Application Title: OUTPUT PRODUCTION
Docket Number: CH08USA
Application Number: 13/194,946

We hereby revoke all previous powers of attorney given in the above-identified application and appoint the
following joint inventors to prosecute the application identified above, and to transact all business in the
United States Patent and Trademark Office (the "Office") connected therewith:

Brendan Edward Clark and Ronald Charles Krosky

along with any practitioner associated with the Customer Number:

85449

the inventors and the Customer Number having the correspondence address as

19530 Telbir Ave.
Rocky River, OH 44116.

Ronald Charles Krosky only has power of attorney to represent himself and his interests and has no power of
attorney to represent any other inventor. Any document signed by Ronald Charles Krosky is signed only with
regard to him and no representation is made with regard to any other inventor. In any interview conducted
with Ronald Charles Krosky and another inventor, the presence of Ronald Charles Krosky is only and
exclusively for himself and not representation of any other inventor. Any action taken by Ronald Charles
Krosky before the Office with regards to this application is exclusively for representation of himself and no
other inventor. Ronald Charles Krosky does not have power of attorney to represent any other inventor.

Brendan Edward Clark only has power of attorney to represent himself and his interests and has no power of
attorney to represent any other inventor. Any document signed by Brendan Edward Clark is signed only with
regard to him and no representation is made with regard to any other inventor. In any interview conducted
with Brendan Edward Clark and another inventor, the presence of Brendan Edward Clark is only and
exclusively for himself and not representation of any other inventor. Any action taken by Brendan Edward

of himself and no other inventor. Brendan Edward Clark does not have power of attorney to represent any other inventor.

The Electronic Filing System (EFS) of the United States Patent and Trademark Office enables a single user to file papers through use of a digital certificate. Since a document can only be filed in the EFS under the digital certificate of a single user, it is impossible for both Ronald Charles Krosky and Brendan Edward Clark to use their digital certificates to submit a document. Therefore, when Ronald Charles Krosky or Brendan Edward Clark cause a document to be submitted under their digital certificate, this is merely done to use the EFS and does not convey representation of any other inventor.

If an inventor is also a practitioner that is associated with the Customer Number, then when that inventor prosecutes the above identified application and/or transacts business connected therewith with the Office, that inventor is doing so not as a practitioner, but as an inventor under 37 CFR 1.45 even if that inventor files the application under his digital certificate or includes his or her registration number in a correspondence.

We are the inventors of the subject applications:


Ronald C. Krosky                          Date: _May 3 2013_

                                          Telephone: 216-536-8718


Brendan E. Clark                          Date: _2013 05 08_

                                          Telephone: 630-452-2416

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 15816512 |
| **Application Number:** | 13194946 |
| **International Application Number:** | |
| **Confirmation Number:** | 1966 |
| **Title of Invention:** | OUTPUT PRODUCTION |
| **First Named Inventor/Applicant Name:** | Ronald Charles Krosky |
| **Customer Number:** | 85449 |
| **Filer:** | Brendan Edward Clark |
| **Filer Authorized By:** | |
| **Attorney Docket Number:** | CI108USA |
| **Receipt Date:** | 20-MAY-2013 |
| **Filing Date:** | 30-JUL-2011 |
| **Time Stamp:** | 13:34:18 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | no |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Amendment After Final | CI108USA_Final_OA_due_5-18-13_Final.pdf | 227085<br>adb40e5fdee9291770aed89d75b16c83565b5e80 | no | 27 |

| | |
|---|---|
| **Warnings:** | |
| **Information:** | |

| 2 | Power of Attorney | ci108poa-f.pdf | 2096136 | no | 2 |
| | | | d2be5921e637b70cd20d110a9cfa3916678796df | | |

| **Warnings:** |
| **Information:** |

| **Total Files Size (in bytes):** | 2323221 |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

