# Exhibit A-11

'241 Patent Filewrapper, eleventh 70 pages

etc.), can be utilized either directly, with or without adjustment (e.g., lighting and shadow adjustment, resolution normalization, color scheme correction, etc.), or completely regenerated and represented in a common application format. The user can use the track and the track can be made available to other players. As used herein, a remote location can refer to, but is not limited to, a first system. The first system and a second system can be two distinct systems that are not directly connected to one another and separated by physical distance that interact via at network or data link such as, for example, the Internet, a local area network, infrared ports, and soforth, in a wired or wireless fashion.

The following paragraphs include definitions of selected terms discussed at least in the detailed description. The definitions may include examples used to explain features of terms and are not intended to be limiting. In addition, where a singular term is disclosed, it is to be appreciated that plural terms are also covered by the definitions. Conversely, where a plural term is disclosed, it is to be appreciated that a singular term is also covered by the definition. In addition, a set can include one or more member(s).

References to "one embodiment", "an embodiment", "one example", "an example", and so on, indicate that the embodiment(s) or example(s) so described may include a particular feature. The embodiment(s) or example(s) are shown to highlight one feature and no inference should be drawn that every embodiment necessarily includes that feature. Multiple usages of the phrase "in one embodiment" and others do not necessarily refer to the same embodiment; however this term may refer to the same embodiment. It is to be appreciated that multiple examples and/or embodiments may be combined together to form another embodiment.

"Computer-readable medium", as used herein, refers to a medium that stores signals, instructions, and/or data. A computer may access a computer-readable medium and read information stored on the computer-readable medium. In one embodiment, the computer-readable medium stores instruction and the computer can perform those instructions as a method. The computer-readable medium may take forms, including, but not limited to, non-volatile media (e.g., optical disks, magnetic disks, and so on), and volatile media (e.g., semiconductor memories, dynamic memory, and so on). Example forms of a computer-readable medium may include, but are not limited to, a floppy disk, a flexible disk, a hard disk, a magnetic tape, other magnetic medium, an application specific integrated circuit (ASIC), a programmable logic device, a compact disk (CD), other optical medium, a random access memory (RAM), a read

5

only memory (ROM), a memory chip or card, a memory stick, and other media from which a computer, a processor or other electronic device can read.

"Component", "logic", "module", "interface" and the like as used herein, includes but is not limited to hardware, firmware, software stored or in execution on a machine, a routine, a data structure, and/or at least one combination of these (e.g., hardware and software stored). Component, logic, module, and interface may be used interchangeably. A component may be used to perform a function(s) or an action(s), and/or to cause a function or action from another component, method, and/or system. A component may include a software controlled microprocessor, a discrete logic (e.g., ASIC), an analog circuit, a digital circuit, a programmed logic device, a memory device containing instructions, a process running on a processor, a processor, an object, an executable, a thread of execution, a program, a computer and so on. A component may include one or more gates, combinations of gates, or other circuit components. Where multiple components are described, it may be possible to incorporate the multiple components into one physical component. Similarly, where a single component is described, it may be possible to distribute that single component between multiple physical components. In one embodiment, the multiple physical components are distributed among a network. By way of illustration, both/either a controller and/or an application running on a controller can be one or more components.

"Maps", "tracks", "open world environments" or other similar terms are used herein to include areas in space and time either developed for the purpose of use with a game or application, or produced by at least one system or other embodiment described herein for use with one or more games or applications. These terms can apply to one or more of: two dimensional representations (e.g., roads, trails, flat scenery/horizon/aerial views), three dimensional representations (e.g., depth including depth through varying media such as gases, fluids and solids, to embrace structures [e.g., city blocks, skyscrapers, walls and fences, curbs], terrain features [e.g., fingers and draws on a mountain or around otherwise flat terrain, fordable rivers, non-fordable lakes], vegetation [e.g., large trees that are impassible, small trees or shrubs that can be driven over], surfaces [e.g., paved, dirt, sand, grass]), and four dimensional representations (e.g., a particular place at a particular time, or through a progression of time, including times that may not be the present time). "Maps", "tracks", "open world environments" and other such can include terrain features (significant or minor), various directions of

observation in different conditions, weather (e.g., within a given time period [e.g., winter in Alaska], at a stated time [e.g., on April 28, 1983], or during the current time [e.g., from available local sensors or from an online weather resource]) to include illumination data. "Maps", "tracks", and "open world environments" or other similar can further include, exclude or alter the

5      impact of natural events (e.g., hurricane, volcano, flood). "Maps", "tracks", and "open world environments" or other similar can also include human-impact or behavioral features, such as foot or vehicle traffic, traffic signals and control features, the ability to speed up or reverse human activity (e.g., deforestation or drainage, infrastructure development such as paving). A "map", "track", or "open world environment" can provide a user with the ability to "step into" a

10      particular location and explore it as if they were present, and can then be altered according to the user's particular preferences relating to space, time and other variables impacting the map. As with other portions of this application, this description is meant only to provide a brief, non-limiting word picture that provides some features relating to the essence of the invention described herein.

15      Figure 1 illustrates one embodiment of a system 100 that includes an analysis component 105 and a production component 110. The analysis component 105 can be configured to analyze a map data set 115 to produce an evaluation result. The production component 110 can be configured to produce a rendered map 120 based, at least in part, on the evaluation result, where the rendered map is stored in a computer-readable medium (e.g., made available for use from the

20      computer readable medium).

In one embodiment, the production component 110 can produce the rendered map 120 configured for use in a video game. In one embodiment, the rendered map 120 is a file that can be used by a video game console or other electronic device to produce a playable map in a video game. In an embodiment, the playable map was not included in the game's original content or

25      developed for mass-use by a particular entity, but generated on-demand based on an individual end user's desire to participate in a previously un-modeled environment in the game setting. In one embodiment, the rendered map 120 is content produced on a display screen.

In one embodiment, a player can play a racing video game that enables the player to drive a video game race car (e.g., 2008 Ford Mustang GT) upon a video game race track (e.g.,

30      Indianapolis Motor Speedway). This video game race track may be based off a real race track and included on a disk of the video game. Tracks included on the disk can be considered a video

game track set.  The player may want to race in the video game on a specific track not included in the video game track set.  Therefore, the system 100 may operate to create the specific track, or a plurality of tracks that are not pre-established within the shipped package.

Under the disclosures set forth herein, one or more systems or processes can have instances where workers (e.g., truck drivers, law enforcement, military personnel) can train on an area they are going into.  In one example, the President of the United States can visit Elkhart, Indiana.  As part of Secret Service training, the rendered map 120 can be created proactively of a current state of Elkhart roads and agents can train on the map.  This can allow realistic training that can be enabled at minimal expense and in an ongoing, timely fashion.  Being able to render navigable or interactive maps using available data can have multiple applications.

Aspects disclosed herein can apply to various applications, subject matters, etc.  Example areas where aspects disclosed herein can be practiced include video games (e.g., first person, third person, user interfaces or controls as replicated in games, etc.), simulators (e.g., ground vehicle, flight, ship, etc.), training systems, operation rehearsals (e.g., dismounted military mission, convoy preparation, commercial logistics, etc.) leisure, planning, navigation, virtual sightseeing or visitation, contingency development (e.g., providing alternative routes and familiarization on new routes), modeling and other predictive, optimization or analytical utilities dependent upon accurate reflections of space and time, etc.  In addition, features described herein can be used to supplement or augment actual developer effort, by, for example, producing beta maps for refinement, determining new places in time and space suitable for inclusion as a map in a game or application, or shifting developer strength from map development to the enhancement of maps (e.g., by adding additional interactive features, enemy or friendly units, dynamic areas, etc.).  It is to be appreciated that these example areas are not an exhaustive list.

Figure 2 illustrates one embodiment of a system 200 that includes a search component 205 along with the analysis component 105 and the production component 110.  The search component 205 can be configured to determine if a base map 210 for the rendered map 120 is available.  The base map can be considered is at least part of the map data set (e.g., the analysis component 105 analyzes the base map to determine if the base map meets a criteria set (e.g., one or more criterion) and the production component 110 designates the base map as the rendered map, with this designation being an output).  The search component 205 can operate at varying granular levels, determining if portions of the base map 210 are sufficiently current and/or

8

matching a time/situation of the user's choosing and/or if one or more possible base maps can be extracted or combined to provide a more (e.g., the most) desirable search results.

Figure 3 illustrates one embodiment a system 300 that includes an interaction component 305, evaluation component 310, and gather component 315, along with the analysis component 105 and production component 110. The interaction component 305 can be configured to receive a request 320 for the rendered map 120. The evaluation component 310 can be configured to evaluate the request 320 that produces an evaluation result, where the evaluation result indicates information to gather to produce the rendered map 120 (e.g., what data should be gathered as part of the map data set 115). The gather component 315 can be configured to gather the map data set 115 according to the information the evaluation result indicates to gather, where the map data set 115 is gathered prior to analysis by the analysis component 105.

In one example, the player can make the request 320 (e.g., through a user interface) to race at Circuit de Monaco, home of the Monaco Grand Prix, in his video game. The interaction component 305 receives the request 320 and the evaluation component 310 evaluates the request. As part of this evaluation, the evaluation component 310 can determine what information should be gathered to meet the user's request. The gather component 315 can 100 to locate information available on the Circuit de Monaco and collect such information. In one example, racing websites, a web mapping service application, and other locations (e.g., online locations) can be searched to gather information (e.g., map data of the map data set 115) about the Circuit de Monaco. Based on information gathered, the production component 110 can generate a video game version of the Circuit de Monaco and output the video game version (e.g., as the rendered map 210).

In one example, the player can make a request (e.g., entered with a video game console controller) and this requested is received by the interaction component 305. The request can be to race at Burke Lakefront Airport, home of the Cleveland Grand Prix from 1982-2007. The gather component 315 can be employed to locate information available on Burke Lakefront Airport. In one example, racing websites, a web mapping service application, and other locations (e.g., online locations) can be searched to gather information (e.g., map data of the map data set 115) about the Burke Lakefront Airport. However, since a historical track is requested, other information may be used to determine how to render a video game version of Burke Lakefront Airport (e.g., historical weather information, different surface information based on

9

repairs, etc.).   In addition, different track layouts may be used during different years for the Cleveland Grand Prix (e.g., 1989 Cleveland Grand Prix had a different track layout than 1990 Cleveland Grand Prix).  To determine which layout to create, the interaction component 305 can ask the player for more information (e.g., ask player which track should be rendered) or query

5    one or more sources of information (e.g., compare with previous television watching to see if the player watched a particular race and making an inference that the track the player wants is the track he watched).  The requests to the user for more information can either be fixed, based on a gaming or application context, built from a set or library of possible variables, or developed on-the-fly based using artificial intelligence technology (e.g., inferential techniques).   In one

10   embodiment, the production component 310 produces different layouts (e.g., the 1989 layout and 1990 layout) in response to the request 320 (e.g., when a specific layout for the request cannot be ascertained) and makes these layouts available to the player.  The sources of information that make up the map data set 115 can be public or private, or a variant in between – for example, specific data or pointers/links to data can be stored in/on the video game; private or proprietary

15   databases can be interrogated; public information can be investigated locally (e.g., local hard drive) or via a network (e.g., online encyclopedia or other sources described or implied herein); and others.  Based on information gathered, the production component 110 can generate a video game version of the Circuit de Monaco and output the video game version (e.g., as the rendered map 120).