PTO/SB/06 (09-11)
Approved for use through 1/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| PATENT APPLICATION FEE DETERMINATION RECORD<br>Substitute for Form PTO-875 | Application or Docket Number<br>13/194,946 | Filing Date<br>07/30/2011 | ☐ To be Mailed |
|---|---|---|---|

**ENTITY:**   ☐ LARGE   ☒ SMALL   ☐ MICRO

## APPLICATION AS FILED – PART I

|  | (Column 1) | (Column 2) |  |  |
|---|---|---|---|---|
| FOR | NUMBER FILED | NUMBER EXTRA | RATE ($) | FEE ($) |
| ☐ BASIC FEE<br>(37 CFR 1.16(a), (b), or (c)) | N/A | N/A | N/A | |
| ☐ SEARCH FEE<br>(37 CFR 1.16(k), (i), or (m)) | N/A | N/A | N/A | |
| ☐ EXAMINATION FEE<br>(37 CFR 1.16(o), (p), or (q)) | N/A | N/A | N/A | |
| TOTAL CLAIMS<br>(37 CFR 1.16(i)) | minus 20 = | * | X $ = | |
| INDEPENDENT CLAIMS<br>(37 CFR 1.16(h)) | minus 3 = | * | X $ = | |
| ☐ APPLICATION SIZE FEE<br>(37 CFR 1.16(s)) | If the specification and drawings exceed 100 sheets of paper, the application size fee due is $310 ($155 for small entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s). | | | |
| ☐ MULTIPLE DEPENDENT CLAIM PRESENT (37 CFR 1.16(j)) | | | | |
| * If the difference in column 1 is less than zero, enter "0" in column 2. | | | TOTAL | |

## APPLICATION AS AMENDED – PART II

|  |  | (Column 1) | (Column 2) | (Column 3) |  |  |
|---|---|---|---|---|---|---|
| **AMENDMENT** | **05/20/2013** | CLAIMS REMAINING AFTER AMENDMENT | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) |
| | Total (37 CFR 1.16(i)) | * 20 | Minus | ** 20 | = 0 | x $40 = | 0 |
| | Independent (37 CFR 1.16(h)) | * 3 | Minus | *** 3 | = 0 | x $210 = | 0 |
| | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | |
| | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | |
| | | | | | TOTAL ADD'L FEE | **0** |

|  |  | (Column 1) | (Column 2) | (Column 3) |  |  |
|---|---|---|---|---|---|---|
| **AMENDMENT** | | CLAIMS REMAINING AFTER AMENDMENT | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) |
| | Total (37 CFR 1.16(i)) | * | Minus | ** | = | x $ = | |
| | Independent (37 CFR 1.16(h)) | * | Minus | *** | = | x $ = | |
| | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | |
| | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | |
| | | | | | TOTAL ADD'L FEE | |

* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.

** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20".

*** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3".

The "Highest Number Previously Paid For" (Total or Independent) is the highest number found in the appropriate box in column 1.

LIE
/RUTH LLOYD/

This collection of information is required by 37 CFR 1.16. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 13/194,946 | 07/30/2011 | INV001Ronald Charles Krosky | CI108USA | 1966 |

85449          7590          03/18/2013
CONVERGENT INSIGHT, LLC
19530 Telbir Ave.
Rocky River, OH 44116

| EXAMINER |
|---|
| HOANG, BACH V |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3718 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 03/18/2013 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

| | Application No. | Applicant(s) |
|---|---|---|
| ***Office Action Summary*** | 13/194,946 | KROSKY ET AL. |
| | **Examiner** | **Art Unit** | |
| | BACH HOANG | 3718 | |

-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.

- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☒ Responsive to communication(s) filed on <u>02 January 2013</u>.

2a)☒ This action is **FINAL**.      2b)☐ This action is non-final.

3)☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

4)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

5)☒ Claim(s) <u>2,4-6,21-27,31,33 and 35-41</u> is/are pending in the application.