20            In one embodiment, a player can request a rendered map of Indianapolis Motor Speedway.  A track at Indianapolis Motor Speedway can arrange in different configurations.  For example, an Indianapolis 500 configuration can configure as a squared oval while an Indianapolis Grand Prix (motorcycle race) configuration can configure as a road course.  In one embodiment, the production component 110 can produce a rendered map of the Indianapolis

25   Motor Speedway such that a user can select a configuration, a configuration can be proactively brought out by a video game (e.g., default squared oval, but player can select road course), and others.  For example, the rendered map 120 can be produced while including track configurations for modern Indianapolis 500, a classic Indianapolis 500 (e.g., brick-covered track, partially brick-covered track, pre-brick crushed stone and tar track, etc.), a Formula One Grand Prix (a

30   defunct race), the Indianapolis Grand Prix motorcycle race.  In one embodiment, a configuration is selected and high detail levels are given to track aspects that relate to the configuration while

low detail levels are given to track aspects that do not relate to the configuration (e.g., if oval is selected, road course specific aspects can be given visual distance aspects but not be rendered with surface attributes such as track temperature).

In one embodiment, the player can request to play at Indianapolis Motor Speedway with an Indianapolis 500 configuration.  The production component 110 can render the speedway with Indianapolis 500 configuration portions in high detail and other configurations in relatively low detail.  If the player desires to play another configuration of the Indianapolis Motor Speedway, changes can be made accordingly, such as, for example, transforming the low detail portions into high detail.

In one embodiment, as a track is played in a video game, the track can have characteristics changed that change how the game plays.  In one example, tracks can experience weeping (e.g., where water was seeping up through the asphalt and creating dangerous wet spots), tire marks from other video game cars breaking heavily on a track, and others.  The track can reflect these changes to influence how a game plays (e.g., later in a game, more rubber on a track can lead to a different gaming result).

Figure 4 illustrates one embodiment of a map area 400.  The map area 400 can be at least a part of the rendered map 120 of Figure 1.  In one example, a video game can employ an open world concept.  In the open world concept, a player can have an unconstrained area to maneuver. In one example, the player can drive various streets of Cleveland, Ohio (e.g., streets, streets with postal addresses, drivable areas (e.g., lawns, city parks, and others), and others).  This differs from a track concept, where a player can be limited to drive on a track (e.g., Daytona International Speedway).  The rendered map 120 can represent an open world concept map, a track concept, etc.

In the open world concept, a vast amount of information can exist, a vast amount of possible roads along with scenery can be available, and others.  This can contrast the track concept where drivable roads are fixed, scenery for those roads is smaller than open world scenery, and others.  In addition to preexisting data, other data can be mined or generated to expand the boundaries of the world to permit a user to travel such that there are no limitations or boundaries are apparent or encountered (e.g., in a sailing game, an ocean map can be generated allowing a player to circumnavigate the earth).

11

Due to the vast amount of information available in the open world concept, it may be undesirable to continuously use resources (e.g., processor, memory, and others) to render an entire, or particular thresholds of, an available open world at one time.  In one example, a game can be configured to have a person drive on roads available in the United States and Canada.  A vast amount of resources could be consumed to render possible road combinations available for possible routes in the United States and Canada.  Therefore, selective rendering can occur (e.g., a selection component that can be part of the system 100 of Figure 1) can select what to render.

In one example, a rendered area around a vehicle 405 of a video game is selected (e.g., a distance of 'X' around the vehicle 405 on the vehicle's sides).  The system 100 of Figure 1 can render a rendered area 410 around the vehicle 405 (e.g., the rendered area is at least part of the rendered map 120 of Figure 1).  As the vehicle moves in the map area 400, the rendered area 410 can change.  In one example, an area within which the world is actively rendered by or in system resources is distance 'X'.  If the vehicle moves in 'Y' direction, then a new rendered area 410' can be made around a newly positioned vehicle 405'.  New rendered area 410' can be rendered entirely, or can merely clear a portion of resources representing the eliminated difference of rendered area 410 and recycle or use new resources to render the added difference as a portion of new rendered area 410'.  The map area 400 can be considered the rendered map 120, a rendered area 410 and/or 410' can be considered the rendered map 120, etc.

In one embodiment, the system 100 of Figure 1 causes a part of rendered area 410 that is not part of rendered area 410' to be deleted while rendering a part of rendered area 410' that is not part of rendered area 410.  In one embodiment, the system 100 of Figure 1 causes a part of rendered area 410 that is not part of rendered area 410' to be retained in a database while rendering a part of rendered area 410' that is not part of rendered area 410 (e.g., thus saving areas once they have been driven in the game).

The size of the distance 'X' can be determined based, at least in part, on one or more factors.  In one example, the distance 'X' is fixed (e.g., set by a game programmer).  In one example, 'X' is based, at least in part, on how much detail exists in the map area 400 (e.g., more detail means a smaller rendered area 410).  In one example, 'X' is based, at least in part, on how fast the vehicle 405 is travelling in the game (e.g., faster vehicles have a larger radius since faster vehicles travels more distance is less time).  In one example, 'X' is based, at least in part, on intelligent analysis of player driving style, vehicle speed, information ascertained for other

players of the game, other factors, or a combination thereof.  The rendered area can be a symmetrical shape (e.g., circle, square, sphere, cube, and soforth) or an environmentally-dependent area based on possible rates of movement or usage across particular areas (e.g., render areas across water or mountain at lower resolution or for shorter distances than areas accessible by improved roadways).  Other variables impacting the rendered area (or areas anticipated to be rendered) will be readily appreciated by those skilled in the art upon reflection of the disclosures herein.  In one example, 'X' is based, at least in part, on available system resources.  System resources can be analyzed (e.g., by the analysis component 105 of Figure 1 or other component) in terms of an absolute metric (e.g., total memory), a relative metric (e.g., percentage-wise commit charge), contextual factors (e.g., other programs using memory, priority level of other programs using memory, etc.), and others.    In one embodiment, an optimization algorithm or other selection technique is employed to determine the best use of resources by determining areas to render, to a particular resolution, in a particular order; what rendered areas to store in fast-access memory (e.g., Random Access Memory or cache); what rendered areas to save to storage (e..g, hard drive or network); and what rendered areas to discard.

Figure 5 illustrates one embodiment of a system 500 that includes an alteration component 505 along with the analysis component 105 and the production component 110.  A video game player can be playing a first-person shooter video game and desire to have a multi-player session on a small, uninhabited Pacific island.  The search component 205 of Figure 2 can perform a search for a map of the island and determine that a base map 210 for the island is available.  The base map 210 can be a full rendering of the same island that was created for another game, a rendering of a part of the island, etc.  The base map 210 can be considered the map data set 115 of Figure 1.

The analysis component 105 (or other component) can evaluate the base map 210 to determine if the base map 210 should be altered (e.g., is alteration necessary for usage, balance accuracy against resource usage, etc.), how the base map 210 should be altered (e.g., how the map should be altered can be information of the map data set 115 of Figure 1), etc.  Based on a result of this evaluation, the alteration component 505 can alter the base map 210.  In one embodiment, the alteration component 505 is part of the production component 110 such that alteration of the base map is production of the rendered map 120.  Thus, in one embodiment, the base map is modified to become the rendered map (e.g., by the production component 110).

13

In one embodiment, a player can play a video game with the base map 210. New information can be discovered that pertains to the base map. For example, a golfing video game can include a specific golf course. When the base map 210 is created, an information source may state that the grass of greens on the course is Bent Grass. Thus, in the base map 210 has the

5    player play on Bent Grass greens. However, a new information source can be discovered (e.g., newly available, newly found, a correction to the information source) that indicates the grass of greens is actually Bermuda Grass. The alteration component 505 can modify the base map 210 such that the golf course instead has Bermuda Grass greens. This alteration can change how the greens look, how the greens respond (e.g., how the greens play), etc. This alteration can occur

10   while the base map 210 is being used, not being used, etc. Thus, the rendered map 120 can be produced (e.g., by the production component 110) such that a pre-rendered map (e.g., base map 210) is altered in accordance with the map data set 115 of Figure 1 (e.g., information that the greens are Bermuda Grass) to become the rendered map 120.

A map can be rendered. After the map is rendered, new information (e.g., more recent

15   with respect to the physical world, additional data about a previous time or condition, predicted conditions based on models or anticipated events) can become available (e.g., be made known, be discovered by the system 600, be read, information to make a second data portion more reliable than a first data portion used to create the map, and others). In one example, the new information can be correction information 605 that corrects an error of the map.

20   In one embodiment, the system 500 is remote from the video game console, be located upon the video game console, operate in a non-video game environment, etc. Correction information (e.g., such as the change in the golfing grass) can be identified (e.g., by the search component 205 of Figure 2). The analysis component 105 can evaluate the correction information and the base map 210 to produce an evaluation result. The alteration component 505

25   can determine how to modify the base map 210 based on the evaluation result, modify the map, transfer an instruction on how to modify the map, and others. The system 500 (e.g., by way of the alteration component 505) can emit a modification output. The modification output can be an instruction set on how to modify a map, a software kernel that proactively modifies a map, and others.

30   Additionally, the modification output can be transferred to multiple maps. In one embodiment, multiple iterations of the map can exist on game consoles. In one example,

different consoles can have a rendered map of a particular city.  A determination can be made (e.g., by the system 500) that a street becomes one-way during rush hour.  Rendered maps of the particular city can be updated based on the determination.  The modification output can be transferred to game consoles and the iterations of the map can exist.  In this and other ways, maps can be dynamic based on context and update depending on real or imagined situations, or based on user or other preference (e.g., time of day, map settings, and others).