     5a) Of the above claim(s) _____ is/are withdrawn from consideration.

6)☐ Claim(s) _____ is/are allowed.

7)☒ Claim(s) <u>2, 4-6, 21-27, 31, 33, and 35-41</u> is/are rejected.

8)☐ Claim(s) _____ is/are objected to.

9)☐ Claim(s) _____ are subject to restriction and/or election requirement.

* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov.

**Application Papers**

10)☐ The specification is objected to by the Examiner.

11)☐ The drawing(s) filed on _____ is/are: a)☐ accepted or b)☐ objected to by the Examiner.

     Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

     Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgement is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

     a)☐ All   b)☐ Some * c)☐ None of:

       1.☐ Certified copies of the priority documents have been received.

       2.☐ Certified copies of the priority documents have been received in Application No. _____.

       3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

     * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1)☒ Notice of References Cited (PTO-892)          3)☐ Interview Summary (PTO-413)

                                                   Paper No(s)/Mail Date. _____ .

2)☐ Information Disclosure Statement(s) (PTO/SB/08)     4)☐ Other: _____.

     Paper No(s)/Mail Date _____.

Application/Control Number: 13/194,946                                     Page 2
Art Unit: 3718

## DETAILED ACTION

1.      This responds to Applicant's amendments/arguments filed 12/19/2012 and

1/2/2013.  Claims 2, 4-6, 21-27, 31, 33, and 35-41 are currently pending.


### *Claim Rejections - 35 USC § 112*


2.      The following is a quotation of 35 U.S.C. 112(a):

(a) IN GENERAL.—The specification shall contain a written description of the
invention, and of the manner and process of making and using it, in such full,
clear, concise, and exact terms as to enable any person skilled in the art to which
it pertains, or with which it is most nearly connected, to make and use the same,
and shall set forth the best mode contemplated by the inventor or joint inventor of
carrying out the invention.

The following is a quotation of 35 U.S.C. 112 (pre-AIA), first paragraph:

The specification shall contain a written description of the invention, and of the
manner and process of making and using it, in such full, clear, concise, and exact
terms as to enable any person skilled in the art to which it pertains, or with which
it is most nearly connected, to make and use the same and shall set forth the
best mode contemplated by the inventor of carrying out his invention.

3.      Claims 35, 38, 39, and 40 are rejected under 35 U.S.C. 112(a) or 35 U.S.C. 112

(pre-AIA), first paragraph, as failing to comply with the written description

requirement.  The claim(s) contains subject matter which was not described in

the specification in such a way as to reasonably convey to one skilled in the

relevant art that the inventor or a joint inventor, or for pre-AIA the inventor(s), at

the time the application was filed, had possession of the claimed invention.

Application/Control Number: 13/194,946                                          Page 3
Art Unit: 3718

4.      Claim 35 recites "a discovery component."  A discovery component has not been

previously taught by the specification.  While the specification discusses that new

information sources can be discovered, the specification does not disclose using

a discovery component to discover the new information source.


5.      Claim 38 recites "the rendered map is an animation map."  An animation map

has not been disclosed by the specification.


6.      Claim 39 recites "the rendered map is in part an accurate reflection" and "in part

an inaccurate reflection."   The rendered map being both an accurate and

inaccurate reflection has not been disclosed by the specification.


7.      Claim 40 recites the rendered map is based on the map data set but "does not

include the map data set itself."  The specification has not disclosed such a

feature.


8.      The following is a quotation of 35 U.S.C. 112(b):


    (B)  CONCLUSION.—The specification shall conclude with one or more claims
particularly pointing out and distinctly claiming the subject matter which the
inventor or a joint inventor regards as the invention.


The following is a quotation of 35 U.S.C. 112 (pre-AIA), second paragraph:


The specification shall conclude with one or more claims particularly pointing out
and distinctly claiming the subject matter which the applicant regards as his
invention.