In one example, one correction can apply to different specific maps.  In one example, a first map is of a city and a second map is of a county that includes the city.  Both the city map and the county map can include a street with an error (e.g., a light post is in the rendered map that is not existent in real-life).  The modification output can be applied to the city map and the county map such that the error is corrected.  In one embodiment, different modification outputs can be made (e.g., one for the county map and one for the city map) and/or after the modification output is produced by the system 500 (e.g., by the alteration component 505), it can be copied and/or modified for different maps.  In one embodiment, the system 500 makes different modification outputs for different maps.

In one embodiment, a map can be made up of and/or dependent upon another map.  In one example, a county can be made up of a group of cities.  Therefore, a county map can comprise city maps (e.g., maps of cities in the county).  Thus, there may not actually be a county map in of itself, just a group of city maps that form a county.  In one example, the modification output can be used to correct a city map that in turn corrects a county map.

The correction information can be different types of information.  In one example, an error can be identified in base map 210 and the correction information can be information on how to correct the base map 210 (e.g., where correcting the base map 210 converts the base map 210 into the rendered map 120).  In one example, a real-world area can be updated.  In one example, a stop sign can be replaced with another traffic management notification device (e.g., yield sign, traffic light, and others).  The correction information can be information to update base map 210 (e.g., a previously rendered map) to reflect the real-world area.

In one embodiment, a user can make modification to a track.  In one example, the Indianapolis Motor Speedway can configure with a first and a second straightaway that are about 50 feet wide.  A player can desire that the width be shortened and the alteration component 505 can modify the rendered track and/or the track can be rendered with the first and the second

straightaway being narrowed. In one example, if a player desires to widen the track, the rendered map can be modified to not only widen the track, but modify other aspects (e.g., moving a grandstand, move a barrier wall, eliminate a grandstand, and others) to accommodate the widening.

5    In one embodiment, a multiplayer game or application map can be created and this creation can be based, at least in part, on map information. The multiplayer game or application can be local or over a connection. A group of people can play an online fantasy game (e.g., World of Warcraft) or similar virtual-world application (e.g., Second Life) as well as other games. A new area of the game can be based off a real area. In one example, Central Park in

10    New York City or Nottingham Forrest in England can be analyzed (e..g., by the analysis component 105) and a map can be rendered with features of these areas playable in the online fantasy game. In another example, real-life places can be imported (e.g., function as the base map 210) and modified (e.g., by the alteration component 505) to serve as a basis or inspiration for a representation of an alternate reality (e.g., the rendered map 120). Components can be

15    employed to analyze and render various aspects of a real-life map or environment according to a scheme set forth in the game or application.

Figure 6 illustrates one embodiment of a system 600 that includes a collection component 605 and a render component 610. The collection component 610 configured to collect a physical information set. The physical information set can be collected from one or more physical

20    information sources (e.g., physical information sources 615, 620, and 625) and/or from a remote location (e.g., a remote or local collection device that sends a packaged physical information set to the collection component 605 that the collection component 605 receives). The collection component 610 can also collect information that is not part of the physical information set (e.g., game console requirements). The render component 610 can be configured to produce a video

25    game output 630 based, at least in part, on the physical information set, where the video game output 630 is stored on a computer-readable medium. In one embodiment, the collection component 605 and render component 610 reside upon a video game console (e.g., at least part of the collection component 605 and at least part of the render component 610).

Example physical information sources include Internet websites, databases, etc. Example

30    physical information that can be part of the physical information set can include weather information, route information, opinion information (e.g., a group of users say a road is difficult

16

to drive), visual information, audio information, depth information, etc. Physical information can be gleaned from a variety of sources, including a network or data link to the Internet, local networks, direct-connected systems, and communication devices capable of providing physical information from sources such as satellites, weather systems and stations, radio or telephonic

5    communication, proprietary databases, geological or other surveys, map datum or data, and others. A baseline for such data can be ascertained in order to produce an average result where differing or conflicting physical information exists, and to fill gaps where physical information is incomplete or imperfect. It is to be appreciated that this is by no means a limiting list of physical information and one of ordinary skill in the art can appreciate that other information is to be

10   included. These examples are intended to be non-limiting, and embrace, rather than exclude, other sources and types of information described herein.

In one embodiment, the physical information set is a physical map information set and where the video game output 630 is a video game map. In one embodiment, the video game map comprises a race course and where the video game enables use of the race course in a racing

15   video game application. In one embodiment, the video game map comprises an environment upon which an avatar (e.g., human-type character) can navigate

In one embodiment, the physical information set is voice information and where the video game output is video game audio commentary. For example, a college football broadcasting team (e.g., a play-by-play broadcaster and color commentator) can provide audio

20   support for the broadcast of a college football game. The collection component 605 can obtain a copy of the audio support. The render component 610 can break down the audio support and extract singular lines (e.g., individual lines for the play-by-play broadcaster and color commentator related to play on the field). During game play of a college football video game on a video game console, the render component 610 can output (e.g., cause a video game console)

25   of a singular line or multiple lines in response to an occurrence in gameplay, to set tone of gameplay, etc. For example, if a player in the game makes a hard it, then a common term used by the color commentator can be played. As opposed to playing a version of the common term pre-recorded for the video game, a version is played extracted from a real broadcast. In one embodiment, the render component 610 alters the common term to make it more suitable for

30   gameplay (e.g., lowers volume, changes tone, replaces a player name, removes possibly offensive language, etc.).

17

While aspects disclosed herein discuss that the render component 610 produces a video game output 630, the render component 610 (and other components) can function to produce non-video game outputs. Thus, aspects disclosed herein can have applicability outside of the video game realm.

Figure 7 illustrates one embodiment of a system 700 that includes an identification component 705 and an approximation component 710 along with the collection component 605 and the render component 610. The identification component 705 can be configured to identify missing information in the physical information set (e.g., obtained from the physical information sources 615, 620, and 625). The approximation component 710 can be configured to determine a substitute information set for the missing information, where the video game output 620 is based, at least in part, on the physical information set and the substitute information set.

The collection component 605 can receive a user request for a map to be made of a dirt road area for a rally car racing video game. The collection component 605 can obtain information pertaining to the dirt road area, including information related to how road are configured, weather conditions, and the like. However, some information about the road area may be unavailable. For example, what type of dirt the road is made up of, a mixture ratio of different dirt types for a road surface, and other information may be unavailable. The identification component 705 can identify the missing information (e.g., compare available information against information used to create previous map, compare available information against hardcoded information listed as desirable, etc.). The approximation component 710 can compensate for this missing information by generating substitute information. For example, an aerial photograph of the dirt road area can show the road being a certain color. The approximation component 710 can estimate a road dirt type based on this color. The render component 610 can produce the video game output 630 that is consistent with the estimated road dirt type. The video game output 630 can be a racing track where the track responds in a manner consistent with the estimated dirt type.

Figure 8 illustrates one embodiment of a system 800 that includes a monitor component 805, an appraisal component 810, and a decision component 815 in addition to the collection component 605 and the render component 610. The monitor component 805 can be configured to monitor a content 820 presented by way of an electronic device (e.g., a video displayed on a television, a song played on a personal computer speaker system, a webpage visited on a

smartphone, etc.).  It is to be appreciated that the system 800 can function without the monitor component 805.  The appraisal component 810 can be configured to evaluate the content 820. The decision component 815 can be configured to proactively (e.g., automatically) select the video game output 820 for production (e.g., send an instruction to the render component 810 on what video game output 820 the render component 610 should produce) based, at least in part, on a result from evaluating the content 820.

The system 800 can function to provide a user with content the user is likely to want.  For example, a user can watch a car race on television on a particular track.  The system 800 can make in inference (e.g., through use of at least one artificial intelligence technique) that the particular track should be created for the user after the monitor component 805 monitors the content 820.  In one embodiment, before moving further the system 800 can confirm with a user that the track should be rendered as video game output 620 (e.g., through a user interface) and the decision component 815 instructs components to go forward based, at least in part, on the user confirmation.  The appraisal component 810 can evaluate the content and based on this evaluation, the collection component 605 can seek out information about the particular track, such as recording the content 820 (e.g., on a computer readable medium), performing an Internet search for a website of the particular track and downloading results, and others.  This information can be used by the render component 610 to produce the video game output 630.

In one embodiment, a user can be watching a classic baseball game at Tiger Stadium in Detroit, Michigan on a smartphone, where the classic baseball game is the content 820.  The monitor component 805 can monitor the content 820 (e.g., extract information from the content 820, where the extracted information is a monitoring result).  The appraisal component 810 can evaluate the content 820 (e.g., the content 820 itself, information extracted from the content 820, inferences drawn from monitoring the content 820, etc.) and based on this evaluation, the decision component 815 can decide if the video game output 630 should be produced based on the content 820, determine if enough information is available to produce the video game output 630 (e.g., if so, then instruct the render component 610 to operate; if not, then cause the collection component 605 to gather more information), etc.

Figure 9 illustrates one embodiment of a system 900 that includes an assessment component 905, determination component 910, filter component 915, and output component 920.  The system 900 can incorporate the analysis component 105 of Figure 1, production

component 110 of Figure 1, the collection component 605 of Figure 6, and/or the render component 610 of Figure 6. Different pieces of map data 925 (e.g., that are part of the map data set 115 and/or obtained by the sources 615, 620, and/or 625) can be collected by the system 900. Example map data can include personal images, map application data, text (e.g., available online for a message board), microblogging (e.g., used to ascertain real-time traffic information), new information service broadcasts (e.g., traffic accident reports from new organizations), and others.

The assessment component 905 can evaluate the map data and the determination component 910 can determine which map data 925 to use in rendering and/or updating a map. In one example, different pieces of map data can contradict one another.

In one example, an information source states that traffic on Main Street is heavy while a news report states that traffic on Main Street is medium. In an embodiment, the information source can be a real-time feed or stream such as a microblog (e.g., Twitter) or feed from a social, news or government network (e.g., Facebook news feed, local media RSS (Really Simple Syndication) feed, state police network, etc.). The determination component 910 can determine if traffic on Main Street is heavy or medium (e.g., a determination is made that traffic is medium if intelligence of the determination component 910 weighs the news report as more accurate than the microblog (e.g., microblogs in general, a specific person who made the microblog, and others)). In an embodiment, the determination can be a direct or weighted average of the disputed reports. In the instance of a weighted average, weights can be assigned based on the historical accuracy of a single source, the number of viewers of a source, the size or value of a source, and other variables. Other possible determination means, utilizing various algorithms and techniques, as well as variables not listed, will be apparent to one of ordinary skill in the art upon reflection regarding the disclosures herein.

In one example, two photographs (e.g., a first photograph and a second photograph) are collected by the system 900 and evaluated by the assessment component 905. In the first photograph a light pole is shown colored green. In the second photograph, the light pole is shown as colored blue. The determination component 910 can determine what color to make the light pole in an output (e.g., the rendered map 120 of Figure 1). In one example, the determination component 910 can analyze when the photographs were taken and information in a more recent photograph is used (e.g., date stamp, Exchangeable Image File Format (EXIF) information, Extensible Metadata Platform (XMP) information, International Press

Telecommunications Council (IPTC) metadata information, other metadata, an inference such as that the pole was painted and therefore the more recent photograph is more accurate, and others). In one example, the determination component 910 can actively seek out information to be used in determining a color for the light pole (e.g., find other photographs, acquire a real-time satellite

5  image, and others).

The filter component 915 can limit map data 925 transferred to the output component 920 (e.g., the output component 920 functioning as the production component 110 of Figure 6, the output component 920 functioning as the render component 610 of Figure 6, etc.).   In one embodiment, the determination component 910 instructs the filter component which pieces of

10  map data 925 should be passed to the output component 920 (e.g., used to create a map).   The output component 920 can render a map based on the map data 925 (e.g., map data 925 passed through the filter component 915).   The output component 920 can produce a map output 930 (e.g., the rendered map 120 of Figure 1, a data set upon which the production component 110 of Figure 1 renders a map, an instruction on how to modify the rendered map 120 of Figure 1, the

15  video game output 630 of Figure 6, etc.).

In one embodiment, information related to a person can be used proactively create data (e.g., a gaming map) for the person.   In one example, a person could frequent message boards and write posts stating that they wished they could play a first person shooter on the moon, send messages to friends (e.g., e-mails) expressing this desire, and others.   Based on the posts and

20  messages, an inference could be drawn that the player wants to play a map of the moon in a game she commonly plays.   The system 900 can proactively gather map data 925 that pertains to the moon and proactively generate the map output 930 of the moon for play in the game.

Similarly, a map can be modified based on information.   In one example, a person can play a map on a first person shooter game.   In this map, an unintentional game aspect can occur

25  that a person considers a cheat.   In this example, players may play on opposing teams and have a goal of capturing and retaining checkpoints to achieve a team score.   However, a map can include a feature where players on one team can lob grenades across a game board in an unrealistic and/or unfair manner toward one of the checkpoints that kills members of the opposing team.   A component can function to identify this  alleged cheating behavior or other

30  unintended exploitations of the map, determine if a proactive modification of the map and/or the game should occur, and if a positive determination is made, then to modify the map and/or the

game.   Various outcomes can cause proactive modification and different modifications can occur.   In one instance, the modification can be in response to observed player behavior (e.g., players skipping a map a disproportionate amount of times (e.g., when disproportionate skipping is identified, analyzing conduct to infer why skipping occurs)), response to complaints filed against a certain player who is performing the supposed cheat, response to conversations over a network hosting the game complaining of the supposed cheat, and others.   The modification can include modifying the map to render the supposed cheat inoperable (e.g., placing a barrier [e.g., real or invisible] such that the cheat is disabled), modifying the game (e.g., causing the grenade to explode if sent from a certain angle, from a certain spot, from a certain spot with a certain angle, from a certain weapon; randomly changing key locations to decrease or eliminate the reward of the unsportsmanlike behavior; etc.), modifying the game and/or map locally, modifying the game and/or map universally, and others.   Enabling proactive modification can enable a game to be improved after later versions are out, a game is no longer supported by a manufacturer, and others.

Figure 10 illustrates one embodiment of a system 1000 that includes an obtainment component 1005, a gather component 1010, a generation component 1015, and a transfer component 1020.   The system 1000 can incorporate the analysis component 105 of Figure 1, production component 110 of Figure 1, the collection component 605 of Figure 6, and/or the render component 610 of Figure 6.   A person can make a request 1025 for a map to be generated and the obtainment component 1005 (e.g., operating as the collection component 605 of Figure 6) collects the request 1025.   In one embodiment, the request 1025 is for a specific area to be created (e.g., a map of Bonneville Salt Flats).   In one embodiment, the request 1025 is for a specific area with specific characteristics (e.g., a map of New Orleans on Fat Tuesday (e.g., with roads closed for parade routes), a map of New York City in heavy traffic, a map of Glasgow, Scotland in heavy rain, and others).   In one embodiment, the request 1025 is a general request (e.g., a request for a random map to be created).

The gather component 1010 can be employed to gather information.   In one embodiment, the gather component 1010, obtainment component 1005, and collection component 605 of Figure 6 can implement as one component.   In one embodiment, a requested map may already exist (e.g., on a database, on a game console, and others).   If a requested map already exists, then the gather component 1010 can collect the requested map and the requested map can be

outputted as output 1030 (e.g., by the transfer component 1020 and without passing the map through the transfer component).

In one embodiment, the gather component 1010 searches for a map meeting the request 1025 and identifies a map that meets the request 1025 at a location.  The transfer component 1020 can cause the map that meets the request 1025 to transfer to a location designated in the request 1025 (e.g., transfer directly without residing on the system 1000).

In one embodiment, the gather component 1010 identifies information sources and collects information that can be used in generating a rendered map.  Based on collected information, the generation component 1015 can construct a map for use on a computer (e.g., a video game, a training map, a movie (e.g., a map used in a cartoon), and others).  The transfer component 1020 can transfer the map as output 1030 (e.g., the rendered map 120 of Figure 1, the video game output 630 of Figure 6, etc.).

In one embodiment, a base map (e.g., base map 210 of Figure 5) for a requested map is available.  The gather component 1010 can collect the base map.  In one example, the person requests a map of Lucas County, Ohio.  Maps may be available for Toledo, Ohio; Sylvania, Ohio; and Oregon, Ohio (e.g., these three cities for the base map).  However, maps may not be available for Maumee, Ohio as well as for villages and townships of Lucas County, Ohio.  Therefore, the gather component 1010 collects information on how to render Maumee, Ohio as well as for villages and townships of Lucas County, Ohio.  The generation component 1015 renders a map and the transfer component 1020 outputs the map (e.g., as output 1030).

In one embodiment, the base map is a map of a city and the generation component 1015 modifies the map for specific characteristics.  In one example, the city is Tyler, Texas and a base map for Tyler, Texas is available.  However, the request 1025 can include a portion that specifies racing in a hot temperature.  A hot temperature can change road conditions.  The base map for Tyler, Texas can be configured to function with average temperature properties.  The generation component 1015 can modify the base map to change properties to those of hot temperature.  In one embodiment, public or private weather services or other information sources can be consulted for these purposes (e.g., cause map to reflect weather that is actual/real-time, representative of historic trends, user-selected, etc.).  In one embodiment, how roads in Tyler, Texas react to hot temperatures can be reflected in the output 1030.

In one embodiment a player requests (e.g., through the request 1025) for an arena to be created (e.g., a modern-day Madison Square Garden, a 1920 Madison Square Garden set-up for a fight between Jack Dempsey and Bill Brennan, a Madison Square Garden with player requested modifications, and others) for play in a boxing game. The gather component 1010 can search the

5    Internet for images and information on Madison Square Garden. In one example, if the request 1025 is for the 1920 Madison Square Garden set-up for the fight between Jack Dempsey and Bill Brennan, then the gather component 1010 can search the Internet to find archived photographs, newspaper descriptions, and others. Based on data collected by the gather component 1010, the generation component 1015 can create the arena and the transfer component 1020 can transmit

10   the arena as output 1030 (e.g., transmit the arena to a game console). Data collected by the gather component 1010 can be targeted, for example, to seek a pinpoint information set, representing a specific place and time, or to find a set of information over a range of space and time and aggregate sufficient information for the generation component 1015 to create an accurate approximation where pinpoint (e.g., where pinpoint data is unavailable [e.g., literally or

15   cost prohibitive], resource-intensive, slow to access, etc.).

Figure 11 illustrates one embodiment of a system 1100 that includes an examination component 1105, an identification component 1110, a separation component 1115, and a generation component 1120. The system 1100 can incorporate the analysis component 105 of Figure 1, production component 110 of Figure 1, the collection component 605 of Figure 6,

20   and/or the render component 610 of Figure 6. Map information 1125 (e.g., the map information is the map data set 115 of Figure 1 and/or is obtained from the sources 615, 620, and 625 of Figure 6) can be collected (e.g., actively (e.g., the system 1100 seeks out map information) and/or passively (e.g., map information is sent to the system 1100 (e.g., directly (e.g., by another unit) or indirectly (e.g., radio waves)))) by the system 1100 and evaluated by an examination

25   component 1105. The system 1100 can be configured to render a map 1130 based off a specific location. However, a desire may exist for a map to not be a correct representation of the specific location. In one example, a person can request to have a map made of Windsor, Ontario, Canada. However, some real-life roads may include adult establishments (e.g., casino, strip clubs, night clubs, and others). The desire may be to mask these adult establishments from a

30   child, so if a person making a map request is a child, the system 1100 can filter out adult aspects

when producing the map 1130 (e.g., the map 1130 can be the rendered map 120 of Figure 1, the map 1130 can be video game output 630 of Figure 6, etc.).

The examination component 1105 can examine the map information 1125 and produce an examination result.  The identification component 1110 can use the evaluation result to identify

5    items to not be rendered in the map 1110.  In one example, parental controls can at least partially control intelligence used by the identification component 1110 to identify map information not to be used, replaced, and other in the map 1130.  In one embodiment, the identification component 1110 can identify copyrighted information and cause the copyrighted information to be replaced in a rendered map.  In one embodiment, the identification component 1110 functions by scanning

10   photographs for copyrighted information, inappropriate content (e.g., sexually suggestive advertisements), etc.

In one embodiment, the system 1100 can function to replace advertisements with targeted advertisements.   In one example, the identification component 1110 can identify unused advertisement locations in the map information 1125, identify advertisements that can be

15   replaced, as well as select advertisements for use (e.g., based on aggression levels, personal history, contract fulfillment, and others).  Advertisement locations can include the placement of advertisements in the physical area rendered by the map (e.g., a billboard actually present on a particular roadway), or possible advertisement locations that can be placed within the rendered map but do not exist in reality (e.g., a single-color grain silo with no ornamentation or writing).

20   The separation component 1115 can filter out map information not to be rendered, not to be considered in rendering, and others.  The generation component 1120 can take information produced out of the separation component 1115 and render the map 1130 or cause the map 1130 to be rendered (e.g., at another location).  In one embodiment, the generation component 1120 modifies the rendered map 120 of Figure 1.  In one embodiment, the production component 110

25   of Figure 1 and/or the render component 610 of Figure 6 function as the generation component 1120.

Figure 12 illustrates one embodiment of a system 1200 that includes the examination component 1105, the identification component 1110, an approximation component 1205, and a composition component 1210.  The system 1200 can incorporate the analysis component 105 of

30   Figure 1, production component 110 of Figure 1, the collection component 605 of Figure 6, and/or the render component 610 of Figure 6.  The system 1200 can collect map information

25

1215 (e.g., the map data set 115 of Figure 1) and the examination component 1105 can evaluate the map information 1215. The examination component 1105 can evaluate the map information 1215, at least in part, with regards to if there are any unknown areas.

In one embodiment, the map information 1215 may be deficient or otherwise less than ideal for a particular context or in a particular instance. In one example, the map information is to train submarine crews on navigating oceans. However, specific information at deep ocean depths may not be available. Therefore, the system 1200 can make approximations. The identification component 1110 can identify areas that are appropriate for approximation and the approximation component 1205 can make approximations of these areas. Information used in approximations can, for example, seek a set of information over a range of space and time and aggregate sufficient information for the generation component 1015 to create an accurate approximation where pinpoint (e.g., where specific data is unavailable [e.g., literally or cost prohibitive], resource-intensive, slow to access, etc.).

In one example, a map is designated for creation of an area of ocean at a deep depth. Actual map information related to the area at the deep depth may not be available. However, the system 1200 may be able to obtain auxiliary information. Example auxiliary information can include: wildlife found in the region and are comfortable around the deep depth, scientific calculation information (e.g., pressure at the depth, natural light that would make it to the depth, and others), information derived from ocean models, and others.

The composition component 1210 (e.g., production component 110 of Figure 1, render component 610 of Figure 6, etc.) can create a map based on approximation information and map information 1215. The map can be outputted as an outputted map 1220 (e.g., rendered map 120, video game output 630, etc.). In one embodiment, the composition component 1210 can cause a component to create a map and/or output a map (e.g., send an instruction to the production component 110 of Figure 1 to create the rendered map 120 of Figure 1).

In one embodiment, the outputted map 1220 can be evaluated to determine if approximations are appropriate. If approximations are appropriate, then the outputted map 1220 can be transmitted (e.g., caused to be transmitted, caused to be rendered, caused to be created, and others). If an approximation is not appropriate, then the system 1200 can determine how to correct the approximation (e.g., through implementation of an artificial intelligence technique) and correct the approximation. Another check can occur, this can repeat if appropriate, and the

outputted map 1220 can be outputted.  In one embodiment, approximations can be noted (e.g., in a file associated with the outputted map 1220) and as new map information is gathered, the approximations can be replaced with real map information, approximations can be modified as new information is available, and others.

5        In one embodiment, the outputted map 1220, the video game output 630 of Figure 6, the rendered map 120, and others can be checked for accuracy after production.  In one example, the examination component 1105 can compare the rendered map 120 of Figure 1 against the map data set 115 of Figure 1 to determine if the rendered map 120 of Figure 1 is an accurate representation of the map data set 115 and/or actual location.  If the rendered map 120 of Figure

10       1 is not an accurate representation, then the rendered map 120 of Figure 1 can be corrected, a subsequent rendered map can be generated, an error message can be presented, etc.  In one embodiment, to avoid correction, then rendered map 120 of Figure 1 can have a similarity threshold to the map data set 115 of Figure 1 (e.g., rendered map 120 of Figure 1 be X% similar to the map data set 115 of Figure 1).

15       In one example, a football video game can be released with an error (e.g., a rendered stadium can show a running track around a field when a real stadium upon which the rendered stadium is based has no track).  A user can submit information that an error occurred, an inference can be drawn that users are using a map editor to correct the error, a comparison can be made with photographic evidence publically available (e.g., off an Internet map application), and

20       others.  A result can occur where new releases and/or existing releases can be updated correcting the error (e.g., updated automatically).  In one example, a stadium can be rendered correctly (e.g., as the rendered map 120 of Figure 1), but over a season or over time a change can occur.  In one example, lighting poles can be painted from one color to another.  When this information is learned, an update can occur (e.g., occur proactively).

25       Figure 13 illustrates one embodiment of a system 1300 that includes the examination component 1105, the identification component 1110, the composition component 1210, and a database component 1305.  The system 1300 can incorporate the analysis component 105 of Figure 1, production component 110 of Figure 1, the collection component 605 of Figure 6, and/or the render component 610 of Figure 6.  Map information 1310 can be collected by the

30       system 1300.  The examination component 1105 can analyze the map information 1310 and based on this analysis, the identification component 1110 can identify map information 1310 that

27

can be used to create a map 1320 (e.g., the map a rendered map 120 of Figure 1 produced by the production component 110 of Figure 1).

In one embodiment, the system 1300 is part of a network that shares a database 1315. The database 1315 can retain maps that can be made available to network members (e.g., on a wired network, on a wifi network, on a super wifi network, and others). The map 1320 (e.g., the outputted map 1220 of Figure 12, the rendered map 120 of Figure 1, etc.) can be retained on the database 1315 (e.g., in addition to transferring the map to a designated destination).

In one embodiment, the system 1300 can receive a request for a map 1320 (e.g., a map of Normandy, France on June 6, 1944). A check can occur by the system 1300 (e.g., by the examination component 1105) to determine if the database 1315 includes the map 1320. If the database 1315 does include the map 1320, then the system 1300 is caused to output the map 1320 (e.g., cause the map 1320 to be sent directly from the database 1315). If the database 1315 does not include the map 1320, system 1300 can create the map 1320 (e.g., as the map of Normandy, France on June 6, 1944).

In one embodiment, a check is performed to determine if the database 1315 does not include the map 1320. However, the database 1315 may include a modern-day map of Normandy, France. The system 1300 can gather the modern-day map of Normandy, France and collect historical information about Normandy, France on June 6, 1944. The composition component 1210 can modify (e.g., modify a local copy) and/or base a new map off the modern-day map of Normandy, France.

In an embodiment, a map can exist, but not in a format intended for the desired game or application. For example, a map of Guadalcanal from August 7, 1942 can exist as designed one game, but is not usable by the user's game or application. In this situation, the check can return positive that a map exists, but append information noting the need for modification. Thereafter, various features described herein can employ the map as a base map, or modify the map according to the teachings herein, to utilize the map within the user's desired context. In an embodiment, maps from other platforms can be rendered to an application-neutral format, enabling immediate use or rapid adaptation for a variety of games and applications.

In one embodiment, the database 1315 is in a central location. In one embodiment, the database 1315 is distributed across a network of nodes. In one embodiment, the database 1315 is distributed across individual units (e.g., individual game consoles).

Figure 14 illustrates one embodiment of a network 1400.  The network 1400 can include a first game console 1405 and a second game console 1410.  The first game console 1405 and/or the second game console 1410 can incorporate the analysis component 105 of Figure 1, production component 110 of Figure 1, the collection component 605 of Figure 6, and/or the render component 610 of Figure 6 (e.g., a combination thereof).  The first game console 1405 can retain a first map 1415 and the second game console 1410 can retain a second map 1420. The network 1400 can be a local network, a network over the Internet, and others.  While shown with two game consoles and two maps, it is to be appreciated that the network 1400 can include more than two game consoles, more than two maps, any one particular game console can retain more than one map, and others.

The network 1400 can function such that individual game consoles can have access to a vast amount of maps while retaining relatively few maps locally.  In one example, the first game console 1405 retains first map 1415 locally.  However, first game console 1405 can have access to second map 1420 retained on second game console 1410.

In one embodiment, a player using first game console 1405 can request to play second map 1420.  A permission and/or security check can occur and based on a positive result, the player can play second map 1420.  In one example, a check is made to determine if the player using first game console 1405 makes first map 1415 available to other game consoles.  Sharing or exchange schemes can be enforced according to ratios, purchase, bargaining, trading, credits or money, and other methods of map-swapping including user preferences, map popularity and availability, resource intensity or size, relationship or friend status, necessity (e.g., to play in a tournament or with friends), and a variety of other techniques.  In an embodiment, one user can give a specific map away for free while another requires an exchange.  In one embodiment, users are designated to offer the same map (or other information) for the same value.

In one embodiment, the first map 1415 and the second map 1420 are maps depicting a specific location (e.g., both maps are of Lake Erie).  The maps can be identical or be different (e.g., one map is of a higher quality than the second map, the maps have contrasting information, the first map 1415 is configured for a fishing game and has a relatively large amount of fishing data while the second map 1420 is boating map that has a relatively large amount of wave information, and others).  A search can occur for a map of the specific location.  A component can determine which map to access.  In one example, if the maps are identical, then a component

can select a map (e.g., a cheaper map can be selected, a map that can be downloaded faster can be selected, and others).  In one example, if the maps are different, then a component can select a map (e.g., if a player wants to used a searched map a fishing game, then the first map 1415 is selected; if the player wants to use the searched map in an first person shooter game, then a

5    determination can be made on which map can be more easily converted and/or has more useful metadata (e.g., wave information that can impact travelling on the water) and that map can be selected; and others).

In one embodiment, second map 1420 is downloaded onto first game console 1405 and retained (e.g., saved after play is completed, temporarily retained until done playing, and/or

10   others).  In one embodiment, the first game console 1405 can play the second map 1420 while keeping the second map 1420 on the second game console 1410.  In one embodiment, maps (e.g., first map 1415 and second map 1420) are distributed among game consoles (e.g., first game console 1405 and second game console 1410) and/or other locations (e.g., databases).  In one embodiment, in response to a request by a player on first game console 1405 to play second

15   map 1420, second map 1420 can be retained on first game console 1405 and first map 1415 can be removed off first game console 1405 and retained on second game console 1410 (e.g., first game console 1405 and second game console 1410 switch locally-stored maps).

In one embodiment, first map 1415 and second map 1420 can be gaming maps for use in a shooter video game (e.g., first-person shooter).  In one embodiment, first map 1415 and second

20   map 1420 can be based on real-world areas and rendered by the system 100 of Figure 1.  In one example, first map 1415 can be used in a real-world combat simulation game of a city in Iraq and second map 1420 can be used in a fictional space invasion combat arcade game.  The system 100 of Figure 1 can use a component to modify (e.g., intelligently modify) a map to make a map more game combat friendly.  In an embodiment, first map 1415 can be used on first game

25   console 1405 as a racing video game map, and used on second game console 1410 as a shooter video game map.  Features (e.g. resolution, detail, background interaction, background behavior, and others) can be adjusted to better accommodate the particular gaming (or other) context to which a particular map is applied.  In one embodiment, a map can be converted from a first type (e.g., a shooter map) to a second type (e.g., a racing map).

30   A security component can be used to determine if rendering should occur, to stop a rendering from occurring, and others.  In one example, a child can request that a map be rendered

of his school for a first-person shooter game.  While the map may be rendered from available information (e.g., information from a map application, publically available blueprints, photographs from a social networking site that show decorations, content from a school website, academic or educational games and applications, and others), there may be a social desire to not

5    enable a student to play a game where shootings can happen in school.  Therefore, the security component can stop the rendering from occurring, report the requested rendering, stop the rendering if the requestor meets a metric (e.g., is a student at the school, is underage, and others), and others.  In one embodiment, the security component is integrated as part of the production component 110 of Figure 1.

10        The following methodologies are described with reference to figures depicting the methodologies as a series of blocks.  These methodologies may be referred to as methods, processes, and others.  While shown as a series of blocks, it is to be appreciated that the blocks can occur in different orders and/or concurrently with other blocks.  Additionally, blocks may not be required to perform a methodology.  For example, if an example methodology shows

15    blocks 1, 2, 3, and 4, it may be possible for the methodology to function with blocks 1-2-4, 1-2, 3-1-4, 2, 1-2-3-4, and others.  Blocks may be wholly omitted, re-ordered, repeated or appear in combinations not depicted.  Individual blocks or groups of blocks may additionally be combined or separated into multiple components.  Furthermore, additional and/or alternative methodologies can employ additional, not illustrated blocks, or supplemental blocks not pictured can be

20    employed in some models or diagrams without deviating from the spirit of the features.  In addition, at least a portion of the methodologies described herein may be practiced on a computer-readable medium storing computer-executable instructions that when executed by a computer cause the computer to perform a methodology (e.g., method).

        Figure 15 illustrates one embodiment of a method 1500 that includes retaining a video

25    game content at a first location 1505 and causing the video game content to be available to a second location 1510.  The method 1500 can function in association with the network 1400 of Figure 14.  In one embodiment, the first game console 1405 of Figure 14 can be the first location, the second game console 1410 of Figure 14 can be the second location, the first map 1415 of Figure 14 and/or the second map 1420 of Figure 14 can be the video game content.  In

30    one embodiment, the video game content (e.g., rendered map 120 of Figure 1, video game output 630 of Figure 6, etc.) can be produced and then retained at 1505 by the production component

110 of Figure 1 (e.g., retained in a computer-readable medium, retained in a computer-readable medium by a processor functioning as the production component 110 of Figure 1). In one embodiment, the production component 110 of Figure 1 causes the video game content to be available at 1510.

5　　　In one embodiment, the first location is a first video game console, the second location is a second video game console, and where the first video game console is remote to the second video game console. In one embodiment, the video game content is distributed across the first location and the second location and/or stored at the first location or second location alone. In one embodiment, the video game content is a video game map. In one embodiment, the video game content is created at the first location. In one embodiment, the video game content is created at the second location. In one embodiment, the video game content is created at a separate location (e.g., a computer system at a company office that is then sent to the first location). In one embodiment, the video game content is a first video game content (e.g., the first map 1415 of Figure 14) and where the second video game console (e.g., the second game console 1410 of Figure 14) retains a second video game content (e.g., the second map 1420 of Figure 14) that is available to the first video game console (e.g., the first game console 1405 of Figure 14).

　　　Figure 16 illustrates one embodiment of a method 1600 that includes retaining a video game content at a first location 1505 and causing the video game content to be available to a second location 1510. At 1605, a physical information set is obtained (e.g., in response for a video game content request from entered at the first location). In one embodiment, the physical information is obtained by the collection component 605 of Figure 6. At 1610, the physical information set is evaluated. This evaluation can be performed by the analysis component 105 of Figure 1 and/or the examination component 1105 of Figure 11. The video game content can be produced at 1615. This production can be based, at least in part, on a result from evaluating the physical information set at 1610. In one embodiment, this production can be performed by the production component 110 of Figure 1 and/or the render component 610 of Figure 6.

　　　Figure 17 illustrates one embodiment of a method 1700 that resolves a difference between maps. At 1705, the method 1700 can process maps (e.g., collect maps, evaluate maps, compare maps against one another, compare maps against other information, process a map, and others). Based on map processing, a determination can be made on map differences at 1710

(e.g., if at least one map difference exists, why a map difference exists, and others). At 1715, a determination can be made on how to resolve a map difference. This can include a sub-determination of whether to resolve the map difference, based on usage, location, user preference, etc. At 1720, a resolution to resolve the map difference can be caused to implement (e.g., send an instruction to the production component 110 of Figure 1 on how to create a map, the production component 110 of Figure 1 makes the resolution, etc.). In one embodiment, a solution to resolve the map difference can be tested before implementation.

Figure 18 illustrates one embodiment of a method 1800 that causes a map to be made (e.g., a new map to be created, a map to be modified, a map to be replaced, and others). Information (e.g., the map data set 115 of Figure 1) can be collected at 1805. Information can include map application information, request information, information found off the Internet and others. Information can be collected passively (e.g., sent to a computer-readable medium operating the method 1800) and/or actively (e.g., the computer-readable medium operating the method 1800 seeks out information).

The information can be analyzed at 1810. At 1815 a determination can be made on how to make a map (e.g., based on a result of the analysis). In one embodiment, the information collected at 1805 includes instructions and/or format data for a device that may ultimately use the map. At 1820, a map can be caused to be made (e.g., according to a manner determined at 1815). In one embodiment, the map can be made and caused to be displayed, caused to be used in an application (e.g., software application), and others.

Figure 19 illustrates one embodiment of a town grouping 1900. The town grouping 1900 can include various towns (e.g., Towns A-I). In one example, the town grouping 1900 represents a larger organization (e.g., Towns A-I form a county J).

An interface can be presented to a person that enables the person to designate an area for rendering (e.g., by the production component 110 of Figure 1, by the render component 610 of Figure 6, etc.). In one example, the person can access a personal computer and use a mouse and keyboard to designate a selected area 1905. A map of the selected area 1905 can be rendered and transferred (e.g., to a personal computer, to a game console, to a computer-readable medium, and others). While shown as a rectangle, it is to be appreciated that the selected area can be various shapes and/or arrangements.

In addition, a map can be rendered with a three-dimensional component (e.g., render from ground level to 'x' distance in the air). The selected area 1905 can designate a third dimensional limit and/or one can be inferred. As described above, maps can be altered to fit a particular usage context. For example, one usage can be entirely two-dimensional, another can be three-dimensional wherein the third dimension is treated as background or environment, and still another usage context can involve travel through three dimensions wherein the third dimension is actively engaged with the particular use.

Additionally, an inference can be drawn on how to render map boundaries (e.g., how high to make a third dimension). In one embodiment, a map can be rendered for a racing game. In this embodiment, rendering can be limited to a height of an upper limit of a car windshield. In one embodiment, for specific situations (e.g., an in-game car flips over), a more generic setting can be shown (e.g., non-accurately rendered, but resembling other scenery).

Figure 20 illustrates one embodiment of an interface 2000. A creation component can create the interface 2000 and the interface can be disclosed (e.g., caused to be disclosed). In one embodiment, the creation component is part of the system 1000 of Figure 10 and the interface facilitates the request 1025 (e.g., by filling out the interface 2000, the request 1025 is generated). Disclosure of the interface can occur in response to a command, in response to an inference (e.g., conversation of players wishing they could play a game on a particular circuit), and others. The creation component can identify information that could be beneficial in knowing to create a map and produce the interface. In one embodiment, a person creates the interface 2000 (e.g., a programmer, a player, and others). At least some fields of the interface can be populated with data and based, at least in part, on the data a map can be rendered.

Figure 21 illustrates one embodiment of a system 2100 that may be used in practicing at least one aspect disclosed herein. The system 2100 includes a transmitter 2105 and a receiver 2110. In one or more embodiments, the transmitter 2105 can include reception capabilities and/or the receiver 2110 can include transmission capabilities. In one embodiment, the system 100 of Figure 1 includes the transmitter 2105 and/or the receiver 2110. In one embodiment, the receiver 2110 integrates with and/or functions as the collection component 605 of Figure 6 and the transmitter 2105 integrates with and/or functions as the render component 610 of Figure 6. In one embodiment, the system 100 of Figure 1 and/or the system 600 of Figure 6 integrate with the system 2100 on a mobile device.

34

The transmitter 2105 and receiver 2110 can each function as a client, a server, and others. The transmitter 2105 and receiver 2110 can each include a computer-readable medium used in operation. The computer-readable medium may include instructions that are executed by the transmitter 2105 or receiver 2110 to cause the transmitter 2105 or receiver to perform a method.

5   The transmitter 2105 and receiver 2110 can engage in a communication with one another. This communication can over a communication medium. Example communication mediums include an intranet, an extranet, the Internet, a secured communication channel, an unsecure communication channel, radio airwaves, a hardwired channel, a wireless channel, and others. Example transmitters 2105 include a base station, a personal computer, a cellular telephone, a

10   personal digital assistant, and others. Example receivers 2110 include a base station, a cellular telephone, personal computer, personal digital assistant, and others. The example system 2100 may function along a Local Access Network (LAN), Wide Area Network (WAN), and others. The aspects described are merely an example of network structures and intended to generally describe, rather than limit, network and/or remote applications of features described herein.

15   Figure 22 illustrates one embodiment of a system 2200, upon which at least one aspect disclosed herein can be practiced. In one embodiment, the system 2200 can be considered a computer system that can function in a stand-alone manner as well as communicate with other devices (e.g., a central server, communicate with devices through data network (e.g., Internet) communication, etc). Information can be displayed through use of a monitor 2205 and a user can

20   provide information through an input device 2210 (e.g., keyboard, mouse, touch screen, etc.). In one embodiment, the monitor 2205 displays the interface 2000 of Figure 20. A connective port 2215 can be used to engage the system 2200 with other entities, such as a universal bus port, telephone line, attachment for external hard drive, and the like. Additionally, a wireless communicator 2220 can be employed (e.g., that uses an antenna) to wirelessly engage the system

25   2200 with another device (e.g., in a secure manner with encryption, over open airwaves, and others). A processor 2225 can be used to execute applications and instructions that relate to the system 2200. In one example, the processor 2225 executes at least one instruction associated with at least one of the analysis component 105 of Figure 1 or the production component 110 of Figure 1. In one example, the processor 2225 executes at least one instruction associated with at

30   least one of the collection component 605 of Figure 6 or the render component 610 of Figure 6. Storage can be used by the system 2200. The storage can be a form of a computer-readable

medium.  Example storage includes random access memory 2230, read only memory 2235, or nonvolatile hard drive 2240.  In one embodiment, a memory (e.g., at least one of the random access memory 2230, read only memory 2235, and/or the nonvolatile hard drive 2240) retains instructions that cause a method disclosed herein to operate.  In one embodiment, the memory
5    retains a database in accordance with at least one aspect disclosed herein.

The system 2200 may run program modules.  Program modules can include routines, programs, components, data structures, logic, etc., that perform particular tasks or implement particular abstract data types.  The system 2200 can function as a single-processor or multiprocessor computer system, minicomputer, mainframe computer, laptop computer, desktop
10    computer, hand-held computing devices, microprocessor-based or programmable consumer electronics, and the like.

It is to be appreciated that aspects disclosed herein can be practiced through use of artificial intelligence techniques.  In one example, a determination or inference described herein can, in one embodiment, be made through use of a Bayesian model, Markov model, statistical
15    projection, neural networks, classifiers (e.g., linear, non-linear, etc.), using provers to analyze logical relationships, rule-based systems, or other technique.

While example systems, methods, and so on have been illustrated by describing examples, and while the examples have been described in considerable detail, it is not the intention of the applicants to restrict or in any way limit the scope of the appended claims to such
20    detail.  It is, of course, not possible to describe every conceivable combination of components or methodologies for purposes of describing the systems, methods, and so on described herein.  Therefore, innovative aspects are not limited to the specific details, the representative apparatus, and illustrative examples shown and described.  Thus, this application is intended to embrace alterations, modifications, and variations that fall within the scope of the appended claims.

25    Functionality described as being performed by one entity (e.g., component, hardware item, and others) may be performed by other entities, and individual aspects can be performed by a plurality of entities simultaneously or otherwise.  For example, functionality may be described as being performed by a processor.  One skilled in the art will appreciate that this functionality can be performed by different processor types (e.g., a single-core processor, quad-core processor,
30    etc.), different processor quantities (e.g., one processor, two processors, etc.), a processor with

36

other entities (e.g., a processor and storage), a non-processor entity (e.g., mechanical device), and others.

In addition, unless otherwise stated, functionality described as a system may function as part of a method, an apparatus, a method executed by a computer-readable medium, and other embodiments may be implemented in other embodiments.  In one example, functionality included in a system may also be part of a method, apparatus, and others.

Where possible, example items may be combined in at least some embodiments.  In one example, example items include A, B, C, and others.  Thus, possible combinations include A, AB, AC, ABC, AAACCCC, AB, ABCD, and others.  Other combinations and permutations are considered in this way, to include a potentially endless number of items or duplicates thereof.

CLAIMS

What is claimed is:

5 1. A system, comprising:

  an analysis component configured to analyze a map data set to produce an evaluation result; and

  a production component configured to produce a rendered map based, at least in part, on the evaluation result, where the rendered map is retained in a computer-readable medium.

10

 2. The system of claim 1, where the production component produces the rendered map such that a pre-rendered map is altered in accordance with the map data set to become the rendered map.

15 3. The system of claim 1, where the rendered map is configured for use in a video game.

 4. The system of claim 1, comprising:

  an interaction component configured to receive a request for the rendered map;

  an evaluation component configured to evaluate the request that produces an evaluation result, where the evaluation result indicates information to gather to produce the rendered map; and

  a gather component configured to gather the map data set according to information the evaluation result indicates to gather, where the map data set is gathered prior to analysis by the analysis component.

25

 5. The system of claim 1, comprising:

  a search component configured to determine if a base map for the rendered map is available, where the base map is at least part of the map data set when available.

30 6. The system of claim 5, where the base map is modified to become the rendered map.

7.      A computer-readable medium storing computer-executable instructions that when executed by a computer cause the computer to perform a method, the method comprising:

      retaining a video game content at a first location; and

      causing the video game content to be available to a second location.

5

8.      The computer-readable medium of claim 7, where the first location is a first video game console, where the second location is a second video game console, and where the first video game console is remote to the second video game console.

10    9.      The computer-readable medium of claim 8, where the video game content is a video game map.

10.     The computer-readable medium of claim 8, where the video game content is created at the first location.

15

11.     The computer-readable medium of claim 8, where the video game content is a first video game content and where the second video game console retains a second video game content that is available to the first video game console.

20    12.     The computer-readable medium of claim 7, the method comprising:

      obtaining a physical information set;

      evaluating the physical information set; and

      producing the video game content based, at least in part, on a result from evaluating the physical information set.

25

13.     A system, comprising:

      a collection component configured to collect a physical information set; and

      a render component configured to produce a video game output based, at least in part, on the physical information set, where the video game output is retained on a computer-readable

30    medium.

14.     The system of claim 13, comprising:

an identification component configured to identify missing information in the physical information set; and

an approximation component configured to determine a substitute information set for the missing information, where the video game output is based, at least in part, on the physical information set and the substitute information set.

15.     The system of claim 13, where the collection component and render component reside upon a video game console.

16.     The system of claim 13, where the physical information set is a physical map information set and where the video game output is a video game map.

17.     The system of claim 16, where the video game map comprises a race course and where the video game enables use of the race course in a racing video game application.

18.     The system of claim 16, where the video game map comprises an environment upon which an avatar can navigate.

19.     The system of claim 13, where the physical information set is voice information and where the video game output is video game audio commentary.

20.     The system of claim 14, comprising:

an appraisal component configured to evaluate a content presented by way of an electronic device; and

a decision component configured to proactively select the video game output for production based, at least in part, on a result from evaluating the content.

ABSTRACT

Systems, methods, and other embodiments associated with output production are described. One example system comprises an analysis component configured to analyze a data set to produce an evaluation result. The system also comprises a production component configured to produce a rendered output based, at least in part, on the evaluation result, where the rendered output is stored in a computer-readable medium.

5

1/22



**FIG. 1**

2/22



**FIG. 2**



**FIG. 3**

4/22



**FIG. 5**

5/22



FIG. 5

6/22



**FIG. 6**

7/22



**FIG. 7**

8/22



**FIG. 8**

9/22



**FIG. 9**



**FIG. 10**



**FIG. 11**

12/22



**FIG. 12**

13/22



**FIG. 13**

14/22



**FIG. 14**

15/22



1500

1505 — RETAIN VIDEO GAME CONTENT

1510 — CAUSE VIDEO GAME CONTENT TO BE AVAILABLE

**FIG. 15**

16/22



**FIG. 16**

17/22



FIG. 17



**FIG. 18**

19/22

1900



FIG. 19

20/22

2000

| | |
|---|---|
| NATION | UNITED STATES |
| STATE | OHIO |
| CITY | CLEVELAND |
| NEIGHBORHOOD | NOT SELECTED |
| TIME | EVENING |
| TRAFFIC | REAL-TIME |
| WEATHER | HURRICANE |

**FIG. 20**

21/22



**FIG. 21**

22/22



2200

2205 — MONITOR ←→ PROCESSOR — 2225

2210 — INPUT DEVICE ←→ RANDOM ACCESS MEMORY — 2230

2215 — CONNECTIVE PORT ←→ READ ONLY MEMORY — 2235

2220 — WIRELESS COMMUNICATOR ←→ NONVOLATILE HARD DRIVE — 2240

**FIG. 22**

PTO/SB/14 (11-08)
Approved for use through 09/30/2010.  OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | CI108USA |
|---|---|---|
| | Application Number | |

| Title of Invention | OUTPUT PRODUCTION |
|---|---|

The application data sheet is part of the provisional or nonprovisional application for which it is being submitted. The following form contains the bibliographic data arranged in a format specified by the United States Patent and Trademark Office as outlined in 37 CFR 1.76.
This document may be completed electronically and submitted to the Office in electronic format using the Electronic Filing System (EFS) or the document may be printed and included in a paper filed application.

## Secrecy Order 37 CFR 5.2

☐ Portions or all of the application associated with this Application Data Sheet may fall under a Secrecy Order pursuant to 37 CFR 5.2 (Paper filers only. Applications that fall under Secrecy Order may not be filed electronically.)

## Applicant Information:

**Applicant 1**                                                                                      [Remove]

Applicant Authority ⦿Inventor  ◯Legal Representative under 35 U.S.C. 117  ◯Party of Interest under 35 U.S.C. 118

| Prefix | Given Name | Middle Name | Family Name | Suffix |
|---|---|---|---|---|
| | Ronald | Charles | Krosky | |

**Residence Information (Select One)**  ⦿ US Residency   ◯ Non US Residency   ◯ Active US Military Service

| City | Baltimore | State/Province | MD | Country of Residence i | US |
|---|---|---|---|---|---|

| Citizenship under 37 CFR 1.41(b) i | US |
|---|---|

**Mailing Address of Applicant:**

| Address 1 | 19530 Telbir Ave. |
|---|---|
| Address 2 | |

| City | Rocky River | State/Province | OH |
|---|---|---|---|

| Postal Code | 44116 | Country i | US |
|---|---|---|---|

**Applicant 2**                                                                                      [Remove]

Applicant Authority ⦿Inventor  ◯Legal Representative under 35 U.S.C. 117  ◯Party of Interest under 35 U.S.C. 118

| Prefix | Given Name | Middle Name | Family Name | Suffix |
|---|---|---|---|---|
| | Brendan | Edward | Clark | |

**Residence Information (Select One)**  ⦿ US Residency   ◯ Non US Residency   ◯ Active US Military Service

| City | Rocky River | State/Province | OH | Country of Residence i | US |
|---|---|---|---|---|---|

| Citizenship under 37 CFR 1.41(b) i | US |
|---|---|

**Mailing Address of Applicant:**

| Address 1 | 19530 Telbir Ave. |
|---|---|
| Address 2 | |

| City | Rocky River | State/Province | OH |
|---|---|---|---|

| Postal Code | 44116 | Country i | US |
|---|---|---|---|

All Inventors Must Be Listed - Additional Inventor Information blocks may be generated within this form by selecting the **Add** button.                    [Add]

## Correspondence Information:

Enter either Customer Number or complete the Correspondence Information section below.
For further information see 37 CFR 1.33(a).

☐ **An Address is being provided for the correspondence Information of this application.**

PTO/SB/14 (11-08)
Approved for use through 09/30/2010. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | CI108USA |
|---|---|---|
| | Application Number | |

| Title of Invention | OUTPUT PRODUCTION |
|---|---|

| Customer Number | 85449 |
|---|---|
| Email Address | Brendan@BrendanClark.net | [Add Email] [Remove Email] |

## Application Information:

| Title of the Invention | OUTPUT PRODUCTION | |
|---|---|---|
| Attorney Docket Number | CI108USA | Small Entity Status Claimed ☒ |
| Application Type | Nonprovisional | |
| Subject Matter | Utility | |
| Suggested Class (if any) | | Sub Class (if any) |
| Suggested Technology Center (if any) | | |
| Total Number of Drawing Sheets (if any) | | Suggested Figure for Publication (if any) |

## Publication Information:

| ☐ | Request Early Publication (Fee required at time of Request 37 CFR 1.219) |
|---|---|
| ☒ | **Request Not to Publish.** I hereby request that the attached application not be published under 35 U.S. C. 122(b) and certify that the invention disclosed in the attached application **has not and will not** be the subject of an application filed in another country, or under a multilateral international agreement, that requires publication at eighteen months after filing. |

## Representative Information:

Representative information should be provided for all practitioners having a power of attorney in the application. Providing this information in the Application Data Sheet does not constitute a power of attorney in the application (see 37 CFR 1.32). Enter either Customer Number or complete the Representative Name section below. If both sections are completed the Customer Number will be used for the Representative Information during processing.

| Please Select One: | ● Customer Number | ○ US Patent Practitioner | ○ Limited Recognition (37 CFR 11.9) |
|---|---|---|---|
| Customer Number | 85449 | | |

## Domestic Benefit/National Stage Information:

This section allows for the applicant to either claim benefit under 35 U.S.C. 119(e), 120, 121, or 365(c) or indicate National Stage entry from a PCT application. Providing this information in the application data sheet constitutes the specific reference required by 35 U.S.C. 119(e) or 120, and 37 CFR 1.78(a)(2) or CFR 1.78(a)(4), and need not otherwise be made part of the specification.

| Prior Application Status | Pending | | [Remove] |
|---|---|---|---|
| Application Number | Continuity Type | Prior Application Number | Filing Date (YYYY-MM-DD) |
| | non provisional of | 61/409027 | 2010-11-01 |

Additional Domestic Benefit/National Stage Data may be generated within this form by selecting the **Add** button. [Add]

## Foreign Priority Information:

PTO/SB/14 (11-08)
Approved for use through 09/30/2010. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | CI108USA |
|---|---|---|
| | Application Number | |

| Title of Invention | OUTPUT PRODUCTION |
|---|---|

This section allows for the applicant to claim benefit of foreign priority and to identify any prior foreign application for which priority is not claimed. Providing this information in the application data sheet constitutes the claim for priority as required by 35 U.S.C. 119(b) and 37 CFR 1.55(a).

Remove

| Application Number | Country i | Parent Filing Date (YYYY-MM-DD) | Priority Claimed |
|---|---|---|---|
| | | | ● Yes ○ No |

Additional Foreign Priority Data may be generated within this form by selecting the **Add** button.

Add

## Assignee Information:

Providing this information in the application data sheet does not substitute for compliance with any requirement of part 3 of Title 37 of the CFR to have an assignment recorded in the Office.

**Assignee 1**                                                                    Remove

If the Assignee is an Organization check here. ☐

| Prefix | Given Name | Middle Name | Family Name | Suffix |
|---|---|---|---|---|
| | | | | |

**Mailing Address Information:**

| **Address 1** | |
|---|---|
| Address 2 | |

| **City** | | **State/Province** | |
|---|---|---|---|
| **Country** i | | Postal Code | |
| Phone Number | | Fax Number | |
| Email Address | | | |

Additional Assignee Data may be generated within this form by selecting the **Add** button.

Add

## Signature:

A signature of the applicant or representative is required in accordance with 37 CFR 1.33 and 10.18. Please see 37 CFR 1.4(d) for the form of the signature.

| Signature | /Ronald Krosky/ | | Date (YYYY-MM-DD) | 2011-07-30 |
|---|---|---|---|---|
| First Name | Ronald | Last Name | Krosky | Registration Number | 58564 |

This collection of information is required by 37 CFR 1.76. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 23 minutes to complete, including gathering, preparing, and submitting the completed application data sheet form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

# **Privacy Act Statement**

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent.  Accordingly, pursuant to the requirements of the Act, please be advised that:  (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent.  If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.      The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a).  Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these records.

2.      A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3.      A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4.      A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract.  Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5.      A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6.      A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7.      A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906.  Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive.  Such disclosure shall not be used to make determinations about individuals.

8.      A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151.  Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9.      A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

PTO/SB/35 (07-09)
Approved for use through 07/31/2012. OMB 0651-0031
U.S. Patent and Trademark Office; U. S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| **NONPUBLICATION REQUEST UNDER 35 U.S.C. 122(b)(2)(B)(i)** | First Named Inventor | Ronald Charles Krosky |
| | Title | OUTPUT PRODUCTION |
| | Attorney Docket Number | CI108USA |

I hereby certify that the invention disclosed in the attached application **has not and will not be** the subject of an application filed in another country, or under a multilateral international agreement, that requires publication at eighteen months after filing.

I hereby request that the attached application not be published under 35 U.S.C. 122(b).

| /Ronald Krosky/ | 07/30/2011 |
| Signature | Date |
| Ronald Krosky | 58564 |
| Typed or printed name | Registration Number, if applicable |
| 630-452-2416 | |
| Telephone Number | |

This request must be signed in compliance with 37 CFR 1.33(b) and submitted with the application **upon filing.**

Applicant may rescind this nonpublication request at any time. If applicant rescinds a request that an application not be published under 35 U.S.C. 122(b), the application will be scheduled for publication at eighteen months from the earliest claimed filing date for which a benefit is claimed.

If applicant subsequently files an application directed to the invention disclosed in the attached application in another country, or under a multilateral international agreement, that requires publication of applications eighteen months after filing, the applicant **must** notify the United States Patent and Trademark Office of such filing within forty-five (45) days after the date of the filing of such foreign or international application. **Failure to do so will result in abandonment of this application (35 U.S.C. 122(b)(2)(B)(iii)).**

This collection of information is required by 37 CFR 1.213(a). The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 6 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 (1-800-786-9199) and select option 2.*

Privacy Act Statement

The **Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (*i.e.*, GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

DOCKET: **CI108USA** | PATENT APPLICATION

---

## DECLARATION AND POWER OF ATTORNEY

---

As a below named inventor, I hereby declare that:

My residence/post office address and citizenship are as stated below next to my name;

I believe I am the original, first and sole inventor (if only one name is listed below) or an original, first and joint inventor (if plural names are listed below) of the subject matter which is claimed and for which a patent is sought on the invention entitled:

## OUTPUT PRODUCTION

the specification of which

☒ is filed herewith

I hereby state that I have reviewed and understood the contents of the above-identified specification, including the claims, as amended by any amendment(s) referred to above. I acknowledge the duty to disclose all information which is material to patentability as defined in 37 CFR 1.56.

**Authorization To Permit Access To Application by Participating Offices**

☒ If checked, the undersigned hereby grants the USPTO authority to provide the European Patent Office (EPO), the Japan Patent Office (JPO), and any other intellectual property offices in which a foreign application claiming priority to the above-identified application is filed access to the above-identified patent application, and related applications, in accordance with 37 CFR 1.14(c) and (h). In accordance with 37 CFR 1.14(c), access may be provided to information concerning the date of filing the Authorization to Permit Access to Application by Participating Offices.

**Foreign Application(s) and/or Claim of Foreign Priority**

I hereby claim foreign priority benefits under 35 U.S.C. 119(a)-(d) or (f), or 365(b) of any foreign application(s) for patent or inventor's certificate(s), or 365(a) of any PCT international application which designated at least one country other than the United States of America, listed below and have also identified below any foreign application for patent or inventor's certificate(s), or any PCT international application having a filing date before that of the application on which priority is claimed:

| COUNTRY | APPLICATION NUMBER | DATE FILED | PRIORITY CLAIMED UNDER 35 U.S.C. 119 |
|---------|--------------------|-----------|--------------------------------------|
|         |                    |           | YES: _____   NO: _____           |

## POWER OF ATTORNEY:

As a named inventor, I hereby appoint the following attorney(s) and/or agent(s) associated with

**Customer No.: 85449**

as well as the following attorney(s)/agent(s)

| | |
|---|---|
| Ronald Krosky: Reg. No. 58,564 | Matthew Clapper: Reg. No. 62,216 |
| Brendan Clark: Reg. No. 67,691 | |

to prosecute this application and transact all business in the Patent and Trademark Office connected therewith.

| Send Correspondence to: | Direct Telephone Calls To: |
|-------------------------|----------------------------|
| Company Name      Convergent Insight, LLC | Contact Phone Number      (630) 452-2816 |
| Company Address   19530 Telbir Ave |  |
| City, State and Zip   Rocky River, OH 44116 |  |

DOCKET: CI108USA                                                    PATENT APPLICATION
Title: OUTPUT PRODUCTION

| DECLARATION AND POWER OF ATTORNEY |
| --- |

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

Full Name of Inventor: Ronald Charles Krosky                    Citizenship: United States

Residence:                 Baltimore, Maryland, United States

Post Office Address:       19530 Telbir Ave.

                           Rocky River, OH 44116

_____                    7-30-11
Inventor's Signature                                Date

Full Name of Inventor: Brendan Edward Clark                    Citizenship: United States

Residence:                 Rocky River, Ohio, United States

Post Office Address:       19530 Telbir Ave.

                           Rocky River, OH 44116

_____                    2011 07 30
Inventor's Signature                                Date

Page 2 of 2

## Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | |
| **Filing Date:** | |
| **Title of Invention:** | OUTPUT PRODUCTION |
| **First Named Inventor/Applicant Name:** | Ronald Charles Krosky |
| **Filer:** | Ronald Charles Krosky |
| **Attorney Docket Number:** | CI108USA |

Filed as Small Entity

## Utility under 35 USC 111(a) Filing Fees

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| Utility filing Fee (Electronic filing) | 4011 | 1 | 82 | 82 |
| Utility Search Fee | 2111 | 1 | 270 | 270 |
| Utility Examination Fee | 2311 | 1 | 110 | 110 |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Post-Allowance-and-Post-Issuance:** | | | | |
| **Extension-of-Time:** | | | | |
| **Miscellaneous:** | | | | |
| | | | **Total in USD ($)** | **462** |

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 10634757 |
| **Application Number:** | 13194946 |
| **International Application Number:** | |
| **Confirmation Number:** | 1966 |
| **Title of Invention:** | OUTPUT PRODUCTION |
| **First Named Inventor/Applicant Name:** | Ronald Charles Krosky |
| **Customer Number:** | 85449 |
| **Filer:** | Ronald Charles Krosky |
| **Filer Authorized By:** | |
| **Attorney Docket Number:** | CI108USA |
| **Receipt Date:** | 30-JUL-2011 |
| **Filing Date:** | |
| **Time Stamp:** | 23:20:38 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | Credit Card |
| Payment was successfully received in RAM | $462 |
| RAM confirmation Number | 6795 |
| Deposit Account | |
| Authorized User | |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